## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Anthony Bridgeforth,

     Plaintiff,

     v.

Khadijah Bronson, *et al.*,

     Defendants.

C.A. No.: 06-2128 (RCL)

### DEFENDANTS OFFICER JOSEPH A. POWELL, OFFICER JAMES L. CARTER, OFFICER JOSE ACOSTA, OFFICER DARRELL D. JOHNSON, OFFICER DAVID SMITH, CAPTAIN RALPH W. MCLEAN AND THE DISTRICT OF COLUMBIA'S MOTION FOR SUMMARY JUDGMENT

Defendants Officer Joseph A. Powell (hereinafter "Powell"), Officer James L. Carter (hereinafter "Carter"), Officer Jose Acosta (hereinafter "Acosta"), Officer Darell D. Johnson (hereinafter "Johnson"), Officer David Smith (hereinafter "Smith"), Captain Ralph W. McLean's (hereinafter "McLean"), and the District of Columbia (hereinafter "District"), by and through counsel, move for judgment in their favor pursuant to Fed. R. Civ. P. 56(c), because:

(1)    Plaintiff failed to state a claim for municipal liability under 42 U.S.C. § 1983, and there is no evidence that the District's customs, policies, or practices were the moving force behind his alleged injuries;

(2)    Defendants Powell, Carter, Acosta, Johnson, Smith and McLean are entitled to qualified immunity;

(3)    Plaintiff's Count VI, that Officers Carter and Smith changed the locks to his apartment, is without merit and not based on any evidence;

(4)    Court should not exercise supplemental jurisdiction over plaintiff's remaining common law claims;

(5)    To the extent this Court exercises supplemental jurisdiction over plaintiff's common law claims, his intentional and negligent infliction of emotional distress claim fails as a matter of law because the defendants' actions were not extreme nor outrageous, nor were his alleged injuries severe;

(6)    Punitive damages are not available against the District of Columbia; and

(7)    The evidence is insufficient for an award of punitive damages against defendants Powell, Carter, Acosta, Johnson, Smith and McLean.

Further support for this motion is set forth in the accompanying memorandum of points and authorities attached hereto and incorporated herein.

WHEREFORE, defendants pray this Court that judgment be entered in their favor.

Respectfully submitted,

PETER J. NICKLES
Interim Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division

_____/s/ Patricia A. Jones_____
PATRICIA A. JONES [428132]
Chief, General Litigation, Section IV

_____/s/ Leticia L. Valdes_____
LETICIA L. VALDES [0461327]
Assistant Attorney General
441 4th Street, N.W.
Sixth Floor South
Washington, D.C. 20001
(202) 442-9845; (202) 727-6295

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Anthony Bridgeforth, | |
| Plaintiff, | |
| v. | C.A. No.: 06-2128 (RCL) |
| Khadijah Bronson, *et al.*, | |
| Defendants. | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS OFFICER JOSEPH A. POWELL, OFFICER JAMES L. CARTER, OFFICER JOSE ACOSTA, OFFICER DARRELL D. JOHNSON, OFFICER DAVID SMITH, CAPTAIN RALPH W. MCLEAN AND THE DISTRICT OF COLUMBIA'S MOTION FOR SUMMARY JUDGMENT

In support of their motion for summary judgment, defendants Officer Joseph A. Powell, Officer James L. Carter, Officer Jose Acosta, Officer Darrell D. Johnson, Officer David Smith, Captain Ralph McLean and the District of Columbia (hereinafter collectively referred to as "defendants") state as follows:

## PRELIMINARY STATEMENT

On or about January 24, 2006, plaintiff Anthony Bridgeforth (hereinafter "Bridgeforth") filed a Complaint in the Superior Court of the District of Columbia against co-defendant Khadijah Bronson (hereinafter "Bronson"). On or about September 20, 2006, plaintiff amended his complaint to add Officer Joseph A. Powell, Officer James L. Carter, Officer Jose Acosta, Officer Darrell D. Johnson, Officer David Smith, Captain Ralph McLean and the District of Columbia as party defendants. On or about December 14, 2006, this case was removed to this Honorable Court because the claims raised in plaintiff's Amended Complaint present federal questions appropriate for this Court.

Within his Complaint, plaintiff avers that since the year 2000 or 2001, he received housing benefits through the D.C. Housing Authority. *See* Plaintiff Anthony Bridgeforth's deposition at 82:12-16 and 86:9-22, hereto attached as Exhibit 1. Plaintiff testified that in November 2005, he saw a flyer at the D.C. Housing Authority from defendant Khadijah Bronson advertising a vacant apartment. Pl.'s dep. at 88:15-22, 89:1-3, 89:20-22, 90:1-18, and 91:3-15. According to information on the flyer, defendant Bronson had two apartments available for rent, one at 1718 E Street, N.E., and one at 210 20th Street, N.E. Pl.'s dep. at 90:1-18. Plaintiff claims that he called defendant Bronson and told her that he was interested in the apartment located at 210 20th Street. When he realized he couldn't afford it, plaintiff agreed to rent, sight unseen, the other apartment at 1718 E. Street, N.E. Pl.'s dep. at 90:12-18 and 102:14-19.

The apartment at 1718 E. Street did not pass the inspection required by the D.C. Housing Authority. Defendant Bronson informed plaintiff that she was going to let him have the apartment at 210 20th Street, N.E. Pl.'s dep. at 109:15-110:3, and 111:1-13. Plaintiff testified that he got a call from co-defendant Bronson and they met at 210 20th Street. Pl.'s dep. at 148:6-12 and 149:1-5. Defendant Bronson showed him the apartment up the steps to the right, and stated that it "wasn't" his unit because it wasn't finished, the stove didn't work, and there was a lot of stuff wrong with the unit. Pl.'s dep. at 149:22-150:1-16, 156:6-22. Plaintiff alleges that in early December, defendant Bronson gave him what she thought was the key to his unit. Pl.'s dep. at 167:2-10. Plaintiff testified that the parties did not sign the lease because defendant Bronson was out of town because of an emergency. Pl.'s dep. at 169:9-17 and 170:5-9.

Plaintiff went to 210 20th Street, N.E. with Ms. Yolanda Geter and her mother to show them the apartment. Plaintiff went into the building, up the stairs and turned to the apartment on the left; not the one on the right shown to him by defendant Bronson. Pl.'s dep. at 172:10-173:5.

When plaintiff tried to open the apartment on the left, the key would not open the door.  Pl.'s

dep. at 173:12-22, 174:1-22 and 175:1.  Plaintiff avers that he called defendant Bronson to let her

know that he didn't have the keys and she told him that she gave him the **wrong** keys and she

would send the handyman to bring the correct keys. Pl.'s dep. at 173:12-22, 174:1-22 and 175:1.

Plaintiff claims that Ms. Geter and her mother told him to use the key in the unit to the right.

Plaintiff tried the key in the unit to the right and the key worked.  *Id*.  In the meantime, the

handyman left keys under the mat of the apartment to the right.  Pl.'s dep. at 180:19-22, 181:1-

22, and 182:1-22.  Plaintiff testified that he tried this key in the unit to the left and it didn't work

either, but it opened the door of the unit to the right.  Pl.'s dep. at 180:19-22, 181:1-22, and

182:1-22.  Plaintiff testified that he called defendant Bronson and she told him that the unit to the

right was his unit and he took it. Pl.'s dep. at 183:7-22.

   Plaintiff testified that the unit failed inspection.  Pl.'s dep. at 184:1-15.  Plaintiff testified

that he returned to the D.C. Housing Authority on January 11, 2006, and signed a document

indicating that "he didn't sign a lease" to be in the unit he currently occupied and wished not to

stay in the unit because of the living conditions.  *See* Pl.'s dep. at 211:6-22 and 212:1, hereto

attached as Exhibit 1; see also, January 11, 2006, letter from Anthony Bridgeforth, authenticated

by plaintiff at deposition, and hereto attached as Exhibit 2.  In fact, plaintiff never signed a

residential lease with defendant Bronson to rent her property.  Pl.'s dep. at 115:22-116:1-3.

   Plaintiff testified that on January 20, 2006, at around noon, he was in the back of the unit

sleeping when he heard some "loud banging."  He called the police and told them someone was

trying to break into his apartment.  Pl.'s dep. at 249:9-22, 250:1-8 and 252:18-21. According to

plaintiff, when the police arrived, he heard defendant Bronson telling the police that she was the

landlord and that he was in the unit illegally.  Pl.'s dep. at 255:1-6.  Plaintiff claims that the

police officer informed defendant Bronson that this was a landlord and tenant issue and there was nothing they could do.  The police left and plaintiff went to work.  Pl.'s dep. at 282:3-11.

Plaintiff testified that he returned from work at approximately 11:30 p.m. and the police was again at his apartment.   Plaintiff testified that Officer James Carter asked him if he lived there, and if he had a lease for that unit.  Plaintiff responded that he "didn't have a lease."  Pl.'s dep. at 319:5-16, 321:16-16, and 329:22-330:4.  Plaintiff testified that he told the defendant officers that he had a legal right to be there but he didn't sign a lease.  The officers told him that if he did not leave the unit in five (5) minutes, he would be locked up for unlawful entry because he could not produce a signed lease.  Pl.'s dep. at 329:22:-330:4 and 342:18-343:2.  Plaintiff avers that the defendants violated his constitutional rights and he suffered injuries as a result thereof.

For the reasons set forth below, the defendants are entitled to judgment as a matter of law on all claims filed against them.

## ARGUMENT

### I.    Standard of Review Under Fed. R. Civ. P. 56

"Summary judgment may be granted if the moving party demonstrates through the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The moving party bears the burden of demonstrating the absence of any material issues. The standard for granting summary judgment is the same as that for granting judgments." *See* Fed. R. Civ. P. 56.  *See also, Musa v. Continental Insurance Co.*, 644 A.2d 999, 1001 (D.C. 1994), and *Ferguson v. District of Columbia*, 629 A.2d 15, 19 (D.C. 1993).  Fed. R. Civ. P. 56 must be construed with due regard not only for the rights of

4

[plaintiffs] ... but also for the rights of [defendants] to demonstrate in the manner provided by the Rule, prior to trial, that the claims ... have no factual basis. *Celotex Corp. v. Carrett*, 477 U.S. 317, 327 (1986)   By the very nature of the language of Rule 56(c),

> the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion....

*See, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986).

Although the party moving for summary judgment has the burden of demonstrating the absence of any material facts and the right to judgment as a matter of law, the movant is not obligated to present supporting evidence. *Ferguson,* 629 A.2d at 19.  Instead, the moving party need only assert that there is a lack of necessary evidence to support plaintiff's case.  The burden then shifts to the non-moving party to show the existence of a genuine issue of material fact.  *Id.*; *see also, Beard v. Goodyear Tire & Rubber Co.*, 587 A.2d 195, 198 (D.C. 1991).

When deciding whether to grant a motion for summary judgment, a trial judge must "determine whether there is sufficient evidence upon which a reasonable juror could find by a preponderance of the evidence, that plaintiff, upon whom the burden of proof is imposed, is entitled to a verdict." *Graff v. Malawer*, 592 A.2d 1038, 1041 (D.C. 1991).  In the absence of such evidence, the court must enter judgment in favor of the defendant. *Id.  See also, Hill v. White*, 589 A.2d 918, 921 (D.C. 1991) ("[t]he burden on the non-moving party is [to demonstrate] 'that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"  (citations omitted). "[T]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to defeat a motion for summary judgment. *Graff* at 1041.

A factual dispute by itself is not enough to bar summary judgment. The party opposing the motion must show that there is a genuine issue of <u>material</u> fact. See *Anderson*, 477 U.S. at

247. To be material, the fact must be capable of affecting the outcome of the litigation; to be genuine, the issue must be supported by admissible evidence sufficient for a reasonable trier-of-fact to find in favor of the nonmoving party. *Id.* at 248; and *Laningham v. United States Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

## II.    Plaintiff's Claim for Municipal Liability Against the District of Columbia Under U.S.C. § 1983, Fails As a Matter of Law.

### A.    Plaintiff cannot show that a District custom, policy or practice was the moving force that led to his alleged injuries.

Plaintiff seeks to hold the District liable for the alleged unconstitutional torts committed by its employees. It is clearly established that there is no *respondeat superior* liability on the part of a municipality for the alleged constitutional misconduct of its employees. *See Monell v. Dept. of Soc. Serv. of City of New York*, 436 U.S. 658, 690 (1978), holding municipal liability is restricted to cases in which "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers." The Supreme Court determined that:

> a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom … inflicts the injury that the government as an entity is responsible under § 1983."

*Monell,* 436 U.S. at 694.

The Supreme Court further held in *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985), that, "at the very least there must be an affirmative link between the policy and the particular constitutional violation alleged." The *Oklahoma City* decision interpreted *Monell* as holding that "municipal liability should not be imposed *when the municipality was not itself at fault*." *Id.* at 818 (emphasis added).

6

To hold a municipality liable under 42 USC § 1983, a plaintiff must show that the municipality's customs, practices, and/or policies were the moving force behind the alleged constitutional violation.  In the instant case, plaintiff cannot establish that his alleged injuries resulted from any unconstitutional policy of the District, or that a widespread and deliberate custom or practice of evicting individuals from their home in the District of Columbia was the moving force behind his stated constitutional violations.  During deposition, plaintiff's designated expert R. Paul McCauley, PhD., BCFE, testified that for a period of 10 years, between 1998 and 2008, there were only three instances of **alleged** unlawful evictions in the District of Columbia, including this case now before the Court.  *See* R. Paul McCauley's deposition at 132:11-22 and 133:1-15, hereto attached as Exhibit 2.

First, the three allegations of unlawful evictions that plaintiff uses as support for his claims do not prove wrongful conduct by District employees.  Even assuming that all three instances were supported by evidence of wrongful conduct, they would be insufficient to show a pervasive unconstitutional policy, or the deliberate custom or practice that the plaintiff is required to show to establish the District's liability in this matter.  In *Young v. District of Columbia*, 752 A.2d 138, (D.C. 2000), a case with facts similar to the instant matter, plaintiff Young alleged that the District, acting through officers of the Metropolitan Police Department, assisted his sublessor in wrongfully evicting him from property in which he claimed to be a sublessee.  In its decision, the court held that allegations of evictions cited by plaintiff, as well as calls from several unspecified people allegedly complaining about wrongful eviction involving police action were insufficient to show a pervasive policy on the part of the District of Columbia. *Id*. at 146.  Similar to this case, in *Young*, other police officers had come to the apartment earlier the same day and declined to assist in any attempt to evict plaintiff. *Id.*  Nonetheless, the Court

awarded judgment to the District because plaintiff failed to establish that a District custom, policy or practice was the moving force behind his alleged injuries.

In the case at bar, there is an absence of evidence to support any claim that a District custom, practice or policy led to plaintiff's alleged injuries.  Therefore, the claims against the District must therefore be dismissed.

### B.    Plaintiff Has Not Met His Burden of Proof on His Failure to Train and Supervise Claim against the District.

Plaintiff makes conclusory allegations in his Amended Complaint that the District "breached its constitutional duty to protect plaintiff by its deliberate indifference in inadequately supervising and training MPD officers to prevent their participation in evictions without due process of law." *See* Amended Complaint at ¶¶ 45 and 52.  To prevail on a claim for improper training and supervision against a municipality either under a constitutional or common law theory, plaintiff needs expert testimony.  *See Toy v. District of Columbia,* 549 A.2d 1, 7 (D.C. 1988); *see also District of Columbia v. Peters*, 527 A.2d 1269, 1273 (D.C. 1987) (expert testimony required in criminology/law enforcement); *District of Columbia v. White,* 442 A.2d 159, 164-65 (D.C. 1982) (expert testimony required to determine if police breached standard of care); *Dist. of Columbia v. White,* 442 A.2d 159, 164 (D.C.1982) (requiring expert testimony concerning adequacy of the MPD's weapons safety training);  *Etheridge v. Dist. of Columbia,* 635 A.2d 908, 917-18 (D.C.1993) (expert testimony regarding the recognized standards of care for police training, supervision, and use of force).  To determine whether a municipality is deliberately indifferent, the Court considers "whether the municipality knew or should have known of the risk of constitutional violations," and failed to respond appropriately. *Baker v. District of Columbia,* 326 F.3d 1302, 1307 (D.C.Cir.2003). A single instance of unconstitutional misconduct by a particular police officer is generally not sufficient to impose liability on the

District of Columbia under *Monell* unless plaintiff also can prove that the misconduct was caused by a municipal policy. *See Oklahoma City v. Tuttle*, 471 U.S. at 823-24. Rather, plaintiff must show that "the municipal action was taken with the requisite degree of culpability and [he] must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *See Bd. of the County Comm'rs of Bryan County, Oklahoma v. Brown,* 520 U.S. 397, 404 (1997).

Plaintiff designated expect Dr. McCauley, testified as follows during his deposition:

Q.    Do you have any information, or did you take any information in consideration in formulating your opinion as to the type of training the police officers in the District of Columbia receive?

A.    Including the depositions.

Q.    Anything that you took into consideration.

A.    Yes.

Q.    Okay. What did you find about the District of Columbia's training, when it comes to the subject of evictions?

A.    Well, they have a policy document, and the policy is supposed to serve as the guiding document for training.

Q.    Okay.

A.    And they have, on paper, they have roll call training.

Q.    Okay

A.    They have academy training, level 7 for recruits, lateral officers. They have training in evictions on paper for field training officers. And they may include that for some supervisors, typically the sergeant level, depending I think on what the chief decides that year is relevant or important.

*See* R. Paul McCauley's deposition at 132:11-22 and 133:1-15, hereto attached as Exhibit 3.

Q.    Is that field training officer course in compliance with the national standard?

A.    Consisted with accepted police practices; yes.

9

McCauley's dep at 223:13-17.

> Q. I am going to submit to you that all six officers testified the policy in the District of Columbia is that they do not get involved in evictions.
> Knowing that information, which you did not know when you rendered your opinion, what is your expert opinion regarding the training that police officers receive in the District of Columbia with regards to the policy regarding eviction?
>
> . . .
>
> A. No, I understand, and if they said that they were trained, then I can't argue with that.

McCauley's dep. at 223:13-17.

> Q. **Did the District of Columbia violate a national standard of care when it comes to training police officers?**
>
> A. As a general statement, probably not.
>
> Q. Okay.
>
> A. As a general statement.
>
> Q. Okay. So the District of Columbia, in its training of police officers, does pretty much what the national standard of care is.
>
> A. As a general statement, in my opinion; yes.

McCauley's dep. at 143:19-22 and 144:11.

As shown above, Dr. McCauley opined that the District's training practices are within the national standard of care. Dr. McCauley also opined that the Metropolitan Police Department's General Order regarding evictions that are provided to police officers in the District of Columbia are consistent with accepted police practices. *Id.* at 60:19-22 and 61:1-13. On this record, plaintiff has failed to show that the District failed to train and/or supervise its officers, or knew about the constitutional misconduct of its officers, but were deliberately indifferent to the rights of persons with whom the police come into contact. *See City of Canton, Ohio v. Harris*, 489 U.S. at 388 (emphasis added). *See also*, *Carter v. District of Columbia*, 795 F.2d at 122; D*askalea v. District of Columbia*, 227 F.3d 433, 441 (D.C. Cir. 2000). "This deliberate

indifference requires a high degree of fault. "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality -- a  'policy' as defined by our prior cases -- can a city be liable for such a failure under § 1983." *See Harris,* 489 U.S. at 389; *Dorman v. District of Columbia,* 888 F.2d 159 (D.C. Cir. 1989); *Graham v. Davis,* 880 F.2d 1414 (D.C. Cir. 1989).

Plaintiff must prove facts that the District knew its officers were unlawfully evicting citizens, and chose not to provide them with the necessary training to prevent future misconduct by its officers.  Indifference to an "obvious" inadequacy can be proven by the existence of such "pervasive and widespread" misconduct amounting to what could be considered "custom or usage". *Carter v. District of Columbia,* 795 F.2d 116 (D.C. Cir. 1986); *Dorman v. D.istrict of Columbia,* 888 F.2d 159 (D.C. Cir. 1989).  Plaintiff has not shown evidence of any pervasive and/or widespread misconduct by MPD officers which would have put the District on notice of the need for additional training or tighter supervision.  The District is therefore entitled to judgment as a matter of law because plaintiff has failed to meet his burden of proof for municipal liability.

### III.    Defendants Powell, Carter, Acosta, Johnson, Smith, and McLean are Protected by Qualified Immunity and are Entitled to Summary Judgment.

It is well-settled that government officials enjoy a qualified immunity from constitutional and statutory claims against them.  *See Saucier v. Katz*, 533 U.S. 194, 200 (2001); *Lederman v. United States*, 291 F.3d 36 (D.C. Cir. 2002).  Qualified immunity protects governmental employees against insubstantial lawsuits which, the Supreme Court has noted, lead to several societal costs, such as the expense of litigation, diversion of official energy from pressing public issues, deterrence of able citizens from acceptance of public office, and the possibility that the fear of being sued will dampen the ardor of all but the most resolute individuals.  *Harlow v. Fitzgerald*, 457 U.S. 800, 8l4 (l982).

In an action for damages against a government official under 42 U.S.C. § 1983, the official is protected by qualified immunity if his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *IAC v. United States*, 365 F.3d at 24, quoting *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). The Supreme Court has instructed courts to follow a two-step inquiry in determining whether an official is entitled to qualified immunity in a particular case. *Brosseau v. Haugen*, 543 U.S. 194 (2004); *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The threshold question is, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. at 201. If, assuming the truth of the plaintiff's facts, there was no constitutional violation, then the defendant official is entitled to judgment and there is no necessity for further inquiry concerning qualified immunity. *Id*. If the court finds a violation of a constitutional right (based on the assumed facts), the next question is whether that right was clearly established at the time of the incident. *Id*. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Brosseau*, 543 U.S. at 199, quoting *Saucier*, 533 U.S. at 201. The reasonableness of the officer's conduct should be judged from the officer's perspective on the scene of the incident. *Saucier*, 533 U.S. at 205. The Supreme Court has "cautioned against the '20/20 vision of hindsight' in favor of deference to the judgment of reasonable officers on the scene." *Id.*, quoting *Graham v. Conner*, 490 U.S. 386, 393, 396 (1989).

A police officer should prevail on the qualified immunity defense even if he is mistaken, if a reasonable officer possessing the same information could have believed that the action taken was not in violation of clearly established constitutional law, and that his conduct was lawful.

*See District of Columbia v. Evans*, 644 A.2d l008, l0l5 (D.C. 1994). *See also, Anderson v. Creighton*, 483 U.S. 635, 638 (l987).  As noted by Justice Scalia in *Anderson*, "it is inevitable that law enforcement officials will, in some cases, reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials – like other officials who act in ways they reasonably believe to be lawful – should not be held personally liable." *Id.* at 641.  Qualified immunity thus protects all but the plainly incompetent or those who knowingly violate the law.

The undisputed facts in this case establish that on January 20, 2006, the Metropolitan Police Department received several calls to respond to 210 20th street, N.E.; several of which reported a burglary in progress.  *See* Lt. John Michael Hedgecock's dep. at 78:6-83:19, hereto attached as Exhibit 4. Defendant Bronson testified that she called the police because plaintiff was in the unit and "he wasn't supposed to be there" and "he broke into the unit" while she was out of town.  Bronson dep. at 151:1-12, hereto attached as Exhibit 5.  Defendant Bronson testified that she called the captain and told him that she had somebody in the unit that did not want to live there, that she was away and when she came back he was in the unit illegally.  Defendant Bronson also told the captain that she had a document indicating that plaintiff was not supposed to be there.  Bronson dep. at 173:15-22 and 174:120.

Defendant McLean testified that he was in the office on January 20, 2006, when he received a call from defendant Bronson, a "very angry woman." *See* Captain Ralph McLean's dep. at 27:16-21 and 28:1-6, hereto attached as Exhibit 6.  Defendant Bronson told the captain that plaintiff was in the apartment "without her permission."  McLean dep. at 29:1-6.  Defendant Bronson also told defendant Mclean that plaintiff was a "locksmith or had access to a locksmith" and "she swore she hadn't given him a key."  McLean dep. at 39:18-41:18.

Plaintiff confirmed that he "didn't have a lease" for the apartment he was now in.  Pl.'s dep at 329:22-330:4.  Plaintiff admitted that the officers told him that because he did not have a signed lease, if he did not leave in five (5) minutes, he would be locked up for unlawful entry. Pl.'s dep at 342:18-343:2. Plaintiff testified that all five officers told him "that he had to go." Pl.'s dep at 398:13-22.

Defendant Carter testified that he accompanied plaintiff to the unit and "there wasn't much in there," "a bag of clothes or two." *See* James Carter's dep. at 32:2-21, hereto attached as Exhibit 7.  Defendant Smith testified that he believed plaintiff's girlfriend was in the apartment "causing a commotion." *See* David Smith's dep. at 27:8-21, hereto attached as Exhibit 8.  Based on the information presented to these defendant officers, they reasonably believed that plaintiff was unlawfully on the premises.  Plaintiff admitted that he did not have a lease, and paperwork was shown to the officers that reflected that plaintiff declined to rent the subject property because of the condition of the apartment.  The scant clothing in the apartment contributed to the defendants' belief that plaintiff was a squatter unlawfully on the property.

D.C. Official Code § 22-3302, the District of Columbia unlawful entry statute, provides for the punishment of anyone who remains on either private or public property without lawful authority and who refuses to leave on the demand of the person lawfully in charge.  The essential elements of the offense are:

1.       That the defendant was present in a public or private dwelling, building, or other property, or a part of such dwelling, building, or other property;

2.       That the defendant was directed to leave the property by the lawful occupant or person lawfully in charge of the property;

3.       That at the time s/he was directed to leave the property, the defendant

was without lawful authority to remain there; and

   4.  That upon being directed to leave the property, the defendant refused to

leave.

*See D.C. v. Murphy*, 635 A.2d 929, 931 (D.C. 1993).[1]  *See also, O'Brien v. United States*, 444

A.2d 946, 948 (D.C. 1982) ("the mere demand of the person lawfully in charge to leave

necessarily deprives the other party of any lawful authority to remain").  Additionally, s*ee Mary

Carson, et al. v. U.S.,* 419 A.2d 996 (D.C. 1980), holding under the statute, individual citizens

may not be ejected from public property on the order of the person lawfully in charge absent

some additional, specific factor establishing their lack of a legal right to be there.

   Plaintiff was on private property owned by defendant Bronson.  Defendant Bronson

asked that he leave and he refused to do so.  Because plaintiff did not have a lease for the

property he was without lawful authority to remain there.  The following specific factors gave

the defendant officers reason to believe that plaintiff was unlawfully on defendant Bronson's

property:  1) plaintiff admitted that he had not signed a lease for the apartment, 2) defendant

Bronson showed paperwork to the defendants evidencing that plaintiff did not sign a lease, 3) the

paperwork showed that plaintiff stated his intent not to rent the apartment, and 4) defendant

Bronson indicated that plaintiff was a locksmith and that he had broken into the unit when she

was out of town.  Based on these facts, defendants Powell, Carter, Acosta, Johnson, Smith, and

McLean cannot be held constitutionally liable for alleged wrongful eviction.  Police officers

should not be hindered by the threat of civil liability from attempting to perform their duties to

---

[1]The *Murphy* Court did not grant summary judgment to the District against plaintiff on his false
arrest claim for unlawful entry because there was no evidence produced that plaintiff was
ordered to leave the premises prior to his arrest.

the best of their abilities, as long as they are not violating clearly established constitutional or statutory rights. *See District of Columbia v. Evans,* 644 A.2d 1008, 1016 (D.C. Cir. 1994).

Even if the defendants were mistaken as to what they observed or knew at the time, they still enjoy a privilege and/or are entitled to qualified immunity because they acted in good faith, and reasonably under the circumstances. See Civil Jury Instruction No. 18-3 (2002), see also *Anderson*, 483 U.S. at 64l. As set forth in *Anderson,* qualified immunity protects all but the plainly incompetent or those who knowingly violate the law.   There is clearly no evidence on record that defendants Powell, Carter, Acosta, Johnson, Smith, and McLean knowingly violated the law.   Accordingly, these defendants are entitled to qualified immunity for their complained about conduct.

**IV.    Plaintiff's Count VI, that Officers Carter and Smith Changed the Locks to his Apartment, is Without Merit.**

Plaintiff, in his Amended Complaint, Count VI, alleges that defendants Carter and Smith participated in the changing of the locks and in unlawfully seizing his apartment. On February 3, 2006, plaintiff provided testimony in Superior Court of the District of Columbia in the matter *Anthony Bridgeforth v. Khadijah Bronson*, C.A. No. 447-06.  During those proceedings, plaintiff testified, referring to defendant Bronson, "Sir, the night she put me out, she changed the front door's lock," "with the police there, she changed the locks." *See* Transcript *Anthony Bridgeforth v. Khadijah Bronson*, at 17:23 & 21:3-12, hereto attached as Exhibit 9.  Additionally, during deposition in this matter, plaintiff testified again that the locks were changed by defendant Bronson and not by Officers Carter and Smith. *See* Pl.'s dep. at 349:3-357:14.

Plaintiff's testimony in Superior Court as well as during a deposition in this matter that defendant Bronson changed the locks, requires judgment on behalf of these defendants with respect to his claim against Officers Carter and Smith for changing the locks.

**V.    Plaintiff's Intentional and Negligent Infliction of Emotional Distress Claims Fails As a Matter of Law.**

Plaintiff's claims of intentional and negligent infliction of emotional distress against the herein-named defendants do not rise to the level of actionable claims.  "Intentional infliction of emotional distress consists of (1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress."  *See Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984).  To properly sustain a claim for negligent infliction of emotional distress under District of Columbia law, the plaintiff must allege and prove the following elements:  1) duty, 2) breach of duty, 3) proximate cause, and 4) damages.  *See Williams v. Baker*, 572 A. 2d. 1062, 1064 (D. C. 1990).

The record evidence does not support plaintiff's claim of either intentional or negligent infliction of emotional distress committed by these defendants.  There is no evidence in this record that these defendants breached any alleged duty they owed to plaintiff.  In fact, plaintiff admitted that he had not signed a lease, and the evidence showed that he was unlawfully on the subject premises.  More importantly, there is no evidence that plaintiff suffered any severe emotional distress necessary to prevail on his cause of action.  Moreover, there simply is no evidence that these defendants' conduct was severe or outrageous based on the circumstances they faced on January 20, 2006.  Accordingly, plaintiff's claims fail as a matter of law.

**VI.    Plaintiff's Claim of Wrongful Eviction Must Be Dismissed As It Is Unsupported By Law.**

Plaintiff seeks to hold these defendants liable for wrongful eviction, presumably pursuant to D.C. Official Code § 16-1501.  In the District of Columbia, the wrongful eviction of a tenant by a landlord is a tort and entitles the tenant to sue the landlord.  In deciding a plaintiff's claim for wrongful eviction, the Court must determine whether the eviction violated an alleged right

that plaintiff had to be on the subject property, and that these defendants were not entitled to any privilege to have him removed. *Queen v. Postell,* 513 A.2d 812, 815 (D.C. 1986). Plaintiff must show that he had a legal right to be on the premises and that these defendants' actions were not protected by privilege.

On this record, plaintiff has not shown that he was a lawful tenant on January 20, 2006, nor can he establish that these defendants actions violated his right to remain on the subject premises. According to the record evidence, plaintiff admitted that he had not signed a lease, had signed documents that he did not want to rent the subject property, the owner of the property claimed that plaintiff was on the property unlawfully, and asked that he leave, but plaintiff refused to do so. See evidence set forth in Section III. As police officers, these defendants had a privilege to take police action when presented with information that plaintiff was unlawfully on the subject premises. Plaintiff was in violation of the unlawful entry statute. See D.C. Official Code § 22-3302. Plaintiff testified that these defendants asked whether he had a lease, and when he told them no, they said if he did not leave in five (5) minutes, he would be arrested for unlawful entry. *See* Pl.'s dep. at 329:22:-330:4 and 342:18-343:2. Based on this record, no reasonable jury could find that these defendants wrongfully evicted plaintiff. Therefore, these defendants are entitled to judgment as a matter of law on this claim.

**VII.**   **Plaintiff's Punitive Damages Claim Against These Defendants Fails as a Matter of Law.**

**A.**   **Plaintiff's punitive damages claim against defendants Carter, Acosta, Powell, Johnson, Smith and McLean.**

Plaintiff seeks to recover punitive damages against these defendants for their alleged misconduct. *See* Amended Complaint under plaintiff's prayer for relief. To prevail on a punitive damages claim, plaintiff must establish the following elements:

1.  that the defendant acted with evil motive, actual malice, deliberate violence or oppression, or with intent to injure, or in willful disregard for the rights of the plaintiff; and

2.  that the defendant's conduct itself was outrageous, grossly fraudulent, or reckless toward the safety of the plaintiff.

*See Civil Jury Instruction No.* 16-1 (2002).

Plaintiff has not shown that the officers' claimed misconduct was the result of evil motive, actual malice, deliver violence or oppression, or performed with an intent to injure or with willful disregard for his rights. The officers' conduct arose after the police received several calls from the landlord, defendant Bronson, and from plaintiff. Some of the calls claimed a burglary was in progress, some that a squatter, known to be a PCP user was in the apartment and requesting that plaintiff be removed from the premises for unlawful entry. *See Lt.* John Michael Hedgecock's dep. at 78:6-83:19, hereto attached as Exhibit 4. Plaintiff has not satisfied the necessary requirements to prevail on a punitive damages claim because there is no record evidence to support that either defendants Carter, Acosta, Powell, Johnson, Smith or McLean's conduct rose to a level for which punitive damages may be awarded. Therefore, plaintiff may not prevail under a punitive damages theory as against defendants Carter, Acosta, Powell, Johnson, Smith and McLean.

### B.    Punitive damages Are Not Available Against the District of Columbia.

In *Smith v. District of Columbia*, 336 A.2d 831 (D.C. 1975), the District of Columbia Court of Appeals, after a lengthy discussion of the policy considerations and weight of authority against allowing punitive damages against municipalities, found that punitive damages were *not* available against the District absent a statute expressly authorizing it. While the Court in *Smith* mentioned in dicta that there may be a theoretical possibility that punitive damages might be available against the District of Columbia under certain undefined "extraordinary circumstances," this issue was resolved

19

in favor of the District in *Teart v. WMATA*, 686 F.Supp. 12 (D.D.C. 1988). In *Teart*, the Court first reiterated the long standing precedent that "[i]n the absence of express statutory authority, punitive damages are not recoverable against the District of Columbia." *See Teart,* 686 F.Supp. at 13. In making this statement, the court included language from *Smith* which addressed the public policy issues involved in holding that punitive damages are not allowed against the District of Columbia absent specific statutory authority. Specifically, the court referenced the reasoning of the *Smith* court that punitive damages against the District would only serve to punish the taxpayers for the wrongful acts of District employees, which is contrary to the purpose of punitive damages. *Id.*

The purpose of a punitive damages award, the *Smith* court held, was to deter wrongful behavior and to benefit those wronged by such behavior. The court went on to find that assessing punitive damages against the District (which would require payment by tax dollars) would be in conflict with the purpose of punitive damages because it would only serve to punish the taxpayers, who are the exact people who should benefit from such an award. *Id.* The court in *Teart* also reviewed the "extraordinary circumstances" language included in the *Smith* decision, holding that this language was nothing but dicta, and stating that *no* court had ever imposed punitive damages against the District. *Id*. at 14. The Court decided that "[t]his court will not create a baseline definition of a term which was formulated in dicta." *Id.* Accordingly, because existing case law does not allow for punitive damages against the District of Columbia, and, because even if there did exist a possibility for imposition of such damages under "extraordinary circumstances," clearly this case is not within such a category. As such, plaintiff's claim for punitive damages must be dismissed as a matter of law.

## VIII.   The Plaintiff's Common Law Claims Against the District Defendants Should Be Dismissed for Lack of Jurisdiction.

The plaintiff's Amended Complaint has a common law claim for wrongful eviction, and intentional and negligent infliction of emotional distress against defendants Powell, Carter, Acosta, Johnson, Smith, McLean and the District of Columbia.  *See* Amended Complaint, ¶¶ 37-40.  Should this Court find that dismissal of the common law claims are not appropriate, the Court should not assert "supplemental jurisdiction" over the state claims since there are no viable federal law claims.  *See United Mine Workers v. Gibbs,* 383 U.S. 715 (1966). The factors to be considered by the court under the "supplemental jurisdiction doctrine" are a) judicial economy, b) convenience, c) fairness, and d) comity. *Carnegie-Mellon University v. Cohill,* 484 U.S. 343 (1988).  It is a well founded principle that federal courts should avoid making needless decisions concerning state law in an effort to allow the state courts to make decisions on laws well within their expertise. In *Gaubert v. Gray*, the Court dismissed the plaintiff's constitutional claims on the grounds of qualified immunity.  747 F. Supp. 40, 50 (D.C. Cir. 1990).  Noting that "pendent jurisdiction is a doctrine of discretion, not of plaintiff's right," the court also dismissed the plaintiff's four common law claims.  *Id.*  Citing the Supreme Court's decision in *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966), the District Court wrote:

> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.  Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well. *Gaubert*, 747 F. Supp. at 50.

Here, the plaintiff's constitutional claims are barred under the *Monell* doctrine.  *See Monell*, 436 U.S. at 694.  Furthermore, his constitutional claims do not rise to the level of a constitutional violation.  Finally, the individually named District defendants are entitled to

21

qualified immunity.  Comity and justice mandates dismissal of plaintiff's remaining common law claims.

## <u>CONCLUSION</u>

WHEREFORE, based on the record evidence in this case, and the arguments set forth above, defendants Officer Joseph A. Powell, Officer James L. Carter, Officer Jose Acosta, Officer Darrell D. Johnson, Officer David Smith, Captain Ralph McLean and the District of Columbia are entitled to judgment as a matter of law on all remaining claims asserted by plaintiff.

PETER J. NICKLES
Interim Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division

      /s/ Patricia A. Jones
PATRICIA A. JONES [428132]
Chief, General Litigation, Section IV

      /s/ Leticia L. Valdes
LETICIA L. VALDES [0461327]
Assistant Attorney General
441 4th Street, N.W.
Sixth Floor South
Washington, D.C. 20001
(202) 442-9845; (202) 727-6295
E-mail:  Leticia.valdes@dc.gov

22

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Anthony Bridgeforth, | |
| Plaintiff, | |
| v. | C.A. No.: 06-2128 (RCL) |
| Khadijah Bronson, *et al.*, | |
| Defendants. | |

## <u>ORDER</u>

Upon consideration of Defendants Officer Joseph A. Powell, Officer James L. Carter, Officer Jose Acosta, Officer Darrell D. Johnson, Officer David Smith, Captain Ralph McLean and the District of Columbia's Motion for Summary Judgment, the Memorandum of Points and Authorities in support thereof, any opposition thereto, and the record herein, it is, this _____ day of _____ , 2008;

ORDERED:  that Defendants' Motion for Summary Judgment is hereby granted for the reasons set forth in the motion; and it is,

FURTHER ORDERED:  that judgment is hereby entered in favor of defendants Officer Joseph A. Powell, Officer James L. Carter, Officer Jose Acosta, Officer Darrell D. Johnson, Officer David Smith, Captain Ralph McLean and the District of Columbia.

_____
Judge Royce C. Lamberth

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Anthony Bridgeforth, | |
| Plaintiff, | |
| | C.A. No.: 06-2128 (RCL) |
| v. | |
| Khadijah Bronson, *et al.*, | |
| Defendants. | |

### DEFENDANTS OFFICER JOSEPH A. POWELL, OFFICER JAMES L. CARTER, OFFICER JOSE ACOSTA, OFFICER DARRELL D. JOHNSON, OFFICER DAVID SMITH, CAPTAIN RALPH W. MCLEAN AND THE DISTRICT OF COLUMBIA'S STATEMENT OF MATERIAL FACTS WHICH ARE NOT IN DISPUTE

Defendants Officer Joseph A. Powell, Officer James L. Carter, Officer Jose Acosta, Officer Darrell D. Johnson, Officer David Smith, Captain Ralph McLean and the District of Columbia, by and through counsel, hereby submit that the following material facts are not in dispute:

1.      Plaintiff Anthony Bridgeforth testified that he was the recipient of D.C. Housing Authority Section Eight benefits since either the year 2000 or 2001. *See* Plaintiff Anthony Bridgeforth's deposition at 82:12-16 and 86:9-22, hereto attached as Exhibit 1.

2.      Mr. Bridgeforth testified that sometime in November 2005, he saw some flyers at the D.C. Housing Authority for apartment rentals.  One flyer indicated that defendant Khadijah Bronson had two apartments available, one at 1718 E Street, N.E., and one at 210 20th Street, N.E.  Bridgeforth dep. at. at 88:15-22, 89:1-3, 89:20-22, 90:1-18, and 91:3-15.

4.      Plaintiff testified that the rental lease must be signed before he can move into the apartment under the D.C. Housing Authority program.  Brigeforth dep. at 126:6-12.

5.     Plaintiff testified that defendant Bronson took him up the steps at the apartment located at 210 20th Street, N.E., and to the right and showed him that unit but told him that "wasn't" his uni because "it wasn't finished," "the stove didn't work," and there was a lot of stuff wrong with the unit. Bridgeforth dep. at 149:22-150:1-16.

6.     Plaintiff testified that defendant Bronson "assured" him that the unit to the right wasn't his unit.  Bridgeforth dep. at 156:6-22.

7.     Plaintiff testified that defendant Bronson informed him that she had an emergency, her mother was sick and she wanted to meet with him to give him the keys to his unit.  Bridgeforth dep. at 158:1-14.

8.     Plaintiff did not sign a lease for the unit owned by defendant Bronson.  Bridgeforth dep. at 115:9-22 and 116:1-3.

9.     Plaintiff testified that on January  11, 2006, he returned to the D.C. Housing authority and signed a document indicating that "he didn't sign a lease" to be in the unit and wish not to stay in the unit because of the living conditions. *See* January 11, 2006, letter from Anthony Bridgeforth hereto attached as Exhibit 3, and *See* also Bridgeforth's dep. at 211:6-22 and 212:1, hereto attached as Exhibit 1.

10.     Plaintiff testified that on January 20, 2006, at around noon, he was in the back of the unit sleeping when he heard some "loud banging," so he called the police and told them that someone was trying to break into his house.  Bridgeforth dep. at 249:9-22, 250:1-8 and 252:18-21

11.     Plaintiff testified that when the police got there, he heard defendant Bronson telling the police that she was the landlord and that he was in the unit illegally.  Bridgeforth dep. at 255:1-6.

12.    Mr. Bridgeforth testified that the police officer informed Ms. Bronson that this was a landlord and tenant issue and there was nothing they could do. *Id*. at 282:3-11. Mr. Bridgeforth testified that he eventually left home and went to work. *Id*. at 319:5-11.

13.    Lt. John Michael Hedgecock, one of the District's 30(b)(6) representatives, testified that on January 20, 2006, the Metropolitan Police Department received several calls to respond to 210 20th street, N.E., commencing at approximately 12:23 p.m.  During several of those calls, a burglary in progress was reported.  *See Lt.* John Michael Hedgecock's deposition at 78:6-22-83:19, hereto attached as Exhibit 4.

14.    Plaintiff testified that he returned from work at approximately 11:30 p.m. and the police was again at 210 20th Street, N.E. *See* Anthony Bridgeforth's deposition at 319:5-16, hereto attached as Exhibit 1.

15.    Plaintiff testified that Officer Carter asked him if he had a lease for residing at the unit and he told the officer he "didn't have a lease," and didn't sign a lease.  Bridgeforth dep. at 329:22-330:4.

16.    Plaintiff testified that he was told by the officers that since he was unable to produce a lease he had five minutes to go or he was going to be locked up for unlawful entry.  Bridgeforth dep. at 342:18-343:2.

17.    Defendant Bronson testified she called the police because plaintiff was in the unit and "he wasn't supposed to be there" and "he broke into the unit" while she was out of town. Bronson dep. at 151:1-12, hereto attached as Exhibit 5.

18.    Defendant Bronson testified that she called the captain and told him that she had somebody in the unit that did not want to live there, that she was away and when she came back he was in the unit illegally. Bronson dep. at 173:15-22 and 174:1-20.

19.     Defendant Bronson also told the captain that she had a document indicating that plaintiff was not supposed to be there. Bronson dep. at 173:15-22 and 174:120.

20.     Defendant Bronson showed the officers a document reflecting that plaintiff had not signed a lease, and that he indicated that he didn't want the apartment.  Bronson dep. at 173:15-22 and 174:120.

21.     Defendant Bronson also reported to Captain McLean that plaintiff was a "locksmith or had access to a locksmith" and "she swore she hadn't given him a key." McLean dep. at 39:18-41:18, hereto attached as Exhibit 6.

22.     Defendant Officer Carter testified that he accompanied plaintiff to the unit and "there wasn't much in there," "a bag of clothes or two," which supported his belief that plaintiff was a squatter and on the property illegally.  *See* James Carter's dep. at 32:2-21, hereto attached as Exhibit 7.

23.     Defendant Smith testified that plaintiff's girlfriend was in the apartment and he believed she was "causing a commotion." *See* David Smith's dep. at 27:8-21, hereto attached as Exhibit 8.

24..    Plaintiff's expert R. Paul McCauley testified that in his opinion the District of Columbia did not violate a national standard of care when it comes to training police officers. *See* R. Paul McCauley's dep. at 143:19-22 and 144:11, hereto attached as Exhibit 3.

25.     Mr. McCauley also opined that the Metropolitan Police Department's General Order regarding evictions that are provided to police officers in the District of Columbia are consistent with accepted police practices. R. Paul McCauley's dep. at 60:19-22 and 61:1-13.

25.     Mr. McCauley testified that for a period of 10 years, between 1998 and 2008, there were only three instances of alleged unlawful evictions in the District of Columbia.  R. Paul McCauley's dep. at 132:11-22 and 133:1-15.

26.    Plaintiff testified that he called defendant Bronson to let her know that he didn't have the keys and she told him that she gave him the **wrong** keys and she would send the handyman to bring the right keys.  Bridgeforth dep. at 173:12-22, 174:1-22 and 175:1.

27.    Plaintiff claims that his girlfriend Ms. Geter and her mother told him to try to see if the key would open the door to the unit to the right.  Plaintiff tried the key in the unit to the right and the key worked. Pl.'s dep. at 173:12-22, 174:1-22 and 175:1.

28.    Plaintiff avers that the handyman left keys under the mat of the apartment to the right.  Plaintiff testified that he tried this key in the unit to the left and it didn't work, but it opened the door to the unit to the right.   Pl.'s dep. at 180:19-22, 181:1-22, and 182:1-22.

Respectfully submitted,

PETER J. NICKLES
Interim Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division


    /s/ Patricia A. Jones
PATRICIA A. JONES [428132]
Chief, General Litigation, Section IV


    /s/ Leticia L. Valdes
LETICIA L. VALDES [0461327]
Assistant Attorney General
441 4th Street, N.W.
Sixth Floor South
Washington, D.C. 20001
(202) 442-9845; (202) 727-6295
E-mail:  Leticia.valdes@dc.gov

# Exhibit 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

+ + + + +

IN THE MATTER OF:

ANTHONY BRIDGEFORTH,
     Plaintiff,

     v.

KHADIJAH BRONSON, ET AL,
     Defendants.

C.A. No.
06-2128
(RCL)

Thursday,
December 6, 2007

Washington, D.C.

DEPOSITION OF:

ANTHONY BRIDGEFORTH

called for examination by Counsel for the

Defendant, pursuant to Notice of Deposition,

in the Office of the Attorney General for the

District of Columbia, 441 4th Street, N.W., 6th

Floor South Conference Room, when were present

on behalf of the respective parties:

ORIGINAL

<u>APPEARANCES</u>:

<u>On Behalf of the Plaintiff</u>:


        JEREMY T. MONTHY, ESQ.
of:  Hogan & Hartson, LLP
        555 13th Street, N.W.
        Washington, D.C. 20004
        (202) 637-5600

<u>On Behalf of the Defendants</u>:


        LETICIA L. VALDES, ESQ.
        Assistant Attorney General
        441 4th Street, N.W.
        Sixth Floor South
        Washington, D.C. 20001
        (202) 442-9845

        DARRYL F. WHITE, ESQ.
        4308 Georgia Avenue, N.W.
        Washington, D.C. 20011
        (202) 882-4880

1    A    Apartment No. 3 or 4.

2    Q    And why did you leave that unit?

3    A    That unit didn't have air and it

4  was crazy.

5    Q    Okay.  Mr. Bridgeforth, do you

6  recall the first time you applied for benefits

7  from the D.C. Housing Authority?

8    A    Yes.

9    Q    Okay.  When was that?  What year

10  was it?

11    A    Either 2000 or 2001.

12    Q    Okay.  And have you -- did you

13  receive D.C. Housing benefits continuously,

14  that means without stopping from 2000/2001

15  until this year?

16    A    Yes.

17    Q    Okay.  What is your understanding

18  of the benefits that you received from the

19  D.C. Housing Authority?

20    A    I'm not sure what you mean.

21    Q    Why were you receiving the

22  benefits?

1    explained to you about the program?

2         A    They basically tell you, you know,

3    your name came up, you're entitled to either

4    public housing or Section 8 Program.  They

5    tell you how it work, what communities you can

6    move in and sign the list and then they ended

7    the meeting, you get a copy of your voucher.

8    You can go out and start looking.

9         Q    Okay.  Were you -- did they tell

10   you you were going to receive public housing

11   assistance or Section 8 or both?

12        A    For me personally?

13        Q    Yes, you personally.

14        A    They told me both.

15        Q    Okay.   What's   the   difference

16   between public housing and Section 8?

17        A    Public --

18        Q    If you know.

19        A    -- housing, from my understanding,

20   says like communities that the city own the

21   property.  In Section 8, independent landlords

22   for the city and you can lodge as well.

1    that you were receiving benefits from D.C.

2    Housing Authority, did you report to them that

3    you were working?

4            A    Every time.

5            Q    You reported to them every single

6    time?

7            A    Every single time.

8            Q    Okay.  Is part of the requirements

9    to receive D.C. Housing benefits that you do

10   not work?

11           MR.  MONTHY:    Objection  to  form.

12   If you know, go ahead.

13           THE WITNESS:  I don't know.

14           BY MS. VALDES:

15           Q    Okay.  Tell me how it came about

16   that you found out about renting 210 20th

17   Street, N.E.

18           A    Can I use the bathroom?  Oh, I

19   seen a flyer down at Housing and they have a

20   section with flyers going to this canopy thing

21   that twirl around.

22           Q    Okay.

1          A     I saw some flyers and I took like

2     six or seven flyers and I put them in my bag.

3     And when I got home, I proceeded to call them.

4          Q     Okay.

5          A     Excuse me, excuse me, can I use

6     the bathroom?

7          Q     Sure.  We can take a break.

8               MS. VALDES:  What time is it now?

9               THE WITNESS:  Thank you.

10              COURT REPORTER:  11:45.

11              THE WITNESS:  I'm going to come

12    right back.

13              MR. MONTHY:  Yes, no, that's fine.

14              (Whereupon, at 11:39 a.m. a recess

15    until 11:43 a.m.)

16              MS. VALDES:  What is the time now?

17              COURT REPORTER:  11:43.

18              MS. VALDES:  Back on the record.

19              BY MS. VALDES:

20         Q     When we left off, Mr. Bridgeforth,

21    you said that you had seen several flyers at

22    the D.C. Housing Authority.  You took the

1    flyers home and, I guess, you found a flyer

2    for 210 20th Street.

3         A    Yes, ma'am.

4         Q    Do you recall what information

5    that flyer had in it?

6         A    It had the landlord name as Ms. K.

7    A number on it, 277-1772 (202), and it had

8    1617 -- no, it had 1718 E Street, N.E.,

9    Apartment 3, and it had 210 20th Street, N.E.,

10   Apartment 3 and that was basically it.

11        Q    Okay.  What did you do thereafter?

12        A    I called Ms. K and introduced

13   myself, told her I was interested in 17 -- I

14   told her I was interested in 210 20th Street.

15   But after we talked and she told me how much

16   the rent was and I knew my voucher couldn't

17   cover that, I said okay, I'll take 1718 E

18   Street, N.E., Apartment 3.

19        Q    1718 E Street?

20        A    E, yes.

21        Q    Okay.

22        A    So, you know, we talked.

1        Q      And this was all on the telephone?

2        A      Yes.

3        Q      Do  you  remember,  approximately,

4    when this conversation took -- first of all,

5    do you remember, approximately, when you saw

6    the flyer?

7        A      November '05.

8        Q      Okay.    And  do  you  remember,

9    approximately, when you called and spoke to

10   Ms. K?

11       A      The same date I got the flyer, but

12   I don't know the --

13       Q      Okay.

14       A      -- exact date.   I can tell you

15   maybe it was in the first week of November.

16       Q      Did  you  call  her  on  your  cell

17   phone?

18       A      Yes.

19       Q      Okay.   Do  you  currently  have  a

20   cell phone?

21       A      Yes.

22       Q      How do you pay for that cell phone

1      fill out, you or Ms. Bronson?

2          A     Um, both.

3          Q     Okay.

4          A     Both of us.

5          Q     What kind of paperwork did you

6      have?

7          A     It's a form and I need to fill out

8      and sign.

9          Q     Okay.  Is this a form that you get

10     from the D.C. Housing Authority?

11         A     Yes.

12         Q     Okay.  You had this form with you?

13         A     The whole packet, yes.

14         Q     Okay.  Yet, at this point in time,

15     you still didn't know where you moving into?

16         A     Right.

17         Q     Had you visited any of the two

18     locations?

19         A     No.

20         Q     Okay.  What happened during that

21     meeting?

22         A     Um, I gave her the paperwork.  She

1       A    No.

2       Q    Okay.   You had only completed

3  paperwork for 1718 E Street, N.E.?

4       A    Yes.

5       Q    Okay.  So Ms. Bronson informs you

6  that the apartment passes inspection?

7       A    Right.

8       Q    Okay.  What happened thereafter?

9       A    After that, after -- I'm sorry.

10  Say that again.

11       Q    You told me that Ms. Bronson

12  called you and told you that the apartment

13  passed inspection.  Was that correct?

14       A    That's correct.

15       Q    Okay.  What happened thereafter?

16       A    Okay.  After that, after that, let

17  me think.  Give me a second.  After that, oh,

18  Ms. Bronson told me that the unit passed

19  inspection, but I actually checked behind her

20  and double checked with the inspector after

21  they inspected the units.

22       Q    Okay.

 1        A     And the inspector informed me that

 2   that unit did not pass.  I was going to have

 3   to find another unit.

 4        Q     Okay.  Let me ask you a question.

 5   I know that you mentioned earlier that you get

 6   a voucher from the D.C. Housing Authority.

 7   Did you turn that voucher over to Ms. Bronson

 8   when  you  discussed  renting  one  of  her

 9   apartments when you were at Bank of America?

10        A     No,  you  don't  give  her  the

11   voucher.

12        Q     Okay.  Where does the voucher go?

13        A     Nowhere.

14        Q     You keep it with you all the time?

15        A     At all times.

16        Q     Okay.  So  she  doesn't  get  the

17   voucher?

18        A     No, ma'am.

19        Q     Okay.  So it's your voucher.

20        A     Yes.

21        Q     That you keep.

22        A     Yes.

1          Q      Okay.      So     you    called    the

2     inspector.   The inspector told you that the

3     unit at 1718 E Street, N.E., did not pass

4     inspection.   What happened thereafter?

5          A      After that, I called Ms. Bronson

6     and I spoke to her.   I said Ms. Bronson, I

7     said um, did the unit pass inspection?  She

8     said yeah, but we got a little problem. So I

9     said okay, no problem, what's the problem, Ms.

10    Bronson?  She said -- Ms. K, because I didn't

11    know her as Ms. Bronson.  Ms. K, so she said,

12    you know, what, I think I'm going to let you

13    have the one at 210 20th Street.

14          Q      Okay.

15          A      So I went -- I had to go back down

16    to Housing, get another updated voucher and

17    another lessor package.   So I went in there

18    and I met her at 1204 H Street this time.

19    It's an ice cream shop where we met at.   So I

20    brought the new paperwork back to her and we

21    sat in there.   She filled out her part.   I

22    filled out my part.   She gave it right back to

1        A       After we completed the paperwork,

2    I took the paperwork back to Housing.

3        Q       Okay.  And then what happened?

4        A       I  informed  Ms.  Bronson  that  I

5    completed what I needed and that was the end

6    of it for me.

7        Q       Okay.

8        A       And  then  she  made  a  couple  of

9    phone calls or whatever she did.  The next

10   thing I know she was calling me telling me I

11   need to meet up with her, because she had a

12   family emergency and she needed to leave town

13   to pick up the keys.

14       Q       Okay.

15       A       So --

16       Q       Yet, you still had not visited 210

17   20th Street, N.E.?

18       A       That's correct.

19       Q       Okay.  You had no idea what the

20   apartment looked like?

21       A       No, I didn't.

22       Q       Okay.  During the meeting at the

1    ice   cream   parlor,   did   you   complete   a

2    residential lease with Ms. Bronson for renting

3    her property?

4         A    No.

5              MR. MONTHY:  Objection.

6              BY MS. VALDES:

7         Q    You did not.   As part of the

8    requirement, since you've been in the program,

9    by then you have been in the D.C. Housing

10   Program for at least four years, was part of

11   the requirement that you sign a lease to

12   reside in the unit?

13        A    No.

14             MR. MONTHY:  Objection.  Go ahead.

15             BY MS. VALDES:

16        Q    So as you sit here today, did you

17   ever sign a lease for any of the units that

18   you resided in while the D.C. Housing

19   Authority was providing you assistance?

20        A    Yes.

21        Q    You did.   Every unit that you

22   resided before 210 20th Street?

1    you sign and date it.  The landlord sign and

2    date it and then the -- your officer sign and

3    date it and put their initials, then that

4    start the HAP contract.

5         Q    Okay.

6         A    Then they okay the landlord to

7    give you the keys.  They going to be paying.

8    You have legal rights to that unit.

9         Q    And you have to sign those

10   documents before you can move in?

11            MR. MONTHY:  Objection.

12            THE WITNESS:  Right.

13            BY MS. VALDES:

14        Q    Okay.

15        A    No, no, no, no.  You have --

16   that's the final step of the process.

17        Q    Okay.

18        A    Yeah, you have to sign those

19   documents before you actually get --

20        Q    Move in?

21        A    Right, because -- that's right.

22        Q    Okay.  That's what I wanted to

1    happened with 1718?

2          A    I never even addressed her about

3    1718 failing inspection.    I never even

4    addressed about that.

5          Q    Okay.

6          A    On the 29th of November, either the

7    29th or the 30th, I'm not quite sure, I'm not

8    quite sure, but the date of the inspection, me

9    and Ms. Bronson met up and she showed me a

10    preview of apartment of the renovating -- of

11    the renovating apartment.    We met up the 29th.

12    The date that the unit passed inspection.

13          Q    Did not pass inspection, you mean?

14    Which unit are you talking about?

15          A    20th Street.

16          Q    Okay.

17          A    See 16 E Street, she never gave me

18    a reason about 16.    She -- when -- the next

19    time we met up was on the 29th, I believe, for

20    the inspection.

21          Q    Where did you meet up at?

22          A    210 20th Street.

1       Q    Okay.  When you went to 210 20th

2    Street, did you actually go see the unit or

3    did you just meet up in front of the building?

4       A    I believe I viewed the unit.  I

5    viewed the unit.

6       Q    Okay.  When you went up the

7    stairs, which unit did you view?

8       A    To the right.

9       Q    Okay.  The unit to the right.  Who

10   was with you that day?

11      A    Myself.

12      Q    Who else?

13      A    That's it.

14      Q    Where did you get the keys?

15      A    From Ms. Bronson.

16      Q    To see -- okay.  You got the keys

17   from Ms. Bronson on the 29th.  You went to see

18   the unit on the 29th and the unit passed

19   inspection on the 29th?  I just want to make

20   sure that we're clear that this all happened

21   before December.

22      A    I met up with Ms. Bronson.  She

1    took me up the steps to the right.  That was--

2    she informed me that wasn't my unit.  That's

3    just a layout --

4         Q    Okay.

5         A    -- of the units in the building,

6    how they looked.

7         Q    And she took you to the right?

8         A    Yeah.

9         Q    Showed you that unit and told you

10   that wasn't your unit?

11        A    That wasn't my unit.

12        Q    Okay.

13        A    And I said can I see my unit?

14   They still had to do a few more things in it

15   and she didn't have the keys to it, so that's

16   why she showed me that unit.

17        Q    Okay.  And this was -- you are

18   certain this happened before December 2005?

19        A    I'm not --

20             MR. MONTHY:  Objection.

21             THE WITNESS:  I'm not --

22             MR. MONTHY:  Go ahead.

1    November.

2         Q    When did you move out of 806?

3         A    I'm not quite sure of the month.

4         Q    Okay.

5         A    I can give you the year.

6         Q    So when we left off, let's go back

7    again to 210 20th Street.  When we left off,

8    you had met Ms. Bronson at that location and

9    she had shown you the apartment to the right,

10    as you go up the stairs, and she had told you

11    this is not your unit, but this is the layout.

12    And she said she was going to call you back to

13    give you the keys to your unit, because she

14    didn't have them with her.  Is that correct?

15         A    That's correct.

16         Q    Okay.  What happened thereafter?

17         A    Um, she took -- we went up -- I

18    looked at the unit.  It was a whole lot of

19    stuff in it.  She assured me that wasn't my

20    unit.  It wasn't finished.  The stove didn't

21    work.  You know, it was a lot of stuff was

22    wrong.  It wasn't minor just the layout.

1     Q     Is that correct?  Okay.  And then
2  what happened?

3     A     She informed me she had a family
4  emergency.

5     Q     Okay.

6     A     So she was trying to meet up with
7  me to give me the keys and that -- and you
8  know, that basically was it.

9     Q     Did she tell you what kind of
10 emergency she had?

11    A     Her mom was sick.

12    Q     Okay.  Did she tell you she was
13 leaving town?

14    A     Yeah.

15    Q     Okay.  What did she tell you about
16 leaving town?

17    A     Her mom was sick.

18    Q     Did she say when she was leaving
19 town?

20    A     No.

21    Q     No.  Then what happened?

22    A     Then she gave me the keys.

1    me.

2         Q    Okay.  But you had not -- after

3    you had gotten the keys, you had not gone back

4    to the unit?

5         A    No.

6         Q    Why not?

7         A    Because I didn't have the money to

8    do what I needed to do, so it didn't make

9    sense to just go sleep on the floor, so I

10    didn't -- I just didn't.

11         Q    So where were you staying for that

12    period of time?

13         A    My aunt's house.  I spend the

14    night at my friend's house.  I was spending

15    the night at Geter's house and every place.

16         Q    Okay.  What's your aunt's name?

17         A    Michelle.

18         Q    Michelle?

19         A    Yes.

20         Q    What's her last name?

21         A    Same as mine.

22         Q    Okay.  What's her address?

```
 1          A      Farmer.

 2          Q      Farmer?

 3          A      Farmer, F-A-R-M-E-R.

 4          Q      Okay.

 5          A      Different people.

 6          Q      Okay.  But you did not stay at 210

 7   20th Street, N.E.?  Is that correct?

 8          A      That's correct.

 9          Q      Okay.  What happened during that

10   meeting on December 23, 2007?

11          A      I came down to Housing.

12          Q      Okay.

13          A      And just signed my name on some

14   papers.

15          Q      Was Ms. Geter -- I'm sorry, Ms.

16   Bronson there?

17          A      She was out of town on emergency.

18          Q      What happened after you moved --

19   you signed the paperwork?

20          A      They informed me Ms. Bronson had

21   emergency.  They told me the date she would

22   come in.  After she came in and signed the
```

1    papers, I can come back and get my copy.

2        Q    Okay.   You can come back and get

3    what?

4        A    A copy of it.

5        Q    Okay.   Did they ask you about a

6    lease during that meeting?

7        A    That's why we were there.   We

8    supposed to sign the lease right then and

9    there.

10        Q    Okay.   My question is did someone

11    from the D.C. Housing Authority ask you about

12    a lease?

13        A    Yes.

14        Q    Okay.   What did they say about the

15    lease?

16        A    Ms. Bronson was out of town on an

17    emergency.   They called her.   They informed

18    her what was going on and we was supposed to

19    sign the lease when she came back.

20        Q    Okay.   So they did not have a

21    lease in their package.   Is that correct?

22        A    That's correct.

1        portion either?

2            A    No lease was in it to sign.

3            Q    Okay.  But they had one in their

4        package?

5            A    Blank.

6            Q    Okay.  After that meeting, when --

7        did you go to the unit after the meeting?

8            A    I don't know if it was right

9        after, but I did go.

10           Q    Okay.  Tell me what happened when

11       you -- first of all, who went with you to the

12       unit?

13           A    I took Ms. Geter, her mother, me

14       and I don't know if my -- Ms. Geter, our

15       daughter was there or not.  I can't remember

16       if she was present.

17           Q    What's Ms. Geter's mother's name?

18           A    Towanna.

19           Q    Her last name also Geter?

20           A    Yes.

21           Q    Okay.  Tell me what happened.

22           A    We go in the -- I go get them.

1    I'm excited.  We ready to go to the apartment.

2    I want -- they don't know where they are

3    going.  I'm taking them to where I'm moving

4    at.  We get out, I open the door, we go

5    upstairs.  I turn left, because I'm --

6         Q    Let me stop you for a minute.  You

7    mean you opened the door to the building?

8         A    Yes.

9         Q    Okay.  Okay.

10        A    With a key.

11        Q    Okay.

12        A    I go up the steps.

13        Q    Okay.

14        A    The way the building is structured

15   and numbered, I'm thinking No. 3 to the left.

16   So I stick the key into the left.  It won't

17   open.  So I said, oh, man, let me call Ms.

18   Bronson and tell her I ain't got the key.  So

19   I called Ms. Bronson and let her know I ain't

20   got the keys.  She said okay, I'll get the

21   handyman to bring, you know, the right keys.

22   I must have gave you the wrong key.

1          Okay.   Ms. Geter and her mother

2    want me to try the keys to the right.  I don't

3    want to try the keys to the right, that ain't

4    where I'm supposed to be.  So I tried the keys

5    to the right, they worked.  We go in there.

6    They looked.   It's a nice apartment, but it

7    got junk and trash all on the floor.  So they

8    were like ah, it ain't that bad.  If this is

9    your unit, you can fix it up.

10          You know, you can do this, you can

11   do that.  I said, no, I ain't got time to do

12   that, because this ain't my unit.  So I called

13   Ms. Bronson and let her know that the unit

14   that I'm in, that's not my unit.  I don't have

15   the keys to the other unit.  She said she

16   going to send the handyman past.  So I showed

17   them the unit, locked the door.  She said she

18   is going to have him call me.

19          So we left.  Later on that evening

20   or the next day, the handyman called me, so I

21   met up with him and we exchanged keys.  He

22   gave me some more keys.  So later on that

1     night, I go back to try the keys in Unit 3.

2          Q     Let me stop you for a minute, Mr.

3     Bridgeforth, because I want to go day by day

4     here.  So I know where you stopped and I wrote

5     a note here.  I'll come right back to it.

6          A     Okay.

7          Q     The first time that you went to

8     the building, you went up the stairs and you

9     went to the apartment on the left hand side.

10    Is that correct?

11         A     That's correct.

12         Q     Okay.  You try the keys, the keys

13    didn't work.

14         A     That's correct.

15         Q     Okay.  You did not want to go to

16    the apartment on the right hand side, because

17    that wasn't supposed to be your unit.  Is that

18    correct?

19         A     Right, that's correct.

20         Q     Okay.  Ms. Geter or Ms. Geter's

21    mother suggested that you try that door?

22         A     Yes.

1    going to have her handyman meet you?

2         A    Yes.

3         Q    Is that correct?   What is Ms.

4    Bronson's handyman's name?  Do you know?

5         A    I have no -- I didn't -- I don't

6    know.  He a big dude.  I don't know if she is

7    big on big.  I don't know.  I don't know what

8    his name is.

9         Q    Okay.  Did you see this gentleman

10   at any time during January 20, 2006?  The date

11   of the incident that we're here for?

12        A    No, huh-uh.

13        Q    Okay.  Where did she tell you to

14   meet the handyman at?

15        A    He was -- right in front of the

16   building.

17        Q    Okay.  That same day?

18        A    That same day.

19        Q    Okay.  So tell me what happened.

20   Did Ms. Geter and her mom stay with you and

21   waiting for the --

22        A    No, I didn't stay.  I left and

```
1    came back.  I don't -- I never met up with the

2    handyman.  He put the keys under the mat.

3         Q    Under what mat?

4         A    It's a welcome mat at the door.

5         Q    In front of the building or in

6    front of the unit?

7         A    In front of the unit.

8         Q    Okay.  In front of which unit?

9    The one on the left or the one on the right?

10        A    The one on the right.

11        Q    Okay.  Now, you -- were you told

12   that by Ms. Bronson that he was going to leave

13   the keys?

14        A    No, he called me.  He called me.

15        Q    Okay.

16        A    We talked.

17        Q    Okay.

18        A    I'm -- I believe he called and we

19   talked and the keys ended up under the mat and

20   he put them there.  He -- we talked and I --

21        Q    Okay.  Under which mat?

22        A    -- knew they were there.  The mat
```

1    in front of unit -- the unit to the right.

2         Q    Okay.  Now, why were the keys put

3    in front of the unit to the right?

4         A    Because the unit to the left

5    didn't have a mat.

6         Q    Okay.  So when did you pick up

7    those keys?

8         A    Either the same night or the next

9    day.

10        Q    Okay.  And what happened?

11        A    I tried them in Unit 3, they

12   didn't work.

13        Q    Now, did you try them in the unit

14   on the right or on the left?

15        A    The left first.

16        Q    Okay.  They didn't work?

17        A    Right.

18        Q    What did you do thereafter?

19        A    Tried them on the unit on the

20   right.

21        Q    Okay.  And what happened?

22        A    They worked.

1      Q      Okay.  So then what happened?

2      A      By now, I'm -- okay.  I mean, I'm

3    frustrated, but I take it, because I don't

4    have no where else to go, so I take it.  So

5    okay, no problem.  So as I'm moving my stuff

6    in, I'm noticing stuff about this unit that it

7    could not have passed inspection.

8      Q      Okay.

9      A      So I get on the phone.  I call

10   Housing.  They check the records.  They have

11   no paperwork that this unit passed inspection.

12     Q      Okay.

13     A      So I scheduled a reinspection for

14   January the 10th, I believe.  So they come out

15   and it failed inspection that date.

16     Q      Okay.

17     A      And they called -- my main concern

18   at that inspection was the fact that I didn't

19   have a lease and I couldn't get the gas on, so

20   I was living in the unit with no gas and no

21   hot water.

22     Q      Okay.  Let me stop you for a

1    the D.C. Housing Authority?

2         A    I did.

3         Q    Okay.   But  this  is  not  the

4    document that you signed?

5         A    No, this one -- this is not it.

6         Q    Okay.   Okay.   Mr. Bridgeforth, I

7    just gave you a document that has been marked

8    as Exhibit No. 7.

9                        (Whereupon,   the   document   was

10                       marked   as   Exhibit   7   for

11                       identification.)

12                  BY MS. VALDES:

13        Q    Could   you   tell   me   what   the

14   document is?

15        A    A  letter  that  I  was  advised  to

16   write by Housing.

17        Q    And  you  were  advised  to  write  by

18   who?

19        A    Donna   Scrimes,   Ronald   McCoy,

20   Housing officials.

21        Q    Okay.   Is that your signature on

22   the bottom of the letter?

1      A      It sure is.

2      Q      Okay.

3      A      Yes.

4      Q      Tell me how the writing on this

5      letter came about.

6      A      Okay.  January the 10th, they did

7      an initial inspection at 210 20th Street.  The

8      inspector advised Ms. Bronson certain things

9      to do.  She didn't comply.  They told me if

10     she didn't comply, come back down to Housing

11     on the 11th and see Ms. Donna Scrimes.

12     Q      Okay.

13     A      I came to Housing on the 11th, Ms.

14     Donna Scrimes advised me that the only way I

15     could get out of the unit, because of the HAP

16     contract is now in place, is if the landlord

17     let me out of the unit or if I had a valid

18     reason why -- a valid of reason of me not

19     wanting to be in the unit.

20     Q      Okay.

21     A      I wanted to transfer.

22     Q      Okay.

1    not reported it?

2        A    I -- that's -- I never not -- they

3    knew, they had my work stuff.

4        Q    I asked you a question.

5        A    I don't know.  I don't know.

6        Q    Okay.  You don't know what it had

7    to do with?

8        A    No.

9        Q    Okay.  Okay.  Mr. Bridgeforth,

10    let's go to the day, January 20, 2006.  Tell

11    me  what  happened  on  January  20,  2006

12    commencing with the very early morning hours.

13    So I guess, what I want to know is when you

14    woke up.

15        A    I was sleeping in the back room.

16    There is a room back to sleep.  I got the

17    mattress on the floor, TV on the table and I'm

18    in the back asleep.

19        Q    Okay.  Then what happened?

20        A    I hear some loud banging.

21        Q    Okay.

22        A    But I think I'm dreaming.

1          Q      Okay.

2          A      But I still hear the loud banging,

3     so I wake up.  I see the back door like boom,

4     boom, boom, so I call the police.  I said

5     ma'am, can you send the police to 210,

6     somebody trying to break in my house.  And the

7     lady said well, do you know who it is and I

8     said no, ma'am.

9          Q      Okay.  Tell me about the back door

10    to your apartment.  Where is the back door

11    located in relation to the bedroom where you

12    were at?

13         A      Just a space where I was at, it's

14    the back door right.

15         Q      Okay.  You have to step out of a

16    door out of the bedroom to see the back door?

17         A      No.

18         Q      You can see it from the bedroom?

19         A      Um-hum.

20         Q      Okay.

21         A      It's really not a bedroom, it's a

22    back room.

1          Q      Okay.

2          A      She wanted me to find out if I

3   knew that person.

4          Q      Okay.

5          A      So I said who is that kicking on

6   my door?  They said open up this dang door.

7   I said man, I don't know you.  I don't know

8   him.  He said is it your landlord or somebody?

9   I said no, my landlord is a woman.  This is a

10  male.  I have no clue who he is.

11         Q      Okay.

12         A      So she -- I guess she dispatching

13  the police.  The police come and catch him in

14  the act kicking the door down.

15         Q      Okay.  So the police caught him in

16  the back door?

17         A      Yes.

18         Q      And do you know, approximately,

19  what time this was?

20         A      It happened at 12:00, so maybe

21  12:03.

22         Q      Okay.  How do you know the police

1    Meaning, the man.

2    A    He -- they ain't never -- I ain't

3    never hear what he said.  But I heard Khadijah

4    Bronson told the police this is her building,

5    her unit, she needed to get in, so she gave

6    him permission to kick the door down.

7    Q    Okay.  What happened thereafter?

8    A    Um, they talked to Khadijah.  They

9    -- you know, she told them that she is the

10    landlord.  I'm in here illegally.  She wanted

11    me out.  So they asked me and I showed them

12    all my paperwork and everything.

13    Q    What paperwork did you show them?

14    A    Everything from Housing.

15    Q    What's everything?

16    A    Every piece of paper that I had.

17    A lessor package, the residence for tenancy

18    addendum, HAP contract, everything.

19    Q    Now, the HAP contract is nothing

20    that you signed.  Is that correct?

21    A    That's showing that I got legal

22    obligation to be there.  You asked me what I

1     can do that.

2          Q     Okay.

3          A     Okay.  So then they asked her

4     questions or whatever and she told them I was

5     in there illegally and she wanted me out,

6     locked up.  So the officer looked at -- talked

7     to her.  They came and talked to me and wanted

8     to see all the stuff I had.  And he told Ms.

9     Bronson well, you know, this is a landlord/

10    tenant issue, you know, ain't nothing we can

11    do.  You need to go through the --

12         Q     And there was a he?

13         A     -- process.  The gentleman that

14    was talking to us, talking to me was a male.

15         Q     Okay.  Was there anybody else

16    there?

17         A     Yeah.

18         Q     Okay.

19         A     There was a female sergeant there.

20         Q     Um-hum.

21         A     I don't know if she was a

22    sergeant, but female, she was one who wrote

1        Q    Okay.  Did you leave that area

2    again or did you --

3        A    I --

4        Q    Go ahead.

5        A    -- left.  I stayed home for a

6    minute.

7        Q    Um-hum.

8        A    Yeah, then I left again.

9        Q    Okay.  And then what happened?

10       A    Then I was working and I came home

11    again.

12       Q    Okay.

13       A    At 11:30.

14       Q    Okay.

15       A    And the police was already out

16    there.

17       Q    Okay.  Was Ms. Geter in your home

18    at any time up to this point?

19       A    I don't recall.

20       Q    Okay.

21       A    I don't remember.  When I came

22    home from work, I parked.  I seen police out

1    A    No.

2    Q    Okay.  There were police officers

3  inside the building?

4    A    Yes.

5    Q    Where were they?

6    A    No, no, they -- all of them was

7  outside until I arrived.

8    Q    Okay.  What happened when you

9  arrived?

10    A    I proceeded to go to the building,

11  but they -- when I got to them, they asked me

12  did I live there.  I said yeah.  I tried to

13  proceed, but they wouldn't let me proceed.

14    Q    Okay.  Let me stop you.  Who asked

15  you did you live there?

16    A    James Carter.

17    Q    Okay.  How do you know his name?

18    A    I saw his badge.

19    Q    Okay.

20    A    And he was -- and I just assumed

21  that was his name when I saw the badge.

22    Q    Okay.  Did his badge indicate that

1    A    He was a Spanish man.

2    Q    Well built, built, skinny?

3    A    I ain't look at him like that.

4    Q    Okay.  Anybody else go upstairs

5    with you?

6    A    They did, but I'm not familiar

7    with them.

8    Q    Okay.  And you are telling me that

9    they were going ahead of you and you were

10    following them or they were following you?

11    A    No, they followed me.

12    Q    Okay.  And you said Acosta was a

13    step ahead of you?

14    A    We talked on the steps.

15    Q    Okay.  And he was below you?

16    A    He was either one person behind me

17    or right behind me.

18    Q    Okay.

19    A    But I can't remember if he came

20    all the way up.  He -- I think he may have

21    been the one in the hallway.

22    Q    Okay.  So then what else happened?

1      A    We -- they asked me did I live --

2  no, Carter asked me did I have a lease.

3      Q    Okay.

4      A    I told him I didn't have a lease.

5      Q    Okay.

6      A    He said well, I had to go.  He

7  wasn't interested in nothing but a lease.

8      Q    Okay.

9      A    So, you know, I -- he was -- then

10  he start talking about Ms. Bronson.  So I

11  started dealing with the other officer.

12      Q    Wait.  Let me stop you for a

13  minute.  Did Ms. Bronson also go upstairs with

14  all of you?

15      A    Yeah, I mean, I don't know if she

16  went up, but she was right in the midst of the

17  action.

18      Q    Okay.  I want you to try to keep

19  this description as clear as possible.  You

20  are going up the stairs to look for your

21  paperwork.  Four police officers, at least,

22  follow you.  Did Ms. Bronson also follow you?

1    Q    That's James Carter talking to

2    you?

3    A    Yes, yes.

4    Q    Okay.

5    A    So --

6    Q    And do you know who he was

7    speaking to on the telephone when you said he

8    -- was it he that was on the telephone?

9    A    Both him and Khadijah.

10    Q    Okay.

11    A    I didn't know at the time.

12    Q    Okay.    But they were on the

13    telephone?

14    A    Yes.

15    Q    Do you know whom Officer Carter

16    was speaking to?

17    A    Not at the time.

18    Q    Okay.    That's fine.    Then what

19    happened?

20    A    I couldn't get the lease.    I

21    couldn't -- they wouldn't accept my paperwork,

22    so he said you got five minutes to go or

1    you're going to be locked up for unlawful

2    entry.

3         Q    Okay.

4         A    So --

5         Q    Go ahead.

6         A    -- I said unlawful entry is a --

7    he said yeah.  You're lucky I don't lock you

8    up now.  You're a squatter in these people

9    property illegally.  So I said man, what's a

10   squatter?  So he said I'll tell you what, if

11   you ain't out of here in five minutes, I'm

12   going to lock you up for unlawful entry.  You

13   do know what that is, don't you?  So I said

14   yeah.  So when he said that, I know that

15   statute, so I just said let's go.

16        Q    And that's Officer Carter who said

17   that?

18        A    Yeah.

19        Q    Did Officer Smith ever say

20   anything to you?

21        A    When I'm leaving, I'm trying to

22   get anybody to listen.  I said come on, man,

1          A    I seen him helping to change the

2    locks.

3          Q    Okay.  Mr. Bridgeforth, have you

4    ever provided testimony in a court of law

5    regarding the issue of who changed the locks

6    to 210 20th Street, N.E., on the evening of

7    January 21, 2006?

8          A    I might have.

9          Q    Do you recall being at a hearing

10   on Friday, February 3, 2006, in Superior Court

11   of the District of Columbia in a matter

12   entitled Anthony Bridgeforth vs. Khadijah

13   Bronson, Docket No. C.A. 447-06?

14         A    Yes.

15         Q    Do you recall testifying at that

16   hearing?

17         A    I might -- yes, I do.

18         Q    Okay.  Do you remember testifying

19   to the court, and I quote, this is you

20   speaking to the Judge, "Sir, the night she put

21   me out, she changed the front door's lock."

22              MR. MONTHY:  Object to form, as to

1    what he recalls and whether he was testifying.

2    But go ahead.

3                    BY MS. VALDES:

4        Q    Answer    the    question,    Mr.

5    Bridgeforth.

6        A    I may have said it.

7        Q    Do you recall at the same

8    hearing --

9        A    Can  I  read  that  what  you're

10   reading?

11       Q    Sure.  I'm going to enter it into

12   the record in a minute.  Do you also recall

13   testifying -- do you recall testifying at the

14   same hearing, Friday, February 3, 2006, in the

15   Superior Court of the District of Columbia,

16   Civil Division, and telling the Judge "With

17   the police there, she changed the locks."

18                    MR. MONTHY:  Object to form.  Go

19   ahead.

20                    BY MS. VALDES:

21       Q    You testified?

22       A    She did change them.

1   Q Okay.

2   A She changed the locks several

3 times.  That may not have been that time.  She

4 changed them at least three times.

5   Q Mr. Bridgeforth, how many --

6   MR. MONTHY:  Just answer the

7 question.

8   BY MS. VALDES:

9   Q -- times did she change the locks

10 with the police there?

11   A Twice.

12   Q Twice?  When was the second time?

13   A I don't know the date.

14   Q Okay.  Was it after February 3,

15 2006?

16   A It may have been before.

17   Q Okay.  So you are testifying --

18 you are telling me today that Ms. Bronson

19 changed the locks to the door twice?

20   A Yes.

21   Q With the police there?

22   A Yes.

1              Q      The  first  time  on  January  21,

2       2006.  Is that correct?

3              A      January 20th.

4              Q      The  morning  of  January 21, 2006?

5       Is that correct?

6              A      Yes.

7              Q      Okay.    And  the  second  time  was

8       when?

9              A      Before then.

10             Q      Before then?

11             A      Yes.

12             Q      Okay.    Let  me  show  you  what  has

13      been  marked  as  Exhibit 8,  since  you  want  to

14      look at it.

15                    (Whereupon,    the    document    was

16                    marked    as    Exhibit    8    for

17                    identification.)

18                    BY MS. VALDES:

19             Q      It's  a  copy  of  a  transcript,

20      testimony  you  provided  at  a  hearing.

21             A      Yes.

22             Q      On  Friday,  February  3,  2006,  in

1    front of Judge Robert Moran in the matter of

2    <u>Anthony Bridgeforth vs. Khadijah Bronson</u>,

3    Docket No. C.A. 447-06.  The line that I'm

4    referring to is page 17, line 23.

5             Mr. Bridgeforth: "Sir, the night

6    she put me out, she changed the front door

7    lock."

8             MR.  MONTHY:    Let  the  record

9    reflect that it has been described that this

10   is a transcript.  It's actually just a page

11   and a cover page of a transcript.

12            MS. VALDES:  That's correct.  It's

13   a portion of the transcript.  It's not the

14   entire transcript.

15            MR. MONTHY:  I'm sorry, is there a

16   question?

17            MS. VALDES:  Yes.

18            BY MS. VALDES:

19       Q    The  question  is  do  you  recall

20   testifying in open court that the night she

21   put you out, referring to Ms. Bronson, she

22   changed the front door lock?

1        A     Okay.     Line   23   that   you're

2   referring to?

3        Q     Yes.

4        A     It say Mr. Bridgeforth: "Sir, the

5   night she put me out, she changed the front

6   door lock."

7        Q     Right.

8        A     The front door lock is the front

9   door to the building.

10       Q     Okay.

11       A     I'm talking about my unit.

12       Q     Okay.

13       A     My unit lock.

14       Q     Okay.

15       A     She changed --

16       Q     Well, let me show you No. 9.

17             MR. MONTHY:  Same objection.

18             THE WITNESS:  Okay.

19             BY MS. VALDES:

20       Q     No. 9 I'm refer -- I just handed

21   you what has been marked as Exhibit No. 9.

22       A     Um-hum.

1          (Whereupon, the document was

2          marked as Exhibit 9 for

3          identification.)

4          BY MS. VALDES:

5          Q    It's also a portion of the same

6     transcript, same court proceeding.  Line No.

7     4, Mr. Bridgeforth: "With the police there,

8     when she put me out, she changed the locks."

9          Now, you are referring to locks.

10    What locks were you referring to at the time,

11    Mr. Bridgeforth?

12         A    What line is that?

13         MR. MONTHY:  Object to form.

14         BY MS. VALDES:

15         Q    No. 4 and 5.

16         A    It's three different locks to the

17    -- it's four different locks.  So locks is

18    more than one, it's plural, right?

19         Q    Okay.

20         A    She changed the front door lock,

21    that's the bottom lock and top lock.  The unit

22    door got a bottom lock and top lock.

1       Q       Okay.

2       A       Locks mean more than one.

3       Q       All I'm asking you --

4       A       I'm just clarifying.

5       Q       -- so your testimony is that she

6   changed the locks.  Is that correct?

7       A       Locks.

8       Q       Locks?

9       A       Yes.

10      Q       Okay.  Including the lock to the

11  front door of the unit.  Is that correct?

12      A       Yes.

13      Q       Thank you.  And that was on the

14  early morning hours of January 21, 2006.  Is

15  that correct?  The night that she put you out

16  with the police?

17      A       She changed the locks.

18      Q       Okay.  Thank you very much.

19      A       Can I finish, ma'am?

20      Q       Oh, sure.  In fact, you can have a

21  copy of it when we leave, if you want.  Not

22  the original, but I can make a copy.

1          A     Well, can I look at it while

2    you're going?  I'm just going to review it.

3                MR. MONTHY:  No, just focus on the

4    questions.

5                THE WITNESS:  Okay.

6                BY MS. VALDES:

7          Q     I'll give you a copy of it if you

8    want.

9          A     I've got no problem.

10         Q     Do you want a copy?

11         A     Huh-uh, I'm okay.

12         Q     If you want to take it, there they

13   are.

14         A     Okay.

15         Q     Mr. Bridgeforth, after you made

16   calls to the D.C. -- I believe you said you

17   asked for a D.C. official and you were told

18   you could not get one.  Then you also called

19   6D.  What did you do?

20         A     I went to 6D to get assistance.

21         Q     Okay.  And what happened?

22         A     He was in the process of assisting

1      Q    Mr. Bridgeforth, you filed a

2  lawsuit against Officer Joseph Powell in this

3  matter. When I asked you earlier today what

4  did Officer Joseph Powell do, you indicated

5  that you thought he was the one that stayed

6  behind and not really get that much involved.

7  Is that correct? Do I remember correctly what

8  you testified to?

9      A    I can't remember what he actually

10 did right as of now.

11     Q    Okay.

12     A    I can't. I don't recall.

13     Q    Is there anything that comes to

14 mind when it comes to Officer Powell regarding

15 this incident?

16          MR. MONTHY:    Objection to form.

17 Go ahead.

18          THE WITNESS:    I just know that

19 those was the five officers that told me I had

20 to go with them. That was the voluntary

21 response. He told me I had to go. All five

22 of them did. I don't specifically remember.

# Exhibit 2

I Anthony Bridgeforth

DIDN'T SIGN A LEASE TO

BE IN THIS unit AND I WISH

NOT TO STAY IN unit #4

BECAUSE OF THE LIVING Conditions.

1-11-06
4:50 PM



EXHIBIT

# Exhibit 3

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

\* \* \* \* \* \*

DEPOSITION

\* \* \* \* \* \*

In the Matter of:

ANTHONY BRIDGEFORTH,

      Plaintiff

v.

KHADIJAH BRONSON, et al,

      Defendants

Civil No.
06-CA-002128
(RCL)

Friday,
February 15, 2008

Deposition of:

    R. PAUL McCAULEY, PhD

called for examination by Counsel for the
Defendants, pursuant to notice of deposition,
at 1:00 p.m., in the Office of the Attorney
General for the District of Columbia, Room
6N106, 441 4th Street, N.W., Washington, D.C.
20001, when were present on behalf of the
respective parties:

APPEARANCES:

On behalf of the Plaintiff :

        JEREMY T. MONTHY, ESQ.
of:  Hogan & Hartson
        Columbia Square
        555 13th Street, N.W.
        Washington, D.C. 20004
        (202) 637-5600

On behalf of the Defendants:

        LETICIA L. VALDEZ, ESQ.
        Assistant Attorney General
        Office of the Attorney General
        441  4th Street, N.W.
        Sixth Floor South
        Washington, D.C. 20001
        (202) 442-9845

1          THE WITNESS:  I didn't have it, so

2    the answer --

3          MS. VALDEZ:  You did not have it.

4    And you did not take any of the testimony of

5    the police officers who were at the location

6    that  evening  into  consideration  when  you

7    formulated your opinion; is that correct?

8          THE WITNESS:  That's correct.

9          MS. VALDEZ:  Okay.

10          BY MS. VALDEZ:

11     Q     Do  you  have  any  information,  or

12    did you take any information in consideration

13    in formulating your opinion as to the type of

14    training the police officers in the District

15    of Columbia receive?

16     A     Including the depositions.

17     Q     Anything  that  you  took  into

18    consideration.

19     A     Yes.

20     Q     Okay.  What did you find about the

21    District of Columbia's training, when it comes

22    to the subject of evictions?

1      A      Well, they have a policy document,

2    and the policy document is supposed to serve

3    as the guiding document for training.

4      Q      Okay.

5      A      And they have, on paper, they have

6    roll call training.

7      Q      Okay.

8      A      They have academy training, level

9    7, for recruits, lateral officers.  They have

10   training in evictions on paper for field

11   training officers or master patrolmen, master

12   officers.  And they may include that for some

13   supervisors, typically the sergeant level,

14   depending I think on what the chief decides

15   that year is relevant or important.

16     Q      Okay.

17     A      So that's what they said they have

18   available.

19     Q      Okay.

20     A      The question is did they do it.

21     Q      Okay.

22     A      And the answer is no, they did not

1        Q      Okay.

2        A      Before -- this is a memorandum.

3    This doesn't say --

4        Q      I understand that.  But that

5    memorandum does not say anything about a

6    settlement agreement.  It actually says field

7    training officers course.

8        A      It does.

9        Q      Correct.  And it actually tells

10   you the amount of hours that are going to be

11   spent in each topic; is that correct?

12       A      That's what it says.

13       Q      That's correct.  Is that field

14   training officer course in compliance with the

15   national standard?

16       A      Consistent with accepted police

17   practices; yes.

18       Q      Thank you.  What about the next

19   document?

20       A      Seven.

21       Q      Number seven.

22       A      Lesson plan review sheet.

1      think -- I just want the record to reflect

2      that the pertinent question is whether it's

3      consistent with the standard.

4              MS. VALDEZ:  Correct.

5              MR. MONTHY:  And we're trying to

6      answer it.  I believe that Dr. McCauley is

7      doing his best to answer your questions about

8      all other jurisdictions.  We're seeing

9      objections on the form of those answers.  But

10     to the extent that this line of questioning

11     keeps going about individual jurisdictions,

12     etcetera, there's going to be a point where we

13     will object and try to get the deposition

14     focused on the more pertinent track to the

15     expert opinion certainly.

16             MS. VALDEZ:  Great.  Your

17     objection is noted on the record.

18             BY MS. VALDEZ:

19     Q      Did the District of Columbia

20     violate a national standard of care when it

21     comes to training police officers?

22     A      As a general statement, probably

1    not.

2        Q    Okay.

3        A    As a general statement.

4        Q    Okay.   So the District of

5    Columbia, in its training of police officers,

6    does pretty much what the national standard of

7    care is.

8           MR. MONTHY:  Objection to form.

9           MS. VALDEZ:  Is that correct?

10          THE WITNESS:  As a general

11    statement, in my opinion; yes.

12          MS. VALDEZ:  Okay.

13          BY MS. VALDEZ:

14        Q    What do you mean by "as a general

15    statement?"

16        A    You have a court order about

17    evictions here, that they had to have some

18    kind of training, they had to have a policy,

19    they had to do these kinds of things.  The

20    integrity of the Metropolitan Police is at

21    stake.  Are we going to have a policy?  Yes.

22    They wrote one.  Are we going to train people

# Exhibit 4

1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF COLUMBIA

3    - - - - - - - - - - - - - - x

4    ANTHONY BRIDGEFORTH,              :

5                    Plaintiff,        :

6              vs.                     : Civil Action

7    KHADIJAH BRONSON, et al.,         : No. 06-2128(RCL)

8                    Defendants.       :

9    - - - - - - - - - - - - - - x

10                    Washington, D.C.

11                    Tuesday, February 5, 2008

12          Deposition of Lt. John Michael

13   Hedgecock, a witness herein, called for

14   examination by counsel for Plaintiff in the

15   above-entitled matter, pursuant to notice, the

16   witness being duly sworn by Robert M. Jakupciak, a

17   Notary Public in and for the District of Columbia,

18   taken at the offices of Hogan & Hartson, 555

19   Thirteenth Street, N.W., Washington, D.C., 20004,

20   at 9:00 a.m., on February 5, 2008, and the

21   proceedings being taken down by Stenotype by

22   Robert M. Jakupciak, RPR.

Certified Copy

Washington, DC

Page 2

```
 1    APPEARANCES:

 2    On behalf of the Plaintiff:

 3         JEREMY T. MONTHY, ESQUIRE

 4         Hogan & Hartson

 5         555 Thirteenth Street, N.W.

 6         Washington, D.C., 20004

 7         (202) 637-5553

 8

 9    On behalf of the Defendants:

10         LETICIA VALDES, ESQUIRE

11         Office of the Attorney General

12         One Judiciary Square

13         441 - 4th Street, N.W.

14         Suite 600 South

15         Washington, D.C.  20001

16         (202) 442-9845

17

18

19                   Also Present

20              Teresa E. Brown

21              Kimberly Butler

22
```

Lt. John Michael Hedgecock 30(b)(6)

Washington, DC

1    Unified Communications, which the police

2    department has members assigned to, and the police

3    department refers to it as the Office of Police

4    Communications, the members that are within that

5    unit generate this report.

6        Q    All right.  Now, you don't work for the

7    Office of Unified Communications and I don't want

8    to belabor the individual entries in this event

9    chronology.

10            We took a short break, and I asked you

11    to look through this.  And my question is just,

12    you know, what's your understanding of what

13    happened in layperson's terms so we can talk about

14    those events?

15        A    Okay.  Clearly, it's my understanding

16    that the police were called to 210 20th Street,

17    Northeast, Apartment Number 4.  It's my

18    understanding that they were called subsequent

19    times.

20            Upon reviewing, it's indicated that the

21    complainant states -- this is on page 1.  The

22    complainant identified who used the identifier of

Page 79

1    Mr. Anthony Bridgeforth made a call to the

2    Metropolitan Police Department stating a male and

3    female are banging on his door trying to get into

4    L-O-C, location.  The complainant at 1223 stated

5    they were in the rear of the front of the

6    location, L-O-C, which I'm taking as meaning

7    location.  He further stated he does not know who

8    they are.  That individual identified him as such.

9          In the next incident the complainant,

10   the event comment is the complainant states that

11   she is the building owner.  She states a male is

12   illegally staying inside the location.  This

13   incident began at 1524 hours it appears on January

14   20th, '06.

15         MS. VALDES:  Lieutenant, can you

16   identify by the case number or event number when

17   you speak about them so we can keep the record

18   clear?

19         THE WITNESS:  Sure.  This is event

20   number, the last four of it are 5015.

21         MS. VALDES:  Okay.

22      A    This further -- further describes the

Lt. John Michael Hedgecock 30(b)(6)

Washington, DC

Page 80

1    events as reported that there is more of the --

2    the complainant states she is at the location with

3    all the proper paperwork.

4        Q    What page are you referring to?

5        A    I'm on page 1 of 5015, the event number

6    listed at the top.

7        Q    Page 1?

8        A    The event is the last four, 5015.

9    Further on 5015 some of the transmissions are

10   broken or not complete, so it would be hard to

11   testify -- I can testify to what is stated.

12   Further down the page at 1547 landlord is

13   threatening to throw items out of the apartment.

14        1547 states:  Responding early today,

15   landlord had a male to kick, kick his door down.

16   Again it appears, 5016, 1524, this is a

17   continuation.  Last four, 5228 the event number; I

18   can testify to the burglary 2 in progress.  This

19   is at 1736 hours on January 20th, '06.  It appears

20   the police were called to this location many a

21   time.

22        Second party called, black female, brown

Lt. John Michael Hedgecock 30(b)(6)

Washington, DC

1    shirt, blue, breaking into front door of apartment

2    like she is wife.  Ms. Getter in route to

3    location.

4              Second call from complainant states his

5    wife is on the scene.  This is in reference to CCN

6    Number 008952.  008952 is Exhibit DC3.

7              This call at 1744 hours is indicating

8    it's a burglary 2 in progress.  Complainant states

9    he talked to Srgt. Robinson one day earlier and

10   was told he does not have to be at the scene.  He

11   does not have to be at the scene.  It is my

12   interpretation, the City's interpretation that

13   this individual was not at the location when this

14   call was made, and knowledge of that.  So

15   apparently this call was made with the complaining

16   person not even there.  Okay.

17             I did have knowledge of that, that he

18   made calls and wasn't even there.  Why would you

19   call -- how -- 5322 -- bear with me.  I'm scanning

20   this.

21        Q    Please.  Yeah.  Yes.

22        A    The unit is requesting need official to

Lt. John Michael Hedgecock 30(b)(6)

Washington, DC

Page 82

1    respond to locations referenced to dispute.

2    Officers on the scene.  The official can see

3    complainant's wife, who gave the identifier

4    Yolonda Getter, George Edward, time, Edward

5    Robert.  On the scene.  Complainant is en route.

6    Again it would appear the complainant is not on

7    the scene of this again.

8            My question is -- not my question.  It

9    is evident from these he was not on the scene, and

10   he is making the calls to the police department?

11   Based upon these event chronologies that's what

12   it's indicating, my interpretation.

13           I'm now referring to 5691 in the event

14   number.  This is just more of what appears to be

15   computer marks of indicating the beat, the area.

16       Q    Can you elaborate on that?

17       A    It's -- I'm testifying on behalf of the

18   City, I would have to indicate that this would be

19   just a, the -- the computer-generated responses,

20   identifying the beat 103; that refers to the

21   patrol service area; the priority of the call,

22   three.  And again that would be the procedures

Lt. John Michael Hedgecock 30(b)(6)

Washington, DC

Page 83

1    that the Office of Police Communications has for

2    their computer-aided dispatch system.  There is

3    nothing that's identifiable in that.

4         5696.  Okay.  Event created January

5    20th, 2006, 2047 hours and 12 seconds.  Burglary

6    1.  It's identified as being in progress.  Wow.

7    Event comment:  Caller's name; Anthony

8    Bridgeforth.  Caller is in a bedroom closet.

9    Caller will throw the keys out the window.  TRC is

10   still on phone with caller.  Please send official

11   to respond to the above location.  Police are on

12   the scene.

13        I'm going to the next page.  Burglary 1

14   event closed.  That's all it says on the last

15   line.  6073, January 20th, '06 again.  This time

16   it's 2328, 11:28 p.m.  Event; comment:  Reference

17   a squatter in the apartment unit, per cruiser CR,

18   referring to cruiser 125.  Call source officer.

19   Event comment:  Subject is known to smoke PCP.

20        Q    Can you go back for one second?  When

21   you say call source officer, where do you see

22   that?

# Exhibit 5

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

ANTHONY BRIDGEFORTH,               *

          Plaintiff,               *

                                   *

     vs.                           *    CASE NO.:

                                   *    06-2128 (RLC)

KHADIJAH BRONSON, et al.,          *

          Defendants.              *

* * * * * * * * * * * * * * * * * * * * * * * *

          The deposition of KHADIJAH BRONSON was

taken on Tuesday , November 6, 2007, commencing

at 10:23 a.m. at Hogan & Hartson, LLP, 555 13th

Street, N.W., Washington, D.C. 20004, before

Deborah A. Gurley, Registered Professional

Reporter, Notary Public for the District of

Columbia, when were present on behalf of the

respective parties:

* * * * * * * * * * * * * * * * * * * * * * * *

Reported by:

          Deborah A. Gurley, Court Reporter

COPY

Page 2

```
 1    APPEARANCES:

 2


 3         For the Plaintiff:

 4         JEREMY MONTHY, ESQ.

 5         Hogan & Hartson, LLP

 6         555 13th Street, N.W.

 7         Washington, D.C. 20004

 8         202.637.5600 (Voice)

 9         202.637.5910 (Fax)

10

11         For Defendant Bronson:

12         DARRYL F. WHITE, ESQ.

13         Law Offices of Darryl F. White

14         4308 Georgia Avenue, N.W.

15         Washington, D.C. 20011

16         202.882.4880 (Voice)

17

18

19

20

21
```

Page 3

```
 1    APPEARANCES (Continued):

 2

 3         For Defendant The District of Columbia

 4         LETITIA VALDES, ESQ.

 5         Office of the Attorney General

 6         For the District of Columbia

 7         441 4th Street, N.W.

 8         Suite 600 South

 9         Washington, D.C. 20001

10         202.442.9845 (Voice)

11         202.727.3625 (Fax)

12

13    ALSO PRESENT:  Eric Glover, Esquire

14                   Anthony Bridgeforth

15

16

17

18

19

20

21
```

Page 151

1        Q.    Do you remember what time the police

2    arrived?

3        A.    No.

4        Q.    So what did they say when they arrived?

5        A.    They asked me, I guess they asked me what

6    was going -- I don't remember the conversation

7    verbatim what was said, but it had to be something

8    to the degree where I told them that he was in the

9    unit and he wasn't supposed to be there.  You know,

10   he broke into the unit.  I was out of town, I came

11   back, he's there, and, you know, he's not supposed

12   to be there.

13       Q.    And did Mr. Bridgeforth speak to the

14   police officers also?

15       A.    I'm sure he did.  Yeah.  I'm sure he did.

16   Yeah.  He came outside.  Everything took place

17   outside so I think they like walked up the street or

18   something.

19       Q.    Were you near Mr. Bridgeforth when he

20   spoke to the police officers?

21       A.    No.

1           THE WITNESS:  I don't know.

2   BY MR. MONTHY:

3       Q.    How many people did you speak to before

4   you spoke to the captain, if you remember?

5           MS. VALDES:  Objection as to form.

6       Objection as compound.

7           MR. MONTHY:  I don't believe it is

8       compound.

9           MR. WHITE:  Go ahead and answer if you

10      can.

11          THE WITNESS:  I don't remember how many

12      people I spoke to before I spoke to the

13      captain.

14  BY MR. MONTHY:

15      Q.    Why don't you tell me what you remember

16  about what steps you took to speak to the captain?

17      A.    All I know is I spoke to him.  I don't

18  know what steps, how I got to him.  I don't know who

19  told me what.  I don't know any of that.  All I know

20  is the conversation, part of the conversation we had

21  and that was just me telling him about the

1    situation.  I don't know at what point who referred

2    or what position.  Maybe I came up with the position

3    myself, you know, somebody tired of going through

4    dealing with people who don't really know too much.

5    I want to deal with somebody who would better know

6    or better understand.  So I don't even know if

7    somebody even actually told me to deal with

8    somebody.  In life that's how I deal with things.  I

9    deal with people at a higher authority.  That way

10   you get some results.

11        Q.    And so you said that you remember telling

12   him the situation, right?

13        A.    Yeah.

14        Q.    What did you tell him?

15        A.    That I had somebody in there who was

16   supposed to be a tenant.  They don't want to live in

17   the unit.  I was away.  When I came back he was in

18   the unit illegally.  He wasn't supposed to be there.

19   I had documents showing that he wasn't supposed to

20   be there.  And basically he was there unlawfully.

21        Q.    And when refer to documents are you

# Exhibit 6

Page 1

IN THE UNITED STATES DISTRICT COURT FOR

DISTRICT OF COLUMBIA


ANTHONY BRIDGEFORTH,                    *

      Plaintiff,                        *

                              *

      vs.                               * Case No.:

                              * 06-2128 (RLC)

KHADIJAH BRONSON, et al.,               *

      Defendants.                       *

   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *


      The deposition of CAPTAIN RALPH McLEAN

was taken on Tuesday, November 27, 2007,

commencing at 12:15 p.m. at 555 Thirteenth Street,

N.W., Washington, D.C., 20004, before Nancy P.

Richmond, Registered Professional Reporter, Notary

Public for the District of Columbia, when were

present on behalf of the respective parties:


COPY

1    APPEARANCES:

2

3        For the Plaintiff:

4    M. SCOTT STEVENS, ESQUIRE

5    HOGAN & HARTSON, L.L.P.

6    555 Thirteenth Street, N.W.

7    Washington, D.C. 20004

8    (202) 637-5600

9

10       For the Defendant, BRONSON:

11   DARRYL F. WHITE, ESQUIRE

12   LAW OFFICES OF DARRYL F. WHITE

13   4308 Georgia Avenue, N.W.

14   Washington, D.C. 20011

15   (202) 882-4880

16

17

18

19

20

21

Page 3

1   APPEARANCES (Continued):

2

3        For the Defendant, The District of Columbia:

4        LETICIA VALDES, ESQUIRE

5        OFFICE OF THE ATTORNEY GENERAL

6        FOR THE DISTRICT OF COLUMBIA

7        441 4th Street, N.W.

8        Suite 600 South

9        Washington, D.C. 20001

10       (202) 442-9845

11

12

13

14

15

16

17

18

19

20

21

Page 27

1    everybody else combined.

2        Q.    Okay.  You understand that 210 20th

3    Street is in PSA 103?

4        A.    I couldn't tell you if it was PSA 103

5    back then, because we've -- they redesigned the

6    PSA's a couple years ago.  But it's in the

7    confines of the First District.

8        Q.    Okay.  Regarding the events that took

9    place at 210 20th Street on the night of January

10   20th, 2006, did you actually personally go to the

11   scene?

12       A.    No.

13       Q.    Have you ever been to 210 20th Street,

14   N.E.?

15       A.    Not to my recollection.

16       Q.    Since we're on to these events already,

17   could you walk me through your understanding of

18   what took place at 210 20th Street, N.E., on the

19   night of January 20th, 2006?

20       A.    I recall being in the office and the

21   phone ringing.  And I don't know why I remember

Page 28

1   this, but I picked up.   I was walking somewhere,

2   and I actually picked up the phone on Captain

3   Angel Medina's desk, because that's the phone

4   closest to the door.

5           And I was confronted by a very angry

6   woman, whose name I cannot recall.   It is --

7       Q.   Perhaps Ms. Bronson?

8       A.   Bronson, thank you.   I almost had it.

9   It was right on the tip of my tongue.

10          Ms. Bronson was extremely angry and said

11  the police had been there several times and hadn't

12  done anything.

13          She explained the circumstances to me,

14  and my impression, from speaking with her, was

15  that an individual had moved into one of her

16  apartments, an individual that had looked at the

17  apartment.

18          And there was initially some Section

19  Eight paperwork being done, but that while she

20  was out -- the gentleman had stated he didn't want

21  the apartment.   And while she was out of town, I

Page 29

1    think -- I forget her reason for being out of

2    town, but for some reason I think it was in the

3    Carolinas.

4           And when she came back, this guy had

5    moved into the apartment, and he was there without

6    her permission.

7       Q.   Okay.  First off, how did she get

8    through to that phone that you picked up?  I'm

9    assuming that that's not the phonecall that most

10   people get to the police department?

11          MS. VALDES:  Objection, calls for

12          speculation.  I'm not sure that he would know

13          that.

14          MR. WHITE:  Objection.

15      A.   I'm not -- I don't -- I don't know that.

16   At this time, I don't know.  I may have known that

17   night, but I don't recall now.

18      Q.   I'm curious to know, is this like

19   comparable to your direct line?  I understand that

20   you said that you picked it off someone else's

21   desk.

Page 39

1  officers had been to this location through other

2  channels?

3        MS. VALDES:  Objection as to form,

4        compound.

5        A.   It's the first I recall hearing about

6  it.

7        Q.   Okay.  And how many times did you say

8  you spoke with her throughout that evening,

9  through the night?

10        MS. VALDES:  Objection, asked and

11        answered.  You can go ahead and answer.

12        A.   I think it was three or four.

13        Q.   And do you remember approximately what

14  time you left the office?

15        A.   I thought that I left the office around

16  11:00 and got the last phonecall about him at

17  11:30.

18        Q.   That was on your cell phone?

19        A.   Yeah.  That was on my personal cell

20  phone.  But looking at my time and attendance for

21  this, which I did recently, I think on the Friday

Page 40

1  night, which was the 20th, I was there until 2:30

2  or 3:30 in the morning.

3          And then on Saturday night, Saturday

4  night was the night I left early.  I left about --

5  I left about 11:15.  Because I remember getting

6  the call right after I had gotten off of

7  Kenilworth Avenue onto 50.  I live out in

8  Maryland.  I go out 50 to go home.

9          I remember getting the call while I was

10  on 50, going out, going home.  But I was thinking

11  it was 11:30.  But I might be -- you know, it was

12  so long ago, I might just be getting the dates

13  mixed up.

14          And I'm wondering if this didn't

15  actually encompass two days, because I was

16  thinking this all happened on a Saturday, but the

17  20th is a Friday.  And I'm wondering if -- I'm

18  wondering if this didn't go on for more than the

19  one day.

20          But my recollection was that I was on my

21  way home when they said, "We're here.  She's got

Page 41

1   this paper that says he's turning down the

2   apartment.  He's not supposed to be in there."

3          Also, he was -- I think she'd reported

4   to me that he was a locksmith or had access to a

5   locksmith and that he had -- that's how he had

6   gotten into the apartment.

7          Because, at first, I wasn't clear on how

8   he had gotten in there.  She swore she hadn't

9   given him a key.  She's the property owner.  You

10  know, I lent some credence to her statements,

11  because she had a vested interest in the property

12  and who's in there.

13         And my point of view was that, he had

14  looked at it.  There was a disagreement, where he

15  decided he didn't want the apartment.  She had

16  gone away, and he had moved in there, anyway,

17  which in my eyes made him a squatter and

18  established no landlord and tenant relationship.

19         So I treated it as if he was a squatter.

20  Q.   Did you review any of either party's

21  paperwork before you made the decision to tell the

# Exhibit 7

Page 1

# IN THE UNITED STATES DISTRICT COURT FOR

## DISTRICT OF COLUMBIA

ANTHONY BRIDGEFORTH,            *

      Plaintiff,            *

                     *

      vs.            * Case No.:

                     * 06-2128 (RLC)

KHADIJAH BRONSON, et al.,            *

      Defendants.            *

* * * * * * * * * * * * * * * * * * * * * * * *


      The deposition of OFFICER JAMES CARTER
was taken on Thursday, November 29, 2007,
commencing at 2:06 p.m. at 555 Thirteenth Street,
N.W., Washington, D.C., 20004, before Nancy P.
Richmond, Registered Professional Reporter, Notary
Public for the District of Columbia, when were
present on behalf of the respective parties:



Page 2

1    APPEARANCES:

2

3        For the Plaintiff:

4        M. SCOTT STEVENS, ESQUIRE

5        HOGAN & HARTSON, LLP

6        555 Thirteenth Street, N.W.

7        Washington, D.C. 20004

8        (202) 637-5600

9

10

11        For the Defendant, The District of Columbia:

12        LETICIA VALDES, ESQUIRE

13        OFFICE OF THE ATTORNEY GENERAL

14        FOR THE DISTRICT OF COLUMBIA

15        441 4th Street, N.W., Suite 600 South

16        Washington, D.C. 20001

17        (202) 442-9845

18

19

20

21

Page 32

1        A.    Maybe five, ten minutes.

2        Q.    Okay.  Did you actually go inside the

3    apartment unit?

4        A.    In the -- the door opened, in the mouth

5    of the apartment.

6        Q.    Just in the threshold there?

7        A.    (Nods head.)

8        Q.    And how long were you there?

9        A.    Maybe five to ten minutes.

10       Q.    And why were you there?

11       A.    Just to keep the peace between the two

12   parties.

13       Q.    What was Mr. Bridgeforth doing at the

14   time?

15       A.    I believe he gathered a couple of bags

16   of clothes and some things, and he left.

17       Q.    And at that point in time, he was in the

18   process of gathering his belongings?

19       A.    He gathered -- it wasn't much in there.

20   He just gathered a few things and left.  I want to

21   say it was a bag of clothes or two.

# Exhibit 8

IN THE UNITED STATES DISTRICT COURT FOR

DISTRICT OF COLUMBIA


ANTHONY BRIDGEFORTH,              *

　　　　Plaintiff,              *

　　　　　　　　　　　　　　*

　　vs.                    * Case No.:

　　　　　　　　　　　　　　* 06-2128 (RLC)

KHADIJAH BRONSON, et al.,        *

　　　　Defendants.            *

* * * * * * * * * * * * * * * * * * * * * * *


　　　　The deposition of OFFICER DAVID SMITH

was taken on Thursday, November 29, 2007,

commencing at 10:15 a.m. at 555 Thirteenth Street,

N.W., Washington, D.C., 20004, before Nancy P.

Richmond, Registered Professional Reporter, Notary

Public for the District of Columbia, when were

present on behalf of the respective parties:

Page 2

```
 1   APPEARANCES:

 2


 3        For the Plaintiff:

 4        M. SCOTT STEVENS, ESQUIRE

 5        HOGAN & HARTSON, LLP

 6        555 Thirteenth Street, N.W.

 7        Washington, D.C. 20004

 8        (202) 637-5600

 9

10


11        For the Defendant, The District of Columbia:

12        LETICIA VALDES, ESQUIRE

13        OFFICE OF THE ATTORNEY GENERAL

14        FOR THE DISTRICT OF COLUMBIA

15        441 4th Street, N.W., Suite 600 South

16        Washington, D.C. 20001

17        (202) 442-9845

18

19

20

21
```

Page 27

1      Q.    And who asked him to leave?

2      A.    I don't recall, sir.

3      Q.    But was it a police officer?

4      A.    As far as I know, yes, sir.

5      Q.    Okay.  And did that occur inside the

6  premises?

7      A.    I don't recall.

8      Q.    All right.  You said that you were

9  inside just for a short, few minutes?

10     A.    That's correct.

11     Q.    What was going on during those short,

12  few minutes?

13     A.    To the best of my recollection, several

14  officers were inside, and his girlfriend was

15  causing a commotion inside.  So my presence in the

16  threshold was simply to provide backup.

17     Q.    Do you recall whether this was after he

18  was asked to leave?

19     A.    I don't recall, sir.

20     Q.    Was he collecting his belongings?

21     A.    I don't -- I was standing at the

# Exhibit 9

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

- - - - - - - - - - - - - - - x
                        :

ANTHONY BRIDGEFORTH,       :     Docket Number: CA447-06
                        :

      Plaintiff,       :

      vs.              :

KHADIJAH BRONSON,        :

      Defendant.      :
                        :    Friday, February 3, 2006
- - - - - - - - - - - - - - - x  Washington, D.C.

        The above-entitled action came on for a hearing
before the Honorable ROBERT MORIN, Associate Judge, in
Courtroom Number 517, commencing at 11:28 a.m.

            APPEARANCES:

            On Behalf of the Plaintiff:

            PRO SE

            On Behalf of the Defendant:

            PRO SE

                             06-01570

**Deposition Services, Inc.**
6245 Executive Boulevard
Rockville, MD 20852
Tel: (301) 881-3344  Fax: (301) 881-3338
info@DepositionServices.com  www.DepositionServices.com

rb

1    courtroom?

2         THE COURT:  Do you have a witness?

3         MR. BRIDGEFORTH:  I have one, she just arrived.

4         THE COURT:  She should be outside the courtroom.

5    Do you have your original keys to the apartment?

6         MR. BRIDGEFORTH:  Yes, they're right here in my

7    pocket.

8         THE COURT:  Okay, let me just take a look at

9    them.  Ma'am, have you seen those keys before?

10        MS. BRONSON:  He doesn't have the keys.  If I

11   could call one of my tenants right now they could tell you

12   that the door, the front door locks, there is no door

13   lock.  I call them right now and he could tell you there

14   is no front door lock, because they keep calling me to fix

15   it.

16        THE COURT:  Right, no, I'm talking about, what

17   about his apartment key?

18        MS. BRONSON:  Oh, he changed the locks.  I don't

19   know what he has.

20        THE COURT:  He's saying those are the original

21   keys.  Do you have your car keys, sir?

22        MS. BRONSON:  He's saying a whole lot of things.

23        MR. BRIDGEFORTH:  Sir, the night she put me out

24   she changed the front door lock.

25        THE COURT:  So that's the front door?

rb

1   back on the door because she didn't give me a key when I

2   served her the court order.  I never got the keys.

3            THE COURT:  Did you change the new --

4            MR. BRIDGEFORTH:  With the police there when she

5   put me out, she changed the locks.

6            THE COURT:  Well, it doesn't sound right to me.

7            MR. BRIDGEFORTH:  When she put me out --

8            MS. BRONSON:  This whole thing is not --

9            THE COURT:  Okay, ma'am, I need one person.

10           MR. BRIDGEFORTH:  When the police came at 11:30,

11  told us to leave.  They made us leave.  We surrendered our

12  key.  She changed the top lock to the apartment.

13           THE COURT:  Right.

14           MR. BRIDGEFORTH:  Then she changed the top lock

15  to the door downstairs.

16           THE COURT:  Right.

17           MR. BRIDGEFORTH:  So once I got into the unit, I

18  put the regular lock back on the door to the apartment

19  unit.  I never got a key to the bottom door downstairs to

20  get in the building, so they kept locking me out, and I

21  couldn't get in.  So, you know, I called kept trying to

22  get help.  They said, why don't you just take the lock off

23  and just put it back on.  That's what I did.  That's why

24  the lock's off the front door, because when she changed it

25  I never got the key.  That key right there is when I first

21