**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                          )
Anthony Bridgeforth,                      )
                                          )
                   Plaintiff,             )
                                          )
            v.                            )      Civil Action No. 06-2128 (RCL)
                                          )
Khadijah Bronson, <u>et</u> <u>al</u>.,                 )
                                          )
                   Defendants.            )
_____ )

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>**

Adam K. Levin
Jeremy T. Monthy
HOGAN & HARTSON LLP
555 Thirteenth Street, N.W.
Washington, D.C.  20004–1109
Telephone: (202) 637–5600
Facsimile:  (202) 637–5910

Attorneys for Plaintiff Anthony Bridgeforth

April 7, 2008

# TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................................1

UNDISPUTED FACTS ...........................................................................................3

    A.      Rental and Possession of Apartment Unit at 210 20th Street, N.E..........3

    B.      Ms. Bronson's Self-Help Eviction Efforts................................................5

    C.      District Law and Policy Against Self-help Evictions ..............................7

          1.     The McMillian Case .......................................................................7

          2.     Mandatory MPD Training Procedures ............................................8

    D.      Eviction by District Police Officers........................................................9

    E.      Procedural History .................................................................................11

ARGUMENT .........................................................................................................12

I.     DEFENDANT BRONSON IS LIABLE FOR WRONGFUL EVICTION
      AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS. ..............13

    A.      Ms. Bronson's Own Admissions Prove That She Wrongfully
          Evicted Mr. Bridgeforth..........................................................................14

    B.      Intentional Infliction of Emotional Distress ...........................................17

II.    THE INDIVIDUAL DEFENDANT OFFICERS KNOWINGLY
      VIOLATED DISTRICT POLICY AND MR. BRIDGEFORTH'S
      CONSTITUTIONAL RIGHTS. ......................................................................19

III.   THE DISTRICT OF COLUMBIA HAS MUNICIPAL LIABILITY FOR
      THE ADMITTEDLY WRONGFUL ACTIONS OF ITS POLICE
      OFFICERS.......................................................................................................24

    A.      Failure to train........................................................................................24

    B.      Failure to supervise.................................................................................28

    C.      Unlawful policymaking ..........................................................................31

REQUEST FOR ORAL ARGUMENT ..................................................................32

CONCLUSION.......................................................................................................33

\\\DC - 090334/010285 - 2708799 V1

# TABLE OF AUTHORITIES

**Federal Cases:**                                                                          Page

Abbott v. Latshaw, 164 F.3d 141 (3d Cir. 1998)...................................................... 21

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).............................................. 12

Baker v. Washington, 448 F.2d 1200 (D.C. Cir. 1971) ............................................. 24

Best v. District of Columbia, 743 F.Supp. 44 (D.D.C.1990)...................................... 24

Bd. of County Commissioners of Bryan County v. Brown, 520 U.S. 397 (1997) .... 25

Carter v. District of Columbia, 795 F.2d 116 (D.C.Cir.1986)................................... 24

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ......................................................... 12

City of Canton, Ohio v. Harris, 489 U.S. 378 (1989) ................................... 24, 25, 26

City of St. Louis v. Praprotnik, 485 U.S. 112 (1988) ............................................... 31

Collum v. Incorp. Village of Freeport, 691 F. Supp. 637
    (E.D.N.Y. 1998)..................................................................................................... 21

Commodity Futures Trading Comm'n v. Bd. of Trade, 701 F.2d 653
    (7th Cir.1983)......................................................................................................... 17

Cmty. Nutrition Inst. v. Block, 749 F.2d 50 (D.C.Cir.1984)..................................... 17

Cox v. District of Columbia, 821 F. Supp. 1 (D.D.C. 1993) ..................................... 29

Daskalea v. District of Columbia, 227 F.3d 433 (D.C.Cir.2000) ............................. 25

Elgin v. District of Columbia, 122 A.2d 765 (D.C. Cir. 1964) ................................. 24

Fiacco v. City of Rensselaer, 783 F.2d 319 (2d Cir. 1986) ....................................... 29

Gjertsen v. Board of Election, 751 F.2d 199 (7th Cir.1984) ..................................... 17

Green v. Francis, 705 F.2d 846, 850 (6th Cir. 1983)................................................. 14

Hawksbill Sea Turtle v. FEMA, 126 F.3d 461 (3d Cir.1997) ................................... 17

Holcomb v. Powell, 433 F.3d 889 (D.C.Cir.2006)..................................................... 12

Howerton v. Gabica, 708 F.2d 380 (9th Cir. 1983).................................................... 14

Insurance Group Committee v. Denver & R.G.W.R. Co., 329 U.S. 607 (1947)....... 17

Jeffries v. Georgia Residential Finance Authority, 678 F.2d 919
    (11th Cir. 1982)...................................................................................................... 14

Katz v. United States, 389 U.S. 347 (1967)................................................................ 20

LaChance v. Erickson, 522 U.S. 262 (1998) ............................................................. 21

Lugar v. Edmondson Oil Co., 457 U.S. 922 (1982) .................................................. 19

**Federal Cases (cont'd):**                                                  Page

Messinger v. Anderson, 225 U.S. 436 (1912) ............................................................   17

Monell v. Dep't of Soc. Servs. of the City of New York, 436 U.S. 658 (1978)........   24

Parker v. District of Columbia, 850 F.2d 708 (D.C. Cir. 1988) ...............................   24, 28

Reitz v. County of Bucks, 125 F.3d 139 (3d Cir. 1997)............................................   25

Silverman v. United States, 365 U.S. 505 (1961)......................................................   20

Soldal v. Cook County, 506 U.S. 56 (1992) ...............................................   19, 20, 22

Swann v. Gastonia Housing Authority, 675 F.2d 1342 (4th Cir. 1982) ...................   14

Thomas v. Johnson, 295 F. Supp. 1025 (D.D.C. 1968)............................................   28

United States v. Jacobsen, 466 U.S. 109 (1984)......................................................   19

United States v. Mendenhall, 446 U.S. 544 (1980) ..................................................   20

United States v. Price, 383 U.S. 787 (1966) ............................................................   19

Univ. of Texas v. Camenisch, 451 U.S. 390 (1981) .................................................   17

West v. Atkins, 487 U.S. 42 (1988)...........................................................................   19


**Local Cases:**

Beall v. Everson, 34 A.2d 41 (D.C. 1943)................................................................   22

Davis v. Moore, 772 A.2d 204 (D.C. 2001) .............................................................    1

Eric T. v. National Med. Enters., 700 A.2d 749 (D.C. 1997)....................................   22

Gross v. District of Columbia, 734 A.2d 1077 (D.C. 1999)......................................   26

Hinton v. Sealander Brokerage Co., 917 A.2d 95 (D.C. 2007) ................................   14

Johnson v. Capital City Mortg. Corp., 723 A.2d 852 (D.C. 1999)...........................   17

Johnson v. Fairfax Village Condominium IV Unit Owners Ass'n, 641 A.2d 495
    (D.C.1994) .........................................................................................................   17

Karr v. C. Dudley Brown & Assocs., Inc., 567 A.2d 1306 (D.C.1989) ...................   17

Kingman Park Civic Ass'n v. Williams, 924 A.2d 979 (D.C. 2007)........................   16

Kritsidimas v. Sheskin, 411 A.2d 370 (D.C.1980) ...................................................   17

Larijani v. Georgetown Univ., 791 A.2d 41 (D.C. 2002)..........................................   17

Luskey v. Borger Management Inc., 917 A.2d 631 (D.C. 2007)...............................   14

Major v. Inner City Prop. Mgmt., Inc., 653 A.2d 379 (D.C. 1995).........................   16

McMillian v. Davis, Civil Action No. 98-7746 (D.C. Super.) .....................   1, 7, 8, 26, 29

Mendes v. Johnson, 389 A.2d 781 (D.C. 1978)................................   1, 14, 16, 21, 23

\\\DC - 090334/010285 - 2708799 V1

**Local Cases (cont'd):**                                                                   Page

Oliver v. Mustafa, 929 A.2d 873, 876 (D.C. 2007) ......................................    18

Offutt v. United States, 534 A.2d 936 (D.C. 1987) ......................................    22

Parker v. Stein, 557 A.2d 1319 (D.C. 1989)..............................................    19

Robinson v. Sarisky, 535 A.2d 901 (D.C. 1988) .........................................    19

**Rules and Statutes:**

U.S. Const. Fourth Amendment......................................................    19, 20, 22

U.S. Const. Fifth Amendment.......................................................    19, 21, 22

42 U.S.C. § 1983 ......................................................................    passim

Housing Act of 1937 § 8 ...........................................................    14

D.C. Code § 42-3808 ...............................................................    15, 22

Fed. R. Civ. P. 56....................................................................    12

**Other Sources:**

Restatement (Second) of Torts (1965) ......................................................    18

"Eviction Case a Milestone," Wash. Post (Jan. 31, 2001)........................................    8

"The Metropolitan Police Department does not participate in self-help evictions.  * * *
[O]fficers are instructed that they are not to become involved in
apparent landlord-tenant disputes."
*MPD Circular 01-03 entitled "Landlord Self-help Evictions", dated Feb. 28, 2001*

"I understand it to be a landlord/tenant dispute."
*Deposition of Officer James Carter, officer-in-charge of incident scene*

"[W]e're here because Mr. Bridgeforth was asked [by the MPD] to leave his apartment,
and it was not the proper thing to do . . . ."
*Deposition of Sgt. Jeffrey McGunagal, supervising officer of PSA 103 at time of incident*

## INTRODUCTION

This is a lawsuit for wrongful eviction, intentional infliction of emotional distress, and civil rights violations under 42 U.S.C. § 1983.  Plaintiff Anthony Bridgeforth contends that his landlord, defendant Khadijah Bronson, with the assistance of Officer James Carter, Officer Jose Acosta, Officer David Smith, Officer Joseph Powell, Officer Darrell Johnson, Captain Ralph W. McLean, and other possible unknown police officers, illegally, unconstitutionally, and maliciously evicted Mr. Bridgeforth from his rental home at 210 20th Street, N.E., in Washington, D.C.  What makes this lawsuit unique is that all parties agree that what happened here—eviction at the hands of a landlord and active police officers without legal process—is wrong.  Well-settled District law requires landlords like Ms. Bronson to utilize the legal process provided by Landlord and Tenant Court and the U.S. Marshals Service in order to evict tenants. See Mendes v. Johnson, 389 A.2d 781, 783–87 (D.C. 1978) (en banc), overruled in separate part by Davis v. Moore, 772 A.2d 204, 209 (D.C. 2001) (en banc).  And the MPD expressly adopted this law in response to a self-help eviction lawsuit entitled McMillian v. Davis, Civil Action No. 98-7746 (D.C. Super.), in which a District jury awarded $330,000 against a landlord who had conspired with several uniformed MPD officers to effect a wrongful eviction.

Even though this case mirrors <u>McMillian</u> in all important respects, Defendants have litigated this case aggressively hoping for a different result. The undisputed facts adduced in discovery show that this hope is in vain. On January 20, 2007, Ms. Bronson decided to evict Mr. Bridgeforth from one of her apartments. When attempting to break in herself did not work, she tried to utilize MPD officers acting under the color of law. After four separate waves of officers responded to 210 20th Street, N.E. only to depart the apparent landlord-tenant dispute without taking action, Ms. Bronson eventually found a sympathetic ear in Captain McLean. Captain McLean was not at the scene, did not review any paperwork, and did not even speak to Mr. Bridgeforth; nonetheless, he concluded that no landlord-tenant relationship existed, and he ordered MPD personnel to tell Mr. Bridgeforth that if he didn't leave his apartment then he would be placed under arrest. The officer in charge of the scene, Officer Carter, knew at the time that the dispute was landlord-tenant in nature, but he carried out Captain McLean's directive, loomed over Mr. Bridgeforth when he collected his belongings inside his apartment, and stayed on the property when the locks to Mr. Bridgeforth's apartment were changed. The other police officers on the scene also participated to varying degrees despite the fact that each and every one of them knew, or should have known, better.

Surprisingly, Defendants raise no material factual dispute and offer no legitimate excuse for their actions. This case really is as simple as it appears; Ms. Bronson and the MPD defendants worked together to evict Mr. Bridgeforth in breach of District of Columbia law and in violation of the Fourth and Fifth Amendments to the U.S. Constitution as remedied by 42 U.S.C. § 1983.

## UNDISPUTED FACTS

Plaintiff Anthony Bridgeforth is a resident of the District of Columbia enrolled in Section 8 Tenant-Based Assistance as part of the Housing Choice Voucher Program. 1/ Defendant Khadijah Bronson is the landlord and lessor of 210 20th Street, N.E. 2/  This case arises out of Mr. Bridgeforth's eviction from 210 20th Street, N.E. on January 20–21, 2006. Defendants James Carter, Jose Acosta, David Smith, Joseph Powell, and Darrelle Johnson are, and were during the relevant time period, police officers with the D.C. Metropolitan Police Department ("MPD") dispatched to 210 20th Street, N.E. 3/  At the relevant time, defendant Ralph W. McLean was an MPD Captain serving as the "watch commander" responsible for all police activity in the MPD First District, including the actions of the officers on the scene of the incident. 4/

**A.        Rental and Possession of Apartment Unit at 210 20th Street, N.E.**

In November 2005, Mr. Bridgeforth noticed an advertisement at the District of Columbia Housing Authority ("DCHA") for Section 8 units available for rent.  Bridgeforth Dep. at 88:15 – 91:7.  Mr. Bridgeforth called the number indicated on the ad and spoke with Ms.

---

1/        Deposition of Anthony Bridgeforth, taken Dec. 6, 2007, excerpts of which are attached hereto as Exhibit 1 ("Bridgeforth Dep."), at 84:15–19.

2/        Deposition of Khadijah Bronson, taken Nov. 6, 2007, excerpts of which are attached hereto as Exhibit 2 ("Bronson Dep."), at 11:18 – 12:2.

3/        Deposition of James Carter, taken Nov. 29, 2007, excerpts of which are attached hereto as Exhibit 4 ("Carter Dep."), at 9:4–10; Deposition of Jose Acosta, taken Nov. 28, 2007, excerpts of which are attached hereto as Exhibit 3 ("Acosta Dep."), at 7:17–19; Deposition of David Smith, taken Nov. 29, 2007, excerpts of which are attached hereto as Exhibit 8 ("Smith Dep."), at 9:18 – 10:1; Deposition of Joseph Powell, taken Nov. 28, 2007, excerpts of which are attached hereto as Exhibit 7 ("Powell Dep."), at 8:3–7; Deposition of Darrelle Johnson, taken Nov. 28, 2007, excerpts of which are attached hereto as Exhibit 5 ("Johnson Dep."), at 7:9–13.

4/        Deposition of Ralph W. McLean, taken Nov. 27, 2007, excerpts of which are attached hereto as Exhibit 6 ("McLean Dep."), at 24:12–19.

Bronson. Id. at 90:12–14. The parties met at a Bank of America branch on Capitol Hill and agreed to initiate the DCHA Lease Up package. Id. at 100:11–20. That package consisted of, among other things, a request for tenancy approval, a payment information form, basic inspection standards, and a certification statement by the landlord that the unit is ready to be inspected and occupied. 5/

        Ms. Bronson completed the lease-up package paperwork on November 4, 2005 to rent a unit at 210 20th Street, N.E. "ASAP." Bronson Dep. at 70:11–71:3. On that date, Mr. Bridgeforth and Ms. Bronson met and agreed that Mr. Bridgeforth would rent one of the units at 210 20th Street, N.E. See id. at 215:13–20. They specifically agreed to monthly payments of $1052.00 for the rental and a security deposit of $500, to be paid by Mr. Bridgeforth. 6/ The District of Columbia Housing Authority ("DCHA") inspected the unit on November 29, 2005, in Ms. Bronson's presence, see Bronson Dep. at 82:7-12, and determined that it passed inspection. 7/ The one-year lease between Mr. Bridgeforth and Bronson commenced on December 1, 2005. 8/ Later that month, Ms. Bronson acknowledged receipt of a DCHA notification to Mr. Bridgeforth that his DCHA Lease Up application had been "processed." 9/ Ms. Bronson signed a contract to receive rent payments directly from DCHA 10/ and began to

---

5/    See Lease-up Package Checklist, attached hereto as Exhibit 25 and, e.g., Request for Tenancy Approval Forms, attached hereto as Exhibit 26.

6/    See Lease Information Form, attached hereto as Exhibit 27.

7/    See Inspection Checklist dated Nov. 29, 2005, attached hereto as Exhibit 30.

8/    See Ex. 27 at 1.

9/    See Rent Approval Letter, attached hereto as Exhibit 29.

10/    See Payment Contract, attached hereto as Exhibit 28.

receive rent payments from DCHA on January 1, 2006, 11/ and she continued to receive them each month well after January 20, 2006. See Bronson Dep. at 134:6–14.

Mr. Bridgeforth began moving his belongings into the apartment unit on or about December 23, 2005. See Bridgeforth Dep. at 157:12–15. On January 10, 2006, DCHA conducted a subsequent inspection of the unit in the presence of both Mr. Bridgeforth and Ms. Bronson. See Bronson Dep. at 112:4–8. One day later, Ms. Bronson signed several more documents required by DCHA, including the DCHA Lease Up Package Checklist. 12/

**B.        Ms. Bronson's Self-Help Eviction Efforts**

On January 20, 2006, Ms. Bronson decided that she did not want Mr. Bridgeforth to occupy her unit after all. See Bronson Dep. at 12:18 – 14:4. Ms. Bronson's rationale nearly two years later for her decision was that Mr. Bridgeforth had not yet signed to lease to facilitate payment of rent by the DCHA, id. at 174:15–20, but this rings hollow because Ms. Bronson had been paid. The true rationale may have something to do with Ms. Bronson's annoyance at submitting to "about ten" inspections to bring Mr. Bridgeforth's unit up to Code. See id. at 82:1–6. In any event, as Ms. Bronson acknowledged, in order to evict a Section 8 tenant, a landlord must first file a 30-day notice with DCRA and then file a claim in D.C. Landlord and Tenant Court after the notice period has expired. See id. at 39:15 – 40:4. Although she had used the formal District eviction process in the past, she did not use that process to evict Mr. Bridgeforth. See id. at 43:17 – 44:4.

Instead, Ms. Bronson and a male friend woke Mr. Bridgeforth on January 20, 2006 by banging on his door and demanding that he leave his apartment. See Bridgeforth Dep.

---

11/        See Housing Assistance Payments Register, attached hereto as Exhibit 31; see also Bronson Dep. at 132:10-17.

at 249:9 –250:8; Bronson Dep. at 147:6–21.  Ms. Bronson and her friend attempted to force entry

into the apartment by "prying the door open."  Bronson Dep. at 147:11–18.  Mr. Bridgeforth

dialed 9-1-1, Bridgeforth Dep. at 251:17–18, and MPD officers dispatched to the scene arrived

between 12:30 and 1 p.m. 13/  The officers, however, declined to get involved with the

dispute. 14/  Rather, responding officer Jeannette Williams assigned a six-digit CCN incident

number, issued Mr. Bridgeforth a corresponding business card with the words "LANDLORD

TENANT" at the bottom, 15/ and completed an incident report indicating that it was a dispute

between a landlord and tenant, 16/ i.e., a matter that needed to be resolved through the judicial

process rather than by the officers at the scene as mandated by both D.C. law and MPD policy.

Uniformed MPD officers were called to the property at least four other times the

same day as Ms. Bronson attempted to evict Mr. Bridgeforth.  First, Ms. Bronson called the

police around 3:30 p.m. to report an "unlawful entry."  Ex. 22 at 3.  Even though she claimed to

have "all the proper paper work," the police left the scene before 4 p.m. once it became clear that

the dispute involved a landlord.  Id.  Second, police were dispatched around 5:30 p.m., but after

Mr. Bridgeforth had a "dispute with [the] officers," the event was closed.  Id. at 6–7.  Third,

police were again "on scene" around 8:50 p.m., but the event was closed after cross-referencing

to the earlier incidents.  Id. 9–10.  According to Ms. Bronson, her efforts to evict Mr. Bridgeforth

"took all day, all night."  Bronson Dep. at 161:19–21.

---

12/      See, e.g., Ex. 25.

13/      See Event Chronology, attached hereto as Exhibit 22, at 1.

14/      See Incident Report, attached hereto as Exhibit 23.

15/      Ex. 24.

16/      Ex. 23 at 3.

Ms. Bronson ultimately contacted Captain McLean and told him that she was having a problem with "somebody . . . who was supposed to be a tenant." Id. at 174:11–17. Fearing that the "extremely angry" caller would be filing a complaint unless something was done, Captain McLean decided to "take care of this . . . ." McLean Dep. at 28:10 & 31:11–32:8. After three or four telephone conversations with Ms. Bronson and a "contentious debate," id. at 33:2–4 & 101:2, Captain McLean advised Ms. Bronson to acquire documents outside of the legal process supporting her contention that Mr. Bridgeforth was not entitled to reside at the property. See id. at 34:4–7. Captain McLean never saw any such documents himself, see id. at 41:20 – 42:2, but he authorized MPD officers to evict Mr. Bridgeforth. See id. at 42:4–8. 17/

## C.        District Law and Policy Against Self-help Evictions

Captain McLean was half right. As discussed below, District law is clear that a landlord is prohibited from using self-help to evict a tenant and must proceed instead by using the process provided by law.

### 1.        The McMillian Case

Ann McMillian and her five children brought suit in 1998 against their former landlord, several uniformed members of the MPD, and the District for wrongful eviction, intentional infliction of emotional distress, intentional and negligent misrepresentation, and civil rights violations arising out of the MPD officers' assistance of the landlord in evicting the McMillian family from their home in Northeast Washington. On January 10, 2001, a jury in

---

17/     See also Powell Dep. at 26:18 – 27:4 ("The word was given from the captain to, you know, . . . Mr. Bridgeforth had to leave the apartment."); Acosta Dep. at 31:12–17 ("Captain McLean had said to remove him."); Smith Dep. at 75:4–7 (stating that Captain McLean gave the order to ask Mr. Bridgeforth to leave); Carter Dep. at 29:3–7 & 31:1–5 (McLean's order was "that if Mr. Bridgeforth did not have a lease or did not sign a lease, he would be asked to leave").

D.C. Superior Court returned a highly-publicized verdict of $330,000 against the landlord. 18/
The McMillians entered into a separate settlement with the District of Columbia, under which
the District was obligated to pay the McMillian family a sum of money and to institute new
training programs and new tracking mechanisms for citizen complaints relating to police
involvement in unlawful evictions.

> ## 2.    Mandatory MPD Training Procedures

Documents produced in discovery illustrate the MPD training programs and
complaint-tracking procedures implemented as a result of the McMillian action.  A February 23,
2001 memorandum from the Assistant Chief to the Office of General Counsel entitled "Training
Plan to Meet the Settlement Compliance in McMillian v. D.C.," for example, indicates that the
MPD adopted training in five respects:  (a) "Roll Call Training" on "Residential and Self-help
Evictions" issued to each patrol district and division "at least every three months"; (b) a
component in the "Field Training Officer Course" on eviction policy beginning in March 2001;
(c) training on MPD eviction policy in "all future courses" offered to "First Line Supervisor[s] &
Reserve Officer[s]"; (d) training on MPD eviction policy included in the 32-hours of in-service
training required for "lieutenants and above"; and (e) inclusion of MPD eviction policy in the
standard curriculum offered to all recruits/lateral officers. 19/  A related training document also
provides for revisions to the "Civilian Complaint Computer Database" to permit the MPD to

---

18/    See "Eviction Case a Milestone," Wash. Post (Jan. 31, 2001) ("In the thick annals of D.C.
landlord and tenant disputes, [the McMillian] case marks a milestone for tenants' rights . . . .  As
the result of a lawsuit filed by . . . Ann McMillian, D.C. police are rewriting their rules for
getting involved in the tens of thousands of residential disputes that form an unpleasant but
persistent aspect of District life.").

19/    See Feb. 23, 2001 Memo. to Office of the General Counsel, attached hereto as Exhibit
16.

"document and track" civilian complaints relating to (a) "MPD involvement in evictions" and (b) "MPD involvement in landlord-tenant disputes." 20/

MPD materials used to implement this training and tracking plan plainly advise that MPD "**does not facilitate with evictions**." 21/  MPD Circular CIR-01-03, effective February 28, 2001, specifically documented "existing" MPD policy as follows:  "The Metropolitan Police Department does not participate in self-help evictions. * * * [I]n accordance with the . . . laws, officers are instructed that they are not to become involved in apparent landlord-tenant disputes." 22/

## D.          Eviction by District Police Officers

These policies and training materials did not stop Defendants from agreeing to evict Mr. Bridgeforth at Ms. Bronson's behest.  At approximately 11:30 p.m. on January 20, 2006, an MPD officer identified as "CR125" initiated a report to remove a "squatter" from 210 20th Street, N.E. Ex. 22 at 11.  No fewer than three police units were dispatched containing at least Officers Carter, Smith, Acosta, Powell, and Johnson.  Officer 2077 of unit 1032—Officer Carter—was in charge of the scene.  See id.; see also Powell Dep. at 40:10–12.  Importantly, Officer Carter understood the dispute to "be a landlord/tenant dispute" from the very beginning because "it was dispatched as so."  Carter Dep. at 18:13–14, 17.  Officer Carter accordingly explained to other officers on the scene that "Ms. Bronson is the landlord of the building . . . and she wanted to try to get [Mr. Bridgeforth] out."  Powell Dep. at 16:15–19.

---

20/     See Roll Call Training sheet for Feb. 1, 9, 17 & 25, 2001, attached hereto as Exhibit 17.

21/     Lesson Plan Review Sheet, attached hereto as Exhibit 19, at 2 (emphasis in original).

22/     MPD Circular CIR-01-03, effective Feb. 28, 2001, attached hereto as Exhibit 15.

By all accounts, the scene at 210 20th Street, N.E. was "difficult," 23/ "hectic," 24/ and "pretty out of control." 25/  Over what amounted to "an awful long time," 26/—from approximately 11:30 p.m on January 20 to 1:44 a.m. on January 21 27/—the officers heard Ms. Bronson's side of the story 28/ and reviewed Mr. Bridgeforth's paperwork. 29/  "Things were clouded," 30/ and the officers engaged in considering "credibility issues." 31/  Nonetheless, "[t]he word was given from the captain [that] Mr. Bridgeforth had to leave the apartment . . . [and his girlfriend] had to . . . gather her things and leave the apartment, also."  Powell Dep. at 26:18–27:4.  Officers Carter, Smith, Acosta, and Johnson entered the apartment building when Mr. Bridgeforth was told to gather his things, 32/ and Officer Johnson and several others were in Mr. Bridgeforth's apartment itself. 33/  After Mr. Bridgeforth left the

---

23/     McGunigal Dep. at 26:13–15.

24/     Powell Dep. at 34:20.

25/     Smith Dep. at 67:17 – 68:7.

26/     Powell Dep. at 16:5.

27/     See Ex. 22 at 11.

28/     Carter Dep. at 24:10–20.

29/     Id. at 14:10–11; see also McGunigal Dep. at 32:9–10; Acosta Dep. at 21:4–9, 22:11–16 & 24:8–10; Smith Dep. at 25:4–5 & 48:12–17 ("Mr. Bridgeforth had several pieces of paper that he was attempting to show people.").

30/     McGunigal Dep. at 32:12–13.

31/     Id. at 26:13.

32/     Carter Dep. at 15:10–11, 27:17–20 & 32:13–21; Acosta Dep. at 25:13–15 & 25:21 – 26:7; Smith Dep. at 22:2–13.

33/     Johnson Dep. at 22:2–5 & 23:6–8; see also Smith Dep. at 22:2–13 ("several officers were inside" the apartment).

property, the locks to his apartment were changed while the officers "were still there." 34/  None of the officers completed or filed an incident report about the incident. 35/

E.          Procedural History

On January 24, 2006, Mr. Bridgeforth filed a pro se Complaint and Application for a Temporary Restraining Order in the Superior Court of the District of Columbia to retain access to his apartment. 36/  At a hearing held on January 26, 2006, Mr. Bridgeforth successfully obtained a TRO ordering Ms. Bronson to restore Mr. Bridgeforth's access to the apartment and not to interfere with Mr. Bridgeforth's right to possession.  Ex. 14.  Both Mr. Bridgeforth and Ms. Bronson attended a subsequent hearing on February 3, 2006.  After a full evidentiary hearing and opportunity to be heard, Judge Robert Morin concluded that Ms. Bronson "knew [Mr. Bridgeforth] was in the apartment" in the weeks leading up to the eviction and therefore granted an injunction to restore his tenancy. 37/  Judge Morin explained that the legal effect of his ruling was that Mr. Bridgeforth had "the right to stay in the apartment," Ex. 13 at 44, and advised Ms. Bronson that "if you wish to get him out of the apartment, you should file an action to evict him in accordance with D.C. law."  Ex. 13 at 41.

Mr. Bridgeforth amended his Complaint with leave of Court on August 28, 2006 to add the District and individual police officers as defendants.  The Amended Complaint alleges seven counts: wrongful eviction against Ms. Bronson (Count I) and the District and individual officer Defendants (Count II); violations of procedural due process and Section 1983 against the

---

34/      Carter Dep. at 36:7–12; see also Powell Dep. at 35:14 – 36:7.

35/      Carter Dep. at 36:17–21; see also Johnson Dep. at 39:12–14.

36/      See Temporary Restraining Order, entered January 26, 2006, attached hereto as Exhibit 14.

District (Count III) and all individual officer Defendants (Count V); unreasonable seizure and violation of Section 1983 against the District (Count IV) and Officers Carter and Smith (Count VI); and intentional infliction of emotional distress against Ms. Bronson, the District, Captain McLean, Officer Carter, and Officer Smith (Count VII).  The new defendants removed the Superior Court action to this Court.  Discovery is now complete, the material facts set forth above are undisputed, and Mr. Bridgeforth seeks judgment as a matter of law as to all seven of the Counts in the Amended Complaint.

## ARGUMENT

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Rule 56(c) mandates summary judgment if the nonmoving party fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The party opposing a motion for summary judgment may not rely on mere allegations, denials, or disputed facts to prevail, but instead must set forth specific facts showing that there is a genuine issue of material fact for trial.  See Fed. R. Civ. P. 56(e); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).  An issue is "genuine" if there is evidence on which a jury could base a verdict for the nonmoving party.  See id. at 248.  A fact is "material" if the dispute over that fact could determine the outcome of the suit under governing law.  See Holcomb v. Powell, 433 F.3d 889, 895 (D.C.Cir.2006).

---

37/     Transcript of Proceedings dated Feb. 3, 2006 in Docket No. CA447-06 (D.C. Super.), excerpts of which are attached hereto as Exhibit 13, at 40–41.

Mr. Bridgeforth is entitled to a judgment that each of the three categories of Defendants is liable as a matter of law.  First, defendant Bronson, the private landlord, either admits or is estopped from denying that she intentionally evicted Mr. Bridgeforth without availing herself of appropriate legal process.  Second, there is no material dispute that the individual officer defendants knowingly violated Mr. Bridgeforth's constitutional rights by effectuating an eviction that was in clear contravention of established District law and MPD policy.  Third, the District's own witnesses document a failure to train and failure to supervise MPD officers here, and there is no material dispute that Captain McLean's decision to set policy without sufficient access to evidence was in contravention to law.

## I.        DEFENDANT BRONSON IS LIABLE FOR WRONGFUL EVICTION AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

Ms. Bronson performs landlord duties at five properties in the District with a total of nearly twenty units.  See Bronson Dep. at 31:9–17 & 59:21 – 60:21.  She has been a landlord for over five years, and "[m]aybe 25 percent" of her tenants pay rent through or with the help of subsidies from the DCHA.  Id. at 32:19 – 33:4.  Ms. Bronson also is no stranger to eviction proceedings in Landlord-Tenant Court.  Id. at 38:11–16 (stating that she has initiated eviction proceedings "[a] lot").  These facts simply leave no room for an excuse for Ms. Bronson's admitted behavior here—taking all the steps a landlord could take to lease an apartment to Mr. Bridgeforth, including accepting rent payments from the DCHA, then suddenly seeking to oust Mr. Bridgeforth from that apartment on January 20, 2006 through both physical force and misuse of the MPD.  Indeed, the plain facts admitted in Ms. Bronson's deposition, established in documents Ms. Bronson produced in discovery, and adjudicated against Ms. Bronson in binding

legal proceedings conclusively show that Ms. Bronson is liable for wrongful eviction and

intentional infliction of emotional distress as a matter of law. 38/

**A.     Ms. Bronson's Own Admissions Prove That She Wrongfully Evicted Mr. Bridgeforth**

District of Columbia law is clear that a landlord may not evict a tenant, lock a

tenant out of the rented premises, or remove a tenant's property from the rented premises,

without utilizing the formal processes of the Court as specifically provided by the law. See

Mendes, 389 A.2d at 783–87 ("[T]he legislatively created remedies for reacquiring possession

[of real property] are exclusive."). "A tenant has a right not to have his or her possession

interfered with except by lawful process, and violation of that right gives rise to a cause of action

in tort." Id. at 787. The D.C. Court of Appeals recently upheld this rule in two separate cases

and found in favor of wrongfully-evicted tenants. Luskey v. Borger Management Inc., 917 A.2d

631, 633 (D.C. 2007); Hinton v. Sealander Brokerage Co., 917 A.2d 95, 106 (D.C. 2007). The

eviction process in the District specifically requires a Notice to Quit, notice of at least 30 days

---

38/     Ms. Bronson also may be liable under Section 1983 because a private landlord receiving state funding or subject to state regulation has been found to act "under color of state law" for the purposes of a civil rights action. See Jeffries v. Georgia Residential Finance Authority, 678 F.2d 919, 922-25 (11th Cir. 1982) (eviction of a tenant from private housing subsidized by a state under section 8 of the United States Housing Act of 1937 was conducted under color of state law); Swann v. Gastonia Housing Authority, 675 F.2d 1342, 1346 (4th Cir. 1982) (same). A private landlord's eviction of a tenant is also under cover of state law where, as here, it is accomplished as a joint venture with a state official. See Green v. Francis, 705 F.2d 846, 850 (6th Cir. 1983) (citizens evicting racial minorities with aid of local officials violated Section 1983 because the evidence showed "a sufficient nexus between the official and non-official defendants"); Howerton v. Gabica, 708 F.2d 380 (9th Cir. 1983) (eviction of tenants was under color of state law where, in evicting the tenants, the landlords were accompanied by police officer who later privately approached the tenants and recommended that they leave, creating the appearance that the police sanctioned the eviction). In the event the case is not resolved as a result of the instant motion, Mr. Bridgeforth therefore reserves the right to seek leave to further amend the Complaint to add Ms. Bronson as a defendant to Counts V and VI.

after the Notice, and a civil action in Landlord and Tenant Branch of the Superior Court if the tenant does not respond to the Notice.  See D.C. Code § 42-3808.

Ms. Bronson admitted that she is well-versed in this legal process.  Based on personal experience, she described each required step under oath.  See Bronson Dep. at 39:15 – 40:4.  According to Ms. Bronson,

> You know, there's a process that I told you that you have to do.  You just can't evict somebody even if they want to move out.  If they say they want to move out they have 30 days until they're officially out or then you start your process.

Bronson Dep. at 204:7–12.  But Ms. Bronson never utilized this "process" with respect to Mr. Bridgeforth.  She did not prepare a Notice to Quit.  She did not provide notice of at least 30 days after the Notice to Mr. Bridgeforth.  Nor did she initiate a civil action in Landlord-Tenant Court after the expiration of the 30-day notice.  To the contrary, Ms. Bronson decided that she "wanted him out" and then acted on that decision.  Id. at 13:20.

Ms. Bronson's only stated justification for her extralegal actions is that she "didn't feel like he should have been there" because Mr. Bridgeforth never signed a lease and because she felt that Mr. Bridgeforth forfeited his rights as a tenant by advising the DCHA that he was so fed up with Ms. Bronson's failures to provide acceptable living conditions that he wanted to move out.  Id. at 174:15–20.  Even if these positions had merit—and they do not 39/—

_____

39/      Ample uncontroverted evidence supports Ms. Bronson's own conclusion that Mr. Bridgeforth as "supposed to be a tenant."  See Bronson Dep. at 174:16.  Ms. Bronson went through the Section 8 "lease up" process with Mr. Bridgeforth, id. at 54:18–21, which included a landlord/tenant meeting (id. at 57:9–12 & 92:12–19), her request for tenancy to begin "ASAP" (id. at 70:11–20), her presence at the initial unit inspection and subsequent inspections before January 20, 2006 (id. 82:7–10, 105:2–17 & 112:4–8), her repairs to the unit between January 10 and 20 in response to those inspections (id. at 85:14–17 & 112:14–18), her signature of the lease before January 20, 2006 (id. at 124:1–9), and her receipt of rent in January 2006 and beyond (id. at 134:6–21).  Indeed, Ms. Bronson advocated to the DCHA "for a long time" that Mr.

they do not present a genuine issue of material fact for at least two reasons.  First, D.C. law

mandates that a landlord such as Ms. Bronson adhere to the eviction process to resolve a

possession dispute with a tenant.  <u>See</u> <u>Mendes</u>, 389 A.2d at 787.  Ms. Bronson knew that Mr.

Bridgeforth was claiming that he had a right to occupy the property and not to be evicted.  <u>See</u>

Bronson Dep. at 188:4–5.  As a result, Mr. Bronson had no choice but to proceed through the

judicial process to effect Mr. Bridgeforth's eviction.  By taking the law into her own hands and

engaging in self-help, Ms. Bronson committed the tort of wrongful eviction.  <u>See</u> <u>Mendes</u>, 389

A.2d at 787.

   The other flaw with Ms. Bronson's reasoning is that she already tried this excuse

in a binding legal proceeding and lost.  The doctrine of issue preclusion or "collateral estoppel"

precludes relitigation of factual or legal issues decided in a previous proceeding and essential to

the prior judgment.  <u>See</u> <u>Kingman Park Civic Ass'n v. Williams</u>, 924 A.2d 979, 987 (D.C. 2007)

(citations omitted).  Collateral estoppel applies when

> the issue in the new case [is] one that was actually litigated
> and decided in the prior case, by a final and valid
> disposition on the merits, after a full and fair opportunity
> for litigation by the same parties or their privies, where the
> issue was necessarily decided in disposing of the first
> action, and not mere dictum.

<u>Id.</u> (citing <u>Major v. Inner City Prop. Mgmt., Inc.</u>, 653 A.2d 379, 382 (D.C. 1995)).  In this case,

Ms. Bronson's claim that Mr. Bridgeforth was not actually a tenant at the time of the January 20,

2006 incident was fully litigated and decided on its merits as a dispositive issue by the D.C.

---

Bridgeforth <u>was</u> a tenant before January 20, 2006 in order to get paid.  <u>Id.</u> at 140:17 – 141:5 ("I
said, ' . . . I don't care what this document say.'") & 143:18–20.

Superior Court just two weeks after the incident on February 2, 2006. 40/  Ms. Bronson is

therefore estopped from arguing that there is any factual dispute as to this point. 41/

### B.    Intentional Infliction of Emotional Distress

Likewise, the undisputed facts readily satisfy the requirements for a finding in

Mr. Bridgeforth's favor on his claim of intentional infliction of emotional distress against

Ms. Bronson.  To sustain a claim of intentional infliction of emotional distress in the District,

Mr. Bridgeforth must show:  "(1) extreme and outrageous conduct on the part of the defendant

which (2) either intentionally or recklessly (3) causes the plaintiff severe emotional distress."

Larijani v. Georgetown Univ., 791 A.2d 41, 44 (D.C. 2002).  In determining whether or not

---

40/    Although some courts have held that findings of fact and conclusions of law made by a
court granting a preliminary injunction do not generally form a basis for collateral estoppel, see
Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981); Cmty. Nutrition Inst. v. Block, 749 F.2d
50, 56 (D.C.Cir.1984), such findings and conclusions can have preclusive effect if the
circumstances of the previous proceedings made the findings "sufficiently firm" to remove any
compelling reason to permit the issues to be relitigated.  See Hawksbill Sea Turtle v. FEMA, 126
F.3d 461, 474 n. 11 (3d Cir.1997).  Previous findings are "sufficiently firm" if "the
circumstances make it likely that the findings are accurate [and] reliable."  Commodity Futures
Trading Comm'n v. Bd. of Trade, 701 F.2d 653, 657 (7th Cir.1983); see also Gjertsen v. Board
of Election, 751 F.2d 199, 202 (7th Cir.1984).  Judge Morin's findings at the February 3, 2006
hearing should not be relitigated here because the hearing was conducted just two weeks after
the eviction, with both parties present, and with the purpose of finally concluding Mr.
Bridgeforth's right to reenter the apartment.

41/    Relitigation of this point also may be barred under the law of the case doctrine.  That
doctrine "prevents relitigation of the same issue in the same case by courts of coordinate
jurisdiction."  Johnson v. Fairfax Village Condominium IV Unit Owners Ass'n, 641 A.2d 495,
503 (D.C.1994) (citations omitted); Karr v. C. Dudley Brown & Assocs., Inc., 567 A.2d 1306,
1310 (D.C.1989).  Law of the case is a rule of practice based upon sound policy that when an
issue is once litigated and decided, that should be the end of the matter.  See Insurance Group
Committee v. Denver & R.G.W.R. Co., 329 U.S. 607, 612 (1947); Messinger v. Anderson, 225
U.S. 436, 444 (1912).  Again, although decisions at preliminary injunction hearings do not
generally constitute law of the case, see Johnson v. Capital City Mortg. Corp., 723 A.2d 852,
857 (D.C. 1999), this doctrine applies with full force to any ruling—like Judge Morin's here—of
"sufficient finality" that "is not 'clearly erroneous in light of newly-presented facts or a change
in substantive law.' " Johnson, 641 A.2d at 503 (quoting Kritsidimas v. Sheskin, 411 A.2d 370,
372 (D.C.1980)).

conduct is "extreme and outrageous," the Court should consider "(1) applicable contemporary community standards of offensiveness and decency, and (2) the specific context in which the conduct took place." Id. In addition, the relationship between Ms. Bronson and Mr. Bridgeforth makes it more likely that the alleged conduct was "extreme and outrageous." See Restatement (Second) of Torts § 46 cmt. e (1965) ("The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests . . . . In particular, police officers, school authorities, landlords, and collecting creditors have been held liable for extreme abuse of their position.") (emphasis added).

Here, Ms. Bronson admitted that she intentionally ignored well-settled procedure to put Mr. Bridgeforth out on the street. 42/ She admitted that she first tried to do so through brute force. See Bronson Dep. at 147:6–8. She admitted that she circumvented normal police procedure to "get some results." 43/ She admitted that the process was lengthy and unpleasant. 44/ And other defendants attested to the fact that Mr. Bridgeforth was "very agitated" by the events. See, e.g., Smith Dep. at 35:13–14. Courts have found evictions with even fewer inflammatory elements to justify a finding of intentional infliction of emotional distress as a matter of law. See, e.g., Oliver v. Mustafa, 929 A.2d 873, 876 (D.C. 2007)

---

42/     Bronson Dep. at 13:20 ("I wanted him out."), 168:20 (same) & 169:13–14 (Q: "[Y]ou didn't want him in Unit Number 4 anymore, correct? * * * A: Yeah.").

43/     Id. at 159:2–7 ("I was going to get down to the bottom of it." "I called . . . someone of a higher authority to, you know, explain the situation . . . .") & 174:8–10 ("In life that's how I deal with things. I deal with people at a higher authority. That way you get some results.").

44/     Id. at 152:8 ("It took all night.") & 161:20–21 ("It took forever. It took all day, all night.").

(affirming default judgment on, inter alia, wrongful eviction and intentional infliction of

emotional distress and result of separate damages trial). 45/  The same result is warranted here.

## II.   THE INDIVIDUAL DEFENDANT OFFICERS KNOWINGLY VIOLATED DISTRICT POLICY AND MR. BRIDGEFORTH'S CONSTITUTIONAL RIGHTS.

42 U.S.C. § 1983 establishes a right of action for the deprivation of any "rights,

privileges, or immunities secured by the Constitution and laws" by and against persons acting

under color of law.  See West v. Atkins, 487 U.S. 42, 48 (1988) (citations omitted).  Acting

under the color of law simply means that the conduct complained of allegedly causing the

deprivation of a federal right be "fairly attributable to the State," Lugar v. Edmondson Oil Co.,

457 U.S. 922, 936 (1982); United States v. Price, 383 U.S. 787, 794 n. 7 (1966).  In this case,

there is no dispute that the individual MPD officer defendants were acting in their capacity as

on-duty police officers at the time Mr. Bridgeforth was evicted in January 2006.  Likewise, facts

adduced in discovery demonstrate that the individual MPD officer defendants violated

constitutional rights provided to Mr. Bridgeforth under both the Fourth and Fifth Amendments of

the U.S. Constitution.

The Fourth Amendment prevents state actors from unreasonably seizing property

and effects.  See Soldal v. Cook County, 506 U.S. 56, 61–62 (1992).  A "seizure" of property

occurs when there is some meaningful interference with an individual's possessory interests in

that property.  See United States v. Jacobsen, 466 U.S. 109, 113 (1984).  In Soldal, which, like

here, concerned an action for damages under Section 1983 against state police officers who

---

45/    See also Parker v. Stein, 557 A.2d 1319, 1322 (D.C. 1989) (recognizing that punitive damages may be warranted in aggravated conversion and wrongful eviction claims); Robinson v. Sarisky, 535 A.2d 901, 905 (D.C. 1988) (recognizing that plaintiff may recover damages for mental suffering unaccompanied by physical injury for wrongful eviction).

carried out an eviction for the landlord, the Supreme Court held that a person's right to retreat into his home stands at the very core of the Fourth Amendment, see 506 U.S. at 61 (quoting Silverman v. United States, 365 U.S. 505, 511 (1961)), and that the right against unreasonable seizures is expressly implicated when a state actor seizes a house to effect an eviction.  See 506 U.S. at 69 ("[T]he right against unreasonable seizures would be no less transgressed if the seizure of the house was undertaken to . . . effect an eviction by the police.").  A Fourth Amendment seizure occurs in this context when "a reasonable person would have believed he was not free to leave."  United States v. Mendenhall, 446 U.S. 544, 554 (1980).  The threatening presence of several police officers and the use of language or tone indicating that compliance with the officer's request might be compelled are among the factors indicating that such a seizure has occurred.  See id.  In other words, Defendants can be found to have "seized" Mr. Bridgeforth's property even if the evidence showed that they were merely passive observers while Ms. Bronson kicked Mr. Bridgeforth out of his apartment and changed the locks.  See Soldal, 506 U.S. at 59 (landlord's agents physically moved a mobile home "in the presence of" law enforcement officers). 46/

---

46/     Defendants also arguably violated the "search" protection in the Fourth Amendment by entering Mr. Bridgeforth's actual apartment during the eviction.  See Soldal, 506 U.S. at 67 & n.12 (acknowledging that "the Fourth Amendment's protection would be triggered by a search or other entry into the home incident to an eviction or repossession") (citations and quotations omitted); see also Katz v. United States, 389 U.S. 347 (1967) (search conducted without warrant is per se unreasonable and in violation of Fourth Amendment unless exception applies).  In this case, several of the officers admitted that they actually entered Mr. Bridgeforth's apartment while he was gathering his belongings.  See, e.g., Johnson Dep. at 22:2–5 & 23:6–8; Powell Dep. at 24:1–6; see also Smith Dep. at 22:2–13 ("several officers were inside").

In this case, every one of the individual MPD officer defendants admitted that police officers were the ones who directed Mr. Bridgeforth to leave his apartment. 47/  Captain McLean specifically directed the officers on the scene to tell Mr. Bridgeforth that "if he failed to leave the premises, he would be locked up for unlawful entry."  McLean Dep. at 42:4–8.  48/ The officers also testified that the locks to Mr. Bridgeforth's apartment were changed in the officers' presence.  See Powell Dep. at 35:14 – 36:1 ("I saw them being changed"); Carter Dep. at 36:8 (locks were changed while "we were still there").

Defendants' actions also violated Mr. Bridgeforth's due process rights under the Fifth Amendment by denying him a legal eviction. 49/  See LaChance v. Erickson, 522 U.S. 262, 266 (1998) ("The core of due process is the right to notice and a meaningful opportunity to be heard.").  It is not for law enforcement officers to decide who is entitled to possession of property.  Rather, it is the domain of the courts, and citizens are entitled to have a meaningful opportunity to be heard as to their rights before they are finally deprived of possession of property.  See Abbott v. Latshaw, 164 F.3d 141, 149 (3d Cir. 1998).  District of Columbia law requires that certain procedures be followed in order to deprive tenants of property interests through an eviction.  See Mendes, 389 A.2d at 787 ("A tenant has a right not to have his or her

---

47/      See Carter Dep. at 29:5–7 (the MPD order was "that if Mr. Bridgeforth did not have a lease or did not sign a lease, he would be asked to leave"); Powell Dep. at 18:5 ("He was asked to leave the premises."); Acosta Dep. at 29:6–9 (police officer told Mr. Bridgeforth he had to leave); Johnson Dep. at 21:6–8 & 25:18 – 26:1 (same); Smith Dep. at 26:19 – 27:4 & 43:11–14 (same); see also McGunigal Dep. at 53:4–6 ("Mr. Bridgeforth was asked to leave his apartment.").

48/      Of course, these actions also render the individual MPD officer defendants liable for the tort wrongful eviction.  "[W]here an officer . . . gives a tenant a choice between absenting himself from the premises and being arrested and the tenant chooses the former, a wrongful eviction has taken place."  Collum v. Incorp. Village of Freeport, 691 F. Supp. 637, 641 (E.D.N.Y. 1998).  Mr. Bridgeforth is therefore entitled to judgment in his favor on Count II.

possession interfered with except by lawful process."); D.C. Code § 42-3808. <u>50</u>/  Here, there is

no dispute that those procedures were not followed; no court ever ordered Mr. Bridgeforth to

leave the apartment and Mr. Bridgeforth was never given or provided written notice or an

opportunity to be heard prior to the alleged eviction. <u>51</u>/

   The only remaining question, then, is whether the actions of the individual MPD

officer defendants were reasonable in this situation, which could entitle the officers to qualified

immunity for their illegal acts.  Courts apply an "objective standard" to this question, <u>i.e.</u>,

whether the facts available to the defendants at the moment of the constitutional violation would

warrant a person of reasonable caution to believe that the violation was reasonable.  <u>See</u> <u>Offutt v.</u>

<u>United States</u>, 534 A.2d 936, 938 (D.C. 1987) (applying the Fourth Amendment reasonableness

inquiry in a criminal case).  The simple fact that Defendants did not act pursuant to a court order

permitting them to evict Mr. Bridgeforth suggests that the eviction was unreasonable.  <u>See</u>

<u>Soldal</u>, 506 U.S. at 71 (recognizing this factor as part of the "reasonableness" analysis in a

constitutional eviction claim).  More starkly here, by definition, it is not objectively reasonable

to act in way that is "contrary to the law."  <u>See</u> <u>id.</u> at 72.

---

<u>49</u>/ The Fifth Amendment applies to Due Process claims in the District of Columbia.  <u>See</u>
<u>Eric T. v. National Med. Enters.</u>, 700 A.2d 749, 759 n.19 (D.C. 1997).

<u>50</u>/ As discussed above, it has been conclusively decided in a previous proceeding that Mr.
Bridgeforth was a tenant, and therefore had a property interest in his rental home.  <u>See</u> <u>Beall v.</u>
<u>Everson</u>, 34 A.2d 41, 42 (D.C. 1943) ("[T]he tenant acquires an interest in the real estate and has
the exclusive possession of the leased premises.") (quotation omitted).

<u>51</u>/ In addition, Captain McLean is independently liable for inappropriate supervision of the
other officer defendants at the scene.  <u>See</u> <u>Haynesworth v. Miller</u>, 820 F.2d 1245, 1261 (D.C.
Cir. 1987); <u>Byrd v. District of Columbia</u>, 297 F. Supp.2d 136, 142–43 (D.D.C. 2003)
(supervision claim valid when officer is shown to (a) have a duty to oversee an incident of
alleged officer misconduct and (b) acted with deliberate indifference to and with reckless
disregard for the safety and well-being of the plaintiff and the public at large or allowed or
caused to be committed the acts which deprived the plaintiff of his civil rights).

In this case, District law and MPD policy provide no room to argue that the conduct of the individual MPD officer defendants was anything but unreasonable. D.C. law has prohibited self-help evictions since the late 1970's. <u>Mendes</u>, 389 A.2d at 787. Further, MPD Circular CIR-01-03 documented "existing" MPD policy at the time of this incident as follows: "The Metropolitan Police Department does not participate in self-help evictions. * * * [I]n accordance with the . . . laws, officers are instructed that they are <u>not to become involved</u> in apparent landlord-tenant disputes." Ex. 15 (emphasis added). Nearly every one of the individual MPD officer defendants <u>52</u>/ testified that they were aware of the basic parameters of this policy. <u>53</u>/ Officer Carter's testimony in particular cut straight to the point:

> "Q.     Do you understand that would have been against police policy, in fact, to ask [Mr. Bridgeforth] to leave the scene?
> ***
> A.     Yes.
>
> Q.     So that would have been against policy to have done so?
> ***
> A.     Yes.

Carter Dep. at 41:5–15.

The law was clearly established, and the individual MPD defendants clearly violated it. Therefore, they should be found liable for their actions under Section 1983 as a matter of law.

---

<u>52</u>/     See discussion of the District's failure to train below at page 24.

<u>53</u>/     <u>See</u> McLean Dep. at 61:13–16 ("We don't get involved in evictions."); Acosta Dep. at 45:10–16; Johnson Dep. at 42:9–19; Smith Dep. at 82:20 – 83:1 ("The Metropolitan Police Departments does not participate in evictions.") (sic); <u>see also</u> McGunigal Dep. at 43:4–5 ("We do not evict people. We are prohibited from evictions.").

III.        THE DISTRICT OF COLUMBIA HAS MUNICIPAL LIABILITY FOR
            THE WRONGFUL ACTIONS OF ITS POLICE OFFICERS.

        The District of Columbia may be liable for the torts of police officers.  See Baker

v. Washington, 448 F.2d 1200 (D.C. Cir. 1971); Best v. District of Columbia, 743 F. Supp. 44,

46 (D.D.C.1990) (citing Monell v. Dep't of Soc. Servs. of the City of New York, 436 U.S. 658

(1978)).  In particular, the District may be held liable when officers perform "ministerial" duties,

i.e., duties involved in the execution of policy.  See Elgin v. District of Columbia, 122 A.2d 765,

766–67 (D.C. Cir. 1964); Baker, 448 F.2d at 1201.  In addition, the District is liable for the

constitutional violations of its officers under Section 1983 if District policy was a moving force

behind the violations.  See Carter v. District of Columbia, 795 F.2d 116, 122 (D.C.Cir.1986)

(citing Monell, 436 U.S. at 694).  A "policy" for these purposes need not be an actual written

directive; it can (and usually does) arise out of a failure to train or supervise or the conduct of a

final policymaker.  See City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989); Parker v.

District of Columbia, 850 F.2d 708, 712 (D.C. Cir. 1988).

        In this case, the evidence supporting municipal liability against the District is

powerful.  The District is municipally liable here for three reasons:  (a) deliberately indifferent

training, (b) deliberately indifferent supervision, and (c) a final decision by the pertinent final

decision maker.

        A.      Failure to train

                        "Q:     You state in your [Interrogatory] answer that you do
                                not specifically recall what policy relates to self-
                                help evictions.
                        A:      Yes, sir.
                        Q:      Do you recall having some training regarding self-
                                help evictions?
                        A:      No, sir.."

                        *Deposition of Officer Powell at 45:3–6 & 47:20 – 48:2*

Even where District policy itself is not unconstitutional, a municipality's failure to properly train its employees and officers on that policy can create an actionable violation of a party's constitutional rights under Section 1983 "where the failure to train amounts to deliberate indifference to the rights of persons with whom the [municipal employees] come into contact." Harris, 489 U.S. at 388; see also Daskalea v. District of Columbia, 227 F.3d 433, 441 (D.C. Cir. 2000). Liability arises where the failure to provide training has a "causal nexus" with the alleged constitutional deprivation and where the absence of that training reflects "a deliberate indifference to whether the alleged constitutional deprivations occurred." Reitz v. County of Bucks, 125 F.3d 139, 145 (3d Cir. 1997) (citation omitted); see also Bd. of County Commissioners of Bryan County v. Brown, 520 U.S. 397, 404 (1997) (on causation point).

The District's designated representative on training practices and procedures, Sergeant Kimberly Butler, admitted that, other than a "Note" on one page of the lesson plans for one of the seventeen levels covered in the MPD recruit academy, [54]/ the MPD does not train its police officers as to the legal requirements associated with residential evictions, including the ban on self-help evictions, the obligation to obtain a court order to evict a tenant, and the requirement under D.C. law that evictions are to be carried out by the U.S. Marshals Service, rather than District police officers. See Deposition of Kimberly Butler, taken on Feb. 5, 2008, excerpts of which are attached hereto as Exhibit 11, at 43:7–11 (no set curriculum in field training officer course); 50:7–10 (no first line supervisor school training on eviction policy); 58:1–15 (testifies "with certainty" that no roll call training after February 2001 on eviction policy); 60:4–7 (no knowledge of whether variable in-service curriculum has ever related to eviction policy); see also id. at 5:21 – 6:9 (acknowledging that testimony was being given on

---

[54]/     See MPD Police Academy Lesson Plans Level 7, attached hereto as Exhibit 20, at 20.

behalf of the District under Fed. R. Civ. P. 30(b)(6)).  In other words, at best, the District has implemented only one of the five "training program" elements identified by the MPD in February 2001 "[t]o meet the requirements set forth in <u>McMillian</u>."  <u>See</u> Ex. 16. <u>55</u>/

      This blatant failure to train begs the question whether the need for additional training or is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the District's policymakers can reasonably be said to have been "deliberately indifferent" to the need for such training.  <u>See</u> <u>Harris</u>, 489 U.S. at 390 & n.10; <u>Gross v. District of Columbia</u>, 734 A.2d 1077, 1084 n.15 (D.C. 1999).  The answer to that question is easy in this case.  Not only does the undisputed evidence show a manifest need for such training, <u>56</u>/ but the District's <u>own training policy</u> implemented after the <u>McMillian</u> settlement establishes what training was constitutionally required to meet that need.  The District's indifference with regard to the terms of its own settlement regarding residential eviction training conclusively supports a finding of Section 1983 liability here. <u>57</u>/

---

<u>55</u>/    Captain McLean actually paints an even grimmer picture of MPD training.  He served as the Deputy Director of the MPD police academy from July 2006 to September 2007.  <u>See</u> McLean Dep. at 17:8–9.  Yet Captain McLean testified that he has never given any training based on the eviction policy circular or any training in relation to landlord self-help evictions whatsoever.  <u>Id.</u> at 92:14–20.  Nor does he recall receiving any such training.  <u>Id.</u> at 61:7–9.

<u>56</u>/    <u>See</u> Deposition of Teresa Brown, taken February 5, 2008, excerpts of which are attached hereto as Exhibit 10 ("Brown Dep."), at 59:19 – 60:1 ("Q: Is it common for police officers to respond and make determinations as to whether individuals are landlords and tenants? * * * A: <u>Every day</u>.") (emphasis added).

<u>57</u>/    MPD practice to facilitate landlord-tenant disputes without documenting the police action in an incident report also illustrates a failure to train.  The MPD defendants testified that there was no need to prepare an incident report after Mr. Bridgeforth was evicted on January 20, 2006.  <u>See</u> Carter Dep. at 37:8–11 ("I wouldn't have took a report, because it didn't call for one.") (sic); Johnson Dep. at 39:12–14; Powell Dep. at 39:2–12; McLean Dep. at 42:16–20; <u>see also</u> McGunigal Dep. at 41:14–17.  Not only does this practice runs directly against stated MPD policy, <u>see</u> Field Reporting System General Order, attached hereto as Exhibit 18, at 2; <u>see also</u> Brown Dep. at 66:6–9 & 68:15–18, but the outcome of Mr. Bridgeforth's incident almost certainly would have been different if Captain McLean or the officers at the scene would have

Moreover, the "causal nexus" between the District's failure to train its officers on its bright-line policy that MPD officers do "not facilitate with evictions" and Mr. Bridgeforth's unconstitutional eviction is clear. Without sufficient training, the officer defendants held a wide range of understandings of the straight-forward policy:

- Officers Smith and Carter testified that once a landlord-tenant dispute is apparent and/or if there is "any thought" of a lease, then "the officer has no jurisdiction there" (Smith Dep. at 15:10–17 & 18:3–8; Carter Dep. at 40:3–5)—which is consistent with MPD policy;

- Officer Johnson thought the MPD "should not have gotten involved" once it was known that "rent had been paid up for that month" (Johnson Dep. at 53:3–19)—which it had;

- Officer Powell thought Mr. Bridgeforth could have avoided eviction only if he presented hard evidence of tenancy to the officers such as a "landlord/tenant agreement" "in hand" (Powell Dep. at 46:8 – 47:17), rent payments (id. at 48:3–18), or documents that Section 8 allowed him to reside in the apartment (53:9 – 54:4)—all of which Mr. Bridgeforth had; and

- Officer Acosta thought that the MPD's proper role when they come upon a landlord-tenant dispute is to engage the situation and "[c]onduct an investigation" (Acosta Dep. at 46:3–7)—the exact opposite of MPD policy. 58/

It is no surprise, then, that the officers viewed what should have been a very simple process as "a difficult run, as far as determining what was going on." McGunigal Dep. at 26:13–15.

---

known that at least four previous units had responded to the dispute throughout the day and had declined to facilitate the dispute. See McLean Dep. at 87:11–12 ("[M]y impressions probably would have been different."); see also Smith Dep. at 31:13 – 32:8 & 35:2–10 (he advised officers responding to a later dispute between Ms. Bronson and Mr. Bridgeforth that the situation was between a landlord and tenant).

58/    Jeffrey McGunigal, the sergeant and direct supervisor of the officers at 210 20th Street, N.E. when Mr. Bridgeforth was evicted, also got it right. See McGunigal Dep. at 44:4–8 ("Q: [I]f a person just says, 'I have a lawful right to be here— A: We suggest they speak with landlord/tenant. You know, it's not for us to make that determination.") (emphasis added). Unfortunately, Sergeant McGunigal was not on the scene at the time of the incident. See id. at 22:8–9.

Moreover, the "watch commander" ultimately in charge of the scene, Captain McLean, was perhaps the most off base in thinking that the landlord-tenant dispute here was suitable for "contentious debate." See McLean Dep. at 101:2. In the end, Captain McLean felt the right decision was to authorize Mr. Bridgeforth's eviction under threat of arrest even though he testified nearly two years later that, "I didn't understand that they had any landlord/tenant relationship. I'm still not sure if they did or not. I guess that's for the court to decide then." Id. at 114:1–4 (emphasis added). Even worse, Captain McLean said on several occasions that he "would make the exact same decision this afternoon . . . ." Id. at 74:9–10, 79:20 – 80:1, 99:2–4.

Accordingly, for all these reasons, Mr. Bridgeforth is entitled to judgment as a matter of law that the District's failure to properly train its employees and officers on MPD eviction policy violated Mr. Bridgeforth's constitutional rights as enforced in Section 1983.

**B.    Failure to supervise**

The District also may be liable under Section 1983 for constitutional violations committed by its employees when, as here, the evidence shows that the violations were caused by a failure to adequately supervise or discipline those employees. See Parker v. District of Columbia, 850 F.2d at 712. Failure to supervise is evidenced in two ways: failure to take reprisals for alleged constitutional violations and failure to keep track of such violations as they occur.

First, courts faced with a failure to supervise Section 1983 claim consider whether the government investigated constitutional deprivations and disciplined employees who perpetrated them. See id. at 714 (supervision was inadequate where perpetrator of constitutional deprivation was not subjected to any disciplinary action); see also Thomas v. Johnson, 295 F. Supp. 1025, 1031–32 (D.D.C. 1968) (District liable when the it had been on notice of, but did

nothing about, an officer's poor performance and number complaints about him).  The District's

designee admitted there has been no investigation, no disciplinary action, and no remedial action

taken here.  See Deposition of John Michael Hedgecock, taken Feb. 5, 2008, excerpts of which

are attached hereto as Exhibit 12 ("Hedgecock Dep."), at 121:4–17 (no investigations) & 126:4–

9 (no disciplinary action related to the events).  Captain McLean confirmed this.  See McLean

Dep. at 9:10–14. 59/

> Second, courts have found that failure to supervise also manifests in inadequate

tracking of citizen complaints as long as such inadequate tracking reflects a deliberate

indifference to the risk of a violation of constitutional rights and bears a causal relationship to

plaintiffs' injuries.  See Brown, 520 U.S. at 404, 411. 60/  The District does not carefully track

citizen complaints regarding MPD involvement in landlord-tenant disputes.  See Butler Dep. at

64:4–11 (District designee not aware of any tracking capability).  Indeed, there is not even a

record of this case in the MPD's complaint database.  See Database Search Results, attached

hereto as Exhibit 21.

> Given the history of such complaints, the District's failure to properly track or

categorize citizen complaints against the police necessarily arises out of deliberate indifference.

An important aspect of the District's settlement in the McMillian case was correcting an

inadequate system to track citizen complaints against D.C. police officers.  Immediately

---

59/     Nor is any investigation of Captain McLean likely, as Captain McLean's current
assignment is the "commanding officer of the police misconduct branch of the Internal Affairs
Division."  McLean Dep. at 8:4–6.

60/     See also Fiacco v. City of Rensselaer, 783 F.2d 319, 331 (2d Cir. 1986) (finding evidence
sufficient to support a claim of municipal liability based on a failure to properly respond to
citizen complaints); Cox v. District of Columbia, 821 F. Supp. 1, 20 (D.D.C. 1993) (holding that
the District's failure to record or respond to civilian complaints "constituted deliberate
indifference to the constitutional rights" of the plaintiff), aff'd, 40 F.3d 475 (D.C. Cir. 1994).

following the settlement in February 2001, the MPD announced the following two-part "policy" at roll call training throughout the police force:

> A manual tracking system shall be instituted by the Office of Professional Responsibility and/or the Officer of Internal Affairs, and shall commence no later than February 28, 2001.
>
> Two new categories in the Civilian Complaint Computer Database are currently being developed by the MPD . . . . These categories shall document and track Civilian Complaints relating to:  (1) MPD involvement in evictions, and (2) MPD involvement in landlord-tenant disputes.

Ex. 17 (emphasis added).  However, when a Lieutenant from the Internal Affairs Division was deposed as the District's municipal representative, he stated in no uncertain terms that, nearly seven years after the compliance date, the MPD had no code or complaint category in its database for landlord-tenant disputes and no code or complaint category in its database for residential evictions.  See Hedgecock Dep. at 44:6–16.  This matters because, without implementation of the District's stated complaint tracking goals, MPD police officers do not know better than to engage in the conduct at issue here because the police department cannot identify problems with officer conduct or take steps to correct police training or policies even when valid complaints are filed.

In sum, the District failed to properly supervise MPD officers to prevent their participation in evictions violating Mr. Bridgeforth's rights.  MPD Circular CIR-01-03 was issued and related practices were put in place five years before Mr. Bridgeforth was evicted.  The actions of Officers Carter, Acosta, Smith, Powell, and Johnson suggest either that enforcement related to these polices was lacking in January 2006 or that these policies and practices were not being implemented at all.

C.    **Unlawful policymaking**

The fact that Captain McLean, a senior MPD supervisor, ordered the eviction to take place makes the case for municipal liability even stronger. A single policy decision can violate Section 1983 if the person setting such policy had sufficient decision-making authority over the subject matter. See City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988). The District's designee on MPD policies and procedures testified that, in "normal circumstances," rank-and-file police officers have the "final authority" to determine whether a dispute involves landlord-tenant issues. See Brown Dep. at 59:14–17. Here, a captain—which is three levels of seniority above an officer, see McGunigal Dep. at 10:19 – 11:1—made that call. See McLean Dep. at 34:13–21. As Captain McLean put it, he served as the "watch commander" on the date in question, i.e., "the clearinghouse for decisions." Id. at 24:12–14. In the alternative, then, even if the District's failure to train and supervise its officers somehow fell short of a Section 1983 violation, the actions of Captain McLean alone could expose the District to liability here.

And those actions were incredibly deficient. Again, it was Captain McLean's ultimate decision to "tell [Mr. Bridgeforth] if he doesn't leave the premises, he's going to be placed under arrest for unlawful entry." McLean Dep. at 34:18–21. However, Captain McLean made this critical decision

- without visiting the scene himself (id. at 27:8–12);

- without ever speaking to Mr. Bridgeforth (id. at 33:2–4);

- with the assumption that Mr. Bridgeforth was not on the scene until he was asked to leave (id. at 44:8–12);

- without knowing that Mr. Bridgeforth claimed to be a tenant (id. at 79:3–5);

- without reviewing any of the paperwork related to the parties' relationship (id. at 41:20 – 42:2);

- without specifically reviewing any of the documents provided by Mr. Bridgeforth (<u>id.</u> at 54:12–15);

- without knowing whether any of the officers reviewed Mr. Bridgeforth's documents (<u>id.</u> at 53:3–9 & 55:14–15);

- without any knowledge of the earlier incident report or its contents (<u>id.</u> at 86:10–13); and

- without any knowledge of "how Section 8 works" (<u>id.</u> at 91:6–7 & 100:2–3 ("I have no clued how that stuff works.")).

Indeed, the "whole universe" of information available to Captain McLean when he decided to take landlord-tenant law into his own hands was from telephone conversations with Ms. Bronson and the officers on this scene.  <u>Id.</u> at 57:11–20.  This haphazard decision may not have been "a big deal" to Captain McLean at the time, <u>id.</u> at 48:17–18, but it provides a basis for Section 1983 liability against both Captain McLean and the District of Columbia now.

\*       \*       \*

Mr. Bridgeforth is entitled to judgment as a matter of law for the District's deliberate indifference to, and wanton and malicious disregard of, his rights under the Fourth and Fifth Amendments to the U.S. Constitution.

## <u>REQUEST FOR ORAL ARGUMENT</u>

Pursuant to Local Rule 65.1(d), Mr. Bridgeforth respectfully requests oral argument of this motion at an agreed-upon date after briefing is completed and submitted to the Court.

## CONCLUSION

For the foregoing reasons, plaintiff Anthony Bridgeforth's motion for summary judgment should be granted.

Respectfully submitted,

HOGAN & HARTSON LLP

By: /s/ Jeremy T. Monthy_____
     Adam K. Levin (#460362)
     Jeremy T. Monthy (#468903)
     555 Thirteenth Street, N.W.
     Washington, D.C.  20004
     (202) 637-5600
     (202) 637-5910 (fax)

Dated:  April 7, 2008          Counsel for Plaintiff Anthony Bridgeforth

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
Anthony Bridgeforth,                                )
                                                    )
                        Plaintiff,                  )
                                                    )
            v.                                      )        Civil Action No. 06-2128 (RCL)
                                                    )
Khadijah Bronson, <u>et</u> <u>al</u>.,            )
                                                    )
                        Defendants.                 )
_____ )


**PLAINTIFF'S STATEMENT OF MATERIAL FACTS**
<u>**AS TO WHICH THERE IS NO MATERIAL ISSUE**</u>

Pursuant to Local Civil Rule 7(h), plaintiff Anthony Bridgeforth hereby identifies

the following facts material to his Motion for Summary Judgment, which is being filed herewith,

as to which there exists no genuine issue:

1.      Plaintiff Anthony Bridgeforth is a resident of the District of Columbia enrolled in

Section 8 Tenant-Based Assistance as part of the Housing Choice Voucher Program.  <u>See</u>

Deposition of Anthony Bridgeforth, taken Dec. 6, 2007 ("Bridgeforth Dep."), at 84:15–19.

2.      Defendant Khadijah Bronson is the landlord and lessor of 210 20th Street, N.E.

<u>See</u> Deposition of Khadijah Bronson, taken Nov. 6, 2007 ("Bronson Dep."), at 11:18 – 12:2.

Ms. Bronson performs landlord duties at five properties in the District with a total of nearly

twenty units.  <u>See</u> <u>id.</u> at 31:9–17 & 59:21 – 60:21.  She has been a landlord for over five years,

and approximately one-quarter of her tenants pay rent through or with the help of subsidies from

the DCHA.  <u>See</u> <u>id.</u> at 32:19 – 33:4.  Ms. Bronson has initiated eviction proceedings in D.C.

Landlord-Tenant Court.  <u>See</u> <u>id.</u> at 38:11–16.

3.      Defendants James Carter, Jose Acosta, David Smith, Joseph Powell, and Darrelle Johnson are, and were during the relevant time period, police officers with the D.C. Metropolitan Police Department ("MPD") dispatched to 210 20th Street, N.E.  See Deposition of James Carter, taken Nov. 29, 2007 ("Carter Dep."), at 9:4–10; Deposition of Jose Acosta, taken Nov. 28, 2007 ("Acosta Dep."), at 7:17–19; Deposition of David Smith, taken Nov. 29, 2007 ("Smith Dep."), at 9:18 – 10:1; Deposition of Joseph Powell, taken Nov. 28, 2007 ("Powell Dep."), at 8:3–7; Deposition of Darrelle Johnson, taken Nov. 28, 2007 ("Johnson Dep."), at 7:9–13.

4.      At the relevant time, defendant Ralph W. McLean was an MPD Captain serving as the "watch commander" responsible for all police activity in the MPD First District, including the actions of the officers on the scene of the incident.  See Deposition of Ralph W. McLean, taken Nov. 27, 2007 ("McLean Dep."), at 24:12–19.

5.      In November 2005, Mr. Bridgeforth responded to an advertisement at the District of Columbia Housing Authority ("DCHA") for Section 8 units available for rent by calling Ms. Bronson.  Bridgeforth Dep. at 88:15 – 91:7.  The parties met at a Bank of America branch on Capitol Hill and agreed to initiate the DCHA Lease Up package.  Id. at 100:11–20.

6.      Mr. Bridgeforth and Ms. Bronson met on November 4, 2005, and agreed that Mr. Bridgeforth would rent one of the units at 210 20th Street, N.E.  See Bridgeforth Dep. at 215:13–20.  They specifically agreed to monthly payments of $1052.00 for the rental and a security deposit of $500, to be paid by Mr. Bridgeforth.  See Exhibit 27 to Memorandum in Support of Plaintiff's Motion for Summary Judgment.  The one-year lease between Mr. Bridgeforth and Bronson commenced on December 1, 2005.  See id. at 1.

7.      Ms. Bronson completed the lease-up package paperwork on November 4, 2005 to rent a unit at 210 20th Street, N.E. as soon as possible.  See Bronson Dep. at 70:11–71:3.  Ms.

-2-

Bronson signed a contract to receive rent payments directly from DCHA.  See Exhibit 28 to Memorandum in Support of Plaintiff's Motion for Summary Judgment.  On December 30, 3005, Ms. Bronson acknowledged receipt of a DCHA notification to Mr. Bridgeforth that his DCHA Lease Up application had been "processed."  See Exhibit 29 to Memorandum in Support of Plaintiff's Motion for Summary Judgment.  Ms. Bronson signed a DCHA Lease Up Package Checklist on January 11, 2006.  See Exhibit 25 to Memorandum in Support of Plaintiff's Motion for Summary Judgment.  Ms. Bronson signed a lease before January 20, 2006.  See Bronson Dep. 124:1–9.  Ms. Bronson knew that Mr. Bridgeforth claimed that he had a right to occupy the property and not to be evicted.  See Bronson Dep. at 188:4–5.  Before January 20, 2006, Ms. Bronson even advocated to the DCHA that Mr. Bridgeforth was a tenant.  See id. at 140:17 – 141:5 & 143:18–20.

8.     Mr. Bridgeforth began moving his belongings into the apartment unit on or about December 23, 2005.  See Bridgeforth Dep. at 157:12–15.

9.     The District of Columbia Housing Authority ("DCHA") inspected the unit on November 29, 2005, and determined that it passed inspection.  See Exhibit 30 to Memorandum in Support of Plaintiff's Motion for Summary Judgment.  Ms. Bronson was present at the inspection.  See Bronson Dep. at 82:7-12.  On January 10, 2006, DCHA conducted a reinspection of the unit in the presence of both Mr. Bridgeforth and Ms. Bronson.  See Bronson Dep. at 112:4–8.  Ms. Bronson made repairs to the unit between January 10 and 20 in response to those inspections.  See id. at 85:14–17 & 112:14–18.

10.    Ms. Bronson was paid by the DCHA for renting an apartment to Mr. Bridgeforth on January 1, 2006 and February 1, 2006.  See Exhibit 31 to Memorandum in Support of Plaintiff's Motion for Summary Judgment; see also Bronson Dep. at 132:10-17 & 134:6–14.

\\\DC - 090334/010285 - 2709229 v1

11.     Ms. Bronson knew in January 2006 that a landlord must first file a 30-day notice with DCRA and then file a claim in D.C. Landlord and Tenant Court after the notice period has expired in order to evict a tenant.  See Bronson Dep. at 39:15 – 40:4.  Ms. Bronson took none of those steps with respect to Mr. Bridgeforth.  See id. at 43:17 – 44:4.

12.     On January 20, 2006, Ms. Bronson and a male friend banged on the door to Mr. Bridgeforth's apartment and demanded that he leave.  See Bridgeforth Dep. at 249:9 –250:8; Bronson Dep. at 147:6–21.  Ms. Bronson and her friend attempted to force entry into the apartment by prying the door open.  See Bronson Dep. at 147:11–18.

13.     Uniformed MPD officers were dispatched to 210 20th Street, N.E. five times on January 20, 2006.

a.     MPD officers initially arrived between 12:30 and 1 p.m.  See Exhibit 22 to Memorandum in Support of Plaintiff's Motion for Summary Judgment at 1.  The officers declined to get involved with the dispute.  See Exhibit 23 to Memorandum in Support of Plaintiff's Motion for Summary Judgment.  Officer Jeannette Williams assigned a six-digit CCN incident number to the call, issued Mr. Bridgeforth a corresponding business card with the words "LANDLORD TENANT" at the bottom, see Exhibit 24 to Memorandum in Support of Plaintiff's Motion for Summary Judgment, and completed an incident report indicating that it was a dispute between a landlord and tenant.  See Exhibit 23 to Memorandum in Support of Plaintiff's Motion for Summary Judgment at 3.

b.     Ms. Bronson called the police to the scene around 3:30 p.m.  See Ex. 22 to Memorandum in Support of Plaintiff's Motion for Summary Judgment at 3.

c.     Police were dispatched around 5:30 p.m., but the event was closed after Mr. Bridgeforth spoke to the officers.  See id. at 6–7.

      d.     Police were on scene again around 8:50 p.m.  <u>See</u> <u>id.</u> 9–10.

      e.     MPD officer CR125 initiated a report at approximately 11:30 p.m.  <u>Id.</u> at

11.  At least Officers Carter, Smith, Acosta, Powell, and Johnson responded to the scene.

14.     Ms. Bronson contacted Captain McLean by telephone and told him that she was

having a problem with a supposed tenant.  <u>See</u> Bronson Dep. at 174:11–17.  Captain McLean

advised Ms. Bronson to acquire documents outside of the legal process supporting her contention

that Mr. Bridgeforth was not entitled to reside at the property after three or four telephone

conversations and a contentious debate.  <u>See</u> McLean Dep. at 33:2–4, 34:4–7 & 101:2.

15.     Captain McLean directed MPD officers to tell Mr. Bridgeforth to leave the

premises or he would be locked up for unlawful entry.  <u>See</u> McLean Dep. at 42:4–8; Powell Dep.

at 26:18 – 27:4; Acosta Dep. at 31:12–17; Smith Dep. at 75:4–7; Carter Dep. at 29:3–7 & 31:1–

5.  MPD officers on the scene did so.  <u>See</u> Carter Dep. at 29:5–7; Powell Dep. at 18:5; Acosta

Dep. at 29:6–9; Johnson Dep. at 21:6–8 & 25:18 – 26:1; Smith Dep. at 26:19 – 27:4 & 43:11–14;

McGunigal Dep. at 53:4–6.

16.     At the time Captain McLean issued his directive, he had not visited the scene, <u>see</u>

McLean Dep. at 27:8–12; had not ever spoken to Mr. Bridgeforth, <u>see</u> <u>id.</u> at 33:2–4; had assumed

that Mr. Bridgeforth was not on the scene until he was asked to leave, <u>see</u> <u>id.</u> at 44:8–12; did not

know Mr. Bridgeforth claimed to be a tenant, <u>see</u> <u>id.</u> at 79:3–5; had not reviewed any of the

paperwork related to the parties' relationship, <u>see</u> <u>id.</u> at 41:20 – 42:2; did not know whether any

of the officers reviewed Mr. Bridgeforth's paperwork, <u>see</u> <u>id.</u> at 53:3–9 & 55:14–15; did not

know about an incident report created earlier that day, <u>see</u> <u>id.</u> at 86:10–13; and did not know how

the Section 8 housing program worked, <u>see</u> <u>id.</u> at 91:6–7 & 100:2–3.

17.     Officer Carter was in charge of the scene on the night of January 20, 2006 at 210 20th Street, N.E.  <u>See</u> Powell Dep. at 40:10–12.  He understood the dispute to be a landlord/tenant dispute because it was dispatched as so.  <u>See</u> Carter Dep. at 18:13–14, 17. Officer Carter told other officers on the scene that Ms. Bronson was the landlord of the building and that she wanted to try to get Mr. Bridgeforth out.  <u>See</u>  Powell Dep. at 16:15–19.

18.     Between 11:30 p.m on January 20, 2006 and 1:44 a.m. on January 21, 2006, MPD officers at 210 20th Street, N.E. spoke to both Ms. Bronson and Mr. Bridgeforth and reviewed their paperwork.  <u>See</u> Exhibit 22 to Memorandum in Support of Plaintiff's Motion for Summary Judgment at 11; Carter Dep. at 14:10–11 & 24:10–20; McGunigal Dep. at 32:9–10; Acosta Dep. at 21:4–9, 22:11–16 & 24:8–10; Smith Dep. at 25:4–5 & 48:12–17.  The officers engaged in credibility determinations.  <u>See</u> McGunigal Dep. at 32:12–13.

19.     Officers Carter, Smith, Acosta, and Johnson entered the apartment building at 210 20th Street, N.E.  <u>See</u> Carter Dep. at 15:10–11, 27:17–20 & 32:13–21; Acosta Dep. at 25:13–15 & 25:21 – 26:7; Smith Dep. at 22:2–13.  Officer Johnson and several other officers entered Mr. Bridgeforth's apartment.  <u>Seeu</u> Johnson Dep. at 22:2–5 & 23:6–8; Smith Dep. at 22:2–13.

20.     The locks to Mr. Bridgeforth's apartment were changed while the officers were present.  <u>See</u> Carter Dep. at 36:7–12; Powell Dep. at 35:14 – 36:7.

21.     No MPD officer completed or filed an incident report about the incident taking place on the night of January 20–21, 2006.  <u>See</u> Carter Dep. at 36:17–21; <u>see also</u> Johnson Dep. at 39:12–14.  The MPD General Order on Field Reporting would have required creation of a report.  <u>See</u> Exhibit 18 to Memorandum in Support of Plaintiff's Motion for Summary Judgment at 2.  Captain McLean's impressions of the dispute would have been different if he would have

known about a previous report categorizing the parties as landlord and tenant.  <u>See</u> McLean Dep. at 87:11–12.

22.    MPD policy is that MPD officers are not to become involved in apparent landlord-tenant disputes.  <u>See</u> Exhibit 15 to Memorandum in Support of Plaintiff's Motion for Summary Judgment.  MPD officers also are instructed not to facilitate evictions.  <u>See</u> Exhibit 19 to Memorandum in Support of Plaintiff's Motion for Summary Judgment at 2.

23.    MPD officers respond to and make determinations regarding apparent landlord-tenant disputes every day.  Deposition of Teresa Brown, taken February 5, 2008 ("Brown Dep."), at 59:19 – 60:1.

24.    Rank-and-file police officers typically have the final authority to determine whether a dispute involves landlord-tenant issues.  <u>See</u> Brown Dep. at 59:14–17.

25.    On February 23, 2001, the MPD Assistant Chief advised the Office of General Counsel that the following training programs were being implemented as a result of the litigation in <u>McMillian v. Davis</u>, Civil Action No. 98-7746 (D.C. Super.):  (a) "Roll Call Training" on "Residential and Self-help Evictions" issued to each patrol district and division "at least every three months"; (b) a component in the "Field Training Officer Course" on eviction policy beginning in March 2001; (c) training on MPD eviction policy in "all future courses" offered to "First Line Supervisor[s] & Reserve Officer[s]"; (d) training on MPD eviction policy included in the 32-hours of in-service training required for "lieutenants and above"; and (e) inclusion of MPD eviction policy in the standard curriculum offered to all recruits/lateral officers.  <u>See</u> Exhibit 16 to Memorandum in Support of Plaintiff's Motion for Summary Judgment.  As of January 2006, the MPD did not train its officers on eviction policy in (a) any roll call training sessions held after February 2001 <u>see</u> Deposition of Kimberly Butler, taken on Feb. 5, 2008, at

-7-

58:1–15, (b) its field training officer course, see id. at 43:7–11, (c) its first line supervisor school, see id. at 50:7–10, or (d) variable in-service training programs, see id. at 60:4–7.

26.    As a result of the litigation in McMillian v. Davis, Civil Action No. 98-7746 (D.C. Super.) in 2001, the MPD was required to revise the "Civilian Complaint Computer Database" to permit tracking of civilian complaints relating to (a) "MPD involvement in evictions" and (b) "MPD involvement in landlord-tenant disputes."  See Exhibit 17 to Memorandum in Support of Plaintiff's Motion for Summary Judgment.  As of January 2006, the District did not specifically track citizen complaints regarding MPD involvement in landlord-tenant disputes.  See Butler Dep. at 64:4–11.  The MPD has no code or complaint category in its database for landlord-tenant disputes and no code or complaint category in its database for residential evictions.  See Deposition of John Michael Hedgecock, taken Feb. 5, 2008 ("Hedgecock Dep."), at 44:6–16.

27.    There has been no investigation, no disciplinary action, and no remedial action taken with respect to the events that are the subject of this lawsuit.  See Hedgecock Dep. at 121:4–17 & 126:4–9.

Respectfully submitted,

HOGAN & HARTSON LLP

By: /s/ Jeremy T. Monthy_____
    Adam K. Levin (#460362)
    Jeremy T. Monthy (#468903)
    555 Thirteenth Street, N.W.
    Washington, D.C.  20004
    (202) 637-5600
    (202) 637-5910 (fax)

Dated:  April 7, 2008                    Counsel for Plaintiff Anthony Bridgeforth

\\\DC - 090334/010285 - 2709229 v1

# EXHIBIT 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

+   +   +   +   +

þÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍ»
IN THE MATTER OF:         °
                           °
ANTHONY BRIDGEFORTH,   °
     Plaintiff,      ° C.A. No.
                       ° 06-2128
                       °
     v.             ° (RCL)
                       °
KHADIJAH BRONSON, ET AL,  °
     Defendants.     °
þÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍÍ¼

Thursday,

December 6, 2007

Washington, D.C.

DEPOSITION OF:

ANTHONY BRIDGEFORTH

called for examination by Counsel for the

Defendant, pursuant to Notice of Deposition,

in the Office of the Attorney General for the

District of Columbia, 441 4th Street, N.W., 6th

Floor South Conference Room, when were present

on behalf of the respective parties:

1        A       That's all I got.

2        Q       Okay.  That's what I want to know.

3    So you received assistance with your rent.  Is

4    it assistance with your rent, by the way?

5        A       I don't know.

6        Q       Mr. Bridgeforth, you didn't know

7    what kind of benefits they were providing to

8    you?

9        A       I --

10               MR. MONTHY:  Objection.  Go ahead.

11               THE WITNESS:  I didn't -- see --

12    are you saying -- the benefit was I got a

13    voucher for an apartment.

14               BY MS. VALDES:

15        Q       Okay.  That's what I want to know.

16    So sometime in 2000 or 2001 you started

17    receiving vouchers to rent apartments from

18    D.C. Housing Authority.  Is that correct?

19        A       Yes.

20        Q       Tell me how that program works, as

21    best as you can.  You went to the D.C. Housing

22    Authority, you applied for benefits?

Page 88

1    that you were receiving benefits from D.C.

2    Housing Authority, did you report to them that

3    you were working?

4         A    Every time.

5         Q    You reported to them every single

6    time?

7         A    Every single time.

8         Q    Okay.  Is part of the requirements

9    to receive D.C. Housing benefits that you do

10   not work?

11            MR. MONTHY:  Objection to form.

12   If you know, go ahead.

13            THE WITNESS:  I don't know.

14            BY MS. VALDES:

15        Q    Okay.  Tell me how it came about

16   that you found out about renting 210 20th

17   Street, N.E.

18        A    Can I use the bathroom?  Oh, I

19   seen a flyer down at Housing and they have a

20   section with flyers going to this canopy thing

21   that twirl around.

22        Q    Okay.

Page 89

```
 1            A      I saw some flyers and I took like

 2       six or seven flyers and I put them in my bag.

 3       And when I got home, I proceeded to call them.

 4            Q      Okay.

 5            A      Excuse me, excuse me, can I use

 6       the bathroom?

 7            Q      Sure.  We can take a break.

 8                   MS. VALDES:  What time is it now?

 9                   THE WITNESS:  Thank you.

10                   COURT REPORTER:  11:45.

11                   THE WITNESS:  I'm going to come

12       right back.

13                   MR. MONTHY:  Yes, no, that's fine.

14                   (Whereupon, at 11:39 a.m. a recess

15       until 11:43 a.m.)

16                   MS. VALDES:  What is the time now?

17                   COURT REPORTER:  11:43.

18                   MS. VALDES:  Back on the record.

19                   BY MS. VALDES:

20            Q      When we left off, Mr. Bridgeforth,

21       you said that you had seen several flyers at

22       the D.C. Housing Authority.  You took the
```

Page 90

```
 1          flyers home and, I guess, you found a flyer

 2          for 210 20th Street.

 3                  A      Yes, ma'am.

 4                  Q      Do you recall what information

 5          that flyer had in it?

 6                  A      It had the landlord name as Ms. K.

 7          A number on it, 277-1772 (202), and it had

 8          1617 -- no, it had 1718 E Street, N.E.,

 9          Apartment 3, and it had 210 20th Street, N.E.,

10          Apartment 3 and that was basically it.

11                  Q      Okay.  What did you do thereafter?

12                  A      I called Ms. K and introduced

13          myself, told her I was interested in 17 -- I

14          told her I was interested in 210 20th Street.

15          But after we talked and she told me how much

16          the rent was and I knew my voucher couldn't

17          cover that, I said okay, I'll take 1718 E

18          Street, N.E., Apartment 3.

19                  Q      1718 E Street?

20                  A      E, yes.

21                  Q      Okay.

22                  A      So, you know, we talked.
```

Page 91

```
 1          Q      And this was all on the telephone?

 2          A      Yes.

 3          Q      Do you remember, approximately,

 4     when this conversation took -- first of all,

 5     do you remember, approximately, when you saw

 6     the flyer?

 7          A      November '05.

 8          Q      Okay.  And do you remember,

 9     approximately, when you called and spoke to

10     Ms. K?

11          A      The same date I got the flyer, but

12     I don't know the --

13          Q      Okay.

14          A      -- exact date.  I can tell you

15     maybe it was in the first week of November.

16          Q      Did you call her on your cell

17     phone?

18          A      Yes.

19          Q      Okay.  Do you currently have a

20     cell phone?

21          A      Yes.

22          Q      How do you pay for that cell phone
```

1          A      She told me come and meet her.  We

2    met up.

3          Q      Okay.  Where did you meet up?

4          A      I'm not quite sure.  The question

5    is kind of complicated, because we met up more

6    than once.

7          Q      Well, I want to know the first

8    time you met up.  So let's try to take this as

9    much as we can in order.  The first time you

10    met with her.

11          A      The first time we met up, I

12    believe, was at the Bank of America on

13    Pennsylvania Avenue.

14          Q      Okay.

15          A      S.E.

16          Q      Why did you guys meet up there

17    for?  What was the purpose of meeting there?

18          A      To pick up -- to view the

19    apartment, get the keys and complete the

20    package.

21          Q      Okay.  How close is the Bank of

22    American on Pennsylvania Avenue to 1718 E

Page 157

```
 1            Q     Okay.

 2            A     I liked the layout and I, you

 3      know, told her I would take it.  I would take

 4      it, you know.  She said okay, no problem.  I

 5      don't have my keys with me.  I'll call you

 6      later on and give you the key.

 7            Q     Okay.  Did she call you back the

 8      same day?

 9            A     I don't remember if it's the same

10      day.

11            Q     Okay.

12            A     She called me back and told me the

13      date that we supposed to be at Housing.

14            Q     And what was that date?

15            A     The 23rd of December.

16            Q     Okay.  So that was before the

17      holidays.

18            A     I believe, I believe.

19            Q     Okay.

20            A     The 23rd of December.

21            Q     That was before the holidays.

22            A     Yes.
```

Page 249

1       not reported it?

2              A     I -- that's -- I never not -- they

3       knew, they had my work stuff.

4              Q     I asked you a question.

5              A     I don't know.  I don't know.

6              Q     Okay.  You don't know what it had

7       to do with?

8              A     No.

9              Q     Okay.  Okay.  Mr. Bridgeforth,

10      let's go to the day, January 20, 2006.  Tell

11      me what happened on January 20, 2006

12      commencing with the very early morning hours.

13      So I guess, what I want to know is when you

14      woke up.

15             A     I was sleeping in the back room.

16      There is a room back to sleep.  I got the

17      mattress on the floor, TV on the table and I'm

18      in the back asleep.

19             Q     Okay.  Then what happened?

20             A     I hear some loud banging.

21             Q     Okay.

22             A     But I think I'm dreaming.

Page 250

1          Q      Okay.

2          A      But I still hear the loud banging,

3      so I wake up.  I see the back door like boom,

4      boom, boom, so I call the police.  I said

5      ma'am, can you send the police to 210,

6      somebody trying to break in my house.  And the

7      lady said well, do you know who it is and I

8      said no, ma'am.

9          Q      Okay.  Tell me about the back door

10     to your apartment.  Where is the back door

11     located in relation to the bedroom where you

12     were at?

13         A      Just a space where I was at, it's

14     the back door right.

15         Q      Okay.  You have to step out of a

16     door out of the bedroom to see the back door?

17         A      No.

18         Q      You can see it from the bedroom?

19         A      Um-hum.

20         Q      Okay.

21         A      It's really not a bedroom, it's a

22     back room.

Page 251

1          Q      Okay.   Is there a glass window on

2    that back door?

3          A      No.

4          Q      Okay.   It's just a door just like

5    the one here in this conference room which is

6    complete, just a plain door?

7          A      Yes.

8          Q      Complete wood?

9          A      Yes.

10         Q      Okay.   Was anybody calling your

11   name or saying anything to you that was

12   banging on the door?

13         A      I was asleep.   I don't -- if they

14   did, I was asleep.

15         Q      Okay.   Okay.   Tell me what

16   happened then.

17         A      I woke up.   I grabbed my phone.   I

18   dialed 911.

19         Q      Okay.

20         A      Tell them somebody trying to break

21   in my house.   The lady like well, who could it

22   be?   I don't know.

# EXHIBIT 2

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

ANTHONY BRIDGEFORTH,   *

   Plaintiff,   *

           *

  vs.      * CASE NO.:

           * 06-2128 (RLC)

KHADIJAH BRONSON, et al., *

   Defendants.   *

* * * * * * * * * * * * * * * * * * * * * *

   The deposition of KHADIJAH BRONSON was

taken on Tuesday , November 6, 2007, commencing

at 10:23 a.m. at Hogan & Hartson, LLP, 555 13th

Street, N.W., Washington, D.C. 20004, before

Deborah A. Gurley, Registered Professional

Reporter, Notary Public for the District of

Columbia, when were present on behalf of the

respective parties:

* * * * * * * * * * * * * * * * * * * * * *

Reported by:

  Deborah A. Gurley, Court Reporter

11

1   remember them putting him out.  I kept asking my

2   lawyer are they saying they put him out?   I didn't

3   see them physically remove him because it was --

4   everything took place outside.

5        Q.   All right.  We will get to the specifics

6   of what happened.

7             MR. WHITE:  Off the record.

8             (Mr. White consulted with the witness.)

9   BY MR. MONTHY:

10       Q.   Now throughout today's deposition I would

11   really like to focus as much as possible on events

12   that took place on and around January 20, 2006.  Is

13   that fair?

14       A.   Yes.

15       Q.   And you were the landlord -- you are a

16   landlord, correct?

17       A.   Yes.

18       Q.   And the incident that we were going to be

19   discussing involved a property I believe at 210 20th

20   Street, N.E.

21       A.   Uh-huh.

12

1    Q.    Are you a landlord at that property?

2    A.    Yes.

3    Q.    And is it your understanding that the

4    incident that we have been referring to took place

5    at that property?

6    A.    Yes.

7    Q.    All right.  And in or around that date did

8    you -- was Mr. Bridgeforth residing at 210 20th

9    Street, N.E, before January 20, 2006?

10   A.    He wasn't supposed to be, but he was there

11   I guess.

12   Q.    So he was living there at least one day

13   before January 20, 2006?

14   A.    I don't know if he -- I mean, yeah,

15   because when I came there on that day he was there,

16   so I don't know how long he was there because I

17   wasn't in the city at that time.

18   Q.    You returned from out of town on

19   January 20, 2006?

20   A.    Probably.  Whatever day that I came up

21   there is the day that I returned.

13

1      Q.    And Mr. Bridgeforth was living in a unit

2    at that address at that time, correct?

3      A.    He was in there.

4      Q.    And I take it from your answers that you

5    didn't feel like he should have been there.

6      A.    Right.

7      Q.    Is that fair to say?

8      A.    Right.

9           MR. WHITE:  Excuse me.

10          (Mr. White consulted with the witness.)

11   BY MR. MONTHY:

12     Q.    And when you found him there you wanted

13   him out of there.

14          MS. VALDES:  Objection as to form.

15     Objection leading.

16   BY MR. MONTHY:

17     Q.    You can answer.

18          MR. WHITE:  Objection.  Go ahead and

19     answer.

20          THE WITNESS:  That I wanted him out.  You

21     said because when I saw him there I wanted him

14

1    out?

2    BY MR. MONTHY:

3        Q.    Yes.

4        A.    Right.

5            MR. WHITE:    Excuse me.    Whenever he asks

6        questions don't you rephrase the question.    Let

7        him ask the question again.

8            THE WITNESS:    Can you repeat the question?

9            MR. MONTHY:    Can you please read back the

10       question?

11           (The Court Reporter read back the question

12       as follows: "QUESTION: And when you found him

13       there you wanted him out of there.")

14           THE WITNESS:    Right.

15   BY MR. MONTHY:

16       Q.    I would like to take a couple of steps

17   back actually to make sure that we are making the

18   job of the Court Reporter as easy as possible.    Have

19   you ever been deposed before?

20       A.    Have I ever been what?

21       Q.    Deposed.

31

1      Q.   What do you do as a landlord on a

2  day-to-day basis?

3      A.   Well, I mean I provide a service for the

4  tenant, a place to live, any problems contact me and

5  I get the problems fixed, and that's basically it.

6      Q.   Are you responsible for completing

7  paperwork documenting the lease?

8      A.   No.

9      Q.   Is there anybody else at Agile Properties

10  who fills out paperwork when somebody leases a unit?

11      A.   Oh, I'm sorry. Yeah.  I do.  That's me.

12      Q.   Now how many other buildings do you serve

13  as a landlord for?

14      A.   Two.

15      Q.   Are those also located in Washington,

16  D.C.?

17      A.   Yes.

18      Q.   How long have you been the landlord for

19  those properties?

20      A.   Same, about four years.

21      Q.   Was 210 20th Street, N.E., the first

32

1    property that you owned?

2         A.    Yes.

3         Q.    Do you own any of the other two properties

4    as well?

5         A.    Yes.

6         Q.    So each one of the buildings that you

7    serve as a landlord you own as well.

8         A.    Yes.

9         Q.    How many units total are you a landlord

10   for across all three of your buildings?

11        A.    Ten.

12        Q.    And how many of your --

13              MR. WHITE:  Excuse me.  Off the record.

14              (Mr. White consulted with the witness.)

15              MR. WHITE:  Back on.

16              (Mr. White consulted with the witness.)

17              MR. WHITE:  Back on the record.

18   BY MR. MONTHY:

19        Q.    What percentage of the tenants that you

20   rent to across all three buildings pay rent through

21   or with the help of subsidies from the Housing

33

1    Department?

2                MS. VALDES:   Objection as to relevance.

3                MR. WHITE:   Go ahead and answer.

4                THE WITNESS:   Maybe 25 percent.

5    BY MR. MONTHY:

6         Q.    Ms. Bronson, do you have any -- do you do

7    any other work besides being a landlord?

8         A.    Yes.

9         Q.    What's your other job?

10        A.    I own an ice cream parlor.

11        Q.    And what's the name of the ice cream

12   parlor?

13        A.    Philadelphia Water Ice Factory.

14        Q.    I could have guessed that.   Is that

15   located in Washington, D.C.?

16        A.    Yes.

17        Q.    Do you have any other jobs?

18        A.    No.

19        Q.    And what did you do before working at

20   Philadelphia Water Ice Cream Factory?

21        A.    I was a civil engineer.   I worked for

38

1    Landlord-Tenant Court?

2         A.    Superior.

3              MS. VALDES:  Objection as to form.

4              MR. WHITE:  You can answer.  You answered.

5    BY MR. MONTHY:

6         Q.    Have you ever initiated proceedings in

7    Landlord-Tenant Court?

8         A.    With Bridgeforth?

9         Q.    Anyone.

10        A.    Yes.

11        Q.    And have you ever initiated proceedings in

12   Landlord-Tenant Court seeking to evict somebody?

13        A.    Yes.

14        Q.    How many times?

15        A.    I don't know.  All the time.  I don't

16   know.  A lot.

17        Q.    More than five?

18        A.    Probably about a little less than that

19   probably.

20        Q.    Describe the, in general describe the

21   procedure that you go through to initiate

39

1    proceedings in Landlord-Tenant Court to evict

2    somebody.

3         MS. VALDES:  Objection as to form.

4         MR. WHITE:  My concern with your question

5    is that you are trying to establish some kind

6    of expertise level with the witness.  I would

7    be more comfortable if you asked her what she

8    did in her particular cases.  She is not here

9    as an expert on landlord-tenant laws.

10        MR. MONTHY:  I agree.  She's a named

11   defendant.  She is not here as an expert.

12        MR. WHITE:  So please be specific when you

13   ask those types of questions if you would.

14   BY MR. MONTHY:

15    Q.   Tell me, Ms. Bronson, what steps you take

16   to bring, to initiate proceedings in Landlord-Tenant

17   Court when you seek to evict someone.

18        MS. VALDES:  Objection as to relevance.

19        MR. WHITE:  Go ahead and answer.

20        THE WITNESS:  You file a 30-day -- give

21   the tenant a 30-day notice.  You file it down

40

1      at DCRA.  They stamp it.  It's on the record

2      that you served the tenant 30 days.  After that

3      30 days you go down to Landlord-Tenant and you

4      file a claim.

5  BY MR. MONTHY:

6      Q.   And is it fair to summarize these steps as

7  the formal eviction process?  If I say that would

8  you understand that I'm referring to those steps?

9          MR. WHITE:  Again, objection.

10         MS. VALDES:  Objection as to form.

11         MR. WHITE:  You can't establish her as an

12     expert.  Again, you can ask her what she did,

13     but in terms of any kind of level of expertise

14     I would object to her answering.

15         MR. MONTHY:  Mr. White, I understand.  I'm

16     not deposing her as an expert.  I'm not seeking

17     any expertise.

18         MR. WHITE:  But just be more, you know,

19     for example, if you want to ask her what she

20     did when she sued Mr. Bridgeforth or a

21     particular client I have no problem with that I

43

1          (The Court Reporter read back the question

2     as follows:  "QUESTION:  Did you utilize the

3     formal eviction process to evict a tenant

4     before January 2006?")

5          THE WITNESS:  I don't remember.

6   BY MR. MONTHY:

7     Q.   You have used a formal eviction process to

8   evict tenants approximately five times; is that

9   right?

10         MS. VALDES:  Objection.

11         MR. WHITE:  Objection.  I believe her

12    testimony was --

13         MS. VALDES:  It mischaracterizes her

14    testimony.

15         MR. WHITE:  Yeah.

16   BY MR. MONTHY:

17    Q.   Less than five time?  Okay.  Less than

18   five times you have used the formal eviction process

19   to evict tenants, correct?

20    A.   Uh-huh.

21    Q.   Yes?

44

1       A.    Yes.

2       Q.    Did you use the formal eviction process to

3  seek to evict Mr. Bridgeforth at any time?

4       A.    I never did with him, no, because he

5  wasn't ever a tenant.

6       Q.    So what I'm trying to understand is I'm

7  trying to understand the times that you have used

8  the formal eviction process to evict your tenants.

9  You understand that, right?

10      A.    Yes.

11      Q.    How many times have you used the formal

12 eviction process to evict one of your tenants in the

13 last year?

14           MS. VALDES:  Objection as to relevance.

15           MR. WHITE:  Go ahead and answer.

16           MS. VALDES:  And to the extent that the

17      last year referred to November --

18 BY MR. MONTHY:

19      Q.    In the year 2007.

20           MS. VALDES:  Let me finish.  To the extent

21      that the last year is November 6, 2006, to

54

1    the application, they see the unit, I check it,

2    check their background, and if they like the unit,

3    they have their money, the security deposit, after

4    they sign a lease they can move in the unit.  They

5    don't move in a unit before they sign a lease.

6        Q.    When -- in a situation where a tenant is

7    leasing property through Section 8 at what point in

8    the process do you issue them their keys?

9        A.    Everything take place after the lease up.

10   Just like in everyday life, you don't give nobody no

11   keys to nothing if they are not a tenant.

12       Q.    So after the lease update you give the

13   tenant their keys.

14       A.    Right.

15       Q.    Do you -- is that before or after you

16   receive payment from the housing authority?

17       A.    Before.

18       Q.    You went through the Section 8 lease up

19   process that you just described with Anthony

20   Bridgeforth, correct?

21       A.    Uh-huh.

57

1    Q.    And when did you start that process?

2    A.    You mean date?

3    Q.    Yes.

4    A.    I guess it was -- I don't know.  I guess

5    it was according to the notes maybe November I

6    think, November or December.  I'm not sure.

7    Q.    Of 2005?

8    A.    Yeah.

9    Q.    And so just walking through the steps of

10   the Section 8 leasing process did Mr. Bridgeforth

11   see the unit?

12   A.    Yes.

13   Q.    Do you remember what date he saw the unit?

14   A.    No.

15        MS. VALDES:  I'm going to object again to

16        the use of the leasing process.  I don't think

17        that's the proper name for --

18        MR. MONTHY:  If she understands it then

19        that's all that --

20        MS. VALDES:  I understand that, but I

21        represent the District of Columbia and the D.C.

59

1      A.    My ice cream parlor.

2      Q.    I'm sorry.   Where is that located?

3      A.    In D.C.

4      Q.    Where specifically?

5      A.    12th and H.

6      Q.    What quadrant?

7      A.    Northeast.

8      Q.    Is one of your other properties located at

9  1617 E Street, N.E.?

10      A.    No.

11      Q.    Have you ever served as a landlord for the

12  property located at that address?

13           MS. VALDES:  Objection as to relevance.

14           MR. WHITE:  Go ahead and answer.

15           THE WITNESS:  I guess if that's what you

16      want to call it, yes.

17  BY MR. MONTHY:

18      Q.    Describe what --

19      A.    I mean I'm no the owner.  My cousin is the

20  owner.  I help him out.  So I mean, you know --

21      Q.    Are there other properties in town -- let

60

1    me start over.  Are there any other properties other

2    than the three properties that you own that you help

3    out as a landlord?

4            MS. VALDES:  Objection as to relevance.

5            MR. WHITE:  Go ahead and answer.

6    BY MR. MONTHY:

7        Q.    That wasn't in English, but I hope you

8    understood the question.

9        A.    Yeah.

10       Q.    How many?

11       A.    Just one other one.

12       Q.    And that's the 1617 E Street, N.E.?

13       A.    No.  I said one other one.

14       Q.    Where is that located?

15       A.    D Street, 1839 D.

16       Q.    How many units are there in 1617 E Street,

17   N.E.?

18       A.    They both have four.

19       Q.    Are both of those properties owned by your

20   cousin?

21       A.    Yes.

70

1    On the front page of that towards the top of the

2    page there's a box with the number 3.  And it says,

3    "Requested beginning date of lease."  Do you see

4    that on the left-hand side of the page?

5         A.    Uh-huh.  Yes.

6              MS. VALDES:  I'm sorry.  Which --

7              MR. MONTHY:  Exhibit 6, top left-hand side

8         of the page.

9              MS. VALDES:  Okay.

10   BY MR. MONTHY:

11        Q.    Number 3, requested beginning date of

12   lease, there's some letters, A-S-A-P, under that,

13   correct?

14        A.    Yes.

15        Q.    Is that your handwriting?

16        A.    Yes.

17        Q.    And what did you mean when you wrote

18   A-S-A-P?

19        A.    Whenever, the first available date that

20   they have to do lease up.

21        Q.    And so you're -- what you were trying to

71

1    communicate to the Housing Authority was you wanted

2    to begin a lease as soon as possible?

3         A.    Yes.

4         Q.    On Exhibit 5 the first page on the

5    right-hand side, bottom half of the page, there are

6    a series of letters here, O and T.  Do you see what

7    I'm referring to?

8         A.    Yes.

9         Q.    Is that your handwriting?

10        A.    Yes.

11        Q.    I'm sorry?

12        A.    Yes, yes, yes, yes.

13        Q.    And can you tell me in general what these

14   boxes are referring to?

15        A.    Exactly what it means it says is whatever

16   I provide as the owner and what the tenant has to

17   pay.

18        Q.    And it says, "Referring to utilities in

19   the rented unit"?

20        A.    Yes.

21        Q.    And provided by owner --

82

1      Q.    In this particular case you don't remember

2  whether you were at the --

3      A.    I mean I --

4         MR. WHITE:  Let him finish.  Repeat the

5      question.

6  BY MR. MONTHY:

7      Q.    In this particular case do you remember

8  whether you were at the initial inspection?

9      A.    Let me think.  Yeah.  I guess I would have

10 to be there.

11     Q.    Why do to you say that?

12     A.    Because I would have had to let her in.

13     Q.    So you are assuming you were there for the

14 initial inspection because otherwise the inspector

15 wouldn't have had access to the unit.

16     A.    Right.

17     Q.    You said initial inspection earlier,

18 right?

19     A.    Uh-huh.

20     Q.    Right?

21     A.    Yes.

85

1    A.    I don't remember dates.  I don't remember.

2   I'm just assuming.  This was almost two years ago.

3   I don't remember how everything played out.  During

4   this period of time my mother was sick.  So, you

5   know, I was going through that issue.  Then she

6   passed, so I don't remember exactly what was going

7   on or what dates.  So I'm not going to sit up here

8   and make up a date.  I don't know.

9    Q.    Please don't.  I'm not asking you to do

10  that.  Do you recall whether there was a subsequent

11  inspection before January 20, 2006?

12   A.    Was it one before January 20?  I don't

13  remember.  Probably.  But I don't remember.

14   Q.    And as a result of those other inspections

15  did you have to make any changes to the unit?

16   A.    Yeah.  Yeah.  I think I had to, minor,

17  something minor.

18       MS. VALDES:  I'm going to object as to the

19       form of the last question.

20       MR. WHITE:  Objection.

21  BY MR. MONTHY:

92

1    occupied.

2         Q.    So she was a lawful tenant of Number 3 on

3    January 20, 2006?

4         A.    Uh-huh.

5         Q.    Please say yes or no.

6         A.    Yes.

7         Q.    But you don't know if she was physically

8    present --

9         A.    No.

10        Q.    -- in that unit on that date?

11        A.    No.

12        Q.    When we discussed the steps that you take

13   to lease a property under Section 8 before, the

14   first step if I'm remembering was that the person

15   who wants to be a tenant comes to look at the unit;

16   is that right?

17        A.    Yes.

18        Q.    And that happened with Mr. Bridgeforth?

19        A.    Yes.

20        Q.    And when that happened did Mr. Bridgeforth

21   look at Unit Number 3 or Unit Number 4?

105

1    BY MR. MONTHY:

2        Q.    But did the inspection occur after the

3    judge issued the order saying that he was legally

4    entitled to be in Unit Number 4?

5        A.    Additional inspections happened after

6    that, yeah.

7        Q.    Were there any inspections between the

8    time of the initial inspection and the time that the

9    court issued an order saying that he could reside in

10   Unit Number 4?

11       A.    I told you before I'm sure it was.    I

12   don't remember, but I'm thinking that it was some

13   inspection before he went to court, before we went

14   to court.

15       Q.    And did those -- were you present for

16   those inspections or not present?

17       A.    I was present, too.

18       Q.    So were you present for any inspection

19   that took place for Unit Number 4 between the time

20   of the initial inspection and the date that the

21   court issued an order saying he could be in unit

112

1    that it happened.

2        Q.    That what happened?

3        A.    The inspection.

4        Q.    So were you -- does this indicate that an

5    inspection was performed on January 10?

6        A.    Yes.

7        Q.    And were you present for that inspection?

8        A.    Yes.

9        Q.    And as a result of this inspection there

10   are certain requirements that you had to -- there's

11   certain defects that you had to fix with the unit;

12   is that right?

13       A.    Yes.

14       Q.    And do you know whether you actually fixed

15   those problems?

16       A.    Yeah.  I had to.  Yeah, I'm sure I did.

17       Q.    But do you remember fixing the problems?

18       A.    Yeah, I remember fixing them.

19            (Deposition Exhibit Number 12 was marked

20        for identification.)

21   BY MR. MONTHY:

124

1    it.  I'm not sure, but it's kind of vague where I

2    think they faxed something and I signed it, signed a

3    lease at a certain time or something, but he

4    wouldn't sign it.

5        Q.   And as best you can recall, the faxing

6    back and forth, did that occur before January 20,

7    2006?

8        A.   Yeah, it probably did.  It would have had

9    to.

10        MR. MONTHY:  I'm going to mark this as

11    Exhibit 14A.

12        (Deposition Exhibit Number 14A was marked

13    for identification.)

14        MR. MONTHY:  Counsel, this is a document

15    that was produced by counsel for Ms. Bronson

16    today, so I don't have an extra copy of it but

17    it's been --

18        MS. VALDES:  Is that part of this package?

19        MR. MONTHY:  Yes.  And it's been Bates

20    marked AB 00032.

21        MS. VALDES:  Okay.

134

1          possession we will provide it to you within --

2                THE WITNESS:  I'm not saying that I didn't

3          get it.  I'm just saying that I don't recall

4          it, but I might have.

5     BY MR. MONTHY:

6          Q.    Do you recall whether you were paid in

7     February 2006 for --

8          A.    Yes.

9          Q.    -- in relation to Mr. Bridgeforth?

10         A.    Yeah.

11               MS. VALDES:  Objection as to relevance.

12    BY MR. MONTHY:

13         Q.    And were you paid in March 2006?

14         A.    I was paid all the way -- I don't know how

15    far I was paid, but I was paid because of what was

16    happening so they then in turn started paying me

17    because he in fact then was saying that he was a

18    tenant.  I mean he wasn't never owning up to being a

19    tenant, but the court documents allowed Housing to

20    start paying me.  So at that point I backed off of

21    it.  So I continued to get paid up until Housing

140

1    was when Housing gave you a copy?

2        A.   Yes.   I never received it.   They gave it

3    him -- I mean he, Bridgeforth gave it to them.   They

4    never talked to me and told me about this.

5        Q.   And did they give you a copy in person or

6    was this when you were still out of town?

7        A.   I don't remember how I got it.   I don't

8    know if it was faxed or if it was -- or if I got it

9    when I got back.   I don't remember.

10        Q.   When they showed you a copy of this

11    document what did you do then?

12        MS. VALDES:   Well, I'm going to object as

13        they showed you a copy of this document.   I

14        don't think she testified that they showed her

15        a copy of the document.

16   BY MR. MONTHY:

17        Q.   When you -- let me rephrase it.   When you

18   received a copy of this document from Housing how

19   did you respond?

20        A.   I just told you how I responded.   I said,

21   "What do you mean he doesn't -- I don't care what

141

1    this document say.  He said he was moving in, you

2    know.  I got the place all ready for him."  You

3    know, I went back and forth with them for a long

4    time and, you know, up until trying to go to court

5    fight them with this.

6         Q.    And did you go to court?

7         A.    I went to court, but I don't remember what

8    it was.  I been to court so many times I don't

9    remember it if was -- actually I went to court for

10   him.  I sued Bridgeforth and won my judgment.  But I

11   mean --

12        Q.    Did you go to court to try to convince

13   Housing to pay you?

14        A.    No.

15        Q.    When you said that you went back and forth

16   did you have multiple conversations with Housing to

17   convince them to pay you?

18        A.    Yes.  Actually I had a meeting with all of

19   the execs in reference to this.

20        Q.    And that was an in-person meeting?

21        A.    Uh-huh.  Yes.

143

1    conversations with them like that because I wasn't

2    informed that he never intended on signing the

3    lease.

4        Q.    Let me just -- let me understand.  The

5    first time that you spoke to Housing were they where

6    you say that they notified you that you had been

7    paid in error, are we on the same page?

8        A.    Yes.

9        Q.    Was that before or after January 20, 2006?

10       A.    It was before.

11       Q.    And did they -- did you receive a copy of

12   this letter at that time or was it in a different

13   conversation with Housing?

14       A.    I don't know.  But it had to be -- I

15   probably didn't get the document at that time, but I

16   knew about the document at the time they told me

17   they paid me in error.

18       Q.    So you had some of your conversations with

19   Housing before January 20, 2006.

20       A.    Right.

21       Q.    Now when you -- did you go to 210 20th

1    A.    I don't know if he talked to him because I

2  left out.  I mean, yes, I don't think he did.  I

3  don't remember.  I don't remember if he talked to

4  him or not.  I know I had called the police so I

5  don't know what conversation, if any, took place.

6    Q.    Did either you or your friend actually

7  succeed in getting the door open to the unit at that

8  time?

9    A.    Yeah.  We did, but he must have heard us

10  coming and he beat us to me getting into the unit,

11  like he must have heard us, me prying the door open

12  because it wasn't -- I know I never put no lock on

13  the door.  So I knew it was -- it shouldn't have

14  been hard to get the door open.

15    Q.    What do you mean by prying the door open?

16    A.    Like pushing on it to open it because the

17  door was already kind of weak because I was

18  eventually going to replace it.

19    Q.    Did you use any kind of tool to pry the

20  door open?

21    A.    No.

152

1    Q.   Just to clarify we are talking about the

2   first time that police officers arrived at the

3   property on January 20, 2006.  Okay?

4    A.   It was also a time after that.

5    Q.   Let me ask you that question.  Did police

6   officers arrive at the property more than once on

7   January 20, 2006?

8    A.   Yes.  I said it took all night.

9    Q.   All right.  So my questions are directed

10   to the first time that police officers showed up to

11   the property.  Okay?   Do you understand that?

12    A.   Okay.

13    Q.   So I'm specifically trying to find out

14   what was said when the police officers responded to

15   your initial 911 call or a 911 call on January 20,

16   2006.  Okay?

17    MS. VALDES:  I'm going to object to the

18   form of the question.  A 911 call or the

19   initial 911 call?

20   BY MR. MONTHY:

21    Q.   It's unclear what 911 call they are

159

1            MR. WHITE:  Do the best you can to answer.

2            THE WITNESS:  How did I feel?  I didn't

3    feel anything because I was going to get down

4    to the bottom of it.  I called -- they told me

5    that they will call someone of a higher

6    authority to, you know, explain the situation

7    and that's what I did.

8    BY MR. MONTHY:

9        Q.    Who did you say that to?

10       A.    I think I called one of the captains.

11       Q.    But when you -- you said you were going to

12   get to the bottom of it; is that right?

13       A.    I mean I'm just saying I don't know -- I

14   can't remember verbatim what I'm saying.  I'm just

15   talking about now is how I probably would have

16   worded it.  I don't know what I would have said

17   then.  I'm just saying that I was getting down to

18   figure out what was going on.  He wasn't supposed to

19   be there and that's how I told it.  I called them,

20   told the captain and went from there.

21       Q.    Did you have any conversations with

161

1      me that.

2              MS. VALDES:  Calls for speculation.

3              MR. MONTHY:  You're right.

4              MR. WHITE:  Don't answer that.

5      BY MR. MONTHY:

6          Q.   Did they tell you anything else when they

7      told you the shift was going to change?

8          A.   No, not that I can remember.

9          Q.   Did they suggest that you try to call the

10     police again?

11         A.   No.  I just told you that they told me to

12     contact someone of a higher authority.

13         Q.   What did you do next?

14         A.   I guess at some point I called the captain

15     or called somebody and they transferred me to the

16     captain or something like that.

17         Q.   That happened at some point, but do you

18     remember what the next thing you did was?

19         A.   No.  I don't remember.  All I know, so we

20     don't go through all this, is it took forever.  It

21     took all day, all night.  I don't think everything

168

1        MR. MONTHY:  Did you need to take a break,

2    Mr. White?

3        MR. WHITE:  I just need to feed the meter

4    once more.

5        MR. MONTHY:  Let's try to take a quick

6    break because I need to wrap things up quickly.

7        THE WITNESS:  And I have got to go because

8    I have got four hours on that meter.

9        MR. MONTHY:  Off the record.

10       (There was an off-the-record discussion.)

11       (A recess was taken at 2:26 p.m. and the

12    deposition resumed at 2:36 p.m.)

13    BY MR. MONTHY:

14       Q.   Ms. Bronson, before we took our short

15    break we were talking about January 20, 2006, right?

16       A.   Yes.

17       Q.   And you wanted Mr. Bridgeforth out of Unit

18    Number 4 of 210 20th Street, N.E., on that day,

19    right?

20       A.   Yeah.   I wanted him out because he wasn't

21    supposed to be there.

169

1  Q. You wanted him out of there, right?

2  MS. VALDES: Objection. Asked and

3 answered.

4  MR. WHITE: Go ahead.

5  THE WITNESS: I wanted him out because he

6 wasn't supposed to be there. There's a

7 difference than wanting him out.

8 BY MR. MONTHY:

9  Q. Well, regardless of the -- well, what's

10 the difference in your mind?

11  A. That he wasn't supposed to be there and he

12 was there illegally.

13  Q. Either way you didn't want him in Unit

14 Number 4 anymore, correct?

15  MS. VALDES: Objection.

16  MR. WHITE: Go ahead and answer.

17  THE WITNESS: Yeah.

18 BY MR. MONTHY:

19  Q. And we were discussing the steps you were

20 taking to try to get him out of the apartment. You

21 talked about conversations that you had on that day,

174

1    situation.  I don't know at what point who referred

2    or what position.  Maybe I came up with the position

3    myself, you know, somebody tired of going through

4    dealing with people who don't really know too much.

5    I want to deal with somebody who would better know

6    or better understand.  So I don't even know if

7    somebody even actually told me to deal with

8    somebody.  In life that's how I deal with things.  I

9    deal with people at a higher authority.  That way

10   you get some results.

11        Q.    And so you said that you remember telling

12   him the situation, right?

13        A.    Yeah.

14        Q.    What did you tell him?

15        A.    That I had somebody in there who was

16   supposed to be a tenant.  They don't want to live in

17   the unit.  I was away.  When I came back he was in

18   the unit illegally.  He wasn't supposed to be there.

19   I had documents showing that he wasn't supposed to

20   be there.  And basically he was there unlawfully.

21        Q.    And when refer to documents are you

Page 188

1      A.    Yes.

2      Q.    And do you know whether he showed the

3  officers any documents?

4      A.    I don't know if he did or not.  I'm sure

5  he did.  He tried to.  He tried to, you know -- I'm

6  sure knowing him he tried to show them that he

7  belonged there.

8      Q.    And do you know a person by the name of

9  Yolanda Jeter (phonetic)?

10     A.    No.  Who is that?

11     Q.    Was Mr. Bridgeforth's girlfriend at the

12  property at the time that the last group of officers

13  arrived?

14     A.    Yes.

15     Q.    And did she say anything to the officers?

16     A.    I don't remember.  She said a whole lot so

17  I'm sure she did say something to them.

18     Q.    Other than you, Mr. Bridgeforth, and Mr.

19  Bridgeforth's girlfriend, and the officers were any

20  other people present at the time that the last

21  officers arrived on January 20, 2006?

204

1      Q.    Let's not talk about Mr. Bridgeforth for a

2  second.   I'm asking about the general rule.

3      A.    Yeah.   I have a tenant whether it's

4  Section 8 or it's anybody that's a tenant, yeah,

5  they all have 30 days, not just specifically for

6  Section 8.   That's anybody that's a tenant.   They

7  have a 30-day notice.   You know, there's a process

8  that I told you that you have to do.   You just can't

9  evict somebody even if they want to move out.   If

10  they say they want to move out they have 30 days

11  until they're officially out or then you start your

12  process.   So I know the rules, but it don't apply to

13  him.

14      Q.    And did you feel that the rules did not

15  apply to him on January 20, 2006?

16          MS. VALDES:   Objection as to form.

17          MR. WHITE:   Answer it to the best you can

18      patiently.

19          THE WITNESS:   Yes, yes, yes, yes.   The

20      rules did not apply.

21  BY MR. MONTHY:

215

1    recall if that captain is Captain Ralph McLean?

2        A.    McLean, it sounds familiar.

3        Q.    I have a couple of questions about some of

4    the exhibits that you were shown today.  And I'm

5    going to refer you back to them if you have them

6    with you.  On Exhibit Number 3 -- I'm sorry.

7    Exhibit Number 3.  Before I ask you that, let me ask

8    you some other questions first.  You mentioned that

9    you had been out of town sometime in January.  Do

10   you recall if you left out of town before the

11   holidays or after the holidays?

12       A.    Both.  I was back and forth.

13       Q.    Do you recall the first time that you met

14   Mr. Bridgeforth regarding renting a unit from you?

15   Was it before the holidays in December or after?

16       A.    It was in November.

17       Q.    Okay.  It was in November.  And did you

18   agree after you met him to rent one of your units to

19   him?

20       A.    Yes.

21       Q.    Which unit was that?

# EXHIBIT 3

1

IN THE UNITED STATES DISTRICT COURT FOR

DISTRICT OF COLUMBIA


ANTHONY BRIDGEFORTH,                    *

        Plaintiff,                      *

                                *

    vs.                            * Case No.:

                            * 06-2128 (RLC)

KHADIJAH BRONSON, et al.,               *

        Defendants.                     *

* * * * * * * * * * * * * * * * * * * * * * * *


      The deposition of OFFICER JOSE ACOSTA

was taken on Wednesday, November 28, 2007,

commencing at 1:20 p.m. at 555 Thirteenth Street,

N.W., Washington, D.C., 20004, before Nancy P.

Richmond, Registered Professional Reporter, Notary

Public for the District of Columbia, when were

present on behalf of the respective parties:



7

1    the Metropolitan Police Department?

2         A.    May of 2002.

3         Q.    And is it all right if I refer to the

4    Metropolitan Police Department as M.P.D.?

5         A.    Yes.

6         Q.    And what position did you start out in

7    with the M.P.D.?

8         A.    Basic recruit.

9         Q.    Has that position changed over time?

10        A.    Yes.

11        Q.    Could you tell me how?

12        A.    I graduated the academy, became a police

13   officer.

14        Q.    Okay.  And so your current position is

15   officer?

16        A.    Yes.

17        Q.    And could you tell me what your position

18   was in January of 2006?

19        A.    Police officer.

20        Q.    Are you assigned to any specific

21   geographical area?

21

1    scene, into the investigation, yes.

2         Q.    Had you ever met him before that point?

3         A.    No.

4         Q.    Did you have any conversations with him

5    on that day?

6         A.    At what point?

7         Q.    At any point during the investigation.

8         A.    He came over to me and showed me a piece

9    of paper.

10        Q.    Okay.  And what piece of paper was that?

11        A.    I don't know.  It was a pink sheet of

12   paper.  That's all I remember.

13        Q.    Did you look at it at all?

14        A.    I did, but I didn't understand it.

15        Q.    Can you give me any specifics as to what

16   that piece of paper was or what he said it was?

17             MS. VALDES:  Objection, compound.

18        A.    It was from the housing office, but I

19   didn't know -- you know, he showed me a form.  I

20   didn't know what the form was.  I didn't know what

21   it signified.  I didn't know what it was, and I

22

1   told him that.

2       Q.    Did he try to explain it to you at all?

3       A.    He did, but he wasn't making any sense.

4       Q.    Could you tell me all what he said to

5   you that night about the piece of paper?

6       A.    I can't recall his exact words, no.

7       Q.    Can you give me a general sense as to

8   what he was trying to tell you?

9             MS. VALDES:   Objection, asked and

10            answered.

11      A.    He was talking about the form and what

12  it meant.   But I wasn't conducting the

13  investigation, so I referred him to the officers

14  that were.

15      Q.    Who did you refer him to?

16      A.    Back to Carter, Powell and Johnson.

17      Q.    Do you have any knowledge as to whether

18  he went and showed those officers the paper?

19      A.    I don't know what he did with the

20  papers.

21      Q.    Did you, by any chance, make a copy of

24

1      A.    Sir, I didn't know what the paperwork

2   was.  It had his name on it.  That's the only

3   thing I remember.  He kept showing it to me.

4           And I referred him back to the officers

5   that were doing the investigation.  I can't -- I'm

6   not going to take over from the officers who are

7   already conducting the investigation.

8      Q.    But you did say he said it had something

9   to do with the housing department?

10     A.    It did.

11     Q.    It looked like a housing department

12  form?

13     A.    It had the housing department on it.  I

14  don't know if it was one of their official forms.

15     Q.    Okay.  Did you at any point inform --

16  other than referring Mr. Bridgeforth to the other

17  officers, did you tell anyone else about the

18  document?

19     A.    He went over and spoke directly to them

20  after I pointed him in that direction.

21     Q.    You saw him go speak to them?

25

1      A.    Yes.

2      Q.    Did he show them the document?

3      A.    He had his back to me.

4      Q.    Did any of the other officers mention

5  anything to you about the document?

6      A.    No.

7      Q.    Did you speak with any other non-police

8  witnesses on the scene?

9      A.    No.

10      Q.    So the only person you spoke with that

11  wasn't a police officer was Mr. Bridgeforth?

12      A.    Yes.

13      Q.    Did you ever enter the building at 210

14  20th Street?

15      A.    I did go up.

16      Q.    Did you ever enter the apartment that

17  Mr. Bridgeforth was occupying at the time?

18      A.    Define "enter."

19      Q.    Did you go inside the doorway?

20      A.    I looked inside the doorway.

21      Q.    Where were you standing when you looked

26

1    inside the doorway?

2        A.    At the threshold, the entrance.

3        Q.    So in the doorway?

4        A.    I wouldn't say in the doorway.  About a

5    foot or two back from the doorway.

6        Q.    And that would be outside the doorway --

7        A.    Outside the doorway.

8        Q.    -- in the building.  How did you -- was

9    the door open when you got there?

10       A.    It was.

11       Q.    Were there any other officers inside?

12       A.    I can't recall.

13       Q.    Was there anyone inside when you were

14   viewing, when you were looking into it?

15       A.    I couldn't see anybody.

16       Q.    Do you know where Mr. Bridgeforth was at

17   the time when you were looking into the apartment?

18       A.    I think I seem to recall he was outside.

19       Q.    Do you know where Ms. Bronson was when

20   you were viewing the apartment?

21       A.    I don't know where she was.

29

1    Q.    Do you know why he left?

2    A.    I don't know why he left.  I know that

3    he left.

4    Q.    So you're unaware of whether anyone told

5    him that he had to leave?

6    A.    He was told -- he was told he had to

7    leave, but I don't know who said it.

8    Q.    Was it one of the officers?

9    A.    It was an officer.

10    Q.    You don't know which one, though?

11    A.    No, I do not.

12    Q.    At what point was he told to leave?

13    A.    Sometime in the investigation.

14    Q.    Was it before you arrived?

15    A.    No.

16    Q.    Was it before or after you viewed the

17    apartment?

18    A.    It was after.

19    Q.    Did you have -- after seeing the

20    document that he presented to you and after

21    looking in the apartment, did you have any

31

1     Q.    Was it before Mr. Bridgeforth was

2    ordered to leave?

3     A.    It was before Mr. Bridgeforth left.

4     Q.    Okay.  But you don't know whether it was

5    before the officer told him to leave?

6     A.    I don't know the exact time line, sir.

7     Q.    Do you have any knowledge of the

8    discussions that took place between the officers

9    and Captain McLean?

10     A.    I don't know the exact conversation they

11    had.  I know they were talking to one another.

12     Q.    Okay.  Do you know whether Captain

13    McLean was the one who ultimately told them to ask

14    Mr. Bridgeforth to leave?

15          MS. VALDES:  Objection as to form.

16     A.    I heard from standing -- when I was

17    back, that Captain McLean had said to remove him.

18     Q.    I'm sorry.  You heard when you were

19    standing where?

20     A.    I was back at my car.

21     Q.    Okay.

45

1      first.  And number two, objection to the

2      extent that it's irrelevant and calls for

3      speculation.

4      A.   There's any number of different

5 scenarios that could play out.  I can't speak to

6 say that this would be the only thing that would

7 lead me to believe that he lived there or that

8 this was even a legitimate landlord/tenant

9 dispute.

10     Q.   Now, are you aware of a general policy

11 in the M.P.D. regarding landlord/tenant disputes?

12     A.   I'm aware.

13     Q.   And what is that policy?

14     A.   Refer them to civil court.

15     Q.   And when would you do that?

16     A.   Any landlord/tenant dispute.

17     Q.   Would it be any time it appears to be a

18 landlord/tenant issue, you would refer them to

19 landlord/tenant court?

20          MS. VALDES:  Objection as to form.

21     A.   There are other factors that could

46

1    change the situation, the scenario.  Again, you

2    have to conduct an investigation.

3         Q.   So if -- what is the M.P.D.'s role then

4    if they come upon a landlord/tenant dispute?

5              MS. VALDES:  Objection, calls for

6         speculation.  Objection, asked and answered.

7         A.   Conduct an investigation.

8         Q.   And if you determine that it appears to

9    be a landlord/tenant dispute, what do you do?

10             MS. VALDES:  Asked and answered.

11        A.   Refer them to landlord/tenant court.

12        Q.   Would Mr. Bridgeforth -- if

13   Mr. Bridgeforth had stated that he had permission

14   to be there by Section Eight, would that influence

15   your decision as to whether it was a

16   landlord/tenant dispute?

17             MS. VALDES:  Objection, asked and

18        answered, and objection, calls for

19        speculation and irrelevant.

20        A.   Alone, no.

21        Q.   Okay.  Let's look at the next statement

# EXHIBIT 4

1

IN THE UNITED STATES DISTRICT COURT FOR

DISTRICT OF COLUMBIA


ANTHONY BRIDGEFORTH,            *

            Plaintiff,          *

                                *

    vs.                         * Case No.:

                                * 06-2128 (RLC)

KHADIJAH BRONSON, et al.,       *

            Defendants.         *

* * * * * * * * * * * * * * * * * * * * * * * *


        The deposition of OFFICER JAMES CARTER

was taken on Thursday, November 29, 2007,

commencing at 2:06 p.m. at 555 Thirteenth Street,

N.W., Washington, D.C., 20004, before Nancy P.

Richmond, Registered Professional Reporter, Notary

Public for the District of Columbia, when were

present on behalf of the respective parties:



9

1       A.    Yes.

2       Q.    And that's 103?

3       A.    Yes, sir.

4       Q.    Do you understand that we're here today

5    to discuss the events that occurred on the evening

6    of January 20th, 2006, at 210 20th Street?

7       A.    Yes.

8       Q.    Were you one of the officers on the

9    scene at that event?

10      A.    Yes, I was.

11      Q.    Who was your partner that evening?

12      A.    There were five of us.  I believe it was

13   Officer Smith, Acosta, myself, Powell, Johnson.

14      Q.    Do you know who Sergeant McGunigal is?

15      A.    Yes.

16      Q.    How do you know him?

17      A.    He's a sergeant at the First District.

18      Q.    Okay.  Is he a current supervisor of

19   yours?

20      A.    He's not my direct supervisor, but he is

21   a current supervisor, yes.

14

1    address, I believe I saw Ms. Bronson first, and

2    she was stating that she was having a problem with

3    Mr. Bridgeforth.

4         I believe she had some type of paperwork

5    that she had received earlier that she had got.  I

6    can't recall which other officers were actually

7    talking to her.

8         Later on, Mr. Bridgeforth arrived.  When

9    he arrived, then he was very angry, very

10   confrontational.  He also had some type of papers

11   that he had, and they were basically talking or

12   arguing back and forth between the two.

13   Q.   Okay.  What happened next?

14   A.   I believe the other officers were

15   handling talking to Ms. Bronson; other officers

16   was talking to Mr. Bridgeforth, basically trying

17   to keep them apart.

18        As I said before, Mr. Bridgeforth was

19   very confrontational, arguing, cussing, blah,

20   blah, blah.

21        I don't mean to say blah, blah, blah.

15

1      Q.    That's fine.

2      A.    Cussing.  And he was kind of very

3    agitated.  So it was, I believe, myself just,

4    basically, standing in between the two of them.

5      Q.    Okay.  And did anything else happen that

6    evening?

7      A.    At one point I believe his wife, I think

8    he said it was, was there.  She was on the phone,

9    talking.

10         And then there was a time when we went

11   upstairs.  I believe Mr. Bridgeforth took some

12   things with him and left.

13     Q.    Why did Mr. Bridgeforth leave?

14         MS. VALDES:  Objection, calls for

15   speculation.  You can go ahead and answer.

16     A.    Why did he leave?

17     Q.    Yes, sir.

18     A.    Just, he left.

19     Q.    Was he asked to leave?

20     A.    He wasn't asked to leave by me.

21     Q.    Was he asked to leave by anybody?

18

1      Q.    But it was not you?

2      A.    It wasn't me.

3      Q.    It wasn't you, okay.  All right.  Let's

4  go back sort of towards the beginning.  You said

5  that when you arrived, Mr. Bridgeforth was not

6  present?

7      A.    No.  I don't believe he was.

8      Q.    Let's go back even further.  Why did you

9  go to the scene?  Was it a radio run?

10     A.    It was a radio run.

11     Q.    And when you received that radio run,

12  what did you understand the situation to be?

13     A.    I understand it to be a landlord/tenant

14  dispute.

15     Q.    And how did you come to that

16  understanding?

17     A.    I believe it was dispatched as so.

18     Q.    Do you know whether records are kept of

19  these dispatches?

20          MS. VALDES:  Objection as to form.

21     A.    I wouldn't have any knowledge of that.

24

1    pages?  Was it multiple documents, or was it --

2         A.    Multiple.  It wasn't single.  It was

3    multiple.

4         Q.    Okay.  How much of that did you look at?

5         A.    None.

6         Q.    None of that?  Did you -- you said at

7    one point in time you saw it in her hands.  Did

8    you even read the front page of what she had?

9         A.    No.

10        Q.    So, as you sit here today, you don't

11   know what that paperwork might have said?

12        A.    I don't know from reading it.  I know

13   bits and pieces from, I guess, just being there.

14             Let me see.  I didn't read it.  But I

15   believe it was some type of documents that she got

16   from the court about the dispute between them two,

17   a landlord/tenant disagreement.

18        Q.    Okay.  And how did you come to that

19   knowledge?

20        A.    Just listening to her talk.

21        Q.    Okay.  And she said it was from the

27

1  stated that he did not want to sign a lease or did

2  not want to lease the apartment that she owned.

3       Q.    That was on the paperwork that he had?

4       A.    That he had.

5       Q.    Okay.  But you never specifically read

6  it?

7       A.    No.

8       Q.    And you never -- you never even saw his

9  paperwork?

10       A.    I saw it in his hands.  I'm just going

11  by what one of the officers on the scene, which I

12  can't recall which officer, but it was an officer

13  that read it.

14       Q.    Okay.  Got it.  And at this point in

15  time, are we still outside the premises?

16       A.    Yes.

17       Q.    All right.  Why did -- I believe you

18  stated earlier, was there a point in time that you

19  went inside?

20       A.    Yes.

21       Q.    And why did you do so?

29

1    that evening?

2        A.    Yes.

3        Q.    Did Captain McLean give any orders about

4    what to do at the scene?

5        A.    I believe he gave a order that if

6    Mr. Bridgeforth did not have a lease or did not

7    sign a lease, he would be asked to leave.

8              See, I didn't talk to him, so I'm just

9    going by basically what I heard.

10       Q.    Your understanding was that if he didn't

11   have a lease in hand, that he was going to be

12   asked to leave?

13       A.    No, not asked to leave by me.

14       Q.    Right.

15       A.    But he would leave the premises.  I

16   don't know if he agreed to leave the premises or

17   not, but eventually he left the premises.

18       Q.    I'm just -- I'm trying to clarify what

19   the instruction was.  I understand it wasn't --

20       A.    The instructions weren't to me.

21       Q.    But it was to an officer?

31

1    Q.    Let me ask it this way.  Do you

2  understand whether or not Captain McLean's order

3  was, to any police officer, that, if he doesn't

4  have a lease, he needs to be asked to leave?

5    A.    I believe it went that way.  I'm not

6  sure, because I didn't talk to him.

7    Q.    Okay.  But you do believe it went that

8  way?

9    A.    I believe the officer that he relayed

10  the information to -- the officer that he relayed

11  the information to that talked to him, I believe

12  he said that if he was leaving, that he could

13  leave.  He would leave.

14    I don't know if he -- I'm not saying

15  that they told him to leave.  But at some point he

16  left, and I didn't tell him to leave.

17    Q.    How long were you inside the premises?

18    MS. VALDES:  Objection as to form.  You

19  mean inside the building or the apartment?

20    MR. STEVENS:  I'm talking about the

21  building in general right now.  Thank you.

32

1      A.    Maybe five, ten minutes.

2      Q.    Okay.  Did you actually go inside the

3    apartment unit?

4      A.    In the -- the door opened, in the mouth

5    of the apartment.

6      Q.    Just in the threshold there?

7      A.    (Nods head.)

8      Q.    And how long were you there?

9      A.    Maybe five to ten minutes.

10      Q.    And why were you there?

11      A.    Just to keep the peace between the two

12    parties.

13      Q.    What was Mr. Bridgeforth doing at the

14    time?

15      A.    I believe he gathered a couple of bags

16    of clothes and some things, and he left.

17      Q.    And at that point in time, he was in the

18    process of gathering his belongings?

19      A.    He gathered -- it wasn't much in there.

20    He just gathered a few things and left.  I want to

21    say it was a bag of clothes or two.

36

1        Q.    By whom?

2        A.    Ms. Bronson.

3        Q.    Did any police officer aid her in

4    changing the locks?

5        A.    No.

6        Q.    But you watched her do it?

7        A.    Well, she began doing it as soon as he

8    left.  We were still there.

9        Q.    Was she completed -- had she completed

10   changing the lock by the time you left?

11       A.    I can't recall if she completed it, but

12   she had started.

13       Q.    She had started, okay.  And then you

14   walked outside.  Did you talk with the officers

15   for a while?

16       A.    I can't recall that we talked or not.

17       Q.    Okay.  Do you know whether anyone took

18   an incident report?

19       A.    No.

20       Q.    No, you don't know, or no, they didn't?

21       A.    No, no report was taken, I don't

37

1    believe.

2        Q.    And why was that?

3        MS. VALDES:  Objection, calls for

4    speculation.  I mean, if you can answer, I

5    guess you should answer the question as to

6    yourself.  I don't know that you can answer

7    as to everybody else.

8        A.    Me, I wouldn't have took a report,

9    because it didn't call for one.  Every incident

10   that we, as police, go on is not -- a report is

11   not always taken.  And I didn't take a report.

12       Q.    Okay.  Was there a particular officer

13   that was in charge of making the decision as to

14   whether or not a report should be taken?

15       MS. VALDES:  Objection as to form.

16       A.    No.

17       Q.    There was not?

18       A.    No.

19       Q.    Did you have any understanding at the

20   time that other officers had been to the location

21   earlier in the day?

40

1    evictions?

2            MS. VALDES:   Objection as to form.

3       A.   The Metropolitan Police Department

4    doesn't assist in evictions.  We only refer

5    parties to landlord/tenant.

6       Q.   And you understand that to actually be a

7    policy, correct?

8       A.   Yes.

9       Q.   In this case, did you refer

10   Mr. Bridgeforth or Ms. Bronson to landlord/tenant

11   court?

12      A.   I didn't, no.

13      Q.   But you were told, in responding to the

14   radio run, that it was a landlord/tenant dispute?

15      A.   Correct.

16      Q.   If the policy is for police not to get

17   involved with such disputes, why did police become

18   involved with this dispute?

19           MS. VALDES:  Objection, calls for

20       speculation.

21      A.   I was involved with this dispute just as

41

1    a peacekeeper, to keep both parties aside.

2        Q.    Okay.    You were never part of asking him

3    to leave the scene?

4        A.    No.

5        Q.    Do you understand that would have been

6    against police policy, in fact, to ask him to

7    leave the scene?

8            MS. VALDES:    Objection, calls for

9        speculation.

10       A.    Yes.

11       Q.    So that would have been against policy

12   to have done so?

13           MS. VALDES:    Objection, asked and

14       answered.

15       A.    Yes.

16           MS. VALDES:    Off the record.

17           (Whereupon, a discussion off the record

18   took place.)

19           MR. STEVENS:    This is out of order, and

20       I apologize for that, but let the record

21       reflect I've handed the witness what's been

# EXHIBIT 5

1

IN THE UNITED STATES DISTRICT COURT FOR

DISTRICT OF COLUMBIA


ANTHONY BRIDGEFORTH,                *

          Plaintiff,               *

                                   *

     vs.                           * Case No.:

                                   * 06-2128 (RLC)

KHADIJAH BRONSON, et al.,          *

          Defendants.              *

* * * * * * * * * * * * * * * * * * * * * * * *


The deposition of OFFICER DARRELLE

JOHNSON was taken on Wednesday, November 28, 2007,

commencing at 9:40 a.m. at 555 Thirteenth Street,

N.W., Washington, D.C., 20004, before Nancy P.

Richmond, Registered Professional Reporter, Notary

Public for the District of Columbia, when were

present on behalf of the respective parties:



7

1      Q.   -- District of Columbia Metropolitan

2  Police Department?

3      A.   Yes.

4      Q.   Had you ever worked for any law

5  enforcement agency before?

6          MS. VALDES:  Objection as to relevance,

7     but you can go ahead and answer.

8      A.   No.

9      Q.   And what was your position when you were

10  hired?

11      A.   Police officer.

12      Q.   And has that position changed over time?

13      A.   No.

14      Q.   Do you have a current geographical area

15  to which you're assigned?

16      A.   Yes.  I'm assigned PSA 103.

17      Q.   And when were you first assigned to 103?

18      A.   December -- I don't exactly recall.  It

19  might have been December of 2005.

20      Q.   Okay.  You understand that we're here

21  today to discuss an incident that occurred at 210

21

1      Q.   And why was he not on the scene?

2      MS. VALDES:  Objection as to form and

3      calls for speculation.

4      MR. STEVENS:  You can answer.

5      A.   He left.

6      Q.   Okay.  Was he asked to leave by a police

7 officer?

8      A.   Yes.

9      Q.   And do you recall by which officer?

10     A.   No.

11     Q.   But it was not yourself?

12     A.   No.

13     Q.   And it was not your partner, Officer

14 Powell?

15     A.   No.

16     Q.   Did you ever go inside the premises at

17 210 20th Street that evening?

18     MS. VALDES:  Objection as to form.  Can

19     you be more specific?  Do you want him to

20     answer the building or the apartment?

21     MR. STEVENS:  Sure.  I'll reask the

22

1    question.

2        Q.    Did you ever go inside the building?

3        A.    Yes.

4        Q.    Did you ever go inside any apartment?

5        A.    Yes.

6        Q.    Okay.  Why did you go inside the

7    building?

8        A.    'Cause that's where they were at.  They

9    was inside the building.

10       Q.    Okay.  And why did you go inside the

11   apartment?

12       A.    Because that's where Bridgeforth and the

13   landlord was at.

14       Q.    The landlord was also in the apartment

15   itself?

16       A.    She was at the front -- in the front of

17   the apartment.

18       Q.    So she was in the building, but not --

19       A.    She was in the building.  Whatever

20   apartment that Bridgeforth was in, she was

21   standing in front of that apartment.

23

1      Q.   Like right in front of the door?

2      A.   Exactly.

3      Q.   And he was inside?  He was on the other

4 side of the door?

5      A.   Yes.

6      Q.   And you actually went into the apartment

7 at some point in time?

8      A.   Yes.

9      Q.   And how did you get into the apartment?

10      A.   It was open.

11      Q.   It was open.  I'm going to assume you

12 weren't the first officer actually inside the

13 apartment?

14      A.   No.

15      Q.   You said that you viewed the document

16 that Ms. Bronson had given to the officers.

17      A.   Yes.

18      Q.   Did she specifically give it to you, or

19 had she given it to another officer who gave it to

20 you?

21      A.   She had gave it to another officer, and

25

1      A.    It was another female there.

2      Q.    So it was Mr. Bridgeforth and another

3   female?

4      A.    Yes.

5      Q.    And was -- were they ultimately both

6   asked to leave?

7      A.    I think -- well, that I don't recall.

8      Q.    Okay.

9      A.    But the female, if I -- was the

10  girlfriend, if I recall correctly.

11     Q.    Was Mr. Bridgeforth asked to leave the

12  premises?

13         MS. VALDES:   Objection, asked and

14     answered.

15     A.    Yes.

16     Q.    And did he comply with that request?

17     A.    Yes.

18     Q.    And that request came from an officer in

19  the Metropolitan Police Department?

20         MS. VALDES:   Objection, asked and

21     answered.   You can go ahead and answer.

26

1      A.   Yes.

2      Q.   But it wasn't yourself?  It was a

3  different --

4      A.   No.

5           MS. VALDES:  Objection, asked and

6      answered.

7      Q.   Do you recall inside the apartment

8  whether there were any personal belongings?

9      A.   Well, from what I recall, it was trashed

10  in the apartment.

11     Q.   You mean just things strewn about?

12     A.   Thing strewn about.  I didn't see no

13  furniture or anything like that.  It was just --

14  apartment just looked trashed.

15     Q.   Did you see any clothing?

16     A.   No.

17     Q.   No clothing?  And you said there was no

18  furniture?

19     A.   No furniture.

20     Q.   Did you look around the apartment, or

21  did you just stay in one place?

39

1    said anything about him having any paperwork?

2        A.    No.

3        Q.    From the incident, as you saw it, should

4    there have been an incident report created?

5            MS. VALDES:  Objection, calls for

6        speculation.

7        Q.    If you were the officer that had

8    received the radio run for this incident, would

9    you have written an incident report?

10           MS. VALDES:  Objection, calls for

11       speculation.  You can go ahead and answer.

12       A.    Would I have written a report?

13       Q.    Yes, sir.

14       A.    No.

15       Q.    And why do you feel as though it did not

16   call for a report?

17           MS. VALDES:  Objection.  I mean, he's

18       not an expert, and he's not here on behalf --

19           MR. STEVENS:  Counsel, you have the

20       right to object to form, and I have a right

21       to get the answer to the questions.

42

1    fact?

2         MS. VALDES:   Objection as to form.

3    A.    When you say training, what do you...

4    Q.    Have you ever had any formal training or

5    any roll call training that officers are not

6    supposed to intervene in what appear to be

7    landlord/tenant disputes?

8    A.    Yes.

9    Q.    And you understand that the protocol is

10   not to interfere in what appear to be

11   landlord/tenant disputes?

12        MS. VALDES:   Objection as to form.

13   A.    That's correct.

14   Q.    And you understand that even after a

15   court order is issued, it's the U.S. Marshals that

16   are supposed to actually effect the eviction?

17        MS. VALDES:   Objection as to form.   You

18   can go ahead.

19   A.    Yes.

20        (Whereupon, Johnson Exhibit Number 1 was

21   marked.)

53

1          (Thereupon, a discussion off the record

2     took place.)

3          A.    Okay.  If I would have known that rent

4     had been paid up for that month, I would -- I

5     would have told that it was a -- it was still a

6     landlord/tenant issue, that he had the right to

7     stay there to at least the end of that month,

8     since he had a document stating that he had his

9     rent paid up to the end of that month.

10         Q.    Okay.  And in that event, this would

11    have been, as we discussed earlier, something that

12    the police department should not have gotten

13    involved with because it appeared to be a

14    landlord/tenant dispute?

15         MS. VALDES:    Objection, calls for

16         speculation, but go ahead.

17         A.    If that would have presented to be when

18    I was on the scene.

19         Q.    Okay.

20         (Whereupon, Johnson Exhibit Number 2 was

21    marked.)

# EXHIBIT 6

1

IN THE UNITED STATES DISTRICT COURT FOR

DISTRICT OF COLUMBIA


ANTHONY BRIDGEFORTH,              *

            Plaintiff,            *

                                  *

    vs.                           * Case No.:

                                  * 06-2128  (RLC)

KHADIJAH BRONSON, et al.,         *

            Defendants.           *

* * * * * * * * * * * * * * * * * * * * * * * * *


        The deposition of CAPTAIN RALPH McLEAN

was taken on Tuesday, November 27, 2007,

commencing at 12:15 p.m. at 555 Thirteenth Street,

N.W., Washington, D.C., 20004, before Nancy P.

Richmond, Registered Professional Reporter, Notary

Public for the District of Columbia, when were

present on behalf of the respective parties:



8

1        A.    Absolutely not.

2        Q.    Okay, great.  What is your current

3   position with the Metropolitan Police Department?

4        A.    I am the commanding officer of the

5   police misconduct branch of the Internal Affairs

6   Division.

7        Q.    If I refer to the M.P.D. or police

8   department, is it acceptable that we all

9   understand that that's the Metropolitan Police

10  Department for the District of Columbia?

11       A.    Yes.

12       Q.    What are your job responsibilities today

13  as the commanding officer?

14       MS. VALDES:  Objection as to relevance.

15  Go ahead.  You can answer.

16       A.    I supervise the investigation of

17  citizens' -- the investigation of citizens'

18  complaints, criminal allegations against members

19  of the department and whatever other

20  investigations the chief or my assistant chief

21  deem appropriate.

9

1    Q.    You understand that we're here today

2    regarding the incident that took place back in

3    January of '06?

4    A.    Yes.

5    Q.    We'll talk more about that later, but

6    with regard to your work as the commanding officer

7    at the Internal Affairs Division, have you ever

8    dealt with that incident specifically?

9    A.    No.

10    Q.    Do you know whether the Internal Affairs

11    Division has ever investigated or done anything

12    relating to those events?

13    MS. VALDES:  Objection as to form.

14    A.    Not to my knowledge.

15    MS. VALDES:  Go ahead.

16    Q.    Not to your knowledge, okay.  Is

17    there -- just trying to understand the chain of

18    command within the Internal Affairs Division.  Do

19    you report to anybody?

20    A.    I report to the inspector that's in

21    charge of the division --

17

1    House basically over to the railroad tracks behind

2    Union Station, from Constitution Avenue up to L

3    Street.

4        I received awards for being the

5    commander of the PSA of the year twice, and I

6    earned a sustained superior performance award and

7    an outstanding achievement award.

8        In July of '06, I was transferred to the

9    police academy as the deputy director.

10   Approximately two months ago I was transferred to

11   internal affairs, not by choice, but by

12   designation.  It's one of those things where they

13   needed somebody, and they felt I was qualified,

14   and I went.

15       Q.  So me referring to you as captain is

16   actually incorrect.  What is the proper way to

17   refer to you here today?

18       A.  I'm a captain.

19       Q.  Captain is still correct.  I do have a

20   few questions.  I think between the time of 1990

21   and 1996, when you were a lieutenant, you

24

1          But when we first started, I used to

2     have to stay in the office and type this stuff up.

3     And it's time-consuming.

4          If I went home -- most nights I didn't

5     go home before 1:00 o'clock.  If you file for our

6     time and attendance records, you'll see I was

7     probably staying at work at least ten hours a day

8     and probably more like twelve.

9          Q.   You used the term, "watch commander."

10    Can you just tell me from a layman's point of view

11    what that is?

12         A.   The watch commander is the on-duty

13    official in each district, the senior official.

14    Usually, it's supposed to be a captain.  When a

15    captain's not present, it will be a lieutenant.

16         And the watch commander is basically the

17    clearinghouse for decisions, or you're also the

18    person that's responsible up the chain of command

19    to either the night supervisor or the chief of

20    police, if something goes on, if there's an

21    activity or event, yes.

27

1    everybody else combined.

2        Q.   Okay.  You understand that 210 20th

3    Street is in PSA 103?

4        A.   I couldn't tell you if it was PSA 103

5    back then, because we've -- they redesigned the

6    PSA's a couple years ago.  But it's in the

7    confines of the First District.

8        Q.   Okay.  Regarding the events that took

9    place at 210 20th Street on the night of January

10   20th, 2006, did you actually personally go to the

11   scene?

12       A.   No.

13       Q.   Have you ever been to 210 20th Street,

14   N.E.?

15       A.   Not to my recollection.

16       Q.   Since we're on to these events already,

17   could you walk me through your understanding of

18   what took place at 210 20th Street, N.E., on the

19   night of January 20th, 2006?

20       A.   I recall being in the office and the

21   phone ringing.  And I don't know why I remember

28

1    this, but I picked up.  I was walking somewhere,

2    and I actually picked up the phone on Captain

3    Angel Medina's desk, because that's the phone

4    closest to the door.

5         And I was confronted by a very angry

6    woman, whose name I cannot recall.  It is --

7         Q.    Perhaps Ms. Bronson?

8         A.    Bronson, thank you.  I almost had it.

9    It was right on the tip of my tongue.

10        Ms. Bronson was extremely angry and said

11   the police had been there several times and hadn't

12   done anything.

13        She explained the circumstances to me,

14   and my impression, from speaking with her, was

15   that an individual had moved into one of her

16   apartments, an individual that had looked at the

17   apartment.

18        And there was initially some Section

19   Eight paperwork being done, but that while she

20   was out -- the gentleman had stated he didn't want

21   the apartment.  And while she was out of town, I

31

1    writing, taking my pens out and setting them down,

2    and then when I need another pen, grabbing it,

3    writing with it, setting it down.

4         I didn't have a pen.  So I had to put

5    the lady on hold, grab a pen and something to

6    write on, because I think I took a phone number or

7    some information from her.  I don't recall what it

8    was.  It was something simple.  It was something

9    on like a sticky note.

10        Q.    Sure.

11        A.    And I got some information and told her

12   I would get back to her, because she was very

13   angry.

14             And when I hung the phone up, my

15   recollection is that I was saying, well, here

16   comes a complaint Monday, because she was so

17   angry.  And, thankfully at the time, I was also

18   thinking that that's the substation area and she

19   could pursue her complaint with the substation

20   commander, who -- I don't recall if it was

21   Inspector Keith Williams or Inspector Kevin Keegan

32

1  at the time.

2            It could even have been Kevin Anderson.

3  He was there briefly.

4            But I also remember thinking, well, you

5  know, I'll be part of the complaint, so I'll be

6  writing a P.D. 119.  A P.D. 119 is a witness

7  statement basically, and kind of figured, well,

8  let me see if I can take care of this complaint.

9            And I had the officers that were on the

10 scene call me in the office.  I don't remember who

11 it was that called me.

12           And I asked them, I said, "What the heck

13 is going on over there?"

14           And they started explaining.

15           The one thing I do remember was that

16 Mr. Bridgeforth was not there but was calling as

17 if he was there, which was -- which I found to be

18 a little bit irritating and, quite frankly, very

19 irresponsible, because I was told that at some

20 point in time the call came as a code one run, I

21 think, for a burglary.

33

1          So I talked to them.  I went back and

2  forth and talked to -- I probably talked to

3  Ms. Bronson at least three times, probably four.

4          I never spoke to Mr. Bridgeforth.  I

5  talked to different officers on the scene.

6          What I would do is generally find out

7  who the senior officer was and talk to them.  I

8  know I had been at the First District long enough

9  to know who I could rely upon to get good

10  information from at that point.

11          And I kept getting more and more

12  information about the situation.  And I wasn't

13  sure that we could ever resolve it.  So I pretty

14  much was resigned to getting that complaint on

15  Monday morning.

16      Q.   And how was it resolved?

17      A.   Well, eventually I kind of put it back

18  on Ms. Bronson.  She was saying she owned the

19  building.  This guy wasn't supposed to be in

20  there, but that he had looked at that apartment

21  through Section Eight.

34

1        I didn't know what paperwork Section

2  Eight had.  I didn't know what paperwork she had,

3  but she didn't have any with her then.

4        And I said, "Ma'am, if you can't prove

5  to me that this guy's squatting in your apartment,

6  I'm not doing anything with it, and you'll have to

7  go to court Monday."

8        She said, "Well, I can get the

9  paperwork."

10        And she said she had -- she either had

11  some paperwork or she could get some paperwork

12  from somebody she could get in touch with.

13        And eventually, I believe when I was

14  driving home, I got a cell phone call.  And the

15  officer told me that she had paperwork stating

16  that this individual had turned the apartment

17  down.

18        And I said, "In that case he's a

19  squatter, and tell him if he doesn't leave the

20  premises, he's going to be placed under arrest for

21  unlawful entry."

41

1  this paper that says he's turning down the

2  apartment.  He's not supposed to be in there."

3          Also, he was -- I think she'd reported

4  to me that he was a locksmith or had access to a

5  locksmith and that he had -- that's how he had

6  gotten into the apartment.

7          Because, at first, I wasn't clear on how

8  he had gotten in there.  She swore she hadn't

9  given him a key.  She's the property owner.  You

10  know, I lent some credence to her statements,

11  because she had a vested interest in the property

12  and who's in there.

13          And my point of view was that, he had

14  looked at it.  There was a disagreement, where he

15  decided he didn't want the apartment.  She had

16  gone away, and he had moved in there, anyway,

17  which in my eyes made him a squatter and

18  established no landlord and tenant relationship.

19          So I treated it as if he was a squatter.

20      Q.   Did you review any of either party's

21  paperwork before you made the decision to tell the

42

1    officers to remove him?

2        A.    No.  I relied on what the officer told

3    me over the telephone.

4        Q.    What specifically was your directive to

5    the officers?

6        A.    To advise him that if he failed to leave

7    the premises, he would be locked up for unlawful

8    entry.

9        Q.    And it's your understanding that that

10   is, in fact, what actually happened?

11       A.    Yeah.  That's what I believe happened.

12       Q.    Was an incident report created for this?

13            MS. VALDES:  Objection as to form.  Go

14       ahead and answer.

15       A.    I'm not sure.

16       Q.    Would one typically be?

17       A.    Not for an unlawful entry warning, no.

18       Q.    Okay.  So if he left voluntarily, one

19   would not necessarily be created?

20       A.    That's correct.

21       Q.    But if he were arrested --

44

1      A.    Yes.

2      Q.    And you understand that they had not

3  asked --

4           MR. WHITE:   Same objection to form.

5      Q.    Do you understand that they had not

6  asked Mr. Bridgeforth to leave?

7           MS. VALDES:   Same objection.   Go ahead.

8      A.    My understanding was that they had never

9  encountered Mr. Bridgeforth, that he was making

10  911 calls from somewhere in Anacostia, and the

11  first time they encountered him was when they

12  asked him to leave.   That was my understanding of

13  the circumstances.

14     Q.    What time -- you say, looking back at

15  the logs on the evening of the 20th into the

16  morning of the 21st, you were there through 2:30

17  in the morning?

18          MS. VALDES:   Objection.   I think you're

19          misstating the testimony.   I don't know about

20          logs.   I think he said he looked at his time

21          sheets.

48

1    actual event, did you speak to the officers about

2    this?

3        A.    No, I don't think so.

4        Q.    Okay.

5        A.    I think the last I heard was that

6    officer saying -- on the phone saying she had the

7    paperwork, telling him, "Well, tell him if he

8    doesn't leave, he's going to get locked up for

9    unlawful entry."

10            And I think that's the last dealing I

11    had with it.  I don't recall having any

12    conversations about it following -- it's --

13            Our work in the First District, at the

14    time that was a fairly minor incident.  We had --

15    I had the most violent area in the city.  I had

16    Sursumcorda.

17            An unlawful entry across town, that's --

18    it wasn't that big a deal to me.

19        Q.    Sure.

20        A.    You know, I had Sursumcorda.  I had

21    downtown.  I had robberies.  There were other

53

1      Q.    You don't know?

2      A.    I wasn't on the scene.

3      Q.    Did you ever review any materials from

4  Mr. Bridgeforth, any paperwork that he might have

5  had regarding the unit?

6      A.    No.

7      Q.    Do you know whether any of the police

8  officers did?

9      A.    No.

10     Q.    But you said you had several

11  conversations with the police officers about the

12  situation as a whole?

13     A.    Yes.  And I also told Ms. Bridgeforth --

14  or Ms. Bronson on the phone that unless she could

15  substantiate that he wasn't supposed to be in

16  there, I wasn't going to take any action, because

17  I was going to default to it being a

18  landlord/tenant issue.

19         But when she came up with papers

20  saying -- I believe it was something that said he

21  didn't want the apartment.  He was telling the

54

1    Section Eight people that he didn't want the

2    apartment.  And now he's in there, and she didn't

3    give him the key.  To me, that's an unlawful

4    entry.

5        Q.   Do you understand there to be a document

6    that gives notice of no longer wanting the Section

7    Eight apartment?

8        A.   I've seen documents since this has been

9    going on.  But I don't recall specifically what

10   any of them say.

11       Q.   Okay.  And, again, just to make sure,

12   before you gave the order or you directed the

13   officers to ask him to leave, you didn't look at

14   this paperwork with your own eyes?

15       A.   No.

16            MS. VALDES:  Objection, asked and

17       answered.

18       Q.   Just want to make sure.  So you spoke

19   with Ms. Bronson on the phone several times.  How

20   many officers did you speak with on the phone?

21       A.   I couldn't tell you with any certainty.

55

1    It could have been three.  It could have been six.

2         Q.   Okay.  That's fine.  Anyone else?

3         A.   No.  All officers and Ms. Bronson.

4         Q.   Okay.  Do you know whether the officers

5    on the scene viewed any of the paperwork that

6    Mr. Bridgeforth had?

7              MS. VALDES:  Objection, asked and

8         answered.  I think you just asked that a

9         minute ago.  Go ahead and answer.

10             MR. STEVENS:  I think I asked if he did.

11             MS. VALDES:  No.  I think you asked if

12        the other officers did.

13             MR. STEVENS:  Okay.

14        A.   I don't know if Mr. Bridgeforth showed

15   anybody any paperwork.  My impression was

16   Mr. Bridgeforth was not there.  My impression was

17   Mr. Bridgeforth was -- had been in Anacostia

18   somewhere and was making 911 calls, saying there

19   was a burglary going on at his apartment when he

20   wasn't present.

21        Q.   Okay.

57

1    landlord to burglarize an apartment that he or she

2    actually owns?

3        MS. VALDES:  Objection, calls for

4        speculation.

5        A.   I would disagree with you, but I guess

6    if there's notice that says you're not to go in

7    there and you go in, I guess technically it's a

8    burglary.

9        I don't think we'd treat it as such.  I

10   think we'd refer it back to landlord/tenant court.

11   But, again, my understanding was this individual

12   had no landlord/tenant relationship with

13   Ms. Bronson.

14       Q.   Okay.  And, again, that was from your

15   conversations with her and the officers?

16       A.   Yes.

17       Q.   And that was the -- that was the whole

18   universe of the information that you reviewed

19   before the decision was made?

20       A.   Yes.

21       Q.   And subsequent to that period of time,

61

1     should be there --

2          A.    I'd send them to court.

3               MS. VALDES:   Objection, calls for

4          speculation.   Go ahead.

5          Q.    And is that the proper protocol?

6          A.    I believe so.

7          Q.    Have you ever received any training

8     regarding self-help evictions?

9          A.    Not that I specifically recall.   I know

10    we've gone over it.   We've probably had -- we've

11    probably had in-service training on it at one

12    point in time, but I don't recall when or where.

13         Q.    What do you understand the policy to be

14    regarding self-help evictions?

15         A.    We don't do evictions.   We don't get

16    involved in evictions.   We only keep the peace.

17         Q.    Okay.   When asked to intervene in an

18    eviction, what is the proper protocol?

19              MS. VALDES:   Objection.   I think the

20         question's been asked and answered, but you

21         can go ahead and answer.

74

1     A.    I had the owner of the building stating

2   he didn't belong in there.  She eventually

3   provided the officers on the scene with paperwork

4   that convinced them that he wasn't supposed to be

5   in there.

6         And I told them to go ahead and warn him

7   that if he failed to leave, he was going to be

8   placed under arrest for unlawful entry.

9         I would make the exact same decision

10   this afternoon if the circumstances were the same.

11     Q.    Okay.  Do you understand that the

12   landlord/tenant court has actually looked at this

13   matter to some extent?

14     MS. VALDES:  Objection.  To the extent

15     that you're going to ask questions about

16     anything after the incident, I'm going to

17     object to that line of questioning

18     altogether.  You can go ahead and ask the

19     questions.

20     A.    I have no idea what's transpired with

21   this case after.

1    wouldn't have had him -- I wouldn't have told them

2    that they could warn him and ask him to leave.

3        Q.    Did you understand that he claimed to be

4    a tenant at the time?

5        A.    I never received that information.

6        Q.    Even through your officers?

7        A.    Like I said, I don't think he was on the

8    scene at the same time any of my officers were on

9    the scene.  He made false calls to 911, indicating

10   a burglary was going on, and he was not on the

11   scene.

12            And if I had caught him, I might have

13   locked him up for making the false calls, if I was

14   one of the officers on the scene.

15            But I don't remember him being on the

16   scene.  I wanted to resolve the issue, because I

17   had a very angry property owner, and I believed my

18   interpretation of the law was correct.

19       Q.    Okay.

20       A.    And I would make the same -- I would

21   take the same action tonight if the same thing

80

1    happened.

2         Q.    Okay.

3         A.    If the circumstances were the same.

4         Q.    You understand that he did show up at

5    the scene at some point in time that evening?

6         A.    I believe that's when I got the last

7    phonecall, was while he was on the scene and while

8    she was there with the paperwork, saying he's not

9    supposed to be -- see, he turned the apartment

10   down.  He's not supposed to be there.

11        Q.    And did the officers convey to you any

12   information that he had said to them?

13        A.    I don't recall them saying anything

14   about him asserting that he was a lawful tenant.

15   I just recall them saying she has paperwork that

16   says he's not supposed to be there.

17             I said, "Have you read it?  Do you

18   believe it?  Does it appear to be legit?"

19             "Yes, it appears to be legit."

20             "Okay.  Warn him that he's to leave or

21   he's going to be locked up for unlawful entry."

86

1   been paid through January 31st."

2           Do you have any reason to dispute

3   Ms. Williams' narrative of this incident?

4           MS. VALDES:  No, objection.  Document

5       speaks for itself, and I don't think that's a

6       proper question for this witness.  You may

7       have to ask Ms. Williams.

8           But you can go ahead and answer, if you

9       can.

10      A.   This presents information that I never

11  became aware of.  I have no reason to doubt that

12  this is what Ms. Williams learned between 12:20

13  and 1:00 o'clock when she executed the report.

14      Q.   Okay.  That's all I'm asking.

15      A.   This -- this information never came to

16  my attention.

17      Q.   By that, you mean you were never -- at

18  the time you never were privy to this information?

19      A.   I was never privy to this information,

20  and, quite frankly, Officer Williams' estimate of

21  who these folks are may be wrong.

87

1       Q.    Sure.

2       A.    I went based -- I made my decisions

3    based upon the information I had received.  And

4    with this being a report from the substation, from

5    the 1-D-1 substation, this probably didn't get

6    over to 1-D until Sunday or Monday.

7             I never -- I had seen this report in the

8    sheath of papers, the cover of it in the sheath of

9    papers that Ms. Valdes has.  But I never

10   specifically -- I don't recall specifically

11   reading this.  Otherwise, my impressions probably

12   would have been different.

13      Q.    How so would they have been different?

14      MS. VALDES:  Objection, calls for

15      speculation.  You can go ahead and answer.

16      A.    If somebody decided he was a tenant and

17   she was a landlord.  But I don't know -- not

18   having been there or having the opportunity to

19   talk to Geannette Williams, I couldn't tell you

20   what information she based that statement on.

21   It's a miscellaneous report.

91

1    with the officers and your conversations with

2    Ms. Bronson?

3        A.    That's correct.

4        Q.    Okay.  Do you understand the 30-day opt

5    out period for Section Eight tenants?

6        A.    I have no knowledge of how Section Eight

7    works.

8        MR. STEVENS:  Okay.  Please let the

9        record reflect I've handed the witness what's

10       been marked McLean 2.  It should be a

11       four-page document --

12       THE WITNESS:  Okay.

13       MR. STEVENS:  -- labeled "Circular," and

14       it says, "Topic:  Landlord Self-help

15       Evictions, Series Number CIR-01-03," signed

16       by Charles H. Ramsey, Chief of Police.

17       Q.    Have I correctly identified this

18   document?

19       A.    Yes.

20       Q.    And have you -- take your time if you

21   need to.

92

1        A.    No, no.   I'm fine.

2        Q.    Have you ever seen this document before?

3        A.    Yes, I'm sure I have.

4        Q.    And in what context have you seen it?

5        A.    When new general orders, special order

6    circulars are distributed, I always get a copy.

7        Q.    Have you had any formal training

8    regarding this circular?

9        A.    I don't recall.

10        Q.    And I believe you had stated that

11    recently you have been related to the police

12    academy?

13        A.    Hm-hmm.

14        Q.    Have you ever given any training based

15    upon this circular?

16        A.    No.

17        Q.    Have you ever given any training

18    whatsoever in relation to landlord self-help

19    evictions?

20        A.    No.

21        Q.    The beginning of the second paragraph on

99

1        Q.    I understand that.

2        A.    And I told you I'd make the same

3   decision again tonight if the same thing

4   happened --

5        Q.    And I --

6        A.    -- and I was presented with the same

7   information.

8        Q.    And I understand that.  I understand

9   that your belief is that you didn't need a court

10  order because he was not a tenant in your eyes.  I

11  understand that belief.

12            All I'm trying to understand is whether

13  the officers either told you or you believed

14  whatever document they were referring to, to be a

15  court order, even though you believed it to be

16  unnecessary.

17       A.    I only remember them referring to it as

18  paperwork.  She has paperwork that says he's not

19  supposed to be in there or he refused the

20  apartment or whatever it was that happened between

21  him and Section Eight and her.

100

1          Q.    Okay.   That's my question.

2          A.    And Section Eight, I have no clue how

3    that stuff works.

4          I -- the only time I've ever been a

5    landlord was a piece of vacation property, and a

6    company managed that for me.   And I never had to

7    worry about that stuff.   Never had Section Eight

8    tenants.

9          Q.    Okay.

10         A.    I went based upon my understanding of

11   that night, trying to get -- based upon we go out

12   and we try and resolve issues and move on.

13         I tried to resolve this issue the best I

14   could with the information I had available without

15   letting it consume my valuable time.

16         Because on a Friday night in the First

17   District, I'm speculating if you pulled our radio

18   runs, we had well over a hundred or two hundred in

19   an eight-hour tour of duty.   It's just, we try and

20   resolve things and move so.

21         Why Geannette wrote a miscellaneous

101

1    report, I speculate that she did that to cover her

2    rear end, because it was a contentious debate.

3         And that's probably how I got stuck

4    talking to Ms. Bronson on the telephone and why

5    she was so angry, because she felt the police had

6    come and not done what they were supposed to do.

7         I tried to do what I thought the right

8    thing was.  And it's fine 22 months later to say,

9    "Well, he was a tenant, and now you evicted him.

10   You violated Circular 1-3."

11        I may have.  But my understanding at the

12   time was there was no landlord/tenant

13   relationship.

14        MR. STEVENS:  Please let the record

15       reflect I've handed the witness what's been

16       marked McLean 3, a seven-page document.  And

17       I ask you to confirm that, just to make sure

18       all the pages are there.

19        It's labeled at the top, "Metropolitan

20       Police Department."  It's a memorandum, dated

21       February 23rd, 2001.

114

1    to me, because I didn't understand that they had

2    any landlord/tenant relationship.

3         I'm still not sure if they did or not.

4    I guess that's for the court to decide then.  And

5    this, therefore, would not have applied.

6         Q.   I understand that you believe this would

7    not have applied, but do you understand number two

8    to be a correct statement?  It reads, "In order to

9    evict a tenant, landlord" --

10        MS. VALDES:  Objection, asked and

11        answered.  The document speaks for itself.

12        Q.   All right.  Let's strike all that, and

13   I'll reask the question.

14        My question to you, sir, putting aside

15   any of the events in question, do you understand

16   number two, which reads, "In order to evict a

17   tenant, landlords must first obtain a court

18   order," to be a correct statement?

19        A.   Yes.  I understand that to be a correct

20   statement.

21        Q.   okay.  I understand that you don't

# EXHIBIT 7

1

IN THE UNITED STATES DISTRICT COURT FOR

DISTRICT OF COLUMBIA


ANTHONY BRIDGEFORTH,                *

       Plaintiff,               *

                              *

     vs.                          * Case No.:

                              * 06-2128 (RLC)

KHADIJAH BRONSON, et al.,          *

       Defendants.              *

* * * * * * * * * * * * * * * * * * * * * * * *


       The deposition of OFFICER JOSEPH POWELL

was taken on Wednesday, November 28, 2007,

commencing at 11:20 a.m. at 555 Thirteenth Street,

N.W., Washington, D.C., 20004, before Nancy P.

Richmond, Registered Professional Reporter, Notary

Public for the District of Columbia, when were

present on behalf of the respective parties:



8

1    patrol for various crimes in the city, in

2    Washington, D.C., northeast area.

3        Q.    Would your title have been officer at

4    that point in time?

5        A.    Yes, sir.

6        Q.    And your title today is also officer?

7        A.    Yes, sir.

8        Q.    How, if any, has your role changed since

9    1990 with the police department?

10       A.    Far as?

11       Q.    Have you been assigned to different

12   geographies?  Have you had different positions?

13           MS. VALDES:  Objection, compound.  Go

14       ahead.  You can answer.

15       A.    Yes.  I belonged to the Fifth District

16   vice unit for about five or six years, and the gun

17   recovery unit in the Fifth District, also.  That

18   was for three years, and the vice office for five

19   years.

20       Q.    And after the Fifth District vice

21   office?

16

1          A.    No, sir, I don't recall that.

2          Q.    Okay.  Do you recall approximately how

3     long you were at the scene?

4          A.    I don't recall that, also, how long.  It

5     was an awful long time, but I don't know how long.

6          Q.    It was more than just a few minutes.  It

7     was --

8          A.    That's correct.

9          Q.    Once you arrived, can you just walk me

10    through what happened, once you arrived on the

11    scene?

12         A.    Well, I met with Officer Carter, and I

13    could hear Mr. Bridgeforth being verbally

14    argumentative.

15              And Officer Carter stated to me that

16    Ms. Bronson is the landlord of the building, and

17    Mr. Bridgeforth did not belong in a certain unit

18    in the building.  She wanted to try to get him

19    out.

20         Q.    What else happened?

21         A.    She produced a piece of paperwork, not

18

1      A.    The word was for us to go ahead and

2   remove Mr. Bridgeforth from the apartment.

3      Q.    Okay.  And I'm assuming that was

4   actually done?

5      A.    He was asked to leave the premises, and

6   he just, "Okay.  I'm going to leave."

7      Q.    And do you recall which officer asked

8   him to leave the premises?

9      A.    No, I don't recall that.

10      Q.    Was it you?

11      A.    No, sir, it wasn't me.

12      Q.    Okay.  And you said that, once asked,

13   Mr. Bridgeforth did, in fact, leave the premises?

14      A.    Yes, sir.

15      Q.    Do you recall how long he was given to

16   leave?

17      A.    No, sir.  I don't recall how long he was

18   given to leave.

19      Q.    You were -- you said that you were on

20   the scene for a while.  Was he asked as soon as

21   you arrived to leave, or was it some point in time

24

1    Q.    Did you ever enter the premises?  And by

2    that I mean, did you ever enter the building?

3    A.    Yes, sir, I did.

4    Q.    Did you ever enter the apartment in

5    question?

6    A.    Yes, sir, I did.

7    Q.    Why did you do that?

8    A.    Entry was finally gained from the owner

9    of the building -- or the landlord, Ms. Bronson.

10    Q.    You said entry was gained.  You mean,

11    she let you in?

12    A.    She couldn't get in at first when she

13    attempt to get in the unit.  Out loud she said

14    that he changed the locks.  I cannot get in.

15    Q.    So at the time when you arrived, were

16    any officers actually in the unit?

17    A.    No, sir.  No one was in the unit.

18    Q.    No one at all was in the unit?

19    A.    When I arrived, no one at all was in the

20    unit.

21    Q.    Including Mr. Bridgeforth?

26

1       Q.    How was entry into the unit first

2    gained?

3       A.    The female inside had opened the door.

4       Q.    The female opened the door?

5       A.    Yes.

6       Q.    Did people knock on the door, or did she

7    just happen to open it, or --

8       A.    There was knocks by the owner of the

9    building, Ms. Bronson.  She had knocked several

10   times.

11      Q.    Okay.  Did Ms. Bronson ever go in the

12   apartment?

13      A.    That, I don't recall.  I don't recall

14   that at all.

15      Q.    Once the door opened, you and some other

16   officers went inside, though; is that correct?

17      A.    Yes, sir.

18      Q.    And what was the purpose of going inside

19   the unit?

20      A.    The word was given from the captain to,

21   you know, Mr. Bronson -- Mr. Bridgeforth had to

27

1    leave the apartment.  And his girlfriend was --

2    well, come to find out, she was his girlfriend.

3    She had to also gather her things and leave the

4    apartment, also.

5        Q.   Did the word from Captain McLean, did

6    that come in before Mr. Bridgeforth was in the

7    unit?  I'm just trying to understand the sequence

8    of events.

9            I understand at one point in time, the

10   door was closed, and I assume it was locked, and

11   there was one female on the inside, and everyone

12   else was outside.

13           I'm trying to understand if that is when

14   the order from Captain McLean came, or was it

15   after the door was opened?

16       A.   I really don't know.

17       Q.   You don't know?

18       A.   I don't know.

19       Q.   How long approximately were you inside

20   the unit?

21       A.   Two to three minutes at the most.  Three

34

1    what other officers were at the scene that

2    evening?

3        A.    Officer Acosta and Officer Smith.

4        Q.    Do you recall whether there were any

5    others?

6        A.    If they were, I don't recall the rest of

7    them.

8        Q.    But you know others --

9        A.    The main group, I just named:  Carter,

10   Lampkin, Johnson, Smith, Acosta and myself.

11       Q.    And were all six of you inside the unit

12   at one point in time?

13       A.    At one time?

14       Q.    Yes, sir.

15       A.    No, sir.

16       Q.    When you were inside the unit, which of

17   these six people were not inside the unit with

18   you?

19       A.    I don't recall what officers were there.

20   Like I said, the scene was pretty hectic, and, you

21   know, who came inside the apartment that day, I

35

1    don't recall, at the time that I was there,

2    anyway.

3         Q.   Do you remember when you went into the

4    apartment -- just to make sure I've got this

5    right, you were only in the apartment for about

6    two or three minutes or so?

7         A.   That's right.

8         Q.   Do you recall how many officers were

9    with you in the apartment at that given point in

10   time?

11        MS. VALDES:  Objection, asked and

12        answered.

13        A.   No, sir, I don't recall.

14        Q.   Do you know whether the locks were

15   changed on the apartment door that evening?

16        A.   Yes, sir, they were changed.

17        Q.   And at what point in time was that?

18        A.   After Mr. Bridgeforth and his girlfriend

19   had left the premises.

20        Q.   Were they changed in your presence?

21        A.   Well, I saw them being changed as I was

36

1    leaving the building.

2         Q.   And who was changing the locks?

3         A.   Ms. Bronson, the owner of the building.

4         Q.   Was anybody assisting her?

5         A.   No, sir.

6         Q.   Were any police officers assisting her?

7         A.   No, sir.

8         Q.   When he was leaving, was Mr. Bridgeforth

9    ever asked to turn in his keys or give his keys

10   back?

11            MS. VALDES:  Objection, compound.

12        A.   I don't think I heard that from anyone,

13   none of the officers, anyway, because she was

14   changing the locks, so I guess she didn't need his

15   key back.  If she had asked -- but no officer

16   asked for his keys.

17        Q.   Okay.  I just want to make sure that I

18   understand all the information that was gathered

19   and assessed before a decision was made to remove

20   Mr. Bridgeforth.  I understand that a document was

21   produced by Ms. Bronson; is that correct?

1      A.    Specifically, no.

2      Q.    Okay.  Is this a situation where an

3   incident report should have been taken?

4           MS. VALDES:  Objection, calls for

5      speculation.

6      A.    It's the officer's discretion and the

7   complainant.  If the situation persists that he or

8   she wants a report, then we'll take one.  But if

9   you don't see a need to because of the situation,

10  you don't have to.  Every situation or incident or

11  scene you don't have to take a report.  It depends

12  on the circumstances.

13     Q.    Had he not left and had he been

14  arrested, there would have been a report taken,

15  though?

16          MS. VALDES:  Objection, calls for

17     speculation.

18     A.    Yes, sir.  We do have reports to take if

19  someone comes in custody and we arrest them.

20     Q.    Okay.  You were not the officer, though,

21  that would have been in charge to make a decision

40

1   of whether or not to take a report in this

2   circumstance, were you?

3       A.   No, sir.  I wasn't the officer in

4   charge.

5       Q.   Do you know which officer that would

6   have been?

7       A.   The responding officers to the scene,

8   Officer Carter and Officer Lampkin.  That was

9   their scene.

10      Q.   So Carter and Lampkin were the officers

11  in charge of the scene?

12      A.   Yes, sir.

13      Q.   Does Officer Lampkin still work in 103?

14      A.   Yes, sir, she does.

15      Q.   Do you know her first name?

16      A.   Yolanda.

17      Q.   When you entered the apartment, did you

18  just stay by the door or did you walk through the

19  apartment?

20           MS. VALDES:  Objection, compound.

21      A.   I stayed near the door.

45

1       Q.   Bottom of page six.  It's number 16.

2       A.   Okay.

3       Q.   You state in your answer that you do not

4   specifically recall what policy relates to

5   self-help evictions.

6       A.   Yes, sir.

7       Q.   As we sit here today, what is your

8   understanding of any policy or any rules regarding

9   police involvement in self-help evictions?

10      A.   My understanding is if there's

11  documentation from both parties, you advise the

12  landlord that he or she has to take their

13  complaint or their -- their complaint down to

14  Superior Court landlord/tenant, and the U.S.

15  Marshals will get involved at that point.

16      Q.   And you understand at that point in time

17  the police should take no action?

18      A.   That's correct.

19      Q.   You stated in your answer, I believe,

20  that if both parties have paperwork.  Does that

21  same analysis apply if the defendant -- I'm

46

1    sorry -- if the purported tenant does not have

2    paperwork?

3              MS. VALDES:  Objection as to form.

4         A.   Could you --

5         Q.   Let me see if I can rephrase the

6    question.

7         A.   Please.

8         Q.   You stated that if the purported

9    landlord and tenant have paperwork, that they

10   should go to landlord/tenant court; is that

11   correct?

12        A.   Yes, sir.

13        Q.   Must the purported tenant have

14   paperwork?  In other words, if he just says,

15   "Listen, I'm a tenant in this place.  This is my

16   apartment," is that enough?

17             MS. VALDES:  Objection, calls for

18        speculation.

19        A.   We would ask for them to produce any

20   kind of landlord/tenant agreement, and hopefully

21   that person will have something.

47

1          And in this case here, Mr. Bridge --

2      Q.    Bridgeforth.

3      A.    -- the only thing that was produced was

4   a handwritten letter, stating that he was not

5   renting the apartment in unit 220.  And at that

6   point he was considered like a squatter or a

7   person, you know, that was living unlawfully in

8   the premises.

9      Q.    Okay.  I'm not necessarily asking right

10  now about the incident in question.  I'm asking

11  more broadly about the policy.

12          I'm just trying to understand whether

13  policy is that the purported tenant must have

14  paperwork in hand.

15          MS. VALDES:  Objection.

16     A.    They must have paperwork in hand, yes,

17  sir.

18     Q.    And then on the next page, page seven,

19  you state that you do not specifically recall what

20  training relates to self-help evictions.  Do you

21  recall having some training regarding self-help

48

1    evictions?

2        A.   No, sir.

3        Q.   If you had known at the scene that

4    Mr. Bridgeforth's rent had been paid through the

5    end of January, would you have taken different

6    action?

7            MS. VALDES:  Objection, calls for

8        speculation.

9        A.   The situation would have been, you know,

10   different if we'd have known that money was

11   rendered to the owner of the building.

12       Q.   And how would the situation have been

13   different?

14           MS. VALDES:  Objection, calls for

15       speculation.

16       A.   She would have been told that she has to

17   take her complaint down to the Superior Court,

18   landlord/tenant.

19           MR. STEVENS:  Please let the record

20       reflect that I've handed the witness what's

21       been marked Powell Number 1.  It's a

53

1    Mr. Bridgeforth; is that correct?

2        A.    Yes, sir.

3        Q.    Was Mr. Bridgeforth ever asked whether

4    he has permission from Section Eight to be in the

5    unit?

6        A.    Not to my knowledge, no, sir.

7        Q.    If you had had knowledge, if he

8    stated -- strike the question.

9             If he had stated that he has permission

10   from Section Eight to be there, would that have

11   changed the outcome of the situation?

12            MS. VALDES:  Objection, calls for

13        speculation.

14       A.    Yes, sir, it would have.

15       Q.    And how would that have changed the

16   outcome?

17            MS. VALDES:  Same objection, calls for

18        speculation.

19       A.    He'd have been advised, as well as

20   Ms. Bronson, as stated earlier, that they had to

21   go to landlord/tenant, 500 Indiana Avenue, to

54

1    dispute their case.

2        Q.    Yes, sir.

3        A.    Landlord/tenant court is at 500 Indiana

4    Avenue, Superior Court to dispute their case.

5        Q.    And then the final statement in box 75

6    is, "C1 states that he opted out of his lease and

7    will be out by the end of January."  I'm sorry.

8    Strike that question.

9              Further in the same sentence that we

10   were referring to earlier, it says, "The rent has

11   been paid through January 31st."  I believe you

12   stated earlier that you did not know that fact at

13   the time?

14        MS. VALDES:  Objection, asked and

15        answered.

16        A.    That's correct.

17        Q.    And had you known that, would that have

18   also changed the outcome?

19        MS. VALDES:  Objection, calls for

20        speculation.

21        A.    Yes, sir.

# EXHIBIT 8

1

IN THE UNITED STATES DISTRICT COURT FOR

DISTRICT OF COLUMBIA


ANTHONY BRIDGEFORTH,            *

        Plaintiff,             *

                               *

    vs.                        * Case No.:

                               * 06-2128 (RLC)

KHADIJAH BRONSON, et al.,       *

        Defendants.            *

* * * * * * * * * * * * * * * * * * * * * *


The deposition of OFFICER DAVID SMITH

was taken on Thursday, November 29, 2007,

commencing at 10:15 a.m. at 555 Thirteenth Street,

N.W., Washington, D.C., 20004, before Nancy P.

Richmond, Registered Professional Reporter, Notary

Public for the District of Columbia, when were

present on behalf of the respective parties:



1          A.    Graduated from my bachelor's program in

2     2003.  Currently pursuing a graduate degree from

3     Johns Hopkins University.

4          Q.    What subject matter?

5               MS. VALDES:  Same objection.

6          A.    It's a hybrid business degree,

7     leadership program, Master's of Science and

8     Management.  And I'm also pursuing Arabic

9     undergraduate from Georgetown University.

10         Q.    What was your position when you started

11    with the Metropolitan Police Department in August

12    of 2002?

13         A.    I was a recruit.

14         Q.    Did there come a point in time where

15    that changed?

16         A.    Yes.

17         Q.    And when was that?

18         A.    To the best of my recollection, I

19    graduated on May 3rd, 2003, where I was promoted

20    to officer.

21         Q.    And is that still your position today?

10

1     A.   Yes.

2     Q.   In May of 2003, when you became an

3  officer, were you assigned to a certain

4  geographical area?

5     A.   I was.

6     Q.   Okay.  And what was that?

7     A.   I was assigned to the First District.

8     Q.   And at the time were you assigned to a

9  particular PSA?

10     A.   Yes.

11     Q.   And what was that?

12     A.   Considered the old PSA 102 before the

13  PSA redistricting.

14     Q.   Okay.  And did there come a point in

15  time where that changed?

16     A.   Yes.

17     Q.   And do you recall approximately when

18  that was?

19     A.   No.

20     Q.   What was your next PSA assignment?

21     A.   PSA 101.

15

1    A.    That's correct.

2    Q.    What is a police officer supposed to do

3    if he or she is on the scene and realizes that

4    it's a landlord/tenant dispute that they have been

5    called?

6         MS. VALDES:  Objection as to form and

7         calls for speculation.

8    Q.    That was a poor way to phrase the

9    question.  Let me strike it and start over.

10         If a police officer realizes, once

11    called to the scene, there is an apparent

12    landlord/tenant dispute, what is the police

13    officer supposed to do in that circumstance?

14         MS. VALDES:  Objection, calls for

15         speculation.

16    A.    In the absence of a crime, technically

17    the officer has no jurisdiction there.

18    Q.    Is the officer supposed to inform the

19    witnesses or the people involved of anything?

20    A.    We can, if they ask.

21    Q.    And what would that be?

1          MS. VALDES:  Same objection.  Go ahead.

2     A.    They can ask for the rules and

3 regulations regarding landlord/tenant dispute.

4 Then, under the specific circumstances of the

5 events, they can then be directed under

6 advisement, not under order from the officer.

7     Q.    Can you explain?  I don't understand

8 what you mean by directed.

9     A.    If they want to know the proceedings

10 regarding an eviction or how to start the

11 landlord/tenant process, we would then give them

12 information about going down to 500 Indiana Avenue

13 and starting the landlord/tenant process there.

14     Q.    Gotcha.  Okay.  And is there a certain

15 protocol or standard that police officers use to

16 determine whether or not something is an apparent

17 landlord/tenant dispute?

18          MS. VALDES:  Objection as to form.

19     A.    There's no written general order or

20 direct or special order.  Usually, in the absence

21 of a crime, if the person has a valid lease or the

18

1          MS. VALDES:  Objection, calls for

2      speculation.

3          A.    Under those circumstances, if there is

4    any thought that there is a lease, I don't require

5    people to show me, because that's me acting as an

6    agent of the Metropolitan Police Department.

7    Therefore, I simply say it's a landlord/tenant

8    dispute, and it needs to be resolved in a court.

9          Q.    You understand that we're here today to

10   discuss the events of January -- the evening of

11   January 20th, 2006, at 210 20th Street, N.E.?

12         A.    I do.

13         Q.    Were you on the scene of 210 20th

14   Street, N.E., that evening?

15         A.    I was.

16         Q.    Can you please give me a -- just walk me

17   through what happened that evening?

18         MS. VALDES:  Objection as to form, but

19      go ahead and answer.

20         A.    Sir, this incident happened two years

21   ago.  I was called to the scene to provide backup

22

1    A.    I don't remember.

2    Q.    Did you ever go in the premises?  And by

3    that I mean the building, not necessarily the

4    specific apartment in question.

5    A.    Yes.

6    Q.    Did you go into the specific apartment

7    in question?

8    A.    No.

9    Q.    What did you do inside the premises?

10    A.    I walked upstairs, stood at the entryway

11    to the apartment for a brief time, less than a

12    minute or two, because several officers were

13    inside.

14         I then went back downstairs, went back

15    to my cruiser, leaned against it to provide

16    backup.

17    Q.    Do you recall whether it was both you

18    and your partner that were leaning against the

19    cruiser at that point in time?

20    A.    No.

21    Q.    No, you don't recall?

25

1    Q.    Did you ever see any paperwork provided

2  by either Mr. Bridgeforth or Ms. Bronson that

3  evening?

4    A.    Mr. Bridgeforth had several pieces of

5  paper that he was attempting to show people.  I

6  never got a chance to look at any of it.

7    Q.    So he never handed it to you personally?

8    A.    No.

9    Q.    And you don't know what those pieces of

10  paper might have said?

11    A.    I don't know.

12    Q.    How about Ms. Bronson?  Did she ever

13  hand you any paperwork?

14    A.    No.

15    Q.    Did you ever see any paperwork that she

16  handed any of the other officers?

17    A.    I don't recall her having any paper.

18    Q.    Okay.  And you didn't interview any of

19  the witnesses on the scene?

20    A.    No.

21    Q.    So the entire time your role was

26

1    primarily as backup?

2        A.    That's correct.

3        Q.    Okay.  Was Mr. Bridgeforth asked to

4    leave the premises at any point in time that

5    evening?

6        A.    I don't recall, sir.  My role was

7    backup.

8        Q.    Okay.  Do you recall whether

9    Mr. Bridgeforth ever left the scene?

10       A.    Yes.

11       Q.    He left before you did?

12       A.    Yes.

13       Q.    Do you recall whether he was escorted by

14   a police officer?

15       A.    I don't understand how you mean

16   escorted.

17       Q.    Did he just walk away voluntarily?

18       A.    He did walk away voluntarily.

19       Q.    Okay.  Were you present when he was

20   asked to leave?

21       A.    Yes.

27

1     Q.   And who asked him to leave?

2     A.   I don't recall, sir.

3     Q.   But was it a police officer?

4     A.   As far as I know, yes, sir.

5     Q.   Okay.  And did that occur inside the

6 premises?

7     A.   I don't recall.

8     Q.   All right.  You said that you were

9 inside just for a short, few minutes?

10    A.   That's correct.

11    Q.   What was going on during those short,

12 few minutes?

13    A.   To the best of my recollection, several

14 officers were inside, and his girlfriend was

15 causing a commotion inside.  So my presence in the

16 threshold was simply to provide backup.

17    Q.   Do you recall whether this was after he

18 was asked to leave?

19    A.   I don't recall, sir.

20    Q.   Was he collecting his belongings?

21    A.   I don't -- I was standing at the

31

1    that day?

2         A.    I don't recall, sir.

3         Q.    Okay.  Prior to the evening in question,

4    had you ever met Ms. Bronson, the landlord,

5    before?

6         A.    No.

7         Q.    And subsequent to the evening in

8    question, have you ever met Ms. Bronson, the

9    landlord?

10        A.    Yes.

11        Q.    Can you describe those circumstances,

12    please?

13        A.    To the best of my recollection, another

14    officer got a call to that location regarding a

15    burglary, and I responded to that location once I

16    heard who the complainant -- the suspects were, to

17    provide that officer with information regarding

18    the circumstances surrounding that burglary.

19        Q.    And I'm assuming the complainant was

20    Ms. Bronson?

21        A.    That's correct.

32

1       Q.   And who were the suspects?

2            MS. VALDES:   Objection as to relevance.

3       A.   Mr. Bridgeforth.

4       Q.   Can you tell me approximately the date

5   or the month of the incident to which you're

6   referring?

7       A.   It's after January, but after that, I

8   don't recall.

9       Q.   Okay.  Do you recall anything else about

10  those circumstances --

11      A.   No.

12      Q.   -- about what happened?

13      A.   No.

14      Q.   I'm sorry.  I didn't mean to cut you off

15  there.  Regarding that circumstance, were you

16  called back to the scene of 210 20th Street?

17      A.   No.  I think it was a different address.

18      Q.   A different address, but still with

19  Ms. Bronson and Mr. Bridgeforth?

20      A.   Once again, this incident happened two

21  years ago.  I'm doing my best to remember.

35

1      A.    I don't recall, sir.

2      Q.    I believe you stated earlier that you

3  were called to the scene, or you went to the scene

4  because you had information regarding the

5  suspects?

6      A.    Yes.   I was going to inform the primary

7  officer of the incident which we're discussing now

8  and to advise them of Mr. Bridgeforth's condition

9  and also of the situation regarding

10  landlord/tenant.

11      Q.    Could you please elaborate on what you

12  meant by the condition of Mr. Bridgeforth?

13      A.    Mr. Bridgeforth, on the scene on January

14  20th, was very agitated.   He's known by reputation

15  to fight the police, and therefore, I wanted that

16  officer to know that.   I also wanted me there in

17  case that happened.

18      Q.    Did you know of this reputation to fight

19  the police prior to the evening of January 20th?

20      A.    Only through reputation.

21      Q.    But you knew it through reputation prior

43

1          you define "removed" to mean "asked to

2          leave."

3               MR. STEVENS:  I'm just using the term.

4          If you don't agree with me, feel free to --

5          A.    I'm misunderstanding what you're saying.

6     She's exactly right.  You're going to have to

7     clarify "removed."

8          Q.    Absolutely.  Was he asked to -- you

9     understand that he was asked to leave the scene by

10    a police -- strike the question.

11              You understand that he was asked to

12    leave the premises by a police officer that

13    evening?

14         A.    Yes.

15         Q.    Okay.  Do you believe that to have been

16    the correct protocol?

17         A.    Yes.

18         Q.    And why do you believe that to be?

19              MS. VALDES:  Objection, calls for

20         speculation, and as to relevance, but go

21         ahead.

48

1      Q.    Do you recall whether he was asked

2  whether he had his personal belongings in the

3  unit?

4      A.    No.

5      Q.    And you didn't do so personally?

6      A.    No.

7      Q.    Do you recall whether anyone ever asked

8  Mr. Bridgeforth to tell his side of the story?

9      A.    No.

10      Q.    And you didn't do so personally?

11      A.    No.

12      Q.    But you do remember that Mr. Bridgeforth

13  had some sort of paperwork that he was trying to

14  show to officers?

15      A.    He had a handful of paperwork.  I can't

16  remember which hand it was in, and he kept trying

17  to show people on the scene.  And I wasn't

18  anywhere near him for this entire incident, as I

19  was leaning against my cruiser.  So what was in

20  that paperwork, I don't know.

21      Q.    Okay.  Do you know whether any officer

67

1      Q.    I'm just curious as to why Officer James

2    Carter is listed in your answer to interrogatory

3    number one.

4      A.    Interrogatory number one says all people

5    with knowledge about the events.

6      Q.    And how do you know that Officer James

7    Carter has knowledge of the event?

8          MS. VALDES:  Same objection.

9      A.    Only through conversation with him.

10     Q.    So you've had a conversation with

11   Officer James Carter regarding the events?

12     A.    Not -- one second.

13     Q.    Yes, sir.

14     A.    Trying to remember.  All right.  One

15   more time, sir.  I apologize.  Can you ask the

16   question one more time?

17     Q.    Yes, sir.  Have you had a conversation

18   with Officer James Carter regarding the events in

19   question?

20     A.    Yes.

21     Q.    And when was that conversation?

68

1      A.    Shortly thereafter.

2      Q.    Shortly after the incident itself?

3      A.    The incident.

4      Q.    What did you discuss during that

5  conversation?

6      A.    Only the fact that the scene was pretty

7  out of control.

8      Q.    Why did you or he term it out of

9  control?

10      A.    It's just -- it's law enforcement

11  jargon.  I don't even recall whether it was

12  specifically what he said, but it was sort of

13  reviewing the previous case as being crazy or wild

14  or -- it's just law enforcement jargon.  We didn't

15  even discuss the nature of the case, sir.

16      Q.    Does the fact that you had that

17  conversation lead you to believe that Officer

18  James Carter was, in fact, on the scene the

19  evening in question?

20      A.    Sir, I don't recall.  All I recall is,

21  you know, locker -- it's locker room talk.

75

1       A.   Yes.

2       Q.   Was Captain Ralph McLean on the scene?

3       A.   I don't recall, sir.

4       Q.   Why is Captain Ralph McLean listed in

5  response to interrogatory number one?

6       A.   Because he was known to give the order

7  to ask Mr. Bridgeforth to leave.

8       Q.   And how was that known?

9       A.   I don't recall, sir.

10       Q.   Did you know it at the time?

11       A.   Yes.

12       Q.   At the time on the scene?

13       A.   Yes, sir.

14       Q.   Did you personally have any

15  conversations with Captain McLean that evening?

16       A.   No.

17       Q.   Okay.  Do you have any understanding as

18  to to whom Captain McLean gave the order that

19  evening?

20       A.   No.

21       Q.   How did you know that Captain McLean had

82

1          MS. VALDES:  And I'm going to object

2      because that may be your interpretation and

3      your legal interpretation, but that's not

4      what it says in the document, and the witness

5      is not bound by your legal interpretation.

6          MR. STEVENS:  And that's why I prefaced

7      my question by, "I read it as, and feel free

8      to disagree with me."

9          MS. VALDES:  I think he already answered

10     the question then.

11         THE WITNESS:  Answer the question?

12         MS. VALDES:  Yes.

13     A.   Okay.  Well, you said you were trying to

14  establish a practical definition for eviction.

15  That does not establish a definition for eviction;

16  that provides a guideline.

17     Q.   Okay.

18     A.   Okay.  I am bound by, "does not

19  participate in self-help evictions."  I just take

20  the "self-help" off, and I interpret it to say,

21  "The Metropolitan Police Departments does not

83

1    participate in evictions."

2         Q.    Okay.

3         A.    I'm not a lawyer.  I have no training in

4    legal precedent.  Therefore, I don't even look at

5    that quote when I read this.  I read it because

6    I'm supposed to and then I am bound by what I told

7    you I am bound by.

8         Q.    Okay.

9         A.    I hope that answers your question.

10         Q.    It does.  It does.  Do you know -- are

11    you aware of any circular or any other guideline

12    within the Metropolitan Police Department relating

13    to purported self-help evictions that discusses

14    whether or not rent has been paid as a factor to

15    review?

16         MS. VALDES:  Objection as to form.

17         A.    Sir, there's over something like 1500 to

18    1700 general orders.  And while I am familiar with

19    the orders that pertain to me, if you put them in

20    front of me and I had a chance to review them, I

21    would be able to perfectly help you with them.

# EXHIBIT 9

1

IN THE UNITED STATES DISTRICT COURT FOR

DISTRICT OF COLUMBIA


ANTHONY BRIDGEFORTH,               *

          Plaintiff,               *

                                   *

     vs.                           * Case No.:

                                   * 06-2128 (RLC)

KHADIJAH BRONSON, et al.,          *

          Defendants.              *

* * * * * * * * * * * * * * * * * * * * * * * *


          The deposition of SERGEANT JEFFREY

McGUNIGAL was taken on Tuesday, November 27, 2007,

commencing at 9:35 a.m. at 555 Thirteenth Street,

N.W., Washington, D.C., 20004, before Nancy P.

Richmond, Registered Professional Reporter, Notary

Public for the District of Columbia, when were

present on behalf of the respective parties:

 COPY

1  within the police department, and I'm just trying

2  to get a feel for that.

3         So I assume that officers are the folks

4  who are typically out on a beat or not necessarily

5  inside the police department at all times?

6       A.   Correct.

7       Q.   And is sergeant the direct supervisor?

8       A.   Yes.

9       Q.   And is there a supervisor for you?  Is

10 there somebody higher up than you?

11      A.   Yes.

12      Q.   And what is that person's title?

13      A.   The next level above sergeant would be

14 lieutenant.

15      Q.   Is there a level above lieutenant?

16      A.   Yes.

17      Q.   And what would that be?

18      A.   That would be captain.

19      Q.   So please let me know if I've got this

20 wrong.  It's officer, sergeant, lieutenant,

21 captain?

11

1      A.    Yes.

2      Q.    Is there somebody above captain?

3      A.    Yes.

4      Q.    And what would that position be?

5      A.    Inspector.

6      Q.    And above inspector?

7      A.    I believe probably assistant chief.

8      Q.    Okay.  As a sergeant, how many officers

9    are directly under your supervision?

10      A.    It depends on where you work and where,

11    you know -- depends on where you work, I would

12    guess would be the best answer.  Anywhere from,

13    optimally, six to eight to as many as twenty I've

14    seen some guys supervise.

15      Q.    How about yourself, today?

16          MS. VALDES:  Objection as to form.

17      A.    On my shift I supervise five officers.

18      Q.    And I know that it would take great time

19    to tell me every little detail about doing so, but

20    can you roughly walk me through what supervising

21    officers involves?

22

1      A.    No, sir.

2      Q.    I would like to go back to the incident,

3 as we referred to it, in January of 2006.  What is

4 your recollection of the incident?  If you can

5 just walk us through the chronology of that

6 incident, to the best of your recollection, I

7 would appreciate it.

8      A.    To the best of my recollection, I wasn't

9 on the scene.

10     Q.    Okay.

11     A.    The reason I know that is 'cause I've

12 never been on the scene with Captain McLean.

13     Q.    Is it your understanding that Captain

14 McLean was on the scene for this incident?

15     A.    Yes, sir.

16     Q.    And how did you come to that knowledge?

17     A.    I could take -- the only way I could

18 have come to that is if one of the officers had

19 said something to me about it.

20     Q.    So you believe that you were not on

21 the -- so you were not on the scene?

26

1    Q.    So this is knowledge that you learned

2  post incident?

3    A.    Yes, sir.

4    Q.    Okay.  What steps do you understand were

5  taken to determine what, in fact, was going on?

6    A.    Again, it would have come from

7  conversations with the officers.  I don't remember

8  any specific conversations.  It may have been at

9  the end of the tour that night or the following

10  day.

11         I remember that it was difficult to make

12  a determination of whether or not an offense took

13  place.  There were credibility issues.  That's

14  about it.

15    Q.    And do you recall what specifically the

16  offense was?

17    A.    Not specifically.  Probably a burglary

18  or a unlawful entry or something like that.  That

19  sticks in my mind.

20    Q.    And you said that the decision-making

21  process was whether or not this offense actually

1      A.   Yes.  Obviously, there were credibility

2   problems.

3      Q.   And what do you understand those

4   credibility problems to be?  We can strike the

5   question.  With whom do you understand these

6   credibility issues to -- let me ask it this way.

7         Whose credibility is in question with

8   regard to these incidents?

9      A.   At this time my understanding is there

10   were difficulties in obtaining paperwork

11   substantiating tenancy.  Stories were constantly

12   changing.  People's emotions were high.  Things

13   were clouded.  Things weren't presented in a true

14   light.

15         That's my understanding of, you know,

16   what happened at the time.

17         MR. WHITE:  Can I just get a

18         clarification?  In terms, are you saying in

19         general --

20         THE WITNESS:  Yeah.

21         MR. WHITE:  -- or was that from a

41

1    unlawful entry run is dispatched to a police

2    officer and he responds to this room and you

3    happen to be the proprietor or the tenant in this

4    room and you tell the officer that you've asked

5    Jeff McGunigal to leave this room and he refused,

6    the police officer, in order to establish the

7    elements of the offense of unlawful entry,

8    remaining on premises, is required to hear you ask

9    in his presence for me to leave.

10          When I refuse, the officer will ask or

11   advise, "You've been asked to leave.  You know, if

12   you don't leave, we'll have to place you under

13   arrest.  Could you please leave?"

14          If I leave, no report would be

15   generated.  It would be 10-8, no report, because

16   the elements of that offense do not exist.  I've

17   been sent on my way.

18          If it's domestic related or family

19   related, obviously, there's going to be a report.

20   But no report would be generated for that

21   particular trespass, although generally a report

43

1      Q.    In your scenario, what if the person

2  says they have a right to be on the premises?

3  What happens next?

4      A.    We do not evict people.  We are

5  prohibited from evictions.  In my 18 years, don't

6  come across it very often.

7      Q.    Is there a standard protocol for that

8  situation?

9      A.    You don't evict people.  Marshals

10  usually do the evictions.

11     Q.    Okay.

12     A.    We have in-service training and orders

13  pertaining to that.  But, generally, we do not

14  evict people.

15     Q.    You say generally.

16     A.    Pretty much al the time we don't evict

17  people.

18     Q.    Okay.

19     A.    The only time we take somebody out or

20  take possession of somebody usually an arrest --

21  actually, all the time when we take possession of

44

1    somebody, they're under arrest.  We have no

2    business taking possession of somebody other than

3    locking them up, so...

4         Q.   So in your scenario, if a person just

5    says, "I have a lawful right to be here" --

6         A.   We suggest they speak with

7    landlord/tenant.  You know, it's not for us to

8    make that determination.

9              MR. STEVENS:  Okay.  We've been going to

10             just shy of an hour now.  Why don't we take a

11             couple minute break?  Let's just take a

12             couple minutes, if you don't mind.

13             (Recess taken -- 10:16 a.m.)

14             (After recess -- 10:18 a.m.)

15             (Whereupon, McGunigal Exhibit Number 1

16    was marked.)

17             MR. STEVENS:  Please let the record

18             reflect I've handed the witness what's been

19             marked McGunigal 1.  It's a subpoena to

20             Sergeant Jeffrey McGunigal, dated 10/31,

21             2007.

53

1    occurred?

2        Q.    Either then or have gained subsequent

3    knowledge as to what occurred.

4        A.    Well, we're here because Mr. Bridgeforth

5    was asked to leave his apartment, and it was not

6    the proper thing to do, and that's pretty much why

7    we're here.  That's my understanding of it.

8        Q.    Okay.

9            MR. WHITE:  I'm going to note an

10            objection, only because I'm afraid that I

11            didn't hear him say either it was based on

12            what he had seen in the reports or whether it

13            was hearsay.  And I think there's a little

14            hearsay in what he says.  So from that point,

15            I would like to lodge an objection.

16            MR. STEVENS:  Just to be clear, are you

17            objecting to my question or are you objecting

18            to the answer?

19            MR. WHITE:  I'm objecting to both the

20            question and the answer.  I let him answer

21            only because we're here to be probative.  But

# EXHIBIT 10

1               UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLUMBIA

3  - - - - - - - - - - - - - - x

4  ANTHONY BRIDGEFORTH,      :

5              Plaintiff,  :

6        vs.          : Civil Action

7  KHADIJAH BRONSON, et al.,   : No. 06-2128(RCL)

8             Defendants.  :

9  - - - - - - - - - - - - - - x

10             Washington, D.C.

11            Tuesday, February 5, 2008

12        Deposition of LT. TERESA E. BROWN, a

13  witness herein, called for examination by counsel

14  for Plaintiff in the above-entitled matter, pursuant

15  to notice, the witness being duly sworn by Robert M.

16  Jakupciak, a Notary Public in and for the District

17  of Columbia, taken at the offices of Hogan &

18  Hartson, 555 Thirteenth Street, N.W., Washington,

19  D.C., 20004, at 1:30 p.m., on February 5, 2008, and

20  the proceedings being taken down by Stenotype by

21  Robert M. Jakupciak, RPR.

22

Page 59

1    of MPD policy, what's the rank of MPD officer who

2    has the final say with respect to a particular event

3    and whether somebody is a tenant or not?

4              MS. VALDES:  Objection; calls for

5    speculation; objection as to form, and objection;

6    asked and answered.

7        A    You keep using the word particular.  Are

8    you saying on an average?  Are you saying in an

9    unusual circumstance?  Because as I already stated,

10   an unusual circumstance would be that, from your

11   first hypothetical, where it can't be determined by

12   the officer.  But if it can be determined by the

13   officer, then the officer would have the final.

14       Q    I see.  In normal circumstances an officer

15   has the final authority as to whether an individual

16   is a tenant or not?

17       A    Exactly.

18             MS. VALDES:  Objection as to form.

19       Q    Now, are, are -- is it common for police

20   officers to respond and make determinations as to

21   whether individuals are landlords and tenants?

22             MS. VALDES:  Objection as to form.

Page 66

1        A     According to the policy.  But practical,

2    to be practical, an officer can't possibly take a

3    report for every single call for service that they

4    respond to.  If that happens, we wouldn't have any

5    time for patrol because we would spend more time

6    generating reports.  So the policy does say that

7    every call for service we are required to take a

8    report, but the practice says that it's up to the

9    officer to make a report.

10       Q     Now, what's been marked as DC9, this

11   document states the policy of reporting; is that

12   right?

13       A     That's correct.

14       Q     And in particular, if you could look at

15   page 2 of DC9, halfway down there is a title that

16   says Roman Numeral IV, Regulations, and A; member

17   shall investigate and complete the appropriate

18   reports and paperwork as outlined in this General

19   Order in the following situations.

20             Did I read that right?

21       A     That's correct.

22       Q     And under that, number 3 in a list of five

Page 68

1          MS. VALDES:  Objection as to form, and

2     objection, the document speaks for itself and you

3     misstated what the document says.  Go ahead and

4     answer.

5          A     Whenever it says member shall is

6     consistent with the policy.

7          Q     And since we are talking about policy not

8     practice, on policy, the situations we talked about

9     before, an officer responds to a scene, makes a

10     determination that somebody is a tenant or not a

11     tenant, under the MPD policy as stated in DC9, that

12     member should then complete an appropriate report

13     and paperwork; correct?

14          A     That's correct.

15          Q     Now, but your testimony is that in

16     practice, the practice differs from the policy; is

17     that right?

18          A     That's correct.

19          Q     All right.  And my first question is is

20     there any document where the practice as you've

21     described it is set forth?

22          A     No.

# EXHIBIT 11

Page 1

1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLUMBIA

3    - - - - - - - - - - - - - - x

4    ANTHONY BRIDGEFORTH,              :

5                    Plaintiff,       :

6            vs.                      : Civil Action

7    KHADIJAH BRONSON, et al.,        : No. 06-2128(RCL)

8                    Defendants.       :

9    - - - - - - - - - - - - - - x

10                   Washington, D.C.

11                   Tuesday, February 5, 2008

12           Deposition of KIMBERLY T. BUTLER, a

13   witness herein, called for examination by counsel

14   for Plaintiff in the above-entitled matter, pursuant

15   to notice, the witness being duly sworn by Robert M.

16   Jakupciak, a Notary Public in and for the District

17   of Columbia, taken at the offices of Hogan &

18   Hartson, 555 Thirteenth Street, N.W., Washington,

19   D.C., 20004, at 3:40 p.m., on February 5, 2008, and

20   the proceedings being taken down by Stenotype by

21   Robert M. Jakupciak, RPR.

22

1      A    Once.

2      Q    And was that in your capacity as a police

3   officer?

4      A    No.

5      Q    Was that within the past five years?

6      A    Yes.  Well, let me ask you this, because I

7   was a witness for the government.  I was testifying

8   for the government just in the past three months.

9   So do you mean in the capacity as a police officer

10  or for the government?

11     Q    I appreciate you clarifying that.  So you

12  have been deposed in the past three months; is that

13  right?

14     A    Yes.

15     Q    And you were being deposed in your

16  official capacity; is that right?

17     A    Yes.

18     Q    But you were testifying on behalf of the

19  District of Columbia?  Am I understanding?

20     A    Yes.

21     Q    And you understand that you have been

22  asked to testify on behalf of the District of

Page 6

1    Columbia here as well; correct?

2        A    Yes.

3        Q    And, in particular, you have been

4    designated to respond to questions regarding what

5    I'll generally call training practices and

6    procedures with respect to the MPD policy

7    prohibiting involvement in self-help evictions; is

8    that your understanding?

9        A    Yes.

10       Q    In the other deposition did you also

11   testify on behalf of the District of Columbia with

12   respect to training, policies and practices?

13           MS. VALDES:   Objection as to relevance.

14   Go ahead.

15       A    No.

16       Q    So this is the first time that you have

17   been asked to testify on behalf of the District of

18   Columbia with respect to training, practices and

19   procedures; is that right?

20       A    Yes.

21       Q    What's your current assignment, Sergeant

22   Butler?

Page 17

1    any training in determining whether an individual is

2    a lawful tenant or not?

3        A    No.

4        Q    Do you know if there has ever been any

5    training offered at the MPD academy on determining

6    whether an individual is a lawful tenant or not?

7        A    No.

8            MS. VALDES:  Objection as to form.

9        Q    I'm sorry.  You don't know or you don't --

10       A    No.  I'm saying no, that there has never

11   been offered any training as to whether a tenant is

12   legal or not.

13           MR. MONTHY:  I have three exhibits to

14   mark.  Let's go off the record and mark them.

15                       (DC Exhibit Nos. 10

16                       11 and 12 were marked

17                       for identification.)

18   BY MR. MONTHY:

19       Q    All right.  Sergeant Butler, I would like

20   to show you what's been marked as DC10.  Take a

21   moment and look at that if you would.

22       A    Okay.

Page 43

1    They are a mentor, in other words, to the

2    newly-graduated recruit.  They refresh, teach,

3    instruct, provide guidance for recruits who just

4    graduated from the academy in order to get them to

5    be certified to patrol in a police car on their own

6    or to patrol by themselves.

7         Q    Is there -- are there certain topics that

8    field training officers or master patrol officers

9    are required to instruct the new officers on?

10             MS. VALDES:  Objection as to form.

11        A    No.  The master patrol officer or field

12   training officer is basically there for on-the-job

13   training.  So whatever circumstances or situations

14   arise from either radio runs or just arriving on the

15   scene, then they would be a leader or guidance for

16   the recruit officer to learn their job in the

17   street.

18        Q    Before an officer becomes a master control

19   officer or field training officer, do they receive

20   additional training?

21        A    Yes.

22        Q    And is that training through the field

Page 50

1        A     It is a course that they do go back to the

2    academy for a set period of time.  It's just the

3    topics are not always the same.  They don't always

4    cover the same topics.  Example; the last

5    promotional that they had back in October was based

6    more on scenarios than lecture.

7        Q     Are you aware of any first line supervisor

8    school curriculum that has featured or focused on

9    MPD's eviction policy?

10       A     No.

11       Q     As you sit here today, do you know one way

12   or the other whether that's ever been included in

13   the first line supervisor school?

14       A     No.

15             MS. VALDES:  Objection as to form.

16       Q     You are not sure?

17       A     No.

18       Q     If I could have you look at DC12, on the

19   second page of that, the first heading on page 2

20   reads:  First line supervisor and reserve officer

21   courses.  Do you see that?

22       A     Yes.

Page 58

```
 1       Q    All right.  Other than the three instances

 2   that you listed, 2001, late 2007, and this month,

 3   February 2008, are you aware as you sit here today

 4   of any other times where MPD's policy on evictions

 5   has been included in the roll-call training?

 6       A    No.

 7       Q    Let me ask the opposite.  Can you say with

 8   certainty as you sit here that the roll-call

 9   training -- that there was no roll-call training

10   other than those three instances on MPD's eviction

11   policy given?

12            MS. VALDES:  Objection as to form.

13       A    I can say with certainty.

14       Q    That it was not given?

15       A    That it was not given.

16       Q    So in addition to roll-call training you

17   also talked about in-service.  Was what you were

18   describing with respect to sergeants and other

19   officers in-service training?

20       A    Yes.

21       Q    And in-service training, do I understand

22   that it's a certain number of hours that officers
```

Kimberly T. Butler 30(b)(6)                              February 5, 2008
                        Washington, DC

                                                        Page 60

1       Q    Are there any topics that stay the same

2    year after year after year?

3       A    No.

4       Q    Do you know whether MPD's policy on

5    evictions has ever been a topic for in-service

6    training?

7       A    No.

8       Q    You don't know or you know it has not been

9    included in in-service training?

10      A    No, I do not know.

11      Q    You mentioned outside training before when

12   we had our list?

13      A    Yes.

14      Q    Is that something other than what we've

15   talked about so far?

16      A    Yes.  Completely different.

17      Q    These would be seminars?

18      A    Yes.

19      Q    Things like that?

20      A    Yes.

21      Q    Is there any MPD policy setting a certain

22   requirement for outside training?

Page 64

1    that's good behavior and bad, in that it keeps all

2    records of training and all records of complaints

3    and investigations I believe.

4        Q    Are you aware of any -- aware of any

5    aspect or component of the Personnel Performance

6    Management System that specifically tracks behavior

7    of officers with respect to evictions or

8    landlord/tenant disputes?

9            MS. VALDES:  Objection as to form.

10   Objection; compound.

11       A    No.

12       Q    So if I understand correctly, PPMS is kind

13   of a collection of information and documents that

14   have -- that are generated just in the normal course

15   of business; is that right?  Or are there documents

16   that -- this is not a good question -- but are there

17   documents that are generated specifically for the

18   purpose of PPMS?

19           MS. VALDES:  Object as to form, compound

20   and beyond the notice of the scope of the

21   deposition.

22       A    I don't know.  PPMS just is a

# EXHIBIT 12

1        UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF COLUMBIA

3    - - - - - - - - - - - - - - - x

4    ANTHONY BRIDGEFORTH,           :

5              Plaintiff,    :

6         vs.             : Civil Action

7    KHADIJAH BRONSON, et al.,    : No. 06-2128(RCL)

8              Defendants.   :

9    - - - - - - - - - - - - - - - x

10              Washington, D.C.

11              Tuesday, February 5, 2008

12         Deposition of Lt. John Michael

13   Hedgecock, a witness herein, called for

14   examination by counsel for Plaintiff in the

15   above-entitled matter, pursuant to notice, the

16   witness being duly sworn by Robert M. Jakupciak, a

17   Notary Public in and for the District of Columbia,

18   taken at the offices of Hogan & Hartson, 555

19   Thirteenth Street, N.W., Washington, D.C., 20004,

20   at 9:00 a.m., on February 5, 2008, and the

21   proceedings being taken down by Stenotype by

22   Robert M. Jakupciak, RPR.

Page 44

1    to landlord/tenant disputes?

2        A    No.

3        Q    Is there a complaint category linked to

4    residential evictions?

5        A    No.

6        Q    And, correspondingly, is there any kind

7    of code that someone who is inputting data into

8    the database is going to enter to designate a

9    complaint as one related to a landlord/tenant

10   dispute?

11       A    There is no code associated with that

12   type.

13       Q    Is there a code associated with a

14   residential eviction?

15       A    There is no code associated with

16   residential eviction.

17       Q    Do you know if there has ever been any

18   code associated with either landlord/tenant

19   disputes or residential eviction?

20       A    To the best of my knowledge, no.

21       Q    So earlier when you were describing DC2,

22   you mentioned the word keyword search, without

Page 121

1                          -   -   -

2            (Whereupon the following portion of the

3     testimony was repeated by the Court Reporter:

4            QUESTION:  Other than what we've

5     talked about with respect to DC2, or the Captain

6     McLean investigation, are you aware of any

7     investigations conducted by the Metropolitan

8     Police Department in relation to allegations that

9     the MPD acted in a landlord/tenant dispute?)

10                          -   -   -

11            MS. VALDES:  Objection as to form.

12        A    I have no other documentation received

13     that we had any other investigations other than

14     what we've spoken about today.

15        Q    So the answer to the question would be

16     no?

17        A    No.

18        Q    And other than what we've spoken about

19     so far today, are you aware of any citizen

20     complaints filed against the District of Columbia

21     related to actions by members of the Metropolitan

22     Police Department in relation to landlord/tenant

Lt. John Michael Hedgecock 30(b)(6)                                              February 5, 2008
Washington, DC

Page 126

1    testimony was repeated by the Court Reporter:

2              QUESTION:  Back on the record.  Along

3    the lines of -- other than -- let me ask this

4    first.  Are you aware of any disciplinary action

5    taken with respect to any member of the

6    Metropolitan Police Department related to the

7    events that we've been discussing today?)

8                        -  -  -

9         A    No.

10             MR. MONTHY:  All right.  I have no

11   further questions for you at this time.  Let's

12   take a break for lunch.

13   BY MS. VALDES:

14        Q    I have just a couple of questions.  You

15   referred to an investigation conducted by Captain

16   McLean.  Is there any additional information you

17   can provide regarding that investigation?

18        A    Yes, based on the conversation I had

19   with you.

20        Q    What else -- well, I don't want you to

21   provide any information regarding --

22        A    What are you looking for specifically?

# EXHIBIT 13

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

```
- - - - - - - - - - - - - - x
                           :
ANTHONY BRIDGEFORTH,       :        Docket Number:  CA447-06
                           :
          Plaintiff,       :
                           :
          vs.              :
                           :
KHADIJAH BRONSON,          :
                           :
          Defendant.       :
                           :        Friday, February 3, 2006
- - - - - - - - - - - - - - x        Washington, D.C.
```

The above-entitled action came on for a hearing
before the Honorable ROBERT MORIN, Associate Judge, in
Courtroom Number 517, commencing at 11:28 a.m.


          APPEARANCES:

          On Behalf of the Plaintiff:

          PRO SE

          On Behalf of the Defendant:

          PRO SE


                                        06-01570

**Deposition Services, Inc.**
6245 Executive Boulevard
Rockville, MD 20852
Tel: (301) 881-3344  Fax: (301) 881-3338
info@DepositionServices.com  www.DepositionServices.com

rb

1              P R O C E E D I N G S

2              DEPUTY CLERK:  Are we ready on the Anthony

3    Bridgeforth case?

4              THE COURT:  Okay, well, call the case.

5              DEPUTY CLERK:  Your Honor, this is number 9 on

6    the calendar.

7              THE COURT:  Thank you.

8              DEPUTY CLERK:  Anthony Bridgeforth v. Bronson,

9    06-CA447.  Would the parties please state your names for

10   the record?  I think Mr. Bridge, over here.  Could the

11   parties please state your name for the record.

12             MR. BRIDGEFORTH:  Anthony Bridgeforth, Your

13   Honor.  B-R-I-D-G-E-F-O-R-T-H.

14             THE COURT:  Okay.

15             MS. BRONSON:  Khadijah Bronson.

16             THE COURT:  Okay, a temporary restraining order

17   was issued on January 26th.  This is a motion for

18   preliminary injunction to extend that.  Now, are you

19   objecting to the extension of the temporary restraining

20   order?

21             MS. BRONSON:  Yes.

22             THE COURT:  Okay, place the parties under oath.

23             Thereupon,

24             **ANTHONY BRIDGEFORTH**

25   the plaintiff, having been first duly sworn by the Deputy

rb

1   up.

2          MR. BRIDGEFORTH:  Okay, I apologize.

3          MS. BRONSON:  Oh, I know what this is about, the

4   November the 1st --

5          THE COURT:  Okay, go back to your table.  Okay,

6   ma'am, I can't have you keep saying that under your

7   breath.

8          MS. BRONSON:  I'm sorry.  I mean, this is, I'm

9   sorry.  I'm assuming, I don't know what, November 4th was

10  the first lease-up package, that was when he submitted the

11  package.

12         THE COURT:  Right.

13         MS. BRONSON:  When I came back down to sign the

14  lease, that's when they informed me -- oh, that's exactly

15  what it was, the addresses, the unit numbers was mixed up,

16  so when I came back down we had to do the package again.

17  I mean, not the package, just switch the addresses.  So

18  when you switch the numbers on the units, not the

19  apartments, just switch the numbers on the unit, they make

20  you fill out another package.  So that's why that list

21  shows that you submitted everything all over again, so the

22  date changed from November 4th --

23         THE COURT:  What is your understanding of when

24  he was first in the apartment?

25         MS. BRONSON:  December 1st.  They did an

28

rb

1   might hear messages, but what I'm saying is, just to let

2   you know that this was before, letting him know that

3   people are going to be coming out.

4          MR. BRIDGEFORTH:  Hold on, I'm going to get to

5   the message (indiscernible).

6          (Whereupon, a recording played for the Court was

7   reported, but is not transcribed herein.)

8          MS. BRONSON:  Now, when was these dates?

9          MR. BRIDGEFORTH:  There's more messages, Your

10  Honor.

11         MS. BRONSON:  When were these dates?

12         MR. BRIDGEFORTH:  There's more messages, Your

13  Honor, more, much more.

14         MS. BRONSON:  When was these?

15         MR. BRIDGEFORTH:  The date, the day that you

16  said I didn't.  Your Honor, there's more, Your Honor.

17         THE COURT:  Okay, anything else, ma'am?  It's

18  clear to me that you knew he was in the apartment.

19         MS. BRONSON:  No, this is after, when I told him

20  to get his stuff out, that day before I called the cops.

21         THE COURT:  What about the inspection?

22         MS. BRONSON:  The inspection, he was supposed to

23  come, I told you, the inspection he was supposed to be

24  there to let the people in.

25         THE COURT:  How would he let them in if he

rb

1    didn't have --

2            MS. BRONSON:  He'd already been in there.

3            THE COURT:  That's what I'm saying.

4            MS. BRONSON:  He'd already been in there.

5            THE COURT:  I agree that you knew he was in

6    there.

7            MS. BRONSON:  This man (indiscernible) so much.

8    I (indiscernible) got confused on all this.  I mean, it's

9    not to say, he wasn't supposed --

10           THE COURT:  Ma'am, I don't have a problem with

11   the notion that you let him go in there because you

12   thought the lease was going to be executed.

13           MS. BRONSON:  That was originally the case.

14   That's what was supposed to happen, he supposed to move

15   in.

16           THE COURT:  Right.  But it's clear to me the

17   inspections were taking place before January 20th, from

18   all the paperwork I have.

19           MS. BRONSON:  It was, yeah.

20           THE COURT:  Right, and you're talking to him as

21   if it's his fault that he wasn't there to let in the

22   inspectors.  He wouldn't be able to let in the inspectors

23   unless he had the keys to the apartment.

24           MS. BRONSON:  All right, okay.

25           THE COURT:  Okay?  Sir, I'll extend the

rb

1   temporary restraining order till February 11th, that's

2   your 30 days notice where you said you were leaving the

3   apartment.

4           MR. BRIDGEFORTH:  Would it be a problem to

5   extend 30 days from today?  Through all this, Your

6   Honor --

7           THE COURT:  No.

8           MR. BRIDGEFORTH:  -- I lost my job.

9           THE COURT:  Sir, that, that, even though you

10  lost your job and I appreciate that, that does not affect

11  your right to be in the apartment.

12          MR. BRIDGEFORTH:  Okay.

13          THE COURT:  You have until February 11th, so I'm

14  going to extend the temporary restraining order until

15  February 11th.

16          MS. BRONSON:  Then he has to be out of the unit?

17          THE COURT:  That's when, ma'am, the temporary

18  restraining order indicated to you, if you wish to get him

19  out of the apartment, you should file an action to evict

20  him in accordance with D.C. law.  If you don't know how to

21  do that, I suggest you go over to Landlord/Tenant Court --

22          MS. BRONSON:  Okay.

23          THE COURT:  -- and find out how to do it.  But

24  you have until February 11th and then the preliminary

25  injunction will expire.

41

rb

1    do with that.

2              MR. BRIDGEFORTH:  Your Honor, I have a court

3    order telling not to interfere with that, and the

4    Housing --

5              MS. BRONSON:  You don't have no court order

6    telling me I got to get --

7              THE COURT:  Ma'am, ma'am, ma'am.

8              MR. BRIDGEFORTH:  The Housing inspectors, even

9    on the notice of deficiencies tell her, you know, do what

10   you need to do to get that gas on.  I went to the gas

11   place 10 times.  They called her.  I can't do it by myself

12   because I don't have an executed lease.  So the owner has

13   to do it, and then I get it switched in my name.  They

14   recognize me as a tenant, but I don't have an executed

15   lease so I can't get no gas, and I've been without heat

16   since January the 10th.

17             THE COURT:  Well, you should be able to bring

18   those orders down, and that gives you the right to stay in

19   the apartment.

20             MR. BRIDGEFORTH:  But with no heat, can't get

21   the heat on.  I'm in the apartment but I don't have no

22   heat, no gas.

23             THE COURT:  Right, you should be able to bring

24   those orders down to the gas company.

25             MR. BRIDGEFORTH:  I did that all ready.  They

# EXHIBIT 14

# Superior Court of the District of Columbia
## CIVIL DIVISION

500 Indiana Ave., N.W.
WASHINGTON, D.C. 20001

Rm JM 170

879-1133

Anthony Bridgeforth _____, **Plaintiff**

vs.

SC No. _____

Khadijah Branson _____, **Defendant**

MOTION OF: Plaintiff _____ ~~TO~~ for Preliminary Injunctive Relief

(State briefly what you want the Court to do) Will Court please restore Plaintiff ~~to restore~~ to premises and enjoin ~~defendant~~ Defendant from further interference with his possessory rights 1) Please immediately restore Plaintiff's access to his apartment at 210 15th St, NE Apt 4, Washington, DC 20002. 2) Please enjoin Defendant from any future actions which interfere with Plaintiff's right to possession use & enjoyment of the premises. This injunction should be granted because 1) Plaintiff likely to prevail on the merits in this action; 2) Plaintiff in danger of suffering irreparable harm during the pendency of this action if relief not granted;

Print Name

Anthony Bridgeforth

Signature

_[signature]_

Address

5708 Hayes St, NE     20019

Home Phone No.

202-412-3300

Business Phone

To the best of my knowledge the above statements are true.
Subscribed to before me this _____ day of _____ , 20 _____

_____
Deputy Clerk/Notary Public

~~THIS MOTION HAS BEEN SET FOR HEARING IN SMALL CLAIM COURT ROOM JM-12~~
~~ON~~ _____ ~~AT 9:00 A.M.~~

~~A COPY OF THE ABOVE MOTION WAS MAILED FROM THE CLERK'S OFFICE TO:~~ _____

IT WILL BE NECESSARY FOR YOU TO APPEAR ON THE ABOVE DATE

Form CV

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### CIVIL DIVISION
Washington, D.C. 20001

Anthony Bridgeforth
_____
Plantiff

vs.

Khadijah Bronson
_____
Defendant

CA No. _____

## O R D E R

Upon consideration of the motion _for Temporary Restraining Order_

filed by _Plaintiff_

_opportunity for_
and after hearing argument on behalf of all parties concerned, it is, by the Court, this _26th_

day of _January 2006_, it is, by the Court, this _26th_

ORDERED:

(1) That the motion be, and it is hereby,

☑ GRANTED          ☐ DENIED

(2) That _defendant shall forthwith restore plaintiff's access to 210 20th St. NE Apt. 4._

(3) _defendant shall not interfere with plaintiff's right to possession of said premises;_

(4) _defendant shall take no action to evict plaintiff except under D.C. Landlord-Tenant Law._

(5) _The Metropolitan Police Dept shall assist in enforcing this order._

(6) _This Order shall remain in effect for ten (10) days unless extended by further Order of Court._

Copies to:

_Ronald P. Watkins_
_____
JUDGE

# EXHIBIT 15

# CIRCULAR



**DISTRICT OF COLUMBIA**

| | |
|---|---|
| Topic | **Landlord Self-help Evictions** |
| Series / Number | **CIR – 01 – 03** |
| Effective Date **February 28, 2001** | Distribution **A** |
| Replaces / Rescinds | **Circular 00-01 (Landlord Self-help Evictions)** |

It is becoming a common practice in the District of Columbia for landlords to take the law into their own hands and evict their tenants without the appropriate legal process. This type of eviction is known as a "self-help" eviction. In doing so, landlords have often called for service and sought the support from a Metropolitan Police Department officer to carry out such an eviction. This circular represents a continuation of existing policy, and should not be viewed as creating new policy.

The Metropolitan Police Department does not participate in self-help evictions. Self-help evictions are an illegal practice established by the case of Mendez v. Johnson, 389 A.2d 781 (D.C. 1978) and, in accordance with D.C. Code § 45-2551 (1981 ed.) "… No tenant shall be evicted from a rental unit, notwithstanding the expiration of the tenant's lease or rental agreement, so long as the tenant continues to pay the rent to which the housing provider is entitled for the rental unit…"

A landlord must have a proper court order to engage in an eviction. The landlord must file an action in Landlord and Tenant Court in order to recover possession of a rental unit. This assures that should an eviction take place, U.S. Marshals, who are the only entity empowered to effect an eviction, will execute the Writ of Restitution and deter possible conflict between the landlord and the tenant.

Therefore, in accordance with the above laws, officers are instructed that they are not to become involved in apparent landlord-tenant disputes. Rather, when called to the scene, the officers are instructed to maintain the peace and refer the parties to Landlord and Tenant Court, D.C. Superior Court, 500 Indiana Avenue, N.W., Washington, D.C.

Charles H. Ramsey
Chief of Police

CHR:NMJ:eps:uk

Attachment 3

# EXHIBIT 16

# ROPOLITAN POLICE DEPARTMENT

### Washington, D.C.



## Office of Organizational Development
## Maurice T. Turner Jr., Institute of Police Science

### MEMORANDUM

**TO:**        Office of the General Counsel

**THRU:**    Senior Executive Director
              Office of Organizational Development

**FROM:**    Shannon P. Cockett
              Assistant Chief/Director    *2/26/01*

**DATE:**     February 23, 2001

**SUBJECT:**  Training Plan to Meet the Settlement Compliance in McMillian v. D.C.

---

To meet the requirements set forth in McMillian, et al.v. Davis, et al. Civil Action No 98-7746, the Maurice T. Turner Jr., Institute of Police Science has adopted the following training program:

- **Roll Call Training**

  Roll call training on the Metropolitan Police Department's policy on Residential and Self-help Evictions was distributed to each patrol district and division during the month of January 2001. This training was conducted on February 1st, 9th, 17th, and 25th, of the year 2001. This training will be re-issued at least every three months (Attachment #1).

- **Field Training Officer Course**

  Training on the department's policy on evictions has been incorporated into the Field Training Officer's Course; the next session is scheduled to begin on March 12, 2001 (Attachment #2).

*attachment 4*

2

- **First Line Supervisor & Reserve Officer Courses**

    The department has not conducted a promotion of first line supervisor's or training for reserve officers since the settlement of this case. However, the department's eviction policy will be included in the curriculum of all future courses of this nature.

- **In-Service Training**

    The department mandates forty hours of in-service training for all officers and sergeants each fiscal year and thirty-two hours of in-service training for lieutenants and above. Training on the department's eviction policy has been incorporated into the training program for officers and sergeants, and will be included in the training of personnel in the ranks of lieutenant and above.

- **Recruit/Lateral Officer Training**

    The department's eviction policy has been incorporated into level seven of the Institute of Police Science's recruit/lateral officer training curriculum. This will insure that members graduating from the training facility are aware of the correct procedures prior to taking enforcement action in the field (Attachment #3).

# EXHIBIT 17

FEBRUARY 1, 9, 17, 25, 2001

# RESIDENTIAL EVICTIONS

## POLICY

It is the policy of the Metropolitan Police Department that:

- ➤ Under D.C. law, evictions are to be carried out ONLY by U.S. MARSHALS

- ➤ In order to evict a tenant, landlords must first obtain a COURT ORDER

Members are reminded that, whenever approached by a citizen to assist in evictions, they shall inform that citizen MPD does not facilitate with evictions, and that it is a matter and responsibility relegated to the court.

A manual tracking system shall be instituted by the Office of Professional Responsibility and/or the Officer of Internal Affairs, and shall commence no later than February 28, 2001.

Two new categories in the Civilian Complaint Computer Database are currently being developed by the MPD, in conjunction with the Department of Justice.  These categories shall document and track Civilian Complaints relating to:

1. MPD involvement in evictions, and

2. MPD involvement in landlord-tenant disputes.

This policy shall remain in effect until a General Order outlining distinctive procedural guidelines is distributed to all MPD members.

REFERENCE:  McMillan, et al. v. Davis, et al., Civil Action No. 98-7746

ATTACHMENT # 1

# EXHIBIT 18

# GENERAL ORDER



**METROPOLITAN POLICE**

**DISTRICT OF COLUMBIA**

| | |
|---|---|
| **Title** | Field Reporting System |
| **Topic/Number** | GO-SPT-401.01 |
| **Effective Date** | March 4, 2004 |
| **Distribution** | A |
| **Replaces/ Rescinds:** | General Order 401.1 (Field Reporting System)<br>Special Order 86-12 (Canceling Central Complaint Numbers) |

I. Background.........................Page 1
II. Policy................................Page 1
III. Definitions .........................Page 1
IV. Regulations.......................Page 2
V. Procedural Guidelines .........Page 3
VI. Cross References................Page 16

## I. BACKGROUND

A Field Reporting System that provides accurate information to members within the Department and to the citizens we serve is an essential part of delivering effective law enforcement services. The Metropolitan Police Department (MPD) has a comprehensive reporting system that captures information of reported crimes and incidents, which occur within the District of Columbia, in violation of local and federal laws.

The need to document and preserve information gathered from reported crimes and incidents serves two purposes. First, it provides a record for action taken by law enforcement members, whether it is self-initiated or in response to a request for police service. This will help to ensure that appropriate enforcement action is taken when conducting investigations. Second, the information can be internally used to identify crime trends and solve crimes.

## II. POLICY

The policy of the Metropolitan Police Department is that members shall file a report for all reported crimes and incidents brought to his/her attention. Self-initiated police action taken and calls for police service shall be accurately and thoroughly documented to ensure that a follow-up investigation can be conducted for potential adjudication.

## III. DEFINITIONS

For the purpose of this directive, the following terms shall have the designated meanings:

  1.   Serious Crimes - homicides, rapes, critical injury assaults, robberies, burglaries, stolen autos, bombings, arsons and a loss of other property in excess of $10,000.00.

ATTACHMENT Nº 8

FIELD REPORTING SYSTEM (GO-SPT-401.01)

2. Unusual Incidents – deaths, other than homicides, that fall under the statutory jurisdiction of the Medical Examiner's office, missing persons, bomb scares and natural disasters.

3. Preliminary Investigations - the first investigative effort undertaken by a member of the MPD; normally, the investigative effort of a patrol officer seeking to verify that a crime has occurred and identifying whether there are solvability factors present.

4. Follow-up Investigations - the continued inquiry into a crime or incident due to pending leads, the complexity of the case, new information or time constraints. This process can involve interviews, press releases, and further evidence examination.

5. Solvability Factors - leads that require further investigation to determine if they will lead investigators to identifying the person(s) who committed the criminal act. The factors include the suspect's name and/or address, their description, physical evidence, identifiable automobile, known modus operandi, etc.

## IV. REGULATIONS

A. Members shall investigate and complete the appropriate reports and paperwork as outlined in this General Order in the following situations: (CALEA 82.2.2)

1. For all reports of crimes or offenses that occurred in the District of Columbia as defined by the D.C. Official Code. (CALEA 82.2.2 a)

2. For all citizens' complaints filed against Metropolitan Police Officers, that are not investigated by the Office of Citizen Complaint Review (OCCR). (CALEA 82.2.2 b)

3. Any incident or crime that results in a member being dispatched or assigned to calls for service. (CALEA 82.2.2 c)

4. All criminal or incident responses initiated by sworn members. (CALEA 82.2.2 d)

5. All incidents or crimes resulting in an arrest, the issuance of a citation, or the issuance of a summons. (CALEA 82.2.2 e)

B. A report shall be written for all reported offenses or incidents that occurred in the District of Columbia and shall be classified based on the elements of the crime if the offense/incident is in violation of the law established in the District of Columbia or U.S. Criminal Codes. (CALEA 82.2.1 a)

C.  Complaints in which multiple offenses have occurred shall be classified to reflect the most serious offense, as determined by the penalty in the D.C. Official Code.  Remaining offenses shall be listed in the additional reporting blocks and described in the narrative portion of the report.

D.  It shall be the responsibility of the first member on the scene, regardless of his/her assignment, to begin conducting the preliminary investigation after safety precautions have been taken and the investigation does not interfere with the criminal case or defeat the ends of justice.  Such determination shall be made in conjunction with the field supervisor.  Once the assigned unit arrives on the scene, he/she shall resume the primary preliminary investigation, unless directed otherwise by an official.

E.  Whenever members prepare reports on the scene involving serious offenses or unusual incidents, he/she shall request a district official to respond to the scene of the offense or incident.  The reporting member shall be responsible for preparing all applicable reports and making the necessary notifications.  The report prepared for a serious crime or unusual incident shall include the name and organizational element of the supervising official who responded to the scene, the station clerk notified, if necessary, and any additional notifications made regarding the crime/incident.  (CALEA 82.2.1 a)

F.  Members shall canvass the area with complainant(s), in instances when the suspect may still be in the immediate area and identification can be made.  Further, a member shall advise the dispatcher that the complainant(s) is in the vehicle and gives the vehicle mileage, prior to canvassing and immediately after the complainant(s) exits the vehicle.

G.  Members may find it necessary to leave a scene immediately with a complainant when there is a concern for safety.  Under these circumstances, the dispatcher shall be advised.  The location and mileage shall be given to the dispatcher upon leaving the scene and once a destination is reached.

H.  If a member, other than the primary assigned member, handles the report, the dispatcher shall be notified and the Central Complaint Number (CCN) issued for that report shall be turned over to the member preparing the report.  The dispatcher shall confirm the name and CAD identification number of the member who is now responsible for the report.

## V.  PROCEDURAL GUIDELINES

A.  The preliminary investigation is the combination of those actions that should be carried out, as soon as possible, after the first responding member arrives on the scene.  At a minimum, he/she shall:

1.  Ensure that injured or sick persons receive medical attention.

2.  Secure the crime scene to prevent the evidence from being lost or contaminated.

3.  Determine whether a crime has been committed and, if so, the exact nature of the offense or incident.

4.  Determine the identity of the suspect and make an apprehension when appropriate.

5.  Provide lookout information to the dispatcher and other units, such as descriptions, method and direction of travel, whether armed or unarmed, and any other identifiable information about any suspect(s) and/or the suspect's vehicle.

6.  Identify, interview, and take statements from all victims, witnesses and suspects to determine in detail the exact circumstances of the offense or incident.

7.  Arrange for the collection of evidence.

8.  Take any other action that may aid in resolving the situation or solving the crime as directed by a supervisor.

B.  The preliminary investigation begins when the first Metropolitan Police Officer arrives on the scene of a crime or incident.  The purpose of the investigation is to determine the facts of an offense or incident.  Report numbers (CCN) and all information obtained shall be documented on the appropriate forms and submitted to the supervisor for review and signature.  The reports generated from the investigation should contain information gathered at the scene.  If known, the reports should also include the following:  (CALEA 82.2.1 c)

1.  The names and demographic information of all victims, suspects and witnesses;

2.  The type of crime committed, what was used to commit the crime and whether any evidence was recovered;

3.  In the case of property crimes, a description of, and value assigned to, any property that was stolen, damaged or destroyed (including the make, model, tag and VIN number of any vehicles stolen);

4.  In the case of property crimes, a description and the location of any stolen property that has been recovered;

5.  In the case of drug-related offenses, the results of any drug tests taken by the suspect(s);

6.  The time, date and location where the crime or incident occurred;

7.  The condition of the victim and where he/she was found and taken for treatment;

FIELD REPORTING SYSTEM (GO-SPT-401.01)

8. How was the crime committed, sometimes referred to as the "Modus Operandi;"

9. The circumstances surrounding the commission of the crime, including, but not limited to, any motive the suspect(s) had to commit the crime and the relationship between the suspect(s), victim(s) and witness(es);

10. Information about whether the crime involved a domestic relationship and/or disagreement, whether a TPO/CPO was outstanding and whether a PD Form 387-A (Domestic Violence Brochure) was issued.

11. The current case status information (whether the case is open, suspended or unfounded (and the reason for unfounding it), or whether an arrest has been made.

C. The objective of a follow-up investigation is to accumulate sufficient information and evidence that corroborates probable cause for affecting an arrest. It typically involves interviewing victims and witnesses, as well as interrogation and interview of suspects.

D. The solvability factors can give insight for potentially solving criminal cases. The information supplied can be examined in its totality to help determine the likelihood an arrest will be made, and any resources that may need to be allocated. The following factors shall be submitted on a PD Form 252 (Supplement), if known, as a part of the preliminary investigation:

Note: Each offense specified for a particular case shall be closed on a separate PD Form 252.

1. A summary of the names of witnesses to the crime and statements, if provided.

2. The name and location of the suspect, if known. If the suspect is not known, the member shall report whether the witnesses or victim(s) can identify or construct a composite of the suspect. Any criminal history on the suspect should be included.

3. The member shall report a listing of any evidence, contraband, fruits or instruments involved in the crime. The member shall also report whether the suspect may have the "fruits of the crime" or evidence. The report should relate the current condition and location of any evidence.

4. The reporting member shall document statements made by the victim, including a description of the crime. When necessary, describe the exact injuries and/or the medical or mental condition of the victim.

E.  Members initiating reports shall not be relieved from duty until all reports are completed accurately and have been submitted and corrected as necessary, unless an illness or injury has occurred while in the performance of duty.  In that case, the member's supervisor shall ensure the report is submitted before relieved from duty.  (CALEA 82.2.1 e)

F.  The check-off official for that tour of duty shall not be relieved from duty until all reports are completed accurately and have been submitted and corrected as necessary to the district Crime Analysis Unit.

G.  The district Crime Analyst/PD-93 Clerk shall prepare a PD Form 93 (24-Hour Crime Report) each morning for his/her commander, and enter basic information from the PD Form 251s (Event Report) associated with reports received over the past 24 hours into the Analytical Services Application (ASAP).

H.  Within 24 hours after submission of the report, the district Crime Analyst/PD 93 Clerk shall forward the original and two (2) copies of offense/incident and traffic reports for analysis and screening, with an attached transmittal, as follows:

1.  Homicides - to the Office of Superintendent of Detectives (OSD) Violent Crimes Branch;

2.  Sexual assaults against adults - to the OSD Sex Crimes Branch;

3.  Sexual assaults against juveniles - to the Youth and Preventive Services Division;

4.  Arsons – to the OSD Arson Unit; and

5.  All other reports – to the OSD Investigative Review Officer (IRO).

Note:  The IRO and/or reporting official in the specialty unit shall make a determination about whether the case shall be returned to the officer assigned to a specialty unit or maintained within the district OSD.  (CALEA 82.2.5)

I.  Field reporting procedures.  (CALEA 82.2.1 d)

1.  Each member initiating a field report shall sign the report in the appropriate space on the form.  Only the reporting member shall sign the field report (unless incapacitated), then an official shall sign the report.

2.  All field reports shall either be computer-generated, typed or hand printed in black ink.  The reporting member is responsible for ensuring that the report is accurate and legible prior to submitting it to a supervisor.  Also, the reporting member shall maintain adequate notes of the offense in his/her notebook.  (CALEA 82.2.1 e)

**FIELD REPORTING SYSTEM (GO-SPT-401.01)**

3.  All field reports shall have a valid (non-duplicate, non-transposed) CCN number. The member shall ensure that the CCN is printed in all designated areas of the appropriate form.

4.  Supervisory officials shall be held responsible for collecting the completed reports and reviewing them for legibility, accuracy and completeness at the end of each tour of duty. When a discrepancy is found in a report, the supervisor shall counsel the reporting member and require the member to make the necessary corrections. (CALEA 82.2.4)

5.  Supervisory officials shall conduct periodic inspections of a member's field notebooks to ensure members are properly documenting events. Because the field notebook is considered potential discoverable material, it shall be retained for a period of three years.

6.  When completing the field reporting forms, members shall enter the appropriate information in each numbered item on the form. If the information requested on the form is unknown, enter "UNK" or if it is not applicable, enter "N/A" in the numbered space. Members should refer to the list below for the most frequently used field reporting forms. (CALEA 82.2.1 b and d)

    a.  PD Form 251 (Event Report) - for documenting reported incidents or offenses that indicate a violation of the laws and ordinances established in the District of Columbia and the United States, as well as for documenting miscellaneous reports.

    b.  PD Form 252 (Supplement) - used to change the classification/case status of reports and record additional information regarding the crime, suspect(s), witness(es) and complainant(s).

    c.  PD Form 256 (Quick Booking Form) – used by a member on the scene of an arrest to obtain basic information on a defendant, which will be transported with the defendant to the elements station house so the station clerk may begin the booking process.

    d.  PD Form 163 (Prosecution Report) - used to document arrests and charges lodged against suspects. This report records the violation of the laws and ordinances established in the District of Columbia and the United States.

    e.  PD Form 163A (Prosecution Report ) - used to record Driving Under the Influence/Driving While Intoxicated arrests. This report cites the violation of the laws and ordinances established in the District of Columbia.

FIELD REPORTING SYSTEM (GO-SPT-401.01)

f.  PD Form 47 (Miranda Right's Card) - used to document and advise a suspect of his/her rights.

g.  PD Form 379 (Juvenile Truant, Court, Contact and Juvenile Curfew) - used to document all physical contact made with juveniles.  Records the reported incidents or offenses committed by juveniles.  This report records the violation of the laws and ordinances established in the District of Columbia and the United States.

h.  PD Form 118 (Defendant/Suspect Statement) - for documenting statements taken from a defendant/suspect.

i.  PD Form 119 (Complainant/Witness Statement) - for documenting statements taken from complainants/witnesses and members of the Department.

j.  PD Form 119A (Witness Statement - Driving Under the Influence/Driving While Intoxicated) – for documenting statements taken from witnesses and members for DUI/DWI investigations.

k.  PD Form 202A (Continuation Report) a continuation form.

l.  PD Form 10 (Traffic Accident Report) - for recording traffic accident investigations.

m.  PD Form 81 (Property Record) - for documenting all property that comes into the custody of the Department.

n.  BTA Form 51 (Notice of Infraction) - used to cite violators of the District of Columbia Municipal Regulations, Title 18, Vehicle and Traffic.

o.  PD Form 61D (Warning/Violation Citation) - used to cite violators of the District of Columbia Municipal Regulations, Title 24, Public Space and Safety.

p.  PD Form 901-e (Use of Force Incident Report) – used for any use of force by a member, which is required by GO-RAR-901.08 (Use of Force Investigations).

q.  PD Form 387-A (Domestic Violence Brochure).

7.  Members assigned to foot, bike or scooter patrol shall assist with canvasses when lookouts are broadcast in his/her patrol area.  When in receipt of an original complaint in which an offense or incident report is required, member(s) shall record the necessary information in his/her notebook and prepare the report.  At a minimum, these

members shall handle the following reports, unless directed otherwise by an official: (CALEA 82.2.1 a)

    a.    Animal bite;

    b.    Destruction of property;

    c.    Thefts (all types);

    d.    Lost property;

    e.    Robbery (PBS and pickpocket);

    f.    Sick or injured person (only those occurring on public space);

    g.    Simple assault;

    h.    Stolen bicycle;

    i.    Stolen automobile;

    j.    Miscellaneous reports.

8.    When a member is assigned to a school crossing or traffic post, he/she shall not leave it to take a report. In such cases, he/she shall assist the complainant by contacting the dispatcher and requesting a uniform patrol car to respond to the scene to handle the complaint.

9.    During the course of a preliminary investigation and when appropriate, members shall provide referral information to individuals who are in need of victim/witness assistance services. (See GO-OPS-204.06, Victim Services Program)

    a.    Members shall provide information to the victim/witness about applicable services available within the District of Columbia, such as counseling, medical attention, and the crime victims compensation program. (CALEA 55.2.3 a)

    b.    Members shall advise the victim/witness about what to do if the suspect or anyone known to the suspect, threatens or otherwise intimidates him or her. (CALEA 55.2.3 b)

    c.    Members shall give the victim/witness the CCN numbers, explain the immediate steps in processing the case, consistent with the Department 's guidelines, and a contact telephone number, so that the victim/ witness can call to report additional information or inquire about the status of the case. (CALEA 55.2.3 c & d)

FIELD REPORTING SYSTEM (GO-SPT-401.01)

J.    Reports involving juveniles

    1.    When members are preparing a PD Form 251 on a juvenile victim, he/she shall not disclose identifiers of the complainant. First and last initials shall be used in the name category, age range only shall be given, street blocks shall be used rather than specific addresses, and phone numbers shall be omitted. The PD Form 251 should only include basic information (a brief description of what happened) so the complainant is not forced to repeat him or herself, especially in more sensitive cases.

    2.    When members are preparing a PD Form 251, incident report, on a juvenile victim, he/she shall not disclose the complainant's full name, exact address, exact age and phone number, if applicable. Otherwise, a full detailed description of what happened shall be given and the report filled out as described in section V, B and D, of this directive.

    3.    The PD Form 252 shall be used to disclose all pertinent information involving juvenile victims.

K.    Evaluation of lost or stolen property. (CALEA 82.2.1 d)

    1.    When a member completes a PD Form 251 or 252 for a lost or stolen property report, if available, the serial numbers, as well as identifiable marking, shall be listed in the report. The member shall comply with the following guidelines when assigning a fair and equitable valuation to the property:

        a.    The fair market value shall be used for articles, which are subject to depreciation because of wear and tear, age, or other factors that cause the value to decrease with use.

        b.    The wholesale cost to the merchant shall be used for goods stolen from retail establishments or warehouses. Members shall use the dollar value representing the actual cash loss to the victim, without any markup or profit added.

        c.    The complainant's evaluation shall be used on items such as jewelry, watches, antiques and other similar goods, which decrease in value only slightly or not at all.

        d.    The replacement cost or actual cash cost to the victim shall be used for new or almost new items such as clothing, auto accessories, and bicycles.

    2.    Instruments such as traveler's checks, personal checks, money orders, stocks and bonds shall be reported as a theft or loss, and a monetary value of twenty-five cents (.25) shall be assigned to each item, or items so reported.

3.    Instruments such as bonds payable to the bearer, U.S. Government Bonds and U.S. Treasury Bonds, shall be valued at current market price at the time of theft or loss.

4.    When completing reports on lost or stolen property, members shall enter in the blocks provided, the complainant's estimate of the value of the property and his/her own estimated evaluation of the property.

5.    When more than one item is reported lost or stolen, the property shall be itemized and each item assigned a police department value.

6.    When property is recovered, the value originally reported shall be assigned, unless it is obvious that the value has depreciated.  This procedure does not apply to vehicles.

L.    Canceling Central Complaint Numbers and unfounded reports.  (CALEA 82.2.3)

1.    A PD Form 252 must be prepared to cancel or unfound a CCN number.  The Staff Review Unit of the Records Department, Corporate Support, shall also accept PD Form 252 to cancel CCNs under the following conditions:

a.    Duplicate Numbers - If a situation occurs where two numbers are issued for the same report, a PD Form 252 must be prepared bearing the CCN that will be cancelled.  The body of the report must state it is a duplicate number and list the CCN reflecting the actual PD Form 251 report that was prepared.

b.    Dispatcher's Error - If a unit is credited with a report due for a CCN that was given in error, the unit being held accountable shall prepare a PD 252, explaining the circumstances for a "No Report" disposition and identify the dispatcher that committed the error.  A Communications official shall then cancel the CCN.

2.    The PD Form 252 is filed in the above situations to provide continuity and documentation to support the integrity of the reporting system.

3.    When Computer Aided Dispatcher has issued a CCN for a report and it is immediately determined the incident or crime did not occur, the original PD Form 251 is to be prepared and marked as unfounded.  A PD Form 252 shall only be accepted after the original PD Form 251 has been submitted, or if it is submitted along with the PD Form 251.  In both cases, a statement must be written in the body of the report confirming the fact that after conducting an investigation it was determined the incident did not occur.

4.    A supervisor must approve all unfounded reports.

**FIELD REPORTING SYSTEM (GO-SPT-401.01)**

M.  Reporting offenses or incidents occurring in another district. (CALEA 82.2.2 c)

    1.  When members are dispatched to the scene of an incident outside his/her assigned district, or when an incident is reported to them that occurred outside of his/her assigned district, they shall prepare the appropriate report. A CCN number from the Public Safety Communications Center (PSCC) shall be obtained and the report shall be forwarded through normal channels to be processed in the Staff Review Unit, Records Department, Corporate Support.

    2.  The reporting member shall also relay all information on the report to the Station Clerk of the district in which the event occurred, by faxing a copy of the report, if possible. The name and unit of the member receiving the information shall be entered in the narrative portion of the PD Form 251. The Station Clerk of the district where the reporting member is assigned shall be responsible for transmitting the report over the teletype when appropriate.

    3.  When a motor vehicle is stolen from the District of Columbia and recovered in the District of Columbia, members shall:

        a.  Enter the district/PSA where the motor vehicle was stolen from in boxes #1 and #2 of the PD Form 252, the district/PSA where the motor vehicle was recovered from in box #7 and both pieces of information in the narrative (or at least the location of the recovery).

        b.  If the district where the motor vehicle is stolen is different from the district where it is recovered, the original of the PD Form 252 for the recovery shall be sent to the district from which the motor vehicle was stolen.

N.  Reporting the recovery of property stolen from another jurisdiction, members shall:

    1.  Obtain CCN numbers and prepare a PD Form 251 (Recovered Stolen Property), PD Form 252 and a PD Form 81 (Property Record);

    2.  Obtain the Originating Case Agency (OCA) numbers from the originating jurisdiction where the property was stolen and add them in the narrative part of the PD Form 251.

O.  Reports requiring response to medical facilities. (CALEA 82.2.2 c)

    1.  Members dispatched to a medical facility located outside of his/her assigned organizational element, to take or complete a sick or injured person's report, shall notify the dispatcher to contact a district official for authorization, prior to responding.

2.    Members, who respond to a medical facility to investigate complaints, shall prepare the necessary reports, as well as sign and date the patient's chart when requested by hospital authorities.

3.    If there is any indication that an individual shall be or is admitted into the hospital and no next of kin has been notified, the reporting member shall notify the Telecommunications Branch of the Information Technology Division by telephone. The teletype operator shall be given the individual's identity, a brief report of his/her circumstances and the CCN, when applicable.

4.    In cases when persons are transported to a District of Columbia medical facility for treatment of injuries that occurred in another jurisdiction and requires a police investigation, the member responding for the assignment shall notify the dispatcher to contact the appropriate agency that is responsible for conducting the investigation.

5.    In the interest of expediting police action in the above cases, the reporting member shall provide all necessary information to that agency. Telephone calls involving toll charges shall be handled in accordance with GO-SPT-302.03 (Department Telephones).

6.    When persons are admitted to hospitals in the District of Columbia, as the result of a traffic accident that occurred outside the District of Columbia, and their condition is listed as critical or death occurs, the reporting member shall notify the Major Crash Unit of the Special Investigation Division. If the member is unable to notify a member of the Major Crash Unit, the dispatcher shall make the notification. In the case of a death, a PSCC supervisor shall notify the appropriate law enforcement agency where the next of kin resides to make the notification.

P.    Reports involving a community correctional facility (Halfway House). (CALEA 82.2.2 c)

1.    Members dispatched to investigate an offense that occurred within the confines of a community correctional facility shall notify his/her district official who shall monitor the call. If necessary, an official shall respond to the scene and assist the reporting member.

2.    Upon completion of all required reports, the responding official shall notify the Watch Commander and provide a brief account of the

incident or offense to be documented on the PD Form 150 (Watch Commanders Report).

Q.    Inter-jurisdictional police departments. (CALEA 82.2.2 c)

1.    Inter-jurisdictional police departments are responsible for conducting their own investigations of those incidents/offenses that occur in their

jurisdictions, except deaths. Members shall promptly notify the appropriate police agency of any incident or offense brought to their attention that occurs inter-jurisdictional.

2.  All deaths shall be reported to and investigated by MPD. In addition, the required Metropolitan Police Department's reports dealing with deaths shall reflect the time and date the inter-jurisdictional police agency was notified, including the name of the official or member receiving the information.

R.  Industrial accidents are those incidents occurring at the workplace and involving bodily injury. In such circumstances, MPD shall respond to assist at the scene. (CALEA 82.2.2 c)

1.  Members who respond to an industrial accident shall prepare a PD Form 251 and, as soon as practicable, notify the Office of Occupational Safety and Health of the D.C. Department of Employment Services. Members shall report the date, time and location of the accident, as well as any other information required by the Office of Occupational Safety and Health.

2.  The date, time and name of the person notified, at the Office of Occupational Safety and Health, shall be entered on PD Form 251, along with the name of the member who made the notification. If unable to notify a member of the Office of Occupational Safety and Health, the Emergency Management Agency shall be notified and the above information shall be recorded on the PD Form 251.

3.  The Office of Occupational Safety and Health business hours are from 0830 to 1700, Monday through Friday.

    Note: Any serious crimes or unusual incidents shall be reported to the elements watch commander and the Synchronized Operations Command Center (SOCC), by the reporting member, as soon as practicable.

S.  Station Clerk responsibilities.

1.  When a Station Clerk receives notification that a crime or incident has occurred in a district, from a member of another district, that does not require any investigation, he/she shall obtain the pertinent information and prepare a report. The Watch Commander shall be notified if it is a serious crime or unusual incident.

2.  The Station Clerk receiving a crime, incident or traffic report from a sworn member in another district shall be responsible for preparing a duplicate and information-only copy for the OSD and the Crime Analysis Section. The Crime Analyst/PD 93 Clerk shall be responsible for all Part 1 offenses on the occurring district's PD Form 93 (24-Hour Crime Report). The notation "duplicate report" shall be written in bold

print at the top of the PD Form 251, and this report shall not be forwarded to Staff Review Unit. The duplicate, information-only report, shall be filed in the district for a 90-day period. (CALEA 82.2.5)

3.    The Station Clerks who receives a formal letter from a complainant detailing an incident or offense shall forward the letter, in a separate envelope, to the Telephone Reporting Unit, Communications Division, where the report is prepared.

4.    Station Clerks shall be responsible for the completion of applicable teletype message reports as directed by supervisory officials, and for making any necessary notifications.

5.    For reports involving industrial accidents and where members of the Office of Occupational Safety and Health Division are not available, a station record shall be made. The day Station Clerk shall report the incident to this division as soon as possible on the next business day.

T.    Distribution and files. (CALEA 82.2.5)

1.    The district IRO or specialty unit reporting official shall forward:

a.    The original report(s) to the Staff Review Unit, Records Department, within 24 hours.

b.    If the status of the offense is "Closed by Arrest" or "Unfounded," the corresponding PD Form 252 shall be attached to the PD Form 251 before it is forwarded to the Staff Review Unit.

2.    One (1) reproduced copy shall be made of all incident reports and all supplements to incident reports. (NOTE: The category "incident report" includes missing person reports.)

a.    The original shall be forwarded to the Staff Review Unit, Records Department, within 24 hours. In the event of a holiday or weekend, the original shall be forwarded on the next business day with the morning papers.

b.    The reproduced copy shall be filed in the element's 90-day file.

U.    Staff Review Unit, Records Department.

1.    The Staff Review Unit shall re-classify all offenses and incidents that were classified incorrectly. The section is also responsible for the return of a copy of any report needing to be corrected to the original reporting element for correction.

2.    An original corrected report shall be forwarded back to the Staff Review Unit within 7 days from the date the report was returned for correction.

FIELD REPORTING SYSTEM (GO-SPT-401.01)

## VI.    CROSS REFERENCES

1.    GO-RAR-901.08 (Use of Force Investigations)

2.    GO-OPS-204.06 (Victim Services Program)

3.    GO-SPT-302.03 (Department Telephones)

// SIGNED //
Charles H. Ramsey
Chief of Police

CHR:NMJ:MAR:njg

# EXHIBIT 19

METROPOLITAN POLICE DEPARTMENT
Institute of Police Science

LESSON PLAN REVIEW SHEET

| SUBJECT: | | PROGRAM: | |
|---|---|---|---|
| Reviewer | Month/Year | Change | Approved By |
| Ofc.Mullins.R.E.Jr | 03/02/01 | Set out for Eviction IO 1.7.1.13 | Capt Maupin |

**Note:** Give Property Handout to students has them open to Instructional Objective 1.7.1.13 and instruct them on the set out for eviction. Then have them turn to the Cir-00-01 Landlord Self-help Evictions to show new policy. Field any question on Eviction policy then have them look over property HO and field property questions.

1.7.1.13                    <u>**Set Out For Eviction**</u>

**G.O. 601.1 Pgs 22-23**

Property set out on public space as the result of an eviction shall be removed only when:

1.  It creates a hazard to public travel **AND,**
2.  The owner cannot be located, **OR**
3.  Refuses to move it, **OR**
4.  The property's significant value dictates that it should be safeguarded.

Any questions concerning the value of property may be directed to the **Property Clerk** on the day work tour of duty. The **Watch Commander** on duty at each organizational element shall be responsible for making the determination as to whether or not the property should be taken into custody. When the **Watch Commander** determines that the property is to be safeguarded he shall:

1.  On Monday through Friday (day work tour of duty), notify the Element's Property Officer to respond and take inventory utilizing a PD 81 (Property Record).

2. Transport the property to Property Division during business hours or to the element during non-business hours.

3. Have the Element Property Officer complete all required reports and make entries into PEICS.

4. During hours when the Element Property Officer is not available, assign a member of his/her command to inventory the property and complete all necessary reports.

Whenever possible, Property Division vehicles will be used to transport property directly to Property Division (ECD). Patrol wagons may be used when Property Division vehicles are unavailable. The **Commanding Officer** shall contact the **Office of Finance and Resource Management (OFRM)** to arrange contract vans when MPD vehicles will not be sufficient.

### Note: See below change to curriculum and instruction

On **June 15, 2000** a circular with the topic **Landlord self-help Evictions** was generated referencing the <u>Mendez v Johnson 389 A.2d 781</u> (D.C. 1978) that states in accordance with D.C. Code 45-2551 (1981 ed) " No tenant shall be evicted from a rental unit, notwithstanding the expiration of the tenant's lease or rental agreement, so long as the tenant continues to pay the rent to which the housing provider is entitled for the rental unit…" It's becoming more common for landlords to try and evict tenants from there properties without going through the proper legal channels. Officers are instructed by this circular and in accordance with D.C.Code that they are not to get involved with tenant landlord disputes. Officers who are called to the scene are to maintain the peace only and refer the parties to D.C.Superior court, 5000 Indiana Ave, N.W., Washington D.C.

### Residential Evictions

**Policy:** It is the policy of the Metropolitan Police Department that:

1. Under D.C.Law, evictions are to be carried out by <u>**U.S.Marshals only**</u>
2. In order to evict a tenant, landlords must first obtain a <u>**Court order**</u>

Members are reminded that, whenever approached by a citizen to assist in evictions, they shall inform that citizen MPD <u>**does not facilitate with evictions**</u>, and that it is a matter and responsibility relegated to the court. Citizens or landlords in possession of a court ordered eviction notice shall be referred to the U.S.Marshels for service.

A manual tracking system will be instituted at OPR/ Internal Affairs and two (2) new categories in the Civilian Complaint computer database are currently being developed by MPD, in conjunction with the Department of Justice.

**Categories:**  To be tracked and documented by civilian complaints.

1. MPD involvement in evictions, and
2. MPD involvement in landlord-tenant disputes.

# EXHIBIT 20

# METROPOLITAN POLICE DEPARTMENT



## Level 7

## HANDLING PROPERTY

3/25/01

1

Attachment N° 11

# HANDELING PROPERTY

## **LEVEL SEVEN**
### **Table of content**

1. Table of Content
2. 13 Classification of Property
3. Procedures & Special Instructions
   - A. Proper Release Procedures for Property
   - B. Requesting Property In Court
   - C. Special Instructions for Recovered Property
   - D. Procedures for Evidence & Suspected proceeds of a Crime
   - E. Property Seized for Civil Forfeiture
   - F. Procedures for Impounded Vehicles
   - G. Handling Firearms
   - H. Violation of the NFA (National Firearms Act)
   - I. Disposition of Narcotics/Dangerous Drugs
4. Report Writing Instructions
5. Learning Objective
6. General Order 601-1 A Change #1
7. Circular Cir-00-01 Landlord Self-help Evictions
8. Special Orders
   - A. SO-00-17 (Procedures for Handling Monies)
   - B. SO-01-05 (Recovered Stolen Vehicles)
9. DCMR 6A 8-3
10. D.C. Code 4-152 thru 4-170
11. Blank PD Forms

## <u>The Required Reports in Handling Property</u>

Property forms:

| | |
|---|---|
| PD 14 | Property Envelope |
| PD 32 | Certificate of No Record of Firearms Registration |
| PD 36 | Certificate of No Record of License to Carry a Pistol |
| PD 58 | Prisoners Property Receipt |
| PD 81 | Property Record (also known as Property Return) |
| PD 81-A | Property Released at the District. |
| PD 81-B | Property Request Card |
| PD 81-C | Property Release (Signed by the United States Attorney's Office or Corporation Counsel's Office.) |
| PD 81-D | Property Ownership/ Classification Card |
| PD 82 | Property Book |
| PD 82-A | Property Receipt |
| PD 82-B | Pawn Stop |
| PD 86 | Rifles or Shotgun Bag |
| PD 95 | Heat Seal Envelope |
| PD 117 | Warning Notice |
| PD 147-A | Property Release Card (Only issued by the Evidence Control Department) |
| PD 202A | Continuation Report |
| PD 285 | Property Tag |
| PD 775 | Daily Vehicle Inspection and Activity Report |
| PD 783 | Vehicle Removal Authorization |
| DEA 7 | Report of Property Collected, Purchased or Received (Narcotics) |
| UN 89 | Firearm in Custody of Property Division |

# Thirteen (13) Classifications of Property

| | | | |
|---|---|---|---|
| **A** | Abandon | **B** | Turned over to Police for Destruction |
| **C** | Suspected Proceeds | **D** | Estate of Deceased |
| **E** | Evidence | **F** | Found |
| **G** | Safekeeping/ Recovered Stolen Auto | **H** | Held for Civil Forfeiture |
| **I** | Impounded | **J** | Removed from Impounded Vehicle |
| **K** | Set out for Eviction | **L** | Prisoner's Property |
| **M** | Alleged Mentally Ill | | |

PD form 81 shall be typed or neatly hand printed by the recovering member and when completed, signed by an official (lieutenant or above to include acting). Continuation of the **statement of facts** shall be completed on a **PD Form 202-A** (continuation report). For additional space, regardless of the classification or property type, use another PD Form 81.

A separate PD Form 81 and a separate property control number shall be required in the following circumstances **ONLY**:

1. **Wills**
2. **Prisoners property** (after 90 days and completed by property officer)
3. **Narcotics and Narcotic Paraphernalia**
4. **Motor Vehicles and property removed from Motor Vehicles**
   (Except contraband and/or other stolen property)

# Proper Release Procedures for Property

## 81-A

**Property Released at District:**

A lieutenant and above (to include acting) are authorized to release property being held at the district providing the following circumstances exists:

1. The property is still at the District.
2. Only (1) claimant with Positive I.D.
3. Some type of proof of ownership.

To complete this type of property release, the PD Form 82 (property book) and the PD Form 81 and/or 81-A must be signed by the claimant. A parent or guardian, or other responsible adult must accompany juvenile claimants.

**Note:** Firearms, Evidence, or Suspected proceeds of crime may not be released with out a PD Form 81-C completed from the appropriate U.S. Attorney.

## 147-A

**Property Release Card:**

Impounded vehicles can be released at the element to claimants who are in possession of a **PD Form 147-A** provided by the ECD (Evidence Control Department. Vehicles **Shall Not** be released **After The Date** indicated on the release card.

## 82-A

**Property Receipt:**

Found property turned over to a member by a citizen will be recorded on PD Form 82-A. The member will provide the citizen with the **original** PD Form 82-A and place the copy in a special file maintained by the district property officer.

Found property that is released on the scene to an owner or claimant shall as soon as possible/practicable respond to the district and make the appropriate entry in the PD Form 82 (property book). The entry should be printed and read in bold red letters **"RETURNED ON THE SCENE"** as well as on the face of the PD Form 82-A.

**Note: Do Not** indicate to the finder that they **have any claim** to the property advise them that the Property Clerk at ECD handles all dispositions or disputes of the owner of property.

To turn over property to the owner on the scene you must have:

1. Satisfactory proof of ownership
2. An official rank of Lieutenant or above (to include acting) to approve release
3. Explanation on the PD Form 251 **(who, where, when released)**
4. Owner Claimant signature on the PD Form 82-A

In cases were the owner is identified but cannot be contacted by the end of your tour of duty the station clerk should be informed. The station clerk will then try to make notification and make all necessary entries on the PD forms 251, 81, and 82. When the station clerk is unable to make notifications the property then will be turned over to the element property officer to make notification.

## 81-C

**Property Released from the U.S. Attorney's Office or Corporation Counsel:**

In cases were evidence or suspected proceeds of a crime are seized and there is no suspect, the case is no papered, or there is a disposition in the case it is the responsibility of the member first taking the property into custody to obtain the PD Form 81-C from the appropriate attorney. That member will then deliver the PD Form 81-C to the court property control officer for release procedures at the Evidence Control Department.

**Exception:** Cases being handled by an investigator who shall be responsible for obtaining the release.

# Requesting Property in Court

Members who need an item of property from the district for court shall:
1. Sign for the property on the PD Form 82 (property book)
2. Respond to court with the property and the appropriate **Original** PD Form 81
3. After court proceedings respond to the court property control office and turn the property with PD Form 81 over to the clerk.
4. If the office is closed return property to the district were the station clerk or property clerk will sign the property back in.

Members who need an item from ECD for presentation in court must notify the property clerk by telephone **no later than 1400 hrs the day prior to the date needed in court.** If needed on a Monday, the request will be made that Friday no later then **1400 hrs**. When the property has been delivered it will be retained at the court property office for a period of three (3) days. If the three days has elapsed the property **will be sent back to ECD** and the process will have to be repeated.

When checking into court respond to court property control office retrieving the property and a blank PD Form 81-C. Before checking out of court respond to the property office with the property, and if there is a disposition in the case the completed PD Form 81-C. If the court property office is closed deliver the property to your district and have the station clerk or property officer sign for the property.

After (60) days, if there id no defendant/suspect in the case, and it is evident that the property will not be needed in court, the member first handling the property will obtain an PD Form 81-C from the appropriate attorney for the release of the property.

# Special Instruction for Recovered Property

**Locked container/no keys**

The member handling the property shall notify his/her commanding officer who shall make the decision on how to open the container.

**Recovered large containers**

Items of property have to be inventoried by the recovering member and all items of value ($25 or more) are to be removed and placed on a PD Form 81. Remember to use a separate PD Form 81 when applicable.

**Alcoholic Beverages**

The bottles are to be carefully inspected and the PD Form 81 will reflect the number of **broken** and **unbroken seals.** The bottles will be packaged separately and listed on the same PD Form 81 as separate items. **Unbroken seal** means (never before open) only (1) PD Form 81 is needed and in most cases a CSSO crime scene search officer can take a picture off the bottles.

**Large Amounts of Money**

When a member recovers a large sum of money, the money shall be counted and transported by a **minimum** of two **(2)** officers to the Evidence Control Department during normal business hours (0800-1400 hrs). Once at ECD the money will be counted in front of the delivering members and then verified by an electronic counter. When the ECD is closed for business the **District Watch Commander** shall ensure that the money is safeguarded.

**Perishable Property**

All perishable property belonging to prisoners will be handled in accordance with the guidelines set forth in Title 4-164 of the D.C.Code and DCMR Title A, Chapter 8. Section 804-5.

> **Title 4-164 of the D.C.Code:**
> All perishable property so taken and unclaimed shall be sold at once.

> **DCMR Title 6A Chapter 8. Section 804.5:**
> Except in cases of crime, fowl, and small animals abandoned or found astray shall be considered as perishable, and as other perishable property, may be sold at once under the direction of the property clerk, and the net proceeds thereof duly returned to him/her.

Upon recovery and prior to the sale of the property the recovering officer shall make sure that a PD Form 81 is prepared and that in the "statement of facts" indicates that the property was sold and the proceeds were added to the prisoners property. Prior to auction the property shall be entered on the PD 82 property book and **pictures** should be taken of the property.

7

# Procedures for Evidence
# And
# Suspected Proceeds of a Crime

Evidence or Suspected proceeds of a crime shall be kept separate from prisoner's property and all appropriate entries shall be made on the PD Forms 82/81. Once property is classified as "C" or "E" (Suspected Proceeds or Evidence) the property shall be marked in a manner that does not deface or alter it's appearance, but allows for easy identification at a later date by the recovering member.

Pistols shall be marked at the Firearms Examination section by removing the grips and affixing your initials.

Evidence or Suspected Proceeds found during a search by someone other then the arresting officer will be entered on the PD 82 and signed by the recovering member. In cases were there is no suspect or arrest made of a suspect a PD Form 81-C shall be secured by the recovering member from the appropriate U.S. Attorney or Corporation Counsel. If an **Investigator** is handling the case he/she will be responsible for securing the PD Form 81-C.

Suspected Proceeds is only a **holding charge** for the purpose of investigation and the **recovering** member must change the classification after sixty **(60)** days. The Classification change will be effected by completing a PD Form 81-C or PD Form 81-D (Ownership/Classification).

**Fresh Pursuit**

When an outside jurisdiction chases a suspect into the District, and they catch him/her they may retain all items of property/evidence. If a member of the Metropolitan Police Department catches the suspect we will retain all items of property. In all cases of Fresh Pursuit we will keep the prisoner and hold him as a Fugitive from Justice and advise the jurisdiction were the pursuit originated to follow extradition procedures.

Note: WE CATCH WE KEEP / THEY CATCH THEY KEEP **PROPERTY ONLY**

# Property Seized for Civil Forfeiture

**Contact:** Sgt. Woolridge
NSID / FIU
Work: 202 727-4166
Pager: 202 996-7441

Seizures that are connected with narcotics, gambling or prostitution violations are subject to civil forfeiture and shall be classified as **"E/H"** on the PD Form 81.

The **Property Clerk** is responsible for instituting the **Administrative Forfeiture** process against money and other property seized by the department for violations of the narcotics laws. The **Special Litigation Section**, Office of the Corporation Counsel, is responsible for prosecuting **Civil Forfeiture** (libel) actions against money and other property seized by the department for violation of gambling laws, and those narcotics seizures not subject to the administrative forfeiture process.

A PD Form 163 and 854 (Investigative report) must be completed when seizing property for civil forfeiture and the direct connection between the property and the offense must be clear and concise in the narrative.

When seizing conveyance for prostitution the suspect must drive up to the john/suspect and not exit but use the conveyance in the act of soliciting and only the prostitute's conveyance may be seized.

8

# Level 7 Handling Property

## Learning objectives

**1.7.1.1**                    ### Procedures to Complete PD 81

It is the responsibility of the member first handling property to ensure: the PD 81 is typed or neatly hand printed. See attached hand out (**Report writing Instructions**) series 91 #1 dated 6/5/91 for the description of PD 81 and all information to be completed.

**1.7.1.3**                    ### Property Clerk for MPD

**G.O.601.1 Pg 2 #1 & 37 B**

The Director of the Evidence Control Department (ECD) has been designated as the Property Clerk for the Metropolitan Police Department.
**D.C. Code Title 4-152 thru 4-170**
The Property Clerk for MPD has been given the authority to ensure the proper:

A. Receipt
B. Storage
C. Control
D. Disposition

Of all property coming into control of MPD and is also responsible to handle any and all disputes over property. It is also the Property Clerks responsibility to over see all department property control facilities. And to ensure proper segregation of property acquired and to make evidence available for court. Persons wishing to claim the property of the deceased shall be instructed to contact Evidence Control Unit by **mail or telephone.**

**1.7.1.4**                    ### Evidence Control Department

**G.O.601.1 Pg 36 Pgs A-1 thru 4**

ECD shall properly receive, record, and safely store all property coming into possession of MPD. They will also release property upon authorization from the property clerk or his/her designee.

9

ECD shall also collect all fees for the storage of all property when applicable. As well as receive fees from element property clerks that they are authorized to collect for impounded vehicles.

Members at ECD shall:

1. Inspect all property before assuming custody.
2. Ensure PD 81 (Property Record) has properly completed.
3. Ensure listed property is properly entered into PEICS (Property Evidence Inventory Control System).

If there are any discrepancies they will contact the element property officer who will make necessary corrections.

**Pg 34 #14**

Any property listed on the PD 81 that has been forwarded to ECD weather actually received or not will become the responsibility of ECD.

<u>Note:</u> Property that is stored at the element but has been transferred via the PD 81 to ECD will be safeguarded by the element but become possession of ECD.

1.7.1.4                    <u>**Organizational Element Property Officer**</u>

### G.O. 601.1 Pg 32-34

The element property clerk shall be responsible for the proper safeguard and transfer of property to the ECD.

Responsibilities and duties:

1. Unless otherwise prescribed in this order, transfer all property; expect prisoners, to the Evidence Control Department on the next scheduled delivery day with the original and number one (1) and number two (2) copies of the PD 81 (Property Record).

2. Forward all properly signed PD 81-C's (Property Release) received from members handling cases in court to the Evidence Control Department, ensuring they contain a PCN (Property Control Number) and disposition if an arrest was made in the case.

3. Notify the owner of property whenever the recovering officer or station clerk has been unable to make such notification, and ensure such notification is noted on all applicable reports.

4. Notify the Auto Theft Desk when automobiles remain unclaimed for 24 hours.

5. When property has been classified as "Suspected Proceeds of Crime", after 60 days require the recovering member to:

   A. Change classification by completing a PD 81-D (Property Ownership Information/Classification Change), i.e., Found, Safekeeping, **OR**

B. Secure a PD Form 81-C (Property Release) from the appropriate prosecuting attorney and forward completed PD 81-C and PD 81-D to the Evidence Control Department.

6. Ensure that all property that is to be transferred to the Evidence Control Department is properly recorded on the PD 81(Property Record), and that the necessary signatures have been entered on the PD 82 (Property Book).

7. Ensure that all data from the PD 81 (Property Record) is accurately entered into PEICS (AEGIS). Record the PCN (Property Control Number) on the PD 81 (Property Record) and on the corresponding entry in the PD 82 (Property Book).

NOTE: PEICS (AEGIS) - is a computer database established and utilized by the department for the purposes of automated property control and tracking. Upon entering an item(s) of property into PEICS, the computer will generate a PCN (Property Control Number). This number will be assigned to articles of property and will be used to control and track property through the department's property control system.

8. Forward all unclaimed recovered property (**Expect Prisoner's Property**) to the Evidence Control Department on the designated day each week. If the need arises to retain the property at the element beyond the designated delivery date, permission must be obtained from the Evidence Control Department. The member authorizing the temporary retention, as well as the date and time the authorization is received, shall be noted on the PD 81 (Property Record).

9. Respond and take inventory of property using PD 81 (Property Record), PD 82 (Property Book), and enter into PEICS (AEGIS) when the Director, OFRM (Office of Finance and Resource Management), dispatches moving vans to a location for the purpose of removing property (eviction, deceased, or alleged mentally ill person).

10. Maintain custody and control over all property held at the element.

11. Safeguard all evidence so as to maintain a proper chain of custody for court.

12. Review all PD 81's (Property Record) and property listed thereon for accuracy and completeness.

13. Ensure that miscellaneous property such as clothing, tools, and other loose items are securely wrapped or boxed with a PD 285 (Property Tag) attached.

14. Ensure that all serial numbers and identification numbers are correctly entered on the PD Form 81(Property Record) and in PEICS (AEGIS).

## REMEMBER

Every element that handles property on a regular basis shall set aside a secure space for the temporary storage of evidence/property by the Element's

PropertyOfficer.Access to this storage area shall be strictly limited to ensure the integrity of evidence that may later be introduced in court.

All property listed on the PD 81 (Property Record) that has been forwarded and transferred within the PEICS (AEGIS) to the Evidence Control Department will become the responsibility of the ECD, regardless of the fact that the property may remain in the physical custody of the element.

**1.7.1.6**                    **Station Clerk**

**G.O. 601.1 Pg 18-19**

When the elements property officer is unavailable the station clerk shall:

A. Ensure that property is properly stored, secured, and entered into PEICS.
B. Return to claimant property as authorized
C. Notify owners of property until the owner has been notified or the property has been turned over to the Element Property Officer.

The Station Clerk shall review each entry made on the PD 82 (Property Book) each tour of duty to ensure compliance with departmental orders.

In cases involving John/Jane Doe arrests, list defendant's true name (provide by the Central Cellblock) on the PD 82 (Property Book) and forward it to the Element Property Officer.

Direct owners of vehicles in which the PD 81 (Property Record) has been forwarded to the Evidence Control Department to report there for payment of required fees.

**1.7.1.7**                **Responsibility of Officials in Releasing Property**

**GO 601.1 Pg 34-35**

Officials the rank of **acting lieutenant or above** is authorized to release property (other than firearms, evidence, or suspected proceeds of crime), being held at the organizational element when all of the following circumstances exist:

1. The property is in custody of the element (not at ECD).
2. Only one (1) claimant with positive identification and definite proof of ownership.

12

If the claimant is not the owner, the Property Clerk may be contacted, during normal business hours, for authority to release the property.

To release the property the claimant must:

1. Sign the PD 82 (Property Book)
2. **And** the PD 81 (Property record)
3. **Or** PD 81-A (Property Released at District). A parent, guardian, or other responsible adult must accompany juvenile claimants when claiming property.

Impounded vehicles can be released at the element to claimants in possession of a PD 147-A (Property Release Card) provided by ECD only on the date which appears on the receipt. Forward the completed PD 147-A, or PD 81-A to the Element Property Officer

**Note:** Whenever an item of property listed on the property book is discovered to be lost or missing, an **official** of the element shall immediately bring the matter to the attention of the **Watch Commander** who shall conduct an immediate and thorough investigation.

**In all cases of property which come into the possession of this department, It is the responsibility of the member who first handles the property to Ensure that the property in properly recorded and processed.**

**1.7.1.8**        <u>**Requirements in Completing the PD 81, Property Record**</u>
(Reference G.O. 601.1, pg. 2-5)

**In all cases of property, which come into the possession of this department, it is the responsibility of the member who first handles the property to ensure that the property in properly recorded and processed.**

Members shall ensure that all property, coming into their possession is Properly safeguarded until relieved of that responsibility.

Property shall be classified in one of the thirteen (13) following categories:

1. Abandoned
2. Turned Over to Police for Disposal
3. Suspected Proceeds of Crime
4. Estate of Deceased Person
5. Evidence
6. Found
7. Safekeeping/Recovered Stolen Auto
8. Held for Civil Forfeiture
9. Impounded (Motor Vehicles Only)
10. Removed from Impounded Vehicle
11. Set Out for Eviction
12. Prisoners'
13. Alleged Mentally Ill

Each individually numbered item listed on the PD 81 (Property Record) shall

13

Be packaged separate

The PD 81 (Property Record) shall be:
1. Typed or neatly hand-printed.
2. Signed by Acting Lieutenant or above.
3. Use PD 202-A for continuation of statement of facts.
4. Use PD 81's as needed for additional items.

A separate PD 81 (Property Record) and a separate Property Control Number (PCN) shall be required in the following circumstances:
1. Wills
2. Prisoner's Property (After 90 days)
3. Narcotics and narcotic paraphernalia (each DEA-7 requires a separate PD 81).
4. Motor vehicles and property removed from the motor vehicle (except contraband)

All other property relative to a seizure or case, regardless of the classification or property type, is to be placed on the same PD 81 (Property Record) with the same PCN (Property Control Number).

Upon learning the identity of the Owner/Claimant of recovered property, members shall bring this to the attention of their Element Property Officer using a PD 81-D (Property Ownership/Classification Information Card). The member learning of the owner's identity shall attempt to notify the owner that their property is in custody and shall maintain a complete record of each such attempt.

**Note:** The PD 81 (Property Record) is not a public document.

**1.7.1.9**  <u>**PD Form 82 Property Book**</u>

### GO 601.1 Pg #4

All property coming into the possession of a member of this department shall be recorded on the PD 82 (Property Book). The entry shall be made as soon as practical, but in all instances prior to the completion of the member's tour of duty.

### <u>G.O. 601.1 Pg #24 Item #7</u>

**Exception: Estates of Deceased Person where each item is not listed due to the large number of items.**

Each organizational element shall maintain its current PD 82 (Property Book) in the Station Clerk's office and the Desk Sergeant shall be held accountable for ensuring that it is not removed from the area. The recording officer shall ensure that the **searching officer**, when applicable, and the **station clerk** sign their names in the appropriate spaces.

Corrections shall be made by drawing a line, **in red ink**, through the incorrect entry, and affixing initials and badge number at <u>either end</u> of the line.

Record Central Complaint Number (CCN) on the left-hand page in the space after

14

"If entries on incidental or other record, give record and page."

1.7.1.10                **Special Instructions In Recovering Property**

**G.O. 601.1 Pg 5-6 & 33**

### Locked Containers

When locked containers without keys come into the custody of this department, the member handling the property shall notify the **Commanding Officer** who will decide the method to be used in opening the locked container. (Locked briefcase, safe, etc.)

### Large Containers

Upon recovering large containers (trunks, suitcases, boxes, etc.) in which assorted items of property are contained, members shall:

1. Inventory the container
2. Remove all items of value (money, jewelry, bonds, etc.)
3. Itemize removed items on the PD 81(Property Record) and prepare separate PD 81's when applicable (Wills).

### Alcoholic Beverages

Members shall carefully check to determine if the seal or seals have been broken. PD 81 (Property Record) prepared in reference to their recovery shall indicate:

1. The number of full bottles with the seal intact
2. The number of bottles with the seal broken or missing

Bottles with the seal intact shall be **packaged separately** from those bottles with the seal broken and shall be recorded on **only one PD 81** (Property Record).
         **Remember:  Packaged Separately (Two Items)– One PD 81**

### Large Amounts of Money

When a large amount of money is recovered members shall:

1. Ensure the money is counted by at least two (2) officers
2. List the total sum on the PD 81 (Property Record)
3. Transported, by at least two officers, directly to the Evidence Control Department during normal business hours (M-F, 0800-1400), and verified by an automatic money counter.
4. Counted by a member of the Evidence Control Department in the presence of the delivering member

When ECD is closed the Watch Commander at the recovering officers element shall ensure the money is safeguarded.

Note: The Evidence Control Department recommends that any amount over **$5,000** be considered a large amount of money.  In addition, whenever members are

15

**uncomfortable** with the amount of money they are dealing with, regardless of the amount, they should follow these procedures.

       **This does not apply to the notifications that must be made in reference to seizures of monies on the street in connection with <u>Narcotics or warrant cases.</u>**

### Incendiary Devices or Other Types of Explosives

      Incendiary devices or other types of explosives as described in Part 1-E (bomb, grenade, rocket, etc.), other than fireworks, shall be **HANDLED ENTIRELY BY THE EXPLOSIVE ORDINANCE DISPOSAL UNIT**, Special Operations Division.EOD handles "Explosives, the member will handle **<u>firework</u>**, which will be discussed at a later time.

### Perishable Property

<u>D.C. Code 4-164, reads as follows:</u>
    **"All perishable property so taken and unclaimed shall be sold at once."**

<u>DCMR Title 6A, Chapter 8, Section 804.5 reads as follows:</u>
    **"Expect in cases of crime, fowl, and small animals abandoned or found astray shall be considered perishable, and as other perishable property, may be sold at once under the direction of the Property Clerk, and the net proceeds thereof duly returned to him or her."**

      The only reference to perishable property in the General Orders is as follows:
"All perishable property belonging to prisoners shall be handled in accordance with the guidelines set forth in Title 4-164 of the D.C. Code and DCMR 6A (Police Personnel), Chapter 8, Section 804.5."

**note: SEE ATTACED DCMR 6A**

      The **Commanding Officer** of the organizational element shall be notified immediately of the recovery of perishable property and shall institute a public auction at the organizational element.

      Upon recovery and prior to the auction of the property the recovering officer shall:
1. Make appropriate entries on the PD 82 (Property Book)
2. Prepare a PD 81 (Property Record) making a notation in the narrative section that such perishable property was sold at a public auction authorized by the commanding officer.
3. If property is classified as Evidence or Suspected Proceeds of Crime, have the property photographed prior to auction.

**1.7.1.11**                    <u>**Found Property**</u>

G.O. 601.1 Pgs 20-21

Whenever found, a citizen turns in property; a PD 82-A (Property Receipt) will be given to the citizen. Members shall carry a sufficient number of PD 82-A's (Property Receipt) with them while assigned to street duty.

Members shall not indicate that the finder has any right or claim to the found property and shall give the **original** of the PD 82-A (Property Receipt) to the citizen and the Element Property Officer retains the copy in a special file.

The recovering officer shall then:
1. Prepare a PD 251 (Incident Report), classified as Found Property
2. Prepare a PD 81 (Property Record).
3. List the item(s) of property on the PD 82 (Property Book).

Information that is not available to the recovering member (i.e., property book, page number, CCN) shall be recorded on the original copy of the PD 82-A (Property Receipt) prior to the end of the member's tour of duty

Found property may be turned over to the owner at the scene of the recovery if **ALL** of the following conditions are met:

1. Satisfactory proof of ownership is established.
2. Release is approved by Acting Lieutenant or above.
3. An explanation is provided on the PD 251 regarding the circumstances relating to the return of the property.
4. The owner signs the PD 82-A (Property Receipt).

If the property is released to the owner at the scene members shall, as soon as practical, make the appropriate entry on the property book.
Members shall:

1. Print in bold face red letters on the face of the PD 82-A (Property Receipt), "RETURNED ON SCENE" **and**
2. Attach both copies of the PD 82-A (Property Receipt) to the PD 82 (Property Book).

Members shall attempt to notify identified owners of found property prior to the expiration of their tour of duty. If the member is unable to make such notification, the recovering officer shall notify the Station Clerk, who shall then be responsible for:
1. Making the notification

17

2. Completing the additional entries on the PD 81 (Property Record), PD 251, and PD 82

If the station clerk is unable to make the appropriate notification, the property shall be turned over to the Element Property Officer, who shall then make the notification.

### Taxi Cabs

Officers shall follow the procedures outlined prior for property found in public vehicles (taxi cabs) in addition to:

1. Notifying the D.C. Taxicab Commission and providing them with a complete description of the recovered items.
2. Obtaining the name, date, and time of the person notified and entering the information on the PD 251.

### Metro buses, rails, stations

Property found in or on Metro rail trains, stations, or parking lots shall be turned over to the Metro rail employee manning the station kiosk located in the lobby of the station, who will issue the member a receipt.

Property found on a Metro bus shall be turned over to the bus operator, and the member will be issued a receipt.

Receipts for found property issued to members shall be submitted to the element Station Clerk after the member:

1. Makes an entry on the element's PD 82 (Property Book), listing a brief description of the property turned over to Metro, **and**
2. Completes a PD 251, classified as Found Property, indicating that the property was turned over to the Metro employee.

**NOTE:** Property turned over to members at the scene of a fire shall be classified as "Found Property".

1.7.1.12          ### Abandoned Property

G.O. 601.1 Pgs 21-22

Abandoned Property shall be processed in the **same** manner as "Found Property", except that it shall be classified as "Abandoned Property."

An "Abandoned Vehicle" is a motor vehicle: ·

1. Parked in the **same place, on public space** for more than 72 hours
2. Whose owner cannot be reasonably located
3. To which a PD 783, Warning Notice To Remove Abandoned Vehicle, has been affixed; AND

18

4. That remains parked in the same place on public space for at least 72 hours **after** the notice has been affixed.

A junk or scrap vehicle is any motor vehicle that is in a wrecked, dismantled or irreparable condition, and whose owner cannot be reasonably located. Members handling abandoned or junk vehicles shall make a thorough investigation to determine ownership to include:

1. Canvassing the immediate vicinity in which the vehicle was found
2. Checking the license plate and vehicle identification number, if any, with the Bureau of Motor Vehicle Services, Department of Public Works
3. Forward all information by telephone to the Abandoned and Junk Vehicle Division, Department of Public Works

The Abandoned Vehicle Division, Department Public of Works, has the authority to remove abandoned and junk vehicles from public and private property.

**note:** In recent history, two young children in Washington died while playing inside an abandoned vehicle behind their house. They entered the vehicle on a hot day and were found dead some time later. The police response to abandoned vehicles was called into question. By removing vehicles, in a timely manner this incident might avoid in the future. In addition, abandoned vehicles are used for a variety of illegal activities such as narcotics trafficking and prostitution

**1.7.1.13**        <u>**Set Out For Eviction**</u>

**G.O. 601.1  Pgs 22-23**

Property set out on public space as the result of an eviction shall be removed only when:

1. It creates a hazard to public travel **AND,**
2. The owner cannot be located, **OR**
3. Refuses to move it, **OR**
4. The property's significant value dictates that it should be safeguarded.

Any questions concerning the value of property may be directed to the **Property Clerk** on the day work tour of duty. The **Watch Commander** on duty at each organizational element shall be responsible for making the determination as to whether or not the property should be taken into custody. When the **Watch Commander** determines that the property is to be safeguarded he shall:

1. On Monday through Friday (day work tour of duty), notify the Element's Property Officer to respond and take inventory utilizing a PD 81 (Property Record).

2. Transport the property to Property Division during business hours or to the element during non-business hours.

19

3. Have the Element Property Officer complete all required reports and make entries into PEICS.

4. During hours when the Element Property Officer is not available, assign a member of his/her command to inventory the property and complete all necessary reports.

Whenever possible, Property Division vehicles will be used to transport property directly to Property Division (ECD). Patrol wagons may be used when Property Division vehicles are unavailable. The **Commanding Officer** shall contact the **Office of Finance and Resource Management** (OFRM) to arrange contract vans when MPD vehicles will not be sufficient.

## <u>Note</u>: See below change to curriculum and instruction

On <u>June 15, 2000</u> a circular with the topic **Landlord self-help Evictions** was generated referencing the <u>Mendez v Johnson 389 A.2d 781</u> (D.C. 1978) that states in accordance with D.C. Code 45-2551 (1981 ed) " No tenant shall be evicted from a rental unit, notwithstanding the expiration of the tenant's lease or rental agreement, so long as the tenant continues to pay the rent to which the housing provider is entitled for the rental unit…" It's becoming more common for landlords to try and evict tenants from there properties without going through the proper legal channels. Officers are instructed by this circular and in accordance with D.C.Code that they are not to get involved with tenant landlord disputes. Officers who are called to the scene are to maintain the peace only and refer the parties to D.C.Superior court, 5000 Indiana Ave, N.W., Washington D.C.

### <u>Residential Evictions</u>

**Policy:** It is the policy of the Metropolitan Police Department that:

1. Under D.C.Law, evictions are to be carried out by <u>U.S.Marshals</u>  <u>only</u>
2. In order to evict a tenant, landlords must first obtain a <u>Court order</u>

Members are reminded that, whenever approached by a citizen to assist in evictions, they shall inform that citizen MPD **does not facilitate with evictions**, and that it is a matter and responsibility relegated to the court.Citizens or landlords In possession of a court ordered eviction notice shall be refered to the U.S.Marshels for service.

A manual tracking system will be instituted at OPR/ Internal Affairs and two (2) new categories in the Civilian Complaint computer database are currently being developed by MPD, in conjunction with the Department of Justice.

**Categories:** To be tracked and documented by civilian complaints.

1. MPD involvement in evictions, and
2. MPD involvement in landlord-tenant disputes.

20

1.7.1.14                    <u>Estate of the Deceased</u>                    .

G. O. 601.1 Pgs 23-25

In all cases where a member of the immediate family is present and able to take possession of the property, the property will be turned over to those individuals. **Commanding Officers** shall arrange, through the **Director, Evidence Control Department** to have the property removed to a private storage facility upon determining the property of deceased is totally without adequate safeguards. When removal of property requires outside resources the Director, Office of Finance and Resource Management shall coordinate with the commanding officer to have the property stored them.

When a person dies at a location other than their residences and it becomes necessary to assume responsibility for personal property, the **Commanding Officer** handling the investigation shall:

1.  Advise the **Commanding Officer** of the District where the deceased resided and provide a brief account of the case.

The **Commanding Officer** so notified shall then become responsible for ensuring proper safeguards are taken.

In all cases where a member of the immediate family is not present a search of the premises shall be made for:

1.  Wills (listed on a separate PD 81)        .
2.  Money
3.  Other items of value that could be easily converted to cash.

Immediately forwarded to the Property Clerk items taken into custody. Upon completion of the search the premises shall be left secure. A deceased person's vehicle(s) shall not be impounded if a relative or responsible person assumes custody. The vehicle(s) should not be left at a location for an extended period of time, where it will be exposed to theft or damage.        .

**Exception:** The PD 82 Rule **(That all items taken into custody shall be recorded on the PD 82).** An itemized PD 81 (Property Record) is required for this classification; however, the property of the deceased shall not be listed on the PD 82 (Property Book).

<u>Special Instructions</u>

On the PD form 82 n the space provided for other types of property the class shall be "Estate of the Deceased." The name and address of the deceased person shall be noted on the line after "Taken From" and "Address." On the space marked "Searching Officer",

21

delete the word "Searching" and insert "Listing", and indicate the name of the member that handled and listed the property.

The element's station clerk will sign the PD 82 (Property Book) after checking the PD Form 81 (Property Record). When baggage checks are found among the property of a deceased person, the **member-taking inventory** shall redeem the baggage check and note on the PD 81 (Property Record) the expenditure.

When a death occurs in a hotel/motel, the member inventorying the property of the deceased **will allow** a representative of the hotel/motel to be present during the search so long as their presence **will not defeat the ends of justice.**

**note:**  The PD Form 81 (Property Record) **is not a public record**; therefore, do not give a copy to the hotel/motel representative

When property of a deceased person is forwarded to the Property Clerk the date the property was forwarded shall be noted on the right hand side of the PD 82 (Property Book), and the **Commanding Officer** shall sign the PD 82 (Property Book) to indicate proper disposition.

**1.7.1.15**        <u>**Alleged Mentally Ill Persons"**</u>

**G. O. 601.1 Pgs 25-26**

**Commanding Officers** who find it necessary to safeguard property of the alleged mentally ill shall do so in the same manner as that of the deceased.

This property <u>shall not</u> be taken into custody without prior approval of the **Property Clerk** or his agent. Staff members of any DC General Hospital or mental facility shall do the following when members transport persons directly to the hospital/facility from a locations other than a police facility:

1. Bear the responsibility to search, **and**
2. Safeguard a person's property.

**note:** This responsibility does not relieve the transporting members from taking the **necessary precautions** to insure their safety and the safety of others.

Persons who are **arrested** and thought to be **mentally ill** shall be handled as any other arrested person, classifying the property as **Prisoner's Property**.

**Remember:** <u>**Arrested**</u>  **& Mentally Ill = Prisoner's Property**

**1.7.1.16**        <u>**Evidence or Suspected Proceeds of Crime**</u>

**G.O. 601.1 Pgs 26–27**

22

## Definition

EVIDENCE: Any item of property whether "real" or "tangible" (i.e.: guns, papers, real estate, wallets, etc.) that can be used to prove or disprove that a crime has been committed.

As discussed in Laws of Arrest, Search, and Seizure, Evidence can be recovered in the following instances:

1. At the time an arrest is made.
2. During a preliminary investigation.
3. During a follow-up investigation.
4. During the service of search and or arrest warrants.

Evidence, if recovered at time of arrest, shall be kept **separate** from personal property (Prisoner's Property). Items classified as **Evidence** or **Suspected Proceeds of Crime** shall be marked for future identification by the recovering member. The marking shall be made in a manner that does not alter or deface its appearance. The manner and location shall be described in the **narrative** of the PD 81 (Property Record).

Removing the grips from the frame of the weapon shall mark pistols and making appropriate marks beneath the grips and will be done at the time of test firing by the technician. After processing, the property shall be turned over to the custody of the Element Property Officer.

In cases of evidence or Suspected Proceeds of Crime where **No Arrest** is made, the member first taking the property into custody shall be responsible for:

1. Obtaining a PD 81-C (Property Release) from the appropriate prosecuting attorney, **and**
2. Deliver the PD 81-C (Property Release) to the Court Property Control Office.

**Exception:** In cases being handled by an investigator he/she shall then be responsible for obtaining the release (ie.homicide, sexual assault).

Court cases where a release is required, the member handling the case in court shall be responsible for obtaining and preparing the PD 81-C (Property Release). In cases involving "FRESH PURSUIT" from another jurisdiction, the property recovered may be released on the scene to the out-of-state officer when that out of state officer makes the stop and apprehension. Situations involving "FRESH PURSUIT", and the apprehension is made by an **MPD** officer no property will be released.

Out-of-state officers or jurisdictions requesting evidence in the custody of this department shall be referred to the Evidence Control Department in order to obtain any evidence.

**Remember:** They catch they keep, we catch we keep.

23

## Suspected Proceeds of Crime

There must be some articulated justification to believe that the property may be used as evidence and if you **do not** hold the property while an Investigation is being conducted then property may be disposed of or destroyed by the suspect. If you take the property for any other reason, you cannot use this classification. The classification of Suspected Proceeds of Crime is primarily a **Holding Classification** for the purpose of investigation, and not a final classification. In 60 days with property classified as Suspected Proceeds of Crime, the organizational Element Property Officer shall confer with the recovering officer and either:

1. Change the classification of the property, (e.g., Found, Safekeeping, Abandoned, etc.) by preparing a PD 81-D (Property Ownership /Classification Change), **or**

2. Secure a PD 81-C (Property Release) from the appropriate attorney so that the property may be properly disposed, **then**

3. Forward the PD 81-C (Property Release) or the PD 81-D (Property Ownership/Classification Card) to the Evidence Control Department.

When recovering items as Suspected proceeds they require a separate PD 251 for each incident and a separate set of CCN #'s as well as its own PD 81 (Property Return)

**Note:** A copy of the PD 251 must be attached to the PD 81 (Property Record) and, forwarded to the Evidence Control Department.

Property classified as Suspected Proceeds of a Crime cannot ordinarily be released by the Property Clerk to the claimant until a property release has been obtained from the appropriate attorney or the investigating officer has changed the classification. This rule applies even though there are no arrests made or suspects in the case.

**Exception :**In cases involving vehicles, bicycles, and play vehicles release may be authorized.

1.7.1.17        ## Handling Bicycles and PlayVehicles

**G.O. 601.1 Pgs 9-10**

All lost stolen, and abandoned bicycles or play vehicles recovered shall be recorded on the PD 82 (Property Book), properly tagged (PD 285), and a PD 81 (Property Record) completed. The bicycle registration number and the manufacture's serial number are located under the sprocket and shall be listed on the PD 81.

**Note:** Ownership information can be obtained by checking the serial number and/or the registration number through WALES, where there is a file maintained on both registered ands stolen bicycles.

24

**Exception:** The United States Attorney (USAO) has authorized the <u>Property Clerk</u> or <u>his or her agent</u> to return to owners, those bicycles or play vehicles recovered as Evidence or Suspected Proceeds of Crime when there is **NO ARREST** or **NO SUSPECT**

Lieutenants (including acting) or higher are authorized to returned those Bicycles and play vehicles to the owner under the following conditions:

1.  Only one claimant

2.  Definite proof of ownership

3.  No arrest or suspect in the case

4.  The owner signs the PD 81 or PD 81-A

If the owner is a juvenile a parent or other responsible adult can sign for the property.

1.7.1.18                      <u>Court Property Control Office</u>

**G. O. 601.1 Pgs 12 thru14**

The department maintains a Court Property Control Office, which handles, on a temporary basis, property/evidence that may be need in court. Located at Police Headquarters, 300 Indiana Avenue, NW, room 1115
Open from 0900-1730 hours, Monday through Friday, telephone number 727-4458.

Members needing property for court shall notify the **Court Property Control Office** or **Evidence Control Department** by telephone no later than 1400 hours the **"business day prior** to the date the property is needed in court." Items needed in court on Monday shall be ordered no later than 1400 hours on the **previous Friday**. Items of property ordered for court will remain available for pick-up in the Court Property Control Office for a period not to exceed three (3) days.

**NOTE:** The first day of the three-day period will start the day the property is need for court.

Members who have ordered item(s) of property for court shall first check into Court Liaison Office and then:

1.  Respond to the Court Property Control Office
2.  Sign the Property Control Log Book, thereby accepting personal custody of the property
3.  Obtain a blank PD 81-C (Property Release): **and**

25

4.  Ensure that the Property Control Number and the disposition information are competed on the PD 81-C (Property Release).

Members who have obtained property from the Court Property Control Office are required to return the property to that office before checking out at the Court Liaison Office and:

1.  Provide the Court Property Control Officer with information as to the status of the property (Introduced as evidence, etc.)
2.  If a disposition is available and the property is no longer needed for prosecution, members shall submit a completed PD 81-C (Property Release).

**NOTE:**  The PD 81-C (Property Release) must be signed by the U.S. Attorney's Office or the Corporation Counsel's Office.  Members must deliver the PD 81-C (Property Release) they will not be accepted from civilians.

Members receiving continued court dates may request property in advance and shall document advanced requests in their notebooks. The member shall list the date and time of request the Property Officer contacted and the item(s) of property requested as well as date needed in court

When the Court Property Control Office is closed, the member shall respond to his/her organizational element and turn the property, and the PD 81-C (Property Release), over to the Element Property officer/station clerk when Property officer is unavailable. When returning to court on the next day respond to your element (District) and sign the Property Book for the property and respond to court.

If after sixty (60) days there is no defendant/suspect in the case and it is evident the property will not be needed in court, the original member handling the property shall submit a signed PD 81-C (Property Release) to their elements property officer.

**Note:** General Order 601.1, I-3, and General Order 601.1, F- 1- d, both state that after papering, firearms will be delivered to the <u>Court Property Control Office.</u> Court Property Control Office will only accept property (weapons) with the **original** PD 81.  If you don't have the original PD 81 you must take the weapon to the <u>Element Property Officer.</u>

The 81-B (Evidence Request Card,) is not mentioned in the General Order.  An officer can provide the Court Property Control Office with a completed PD 81-B when requesting property.

**1.7.1.19**          <u>**Civil Forfeiture**</u>

**GO 601.1,601.3**

Listed below are the only offenses for which D.C. Code allows <u>civil forfeiture of</u>

property.

1. **Narcotics** – DC Code 33-352, conveyances (vehicles), money, real property (land, businesses, homes), and proceeds.

2. **Prostitution** -DC Code 22-2723, conveyances (prostitutes only), money involved in violation.

3. **Weapons** - DC Code 6-2376.1, conveyances.

4. **Illegal Dumping** – D.C. Code 6-2911, motor vehicles

5. **Gambling** – D.C. Code 22-1505, money, vehicles, furnishings, fixtures, equipment, stock.

**Note:** Charges such as First Degree Murder or Vending Without a License do not allow for civil forfeiture of the property involved under D.C. Code.

All conveyances (i.e.: autos, aircraft, vessels, etc.) which are used or intended to be used to transport, for the purposes of sale or receipt of illegal controlled substances are subject to seizure and forfeiture. An automobile is not subject to forfeiture for a charge of simple possession of a controlled substance (DC Code 33-552) or for a violation of the Drug Paraphernalia Act only (DC Code 33-604).

Property that is seized in connection with a narcotics or gambling violation and is the subject of a forfeiture action shall be classified as "Held for Civil Forfeiture".

**Note:** The **Property Clerk** is responsible for instituting the **Administrative Forfeiture** process against money and other property seized by the department for violations of the narcotics laws. The **Special Litigation Section**, Office of the Corporation Counsel, is responsible for prosecuting **Civil Forfeiture** (libel) actions against money and other property seized by the department for violation of gambling laws, and those narcotics seizures not subject to the administrative forfeiture process.

The Financial Investigation Unit (FIU) of the Major Narcotics Branch has the responsibility for the following:

1. Coordinating and administering the department's asset removal program.
2. Assisting the department personnel in the investigation and seizure of assets belonging to violators of the Uniform Control Substance Act (UCSA), or any other District or federal law for which the seizure of assets is provided for by statue.
3. Preparing and obtaining all affidavits in support of seizure warrants.

A **Permanent Lieutenant** or higher shall respond to the scene of a potential seizure of a **vehicle for forfeiture** to make a determination as to whether the vehicle should be seized or not. Vehicles and other property that is forfeited and retained by the

department shall be used for official police business only. A PD 163 (Arrest/Prosecution Report) or PD 854 (Investigative File Report) must be attached to the PD 81 (Property Record) and forwarded to Evidence Control Unit.

**Note:** (The connection between the seized property and the violation must be specific).

The PD 81 (Property Record) and the PD 163 (Prosecution Report) should contain the following information:

1. The exact location of any property seizure and/or arrest; (Street address)

2. A clear definition of the relationship between the seized property and the violation for which the defendant was charged.

3. The location (i.e.: shirt, pants, shoe, vehicle, bedroom, etc.) and exact amounts of any specified currency recovered for seizure.

4. The estimated value of seized property shall reflect, so far as possible, the actual market value of the property as determined by the Property Clerk and the owner of each piece of property shall be clearly identified.

A separate item number shall be given to each identifiable item of property, by serial number or other distinct description, multiple items of property with identical descriptions may be reported under one item number.

Classifying money which is determined to be "transaction monies" as "Held for Civil Forfeiture" when narcotics and money are found together. The transaction monies shall be separated from the defendant's personal money (which will classified as prisoners property) and listed on the PD 81 (Property Record) and PD163 (Prosecution Report); clearly identifying the amount of money recovered and the particular location the money was recovered.

**Reporting Requirements**

Members shall be responsible for notifying the Financial Investigation Unit (FIU) (727-0071) of the Major Narcotics Branch during normal business hours, or no later than 1000 hours the next business day of the following:

1. A street seizure of cash in the amount of **$2,500** or greater;

2. Execution of a search warrant and seizure of cash in the amount of **$5,000** or greater during the search;

3. A search warrant is executed and bank or other records located during the search indicate substantial bank deposits or other **unusual** financial or real estate holdings belonging to the **target** of the investigation or any other resident of the location searched.

28

4.  A <u>search warrant</u> is executed for a <u>private residence</u> (i.e.: privately owned house, condominium, etc.) and the investigation indicates the residence is one in which drug trafficking or related activity **regularly takes place.**

**Note:** Whenever cash, vehicles, or other property is seized as a result of the participation by members of the department in any **joint MPD/federal investigative** effort, regardless of the level of participation, the **MPD** **investigators** assigned to the investigation shall <u>notify an official assigned to the</u> <u>Financial Investigation Unit (FIU)</u> no later than the first business day following the seizure of the property.

**1.7.1.20**        <u>**Impounded Vehicle**</u>

### G.O. 601.1 Pgs 28–29

All vehicles impounded shall be listed on a PD 81 (Property Record) and then placed on the PD 82 (Property Book).

The impounding member shall notify the Telecommunications Branch, Communications Division (Teletype), and provide the following:

1.  The description of the vehicle.
2.  The location from which the vehicle was removed.
3.  The impoundment location.

The impounding officer has the responsibility to insure that all required reports are completed and make appropriate notifications, such as attempting to notify the owners and advising the owners of the procedure necessary to reclaim their vehicle.

If the impounding officer is unable to notify or contact the owner, they shall turn the PD 81 (Property Record) over to the oncoming Station Clerk at the end of his/her tour of duty.
If impounded vehicles are not claimed after 24 hours, the impounding member officer shall notify the Auto Theft Desk of the license and engine numbers so that a check can be made against their listing of stolen vehicles.
The Element Property Officer is also required to contact the Auto Theft Desk if a vehicle is unclaimed after 24 hours, to determine if the vehicle is stolen.

Vehicles impounded shall be classified as Impound/Evidence on the PD 82 (Property Book). Before the PD 81 is forwarded to the Evidence Control Department, the recovering member shall confer with the prosecuting attorney for a determination as to whether the vehicle shall be held as Evidence. The name of the advising attorney shall be listed on the PD 81 (Property Record). If the prosecuting attorney approves of the vehicle being held as Evidence then a line will be drawn through the word "Impound" on the PD 82 (Property Book). If authorization is not approved the member will draw a line through the word "Evidence." In both cases the member making the change shall affix their initials and badge number next to the changes made.

**NOTE:** The Impound/Evidence dual classification is used for Hit and Run Vehicles.

When member impound vehicle during periods of the year when radiators and engines blocks are subject to freezing temperatures, the impounding member shall drain the radiator and block unless one of the following circumstances exists:

1. The member has been informed by the owner, or person who has knowledge of the vehicle, that there is sufficient antifreeze to prevent damage by freezing.

2. There is attached to the vehicle, a currently dated tag indicating that the vehicle is equipped with permanent type antifreeze.

3. A check of the antifreeze by the impounding member with a hydrometer shows a reading of a least +5 degrees to the considered adequate protection.

If the radiator is **not** drained the reason must be noted on the PD 81 (Property Record). If the radiator is drained, members shall attach to the steering wheel:

1. A PD 117 (Warning Notice) **and**

2. A PD 285 (Property Tag)

Citizens submitting requests to the organizational elements for repossession of an impounded/ recovered stolen vehicle to which a delinquent lien exists shall be advised to contact the **Evidence Control Department**.

Under authority of D.C. Code 40-812 which states, "A private property owner may remove from his or her property any vehicle subject to impoundment under D.C. Code 812 (a), Parked on Private Property, provided that":

1. A Notice of Infraction (NOI) is issued against the vehicle under 40-812 (a),

2. A valid work order is executed by the property owner and a crane operator (for the **specific vehicle** to be towed),

3. The private property owner makes reasonable efforts to give notice to the vehicle's owner or operator of:
   A. The location of the removed vehicle
   B. The means to retrieve it

The vehicle is towed to a site within **D.C.**, where it is reasonably safe from vandalism where the owner may redeem it at all hours and at a reasonable cost.

**Note:** Under this provision, the MPDC does not impound the vehicle parked on private property. The MPDC officer tickets the vehicle and the owner of the private property must then follow above provisions.

**1.7.1.21**                    **Safekeeping or Recovered Stolen Auto**

G.O. 601.1 Pgs 30-31

**Safekeeping**

Occasionally, members will take custody of property for "Safekeeping" (i.e., a large amount of valuables left inside an auto left unattended or unsecured, etc.). This property shall be handled in the same manner as "Found Property" except that it shall be classified as "Safekeeping". Members shall make every effort to contact the owner of the property recovered as "Safekeeping."

**Stolen Vehicles**

Stolen vehicles are of great concern for the victim as well as the department. Other then the purchase of a house, the purchase of a vehicle is the second largest expenditure a person makes. When their vehicle is recovered they are entitled to a prompt notification by the recovering member. The department expends a great deal of manpower in handling the hundreds of stolen vehicles they process each year. Every effort should be made to return a stolen vehicle at the element shortly after recovery the department would be spared the expense of moving and storage of the vehicle.

**Exception:** The United States Attorney of the District of Columbia has authorized the **Property Clerk** to return to the owner, without separate release those vehicles reported stolen and recovered by the police, including those in which an arrest was made.

When members of the department recover stolen vehicles, the recovering officer should make notification of the recovery as soon as possible to the owner. If the owner or reporting person resides outside the District of Columbia and cannot be reached by telephone without expense to the District of Columbia the recovering member shall make the long distance notification in compliance with G.O. 302.3 (Department Telephones).

In cases involving interstate transportation of a stolen motor vehicle the recovering member shall notify the Auto Theft Desk who will in turn notify the Federal Bureau of Investigation (FBI). Interstate transportation does not mean a vehicle driven on one occasion by one suspect but involves many vehicles and maybe more then one subject. The Auto Theft Desk shall be notified when a stolen vehicle is recovered and an arrest has been made.

When vehicles are transported from the street directly to the Blue Plains Impounding Lot on a <u>flatbed</u> a **completed PD 81** (Property Record) <u>shall accompany</u> the vehicle.  This is generally done for vehicles that are unable to be towed using a regular crane (i.e., no tires).

**1.7.1. 22**                       <u>**Inventory From Impounded Vehicles**</u>

G.O. 602.1

<u>Definitions</u>

**Search** - A search is an <u>examination</u> of a person, place or thing with a view toward discovery of weapons, contraband, instrumentality of a crime, or evidence.  It is to be distinguished from an inventory.

**Inventory** – An inventory is an <u>administrative</u> process by which items of property are listed and secured.  An inventory is not to be considered or used as a substitute for a search.

Automobiles coming into the custody of the police department shall be classified (for purposes of this performance objective relating to inventories) in one of the following five categories:

1.  Seizures for Purposes of Forfeiture.
2.  Seizures as Evidence.
3.  Prisoner's Property.
4.  Traffic Impoundment.
5.  Non-Criminal Impoundment.

<u>**Seizures for Purpose of Forfeiture**</u>

An officer who seizes a vehicle for purpose of forfeiture shall **completely** inventory the contents of the vehicle **immediately** upon its arrival at a police facility.

<u>**Seizures as Evidence**</u>

An officer who seizes a vehicle, as evidence shall **completely** inventory the contents of the vehicle **immediately** upon its arrival at a police facility, provided that such an inventory will not damage or destroy any evidence contained therein.

**Note:**  Whenever there is either a moving or a parking traffic violation the vehicle involved is technically evidence of that offense the vehicles shall not be seized as evidence simply because they were involved in a relatively minor traffic offense, only if it has some evidentiary value beyond the fact that it was used to commit the minor traffic offense it shall be seized as evidence.

### Prisoner's Property

If a vehicle classified as prisoner's property is disposed of so that it is not taken to a police facility, it shall not be inventoried in any way.

If it is necessary to take such a vehicle into police custody, the vehicle shall be taken to a police facility. **Immediately** upon arrival the arresting officer shall remove from the **passenger** compartment any personal property which can be easily seen from outside the vehicle, and which reasonably has a value **in excess of $25.** No other inventory or search of the vehicle shall be made at this time  If the vehicle is not claimed within 24 hours of the time the prisoner was arrested, a **complete inventory** of the contents of the vehicle shall be made by the arresting officer.

### Traffic Impoundment

Only those vehicles that are taken into police custody, and placed on police department property (or a location in front of or near a police facility), shall be classified as Traffic Impoundment. Vehicles impounded for traffic are those vehicles in violation of the traffic regulations such as parked on fire hydrant, rush hour violator, etc.
Immediately upon arrival at the police facility, the impounding officer shall remove from the **passenger compartment** of the vehicle any personal property that can be easily seen from the outside, which has a value **in excess of $25.** No other inventory or search of the vehicle shall be made at this time. If the vehicle is unclaimed by the owner after **24 hours** a complete inventory of the contents of the vehicle shall be made by the impounding officer.

If a vehicle is not placed on police department property or near a police facility, it is **not a traffic impoundment** and shall **not be** inventoried or searched in any way. (Illegally parked during rush hour, presidential movement, etc.)

### Non-Criminal Impoundment

Vehicles taken into police custody for the following reasons shall be classified as Non-Criminal Impoundment:

1. Abandoned
2. Part of estate of deceased person
3. Property of an insane person
4. Property of persons taken to the hospital
5. Property turned over to police at the scene of a fire or disaster

Since the vehicle will be in police custody for an undetermined period of time an officer who impounds a vehicle, as non-criminal impoundment shall **completely** inventory the vehicle **immediately** upon its arrival at a police facility.

33

### Definitions

**Complete Inventory** - The officer shall examine the passenger compartment, the glove box, whether or not locked, and the trunk whether or not locked. Any items of personal property, which reasonably has a **value in excess of $25**, shall be removed from the vehicle and placed in secure custody. Any containers or boxes found within the vehicle shall be opened and any item of personal property found in such containers, which has a **value in excess of $25** shall be removed.

**Limited Inventory** - The impounding officer shall remove from the **passenger compartment** of the vehicle any personal property that can be easily seen from the outside, which has a **value in excess of $25**.

### Type of Inventory

| Classification | Type | After 24 hours |
|---|---|---|
| Seizures for Purposes of Forfeiture. | Complete | N/A |
| Seizures as Evidence. | Complete | N/A |
| Prisoner's Property. | Limited | Complete |
| Traffic impoundment. | Limited | Complete |
| Non-criminal impoundment. | Complete | N/A |

**Note:** Close all the doors and windows and lock the vehicle.

**1.7.I.23**             **Incendiary Devices, Explosives and Illegal Fireworks**

**G.O. 601.1 Pgs 6, 31**

Incendiary devices or other types of explosives as described under Part I-E (missile, rocket, grenade, bomb, etc.) other than fireworks, shall be handled entirely by the **Explosive Ordinance Disposal Section,** Special Operations Division.

Members recovering illegal fireworks shall complete a PD 81 place the property on the PD 82 and complete all other required forms (PD 251, PD 163, etc.). Notify the Explosive Ordnance Unit, Special Operations Division Monday through Friday 0700-2300 hours. After 2300 hours and on weekends and holidays, notification shall be to the **Watch Commander,** Communications Division who in turn will notify the stand-by technician of S.O.D. The technician will contact the recovering officer and

make arrangements for disposal. Include the date/time/name of the technician notified in the narrative of the PD 81 and PD 251.

All fireworks shall be carefully **wrapped** in packages by the recovering member and marked "**Fireworks, Use Caution**"; in addition to all other identifying marks. All explosives and incendiary materials coming into custody of the Explosive Ordinance Division shall be destroyed immediately, members handling court cases involving fireworks will have the technician subpoenaed in order that expert testimony may be provided in lieu of physical evidence

1.7.1.24                **Firearms**

G.O. 601.1 Pgs 7-9

Members recovering firearms shall take all necessary precaution and safeguards. All firearms, except weapons that are to be **fingerprinted**, shall be unloaded immediately after begin taken into custody. Only an **evidence technician** shall unload a firearm, which needs to be fingerprinted, when practicable.

Any weapon that cannot be unloaded shall because of malfunction or any other reason (You do not know how) shall be taken to the Firearms Examination Section for examination and unloading. This examination must be conducted before taking the weapon to court as evidence and prior to delivery to the Property Clerk (Evidence Control Department) for disposition.

**Remember:** The three times you do not unload a firearm Fingerprint – Malfunction – Do Not Know How

All firearms recovered shall be checked through WALES and NCIC and a copy of the printout shall be attached to the PD 81 (Property Record) before being sent to Evidence Control Department.

On the next business day after recovery, all firearms classified as Evidence or Suspected Proceeds of Crime shall be delivered to the:

1.  Firearms Registration Section, Identification and Records Division (UN 89 issued)

2.  Firearms Examination Section, C.I.D. (PD 32 and PD 36 issued)

If an arrest is made the weapon shall processed by the arresting officer with the original PD 81. If ammunition is recovered it shall be recorded as a separate item on the PD 81. All other weapons shall be processed by the officer delivering the firearm to the Evidence Control Department.
(If a weapon were classified as Found, Safekeeping etc., the Element Property Officer would have this responsibility.)

35

Upon taking a rifle or shotgun into custody, members shall enter the weapon on the PD 82 (Property Book) listing:

1. The make (Winchester, Remington, etc.)
2. The caliber (.22, 30/30, 12 ga, etc.)
3. The serial number
4. The type (double barreled shotgun, etc.)
5. The color (blue steel, nickel plated, etc.)
6. Any special type of markings or defects (chip or scratch on stock, trigger guard broken, engraved stock, etc.)
7. Attach a PD 285 (Property Tag) to the weapon's trigger guard and place the weapon in the PD 86 (Shotgun/Rifle Bag).

**Important note**: Under no circumstances shall members remove the weapon from the bag while on public space or while in areas exposed to public view.

All firearms shall be forwarded to the Evidence Control Department firearms **shall not be** returned to an owner without express permission of the Property Clerk of his/her agent. In the event such authorization is granted, the name of the Property Clerk or agent shall be recorded on the PD 81 (Property Record) and the PD 82 (Property Book) as well as the date and time the authorization was obtained.

Title 6, Section 2375 of the D.C. Code allows citizens to turn in and abandoned a firearm to MPD without being prosecuted for violating firearms control regulations. Firearms may be turned in at any of the police districts and no identification will be required. The firearm will be classified as Turned Over to the Police for destruction. The receiving member shall be responsible for completing all necessary reports

**1.7.1.25**          <u>Seized For Violations Of The National Firearms Act</u>

G.O. 601.1 Pgs 6-7

If the NFA (Gun Control Act of 1968, Public Law 90-618) is violated, vehicles, vessels and/or aircraft are subject to seizure and forfeiture
The Bureau of Alcohol, Tobacco and Firearms (A.T.F., U.S. Treasury Department) is responsible for enforcing violations of the National Firearms Act (NFA).
The following weapons are considered contraband and their possession is unlawful, unless properly registered:

1. Fully automatic firearms (i.e., machine guns and machine pistols).
2. Shotguns with a barrel length less than 18 inches.
3. Rifles with a barrel length less than 16 inches.
4. Altered shotgun or rifle where the overall length is less than 26 inches (shoulder stock altered into a pistol grip or barrel sawed-off).

36

5. Any weapon or device (except a conventional pistol or revolver) capable of firing a shot (Ithaca Auto Burglar Guns, Cave guns, etc.).
6. Pistols with shoulder stocks.
7. Any silencing or muffling device designed for use on any firearm.
8. Any destructive device (e.g. explosive, or incendiary) such as:
    A. Gas
    B. Bombs
    C. Grenade
    D. Rockets with a propellant charge of more than four (4) ounces.
    E. Missiles with an explosive or incendiary charge of more than one forth (1/4) ounce.
    F. Mines or similar devices.

**An official** on duty at the arresting officer's element shall be notified of the circumstances in which any vehicle comes into custody as the result of violations of the National Firearms Act (NFA). It shall be **the official's** responsibility to notify ATF. The member making the notification to ATF shall list the name/date/time of the person notified.

A confiscated vehicle, vessel, or aircraft will be listed on the PD 82 (Property Book). No PD 81 (Property Record) is necessary at this time. The vehicle will be classified as "**HELD for FEDERAL AUTHORITIES**".

If the Federal agent decides to confiscate the vehicle, vessel, or aircraft and related property the <u>responding agent</u> will then sign for it on the PD 82 (Property Book). Arrangements will be made with the element property officer for an agent to response and take possession of the property. If the Federal Agent decides **NOT** to confiscate the vehicle, the classification will be changed to "**Prisoner's Property**", or another classification, and a PD 81 (Property Record) shall be completed.

**Note:** It is the policy of the ATF not to seize a vehicle that has less sale value than storage and other costs. This is the only time a **permanent lieutenant** must respond and make seizure determination all the other times it will be an **acting** lieutenant or higher.

1.7.1.26        **Prisoner's Property**

**G.O. 601.1 Pgs 16 thru 19**

All prisoners shall be thoroughly searched upon their arrival at the police station. The recovering officer shall turn all personal property (wallets; money; razors; keys etc.) belonging to the prisoner shall be turned over to the station clerk who shall:

1. Remove all items that could inflict harm or affect an escape.

37

2. Review in the presence of the recovering member all items on the PD 82 (Property Book)
3. Sign the entry in the PD 82
4. Place the items in a and list the items on the PD 14 (Property Envelope) (Those items not able to fit inside the PD 14 shall be properly tagged, Secured, and retained by the organizational element.)
5. Prepare a PD 58 (Prisoner's Property Receipt), give the **copy** to the
6. Prisoner and place the **original** in the PD 14.
7. Note on the back of the PD 58 personal information know only to the Prisoner.

Prisoners may keep, on their person items, which pose no threat cash up to the amount of $100.00. Members will seize all cash exceeding $100.00 and place it on the PD 82 (Property Book).

**Note:** As a safeguard against another person, other than the owner, gaining possession of a receipt and presenting him/herself as the owner, or to assist in returning personal property should prisoner lose his/her copy of the receipt, or the prisoner not have any documented identification, Station clerks shall note on the back of the element's copy of the PD 58, personal information that would generally be known only to the Person from whom the property was taken (i.e.: name of father/mother, Date of birth, etc.)

The PD 58 (Prisoner's Property Receipt) has a section, which provides authorization for a Third Party to pick up the prisoner's property. If it is anticipated the prisoner will be locked up for an extended period this section can be used to return their property to a third person, and it should be encouraged.

All perishable personal property belonging to the prisoner shall be handled in accordance with Title 4, Section 162 of the D.C. Code and the DCMR 6A. Which calls for the Commanding Officer to auction the perishable property. When a prisoner is released, all personal property is returned to the prisoner after he/she signs the PD 82 and the station clerk shall sign the PD 82 as a witness. Both copies of PD 58 (Prisoner's Property Receipt) as well as the PD 14 (Property Envelope) are then destroyed. When a prisoner is sent to court or to another place of confinement, and part of his/her property is not returned, the station clerk shall list such property on the PD 82 (Property Book) and advise the prisoner of the steps in retaining the property.

All property, except that property which can be maintained inside the property envelope, shall be retained at the arresting element. Property returned to a prisoner shall be crossed out on the PD 58 (Prisoner's Property Receipt) and the PD 14 (Property Envelope). The prisoner shall sign the PD82 (Property Book) after the Station Clerk has checked the space indicating **"All Property Returned Except"** and has listed those items that cannot be sent along with the prisoner. The property envelope shall be released by the Station Clerk to the transporting member who shall be responsible for delivery of the property to the member who takes custody of the prisoner. The transporting member shall note the person's name that takes custody of the property on the PD 775 (Daily Vehicle Inspection and Activity Report)

**Note:** At no time will the contents of the property be turned over to the prisoner while he/she is in custody.

Personal property that is not returned shall be retained at the element where the prisoner was booked. Prisoner's property will be maintained at an organizational element for **90 days**, after 90 days, the property will be forwarded to the Evidence Control Department. Prisoner's Property not called for at the Evidence Control Department within **90 days** shall be classified as "**Abandoned**" and disposed of in accordance with the provisions of Title 4 of D.C. Code.

**1.7.1.27**          <u>**Narcotics and Dangerous Drugs**</u>

**G.O. 601.1 Pgs 14 thru 16**

Members coming into possession of suspected narcotics and/or dangerous drugs they shall do the following:

1. Record on the PD 82 (Property Book).
2. Prepare a PD 81 (Property Record).
3. Contact CSSO or VICE Investigator for assistance in processing the narcotics (Field Test).
4. Prepare a DEA 7
5. Prepare a PD 95 (Heat Sealed Envelope).
    A. Use a black felt tip pen to write you initials, badge #, and date inside the bag at the top edge.
    B. Seal the top edge in the heat sealer and check to ensure the envelope is completely sealed.
6. Prepare a separate PD 81 (Property Record) is used for each DEA 7.
7. Ensure the DEA laboratory control number is recorded on the PD 81 in block number 7, and listed in the statement of facts section on the DEA 7.
8. The PCN (Property Control Number) is listed in the statement of facts of each DEA 7.

**Note:** If an arrest occurred in relation to recovered narcotics or dangerous drugs, a copy a the PD 163 (Prosecution Report) shall be affixed to the DEA-7 prior to its delivery to Major Narcotics Branch (MNB) or prior to the deposit of the exhibit into the evidence locker.

<u>**Major Narcotics Branch**</u>

Between 2400 – 0800 hours, a member of MNB will respond to each district to take possession of the narcotics.

The narcotics officer will:

1. Remove all of the suspected narcotics from the narcotics locker, **and**
2. Sign his/her name in the PD 82 (Property Book) adjacent to each entry.

Major Narcotics Branch shall be responsible for transmittal of suspected narcotics/drugs to the Metropolitan Police officer assigned to the DEA Laboratory for:

1. Testing (by a DEA chemist)
2. Safekeeping (for future purposes, i.e. court evidence)
3. Disposal

Narcotics cannot be disposed of without approval from the U.S. Attorney's Office. The actual destruction of narcotic drugs shall be accomplished only by the **Evidence Control Department** personnel.

**Note:** Cases will not be papered without a DEA Lab Number.

1.7.1.28                                  <u>**Stops In Pawn Shops and Secondhand Dealers**</u>

**601.1, pg. 10-11**

Title 16 of the D.C. Municipal Regulations authorizes the seizure of items in the custody of Pawn Shops or secondhand dealers, which are known to be missing, or for which probable cause exists to believe that such items are stolen.

In lieu of taking possession of such items, an officer may place a "Stop" on the property.

<u>**Definitions**</u>

**Stop** - a temporary retainer of an item(s) of property not to exceed **60** <u>calendar days</u>, that may be placed on items in the custody of pawnshops or secondhand dealers when a seizure would otherwise be authorized.

This courtesy allows the merchant to retain custody of items while an investigation is being conducted to verify the status of these items.

During the period a "Stop" is in effect a merchants shall not:

1. Sell
2. Dispose of
3. Changing the identity of the property, and
4. Shall keep the property separate and distinct from all other property in their place of business.

Failure to comply with a police "Stop" constitutes a violation of the DCMR and members shall notify the Pawn Unit immediately (724-3772).

When an officer desires a "Stop" on property he/she shall:

1. Advise the owner of the business that a stop is being placed on the item(s) in question.
2. Prepare a PD 82-B, Stop Record, in triplicate.
3. Give the owner/manager the original.
4. During the day work tour of duty, notify the Intelligence Division, Property Crimes Section, Pawn Unit immediately.

If a stop is placed after the 1600 hours tour of duty, notify that office the next business day. The Pawn Unit maintains a control log on outstanding stops and assigns a control number to each stop placed.  Members shall record the control number on the second and third copies of the PD 82-B (Stop Record)

The member placing the "Stop" shall conduct an investigation to determine whether or not the item(s) are lost or stolen.  The member shall notify an official of the Pawn Unit of the results of the investigation and that official will authorize the member to seize the property or discontinue the "Stop".

**Note:** Once you place a stop an official of the Pawn Unit will determine what you will do (seize or discontinue) after they are informed of the results of your investigation.

When authorization to seize item(s) is granted, the member shall then:

1. Record the name of the official authorizing the seizure in the appropriate block on the PD 82-B.
2. Return the establishment where the stop was placed and seize the item(s).
3. Issue the owner/manager a completed PD 82-A (Property Receipt).
4. Record the recovered property on the PD 82 (Property Book)
5. Complete a PD 81 (Property Record)

Prepare a PD 251 if no such prior report has been prepared, or complete a supplemental PD 252 using the same report numbers. In most cases, property seized as a result of a stop shall be classified as "Evidence" or Suspected Proceeds of Crime".

When instructed to discontinue a "Stop" by an official of the Pawn Unit, a member shall:

1. Record the name of the official authorizing the discontinuance in the appropriate block on the PD 82-B (Stop Record), and
2. Return to the establishment and advise the owner/manager that the stop has been discontinued.

41

**1.7.1.29**          **Preservation of Discoverable Material and Handling of Potential Evidence**

G.O. 601.2, 304.8 Pgs 5-6

In addition to materials which are required to be preserved pursuant to existing departmental orders members shall preserve all potentially discoverable material, including any such material which might prove favorable to an accused. Potentially discoverable material includes such items as tangible documents, reports, tapes, transcripts of tapes, and photographs. All potentially discoverable material, not otherwise required to be preserved according to existing departmental orders, shall be maintained in an investigative jacket or case folder in a secured filing cabinet. All potentially discoverable material required to be preserved shall be preserved until the criminal case is concluded. If no criminal judicial proceeding has been initiated the material shall be preserved for a period of three (3) years from the date the material was first obtained.

Exceptions:

1.  Communications Division magnetic tapes – 2 years
2.  Incoming 911 and Communications Division administrative calls – 1 Year

**Chain of Custody**

The "Chain of Custody" of evidence is essential in the handling of evidence. The admissibility in a court of law will depend, in large part, on the manner in which the evidence was collected, and the precautions taken to ensure its integrity. If any link in this chain is unknown or unaccounted for, the integrity of the evidence can be threatened and it may well be ruled inadmissible.

Members shall ensure the future identification of recovered evidence for court or administrative purposes by:

1.  Initialing the evidence, and/or
2.  Placing the evidence an envelope and marking the envelope.

When taking custody or handling evidence, check its condition and identifying each time it was handled, ensuring that:

1.  It is the original evidence, and
2.  It is in the same condition as at the time of recovery

Members are responsible for ensuring that when testifying, their testimony is able to support the fact that each item of evidence was either found at the crime scene or is otherwise related to the crime. Members are responsible for demonstrating to the satisfaction of the court that the evidence was not altered, and it can be positively identified and distinguished from all other similar items.

| Property Control  Number | | Item # | Court Date | |
|---|---|---|---|---|
| Description of Property | | | | |
| Officer's Name | | Unit | Badge Number | |
| Name of AUSA Corporation Counsel | | | Phone Number | |
| Defendant's Name | | | Case # | |
| CCN # | Court Room # | Property Division Only | Page # | Line # |

PD 81B Rev. 09/89                    **EVIDENCE REQUEST CARD**

# PD Forms

## &

# General Instructions

# <u>Report</u>

## <u>Writing</u>

### <u>Instructions</u>

# **Learning Objectives**

# <u>General</u>

## <u>Order 601-1 A</u>

### <u>Change #1</u>

# Circular Cir 00-01

## Landlord Self-help Evictions

## Special Orders

49

# Special Order SO-00-17

# Procedures for Handling Monies

# DCMR 6A 8-3

## D.C.Code 4-152 thru 4-170

# **<u>Blank PD Forms</u>**

# EXHIBIT 21

Office of Professional Responsibility--Citizen Complaints regarding Eviction

| CaseNumber | Assignment | Date1 | Allegations | ChargeDisp | CaseStatus |
|---|---|---|---|---|---|
| CS-01-1272 | 4D | 10/26/01 | PD93:FAILURE TO TAKE POLICE ACTION: C-1 states that the maintenance crew of his apartment building entered his apartment and that he threw them out. C-1 called the police to make a report and the officer refused to take a report for Unlawful Entry. | Unfounded | Referral |
| CS-01-1335A | 5D | 11/16/01 | PD99: Wrongful Eviction and Arrest: Complainant alleges he was removed from his residence and charged and several officials were not helpful. | Insufficient Facts | Referral |
| CS-01-1335A | 5D | 11/16/01 | PD99: Wrongful Eviction and Arrest: Complainant alleges he was removed from his residence and charged and several officials were not helpful. | Insufficient Facts | Referral |
| CS-01-1335A | 5D | 11/16/01 | PD99: Wrongful Eviction and Arrest: Complainant alleges he was removed from his residence and charged and several officials were not helpful. | Insufficient Facts | Referral |
| CS-01-1335A | 5D | 11/16/01 | PD99: Wrongful Eviction and Arrest: Complainant alleges he was removed from his residence and charged and several officials were not helpful. | Exonerated | Referral |
| CS-01-1335A | 5D | 11/16/01 | PD99: Wrongful Eviction and Arrest: Complainant alleges he was removed from his residence and charged and several officials were not helpful. | Insufficient Facts | Referral |
| CS-01-1335A | 5D | 11/16/01 | PD99: Wrongful Eviction and Arrest: Complainant alleges he was removed from his residence and charged and several officials were not helpful. | Insufficient Facts | Referral |
| CS-01-1335A | 5D | 11/16/01 | PD99: Wrongful Eviction and Arrest: Complainant alleges he was removed from his residence and charged and several officials were not helpful. | Exonerated | Referral |
| CS-01-1335A | 5D | 11/16/01 | PD99: Wrongful Eviction and Arrest: Complainant alleges he was removed from his residence and charged and several officials were not helpful. | Insufficient Facts | Referral |
| CS-01-1335A | 5D | 11/16/01 | PD99: Wrongful Eviction and Arrest: Complainant alleges he was removed from his residence and charged and several officials were not helpful. | Exonerated | Referral |
| CS-01-1335A | 5D | 11/16/01 | PD99: Wrongful Eviction and Arrest: Complainant alleges he was removed from his residence and charged and several officials were not helpful. | Insufficient Facts | Referral |
| CS-01-1335A | 5D | 11/16/01 | PD99: Wrongful Eviction and Arrest: Complainant alleges he was removed from his residence and charged and several officials were not helpful. | Exonerated | Referral |
| CS-01-1335A | 5D | 11/16/01 | PD99: Wrongful Eviction and Arrest: Complainant alleges he was removed from his residence and charged and several officials were not helpful. | Insufficient Facts | Referral |

Attachment No 6

Office of Professional Responsibility--Citizen Complaints regarding Eviction

| CaseNumber | Assignment | Date1 | Allegations | ChargeDisp | CaseStatus |
|---|---|---|---|---|---|
| CS-01-1335A | 5D | 11/16/01 | PD99: Wrongful Eviction and Arrest: Complainant alleges several officials were not helpful. | | |
| CS-01-1335A | 5D | 11/16/01 | PD99: Wrongful Eviction and Arrest: Complainant alleges several officials were not helpful. | Exonerated | Referral |
| CS-01-1335A | 5D | 11/16/01 | PD99: Wrongful Eviction and Arrest: he was removed from his residence and charged and several officials were not helpful. | Exonerated | Referral |
| CS-01-1335A | 5D | 11/16/01 | PD99: Wrongful Eviction and Arrest: he was removed from his residence and charged and several officials were not helpful. | Exonerated | Referral |
| CS-01-1335A | 5D | 11/16/01 | PD99: Wrongful Eviction and Arrest: he was removed from his residence and charged and several officials were not helpful. | Insufficient Facts | Referral |
| CS-01-1335A | 5D | 11/16/01 | PD99: Wrongful Eviction and Arrest: he was removed from his residence and charged and several officials were not helpful. | Exonerated | Referral |
| CS-01-1335A | 5D | 11/16/01 | PD99: Wrongful Eviction and Arrest: Complainant alleges he was removed from his residence and charged and several officials were not helpful. | Insufficient Facts | Referral |
| CS-01-1335A | 5D | 11/16/01 | PD99: Wrongful Eviction and Arrest: Complainant alleges he was removed from his residence and charged and several officials were not helpful. | Insufficient Facts | Referral |
| CS-01-1380 | 5D | 12/04/01 | PD99: Neglect of Duty: C-1 alleges that the listed officer responded to his home for a Tenant Dispute. C-1 arrived home and found another tenant to banging on his door. Officer responded back and allowed the tenant to bang on the door of C-1 which caused damage. The officer then allowed the tenant to push C-1's window air conditioner out. C-1 alleges that th eofficer threatened to arrest him if he did not give the other tenant a key. | Insufficient Facts | Referral |

Office of Professional Responsibility--Citizen Complaints regarding Eviction

| CaseNumber | Assignment | Date1 | Allegations | ChargeDisp | CaseStatus |
|---|---|---|---|---|---|
| CS-01-529 | 1D | 05/08/01 | PD99: FAILURE TO TAKE REPORT/ INTIMIDATION/INSENSITIVITY: c-1 alleges that she called the police for a strange man trying to gain entry to her home and they responded an hour later. The unknown man was a process server for evictions. C-1 states that the officers that responded were insensitive to her plight and made jokes about her with the server. C-1 states that she was treated as a criminal by the officers and that they took sides with the process server. C-1 further states that the officers failed to take report about the incident she had with the server. The officers ordered C-1 out of her home to talk with the server. C-1 feels that the officers were insensitive due to the fact that she is disabled. Intel# I-01-20 | Insufficient Facts | Intelligence |
| CS-01-529 | 1D | 05/08/01 | PD99: FAILURE TO TAKE REPORT/ INTIMIDATION/INSENSITIVITY: c-1 alleges that she called the police for a strange man trying to gain entry to her home and they responded an hour later. The unknown man was a process server for evictions. C-1 states that the officers that responded were insensitive to her plight and made jokes about her with the server. C-1 states that she was treated as a criminal by the officers and that they took sides with the process server. C-1 further states that the officers failed to take report about the incident she had with the server. The officers ordered C-1 out of her home to talk with the server. C-1 feels that the officers were insensitive due to the fact | Insufficient Facts | Intelligence |
| CS-01-529 | 1D | 05/08/01 | PD99: FAILURE TO TAKE REPORT/ INTIMIDATION/INSENSITIVITY: c-1 alleges that she called the police for a strange man trying to gain entry to her home and they responded an hour later. The unknown man was a process server for evictions. C-1 states that the o | Insufficient Facts | Intelligence |
| CS-02-1345 | 4D | 09/30/02 | PD99:HARASSMENT/INTIMIDATION: C-1 alleges that the listed unknown officers responded to her home for a landlord tenant dispute and when they arrived, the officers allegedly harassed and intimidated C-1. | Unfounded | Referral |

Office of Professional Responsibility--Citizen Complaints regarding Eviction

| CaseNumber | Assignment | Date1 | Allegations | ChargeDisp | CaseStatus |
|---|---|---|---|---|---|
| CS-02-442 | 5D | 04/15/02 | PD99: Harassment; Threats; Unlawful Entry:  Complainant alleges officer is her landlord, visits unannounced, demands and gain entry and searches her home.  The following day he requested his rent and threatened to evict her.  She also alleges he has been harassing her for three months.  A male friend provided this information. | Exonerated | Referral |
| CS-02-670 | 6D | 06/14/02 | UNLAWFUL ENTRY:CIVIL ACTION#00-2442:A civil action case was given to the Office of Internal Affairs which required Complaint Summary numbers. | Pending | OIA Monitor |
| CS-02-670 | 6D | 06/14/02 | UNLAWFUL ENTRY:CIVIL ACTION#00-2442:A civil action case was given to the Office of Internal Affairs which required Complaint Summary numbers. | Pending | OIA Monitor |
| CS-03-0588 | 4D | 04/30/03 | PD99:HARASSMENT: C-1 states that she was harassed by several officers after she refused to let a tenant's guest into a unit to retrieve some items. | Pending | Referral OCCR |
| CS-03-1004 | 4D | 08/02/03 | USE OF FORCE:(OC SPRAY): Officer ████ used his MPD Issued OC Spray to subdue a subject who was attempting to force entry into an apartment door.  UFIR COMPLETED 8/2/03 | Justified | Other |

Page 4

# EXHIBIT 22

# Event Chronology

**Event Number:  I20060034742**

| <u>Date</u> | <u>Time</u> | <u>Term</u> | <u>Operat</u> | <u>Action</u> |
|------|------|------|------|------|

01/20/06   12:22:38   d16   5843   EVENT CREATED: Location= 210 20TH ST NE DC :APT 4 , Cross Streets= CONSTITUTION AVE NE / C ST
    NE , Name= MR ANTHONY BRIDGEFORTH , Phone Number= 202 413 3300
    Agency= MPD , Group= 1D , Beat= 103 , Status= P , Priority= 1 , ETA= 0 , Hold Type= 0 ,
      Primary Member= 0 , Current= F , Open Current= F , Type Code= BUA1 - BURGLARY ONE , SubType
      Code= IP - IN PROGRESS
    EVENT COMMENT= COMPL STATES A MALE AND FEMALE ARE BANGING ON HIS DOOR TRYING TO GET INTO LOC

01/20/06   12:22:39   cadcom   5843   EVENT COMMENT= ** LOI search completed at 01/20/06 12:22:39

01/20/06   12:22:40   d16   5843   EVENT UPDATED: Location= 210 20TH ST NE DC :APT 4 , Cross Streets= CONSTITUTION AVE NE / C ST
    NE , Name= MR ANTHONY BRIDGEFORTH , Phone Number= 202 413 3300
    Agency= MPD , Group= 1D , Beat= 103 , Status= A , Priority= 1 , ETA= 0 , Hold Type= 0 ,
      Primary Member= 0 , Current= F , Open Current= F , Type Code= BUA1 - BURGLARY ONE , SubType
      Code= IP - IN PROGRESS

01/20/06   12:23:25   d16   5843   EVENT COMMENT= COMPL STATES THEY ARE INT HE REAR AND FRONT OF THE LOC

01/20/06   12:23:34   d16   5843   EVENT COMMENT= COMPL STATES HE DOES NOT KKNOW WHO THEY ARE

01/20/06   12:23:47   d16   5843   EVENT COMMENT= 'CALLER HUNG UP

01/20/06   12:23:49   d16   5843   N/F

01/20/06   12:23:49   c08   6710   EVENT COMMENT= Duplicate Event:Location = LL(-76:58:44.8499,38:53:27.3228): EST 1792 A ST NE
    DC, Cross Street 1 = 17TH ST NE 19TH ST NE, Cross Street 2 = 19TH ST NE, Caller
    Name = T-MOBILE USA, INC., Caller Ph Number = 202-413-3300, Caller Address =
    1700 Capitol St NE, Call Source = ANI/ALI, Alarm Level = 0
    End of Duplicate Event data

01/20/06   12:23:52   d16   5843   EVENT UPDATED: Location= 210 20TH ST NE DC :APT 4 , Cross Streets= CONSTITUTION AVE NE / C ST
    NE , Name= MR ANTHONY BRIDGEFORTH , Phone Number= 202 413 3300

01/20/06   12:23:53   d16   5843   Agency= MPD , Group= 1D , Beat= 103 , Status= A , Priority= 1 , ETA= 0 , Hold Type= 0 ,
      Primary Unit= 1031 , Primary Member= 1965 , Current= F , Open Current= F , Type Code= BUA1 -
      BURGLARY ONE , SubType Code= IP - IN PROGRESS

01/20/06   12:25:12   c08   6710   EVENT COMMENT= SUBJ ARE IN A SILVER KIA SPECTRA

01/20/06   12:25:22   c08   6710   EVENT COMMENT= WITH PA TAGS

01/20/06   12:25:29   d17   1693   EVENT COMMENT= Duplicate Event:Location = 210 20TH ST NE DC: ALIAS 210 20 ST NE, Cross Street
    1
    = CONSTITUTION AVE NE C ST NE, Cross Street 2 = C ST NE, Alarm Level = 0
    End of Duplicate Event data

01/20/06   12:25:49   d17   1693   EVENT COMMENT= 2ND CALL

01/20/06   12:54:58   d02   1271   CASE NUMBER ASSIGNED= R2006008952
    Disposition Assigned= ASSNCASE
    EVENT COMMENT= ** Case number R2006008952 has been assigned
      ** >>>> by: VELMA JEFFERSON on terminal: d02

01/20/06   12:55:14   d02   1271   EVENT UPDATED: Location= 210 20TH ST NE DC :APT 4 , Cross Streets= CONSTITUTION AVE NE / C ST
    NE , Name= MR ANTHONY BRIDGEFORTH , Phone Number= 202 413 3300
    Agency= MPD , Group= 1D , Beat= 103 , Status= A , Priority= 2 , ETA= 0 , Hold Type= 0 ,
      Primary Unit= 1031 , Primary Member= 1965 , Current= F , Open Current= F , Type Code= MISC -
      MISCELLANEOUS REPORT , SubType Code= NOS3 - NUMBERS ONLY
    EVENT COMMENT= ** Event Type changed from BUA1(IP) to MISC(NOS3) at: 01/20/06 12:55:14
      ** >>>> by: VELMA JEFFERSON on terminal: d02
      ** Event Priority changed from 1 to 2 at: 01/20/06 12:55:14

*Attachment 2*

| <u>Date</u> | <u>Time</u> | <u>Term</u> | <u>Operat</u> | <u>Action</u> |
|------|------|------|------|------|
| | | | | ** >>>> by: VELMA JEFFERSON on terminal: d02 |
| 01/20/06 | 14:00:24 | d03 | 1298 | Agency= MPD , Group= 1D , Beat= 103 , Status= A , Priority= 2 , ETA= 0 , Hold Type= 0 , Primary Unit= 1031 ,.Primary Member= 1965 , Current= T , Open Current= F , Type Code= MISC - MISCELLANEOUS REPORT , SubType Code= NOS3 - NUMBERS ONLY |
| | | | | EVENT CLOSED: |

# Event Chronology

**Event Number:   I20060035015**

| <u>Date</u> | <u>Time</u> | <u>Term</u> | <u>Operat</u> | <u>Action</u> |
|---|---|---|---|---|
| 01/20/06 | 15:24:36 | c09 | 6751 | EVENT CREATED: Location= 210 20TH ST NE DC :APT 4 , Cross Streets= CONSTITUTION AVE NE / C ST |
| | | | | NE , Name= CANDERDA , Phone Number= 484-410-9453 |
| | | | | Agency= MPD , Group= 1D , Beat= 103 , Status= P , Priority= 3 , ETA= 0 , Hold Type= 0 , |
| | | | | Primary Member= 0 , Current= F , Open Current= F , Type Code= ULEN - UNLAWFUL ENTRY , SubType |
| | | | | Code= IP - IN PROGRESS |
| | | | | EVENT COMMENT= COMPL STATES SHE IS THE BLD OWNER |
| 01/20/06 | 15:24:37 | cadcom | 6751 | EVENT COMMENT= ** LOI search completed at 01/20/06 15:24:37 |
| 01/20/06 | 15:25:06 | c09 | 6751 | EVENT COMMENT= SHE STATES A MALE IS ILLEGALLY STAYING INSIDE THE LOC |
| 01/20/06 | 15:25:10 | c09 | 6751 | EVENT UPDATED: Location= 210 20TH ST NE DC :APT 4 , Cross Streets= CONSTITUTION AVE NE / C ST |
| | | | | NE , Name= CANDERDA , Phone Number= 484-410-9453 |
| 01/20/06 | 15:25:11 | c09 | 6751 | Agency= MPD , Group= 1D , Beat= 103 , Status= P , Priority= 3 , ETA= 0 , Hold Type= 0 , |
| | | | | Primary Member= 0 , Current= F , Open Current= F , Type Code= ULEN - UNLAWFUL ENTRY , SubType |
| | | | | Code= IP - IN PROGRESS |
| 01/20/06 | 15:25:32 | c09 | 6751 | EVENT COMMENT= COMPL STATES SHE IS AT THE LOC WITH ALL THE PROPER PAPER WORK |
| 01/20/06 | 15:26:29 | d03 | 1298 | EVENT COMMENT= Duplicate Event:Location = 210 20TH ST NE DC : alias 210 20 ST NE,4, Cross |
| | | | | Street 1 = CONSTITUTION AVE NE, Cross Street 2 = C ST NE, Type = BUA1 BURGLARY |
| | | | | ONE, Subtype = JO JUST OCCURRED, Caller Name = T-MOBILE USA, INC., Caller Ph MIC |
| | | | | Number = 202-413-3300, Caller Address = 2500 Benning Rd, Call Source = ANI/ALI, |
| | | | | ** LOI search completed at 01/20/06 15:25:00 |
| | | | | Alarm Level = 0 |
| 01/20/06 | 15:26:30 | d03 | 1298 | CROSS REFERENCED TO EVENT= I20060035016 |
| | | | | EVENT COMMENT= End of Duplicate Event data |
| | | | | ** Cross Referenced to Event # I20060035016 at: 01/20/06 15:26:30 |
| | | | | ** >>>> by: VERONICA A. STEWART on terminal: d03 |
| 01/20/06 | 15:44:41 | c02 | 1242 | EVENT COMMENT= Duplicate Event:Location = LL(-76:58:44.8499,38:53:27.3228): EST 1792 A ST NE |
| | | | | DC, Cross Street 1 = 17TH ST NE 19TH ST NE, Cross Street 2 = 19TH ST NE, Caller |
| | | | | Name = T-MOBILE USA, INC., Caller Ph Number = 202-413-3300, Caller Address = |
| | | | | 1700 Capitol St NE, Call Source = ANI/ALI, Alarm Level = 0 |
| | | | | End of Duplicate Event data |
| 01/20/06 | 15:46:32 | c02 | 1242 | EVENT COMMENT= 2ND CALL ...... LANDLORD AT COMPL DOOR....... COMPL ALSO WANT A OFFICAL TO |
| | | | | RESPOND |
| 01/20/06 | 15:46:36 | c07 | 6360 | EVENT COMMENT= 2MD CALL |
| 01/20/06 | 15:46:44 | c07 | 6360 | EVENT COMMENT= 2ND CALL///STILL WAITING |
| 01/20/06 | 15:47:07 | c02 | 1242 | EVENT COMMENT= LANDLORD IS THREATING TO THROW IS ITEMS OUT OF HIS APT |
| 01/20/06 | 15:47:31 | c02 | 1242 | EVENT COMMENT= STATES RESPONDING EARLY TODAY .... LANDLORD HAD A MALE TO KICK |
| 01/20/06 | 15:47:36 | c02 | 1242 | EVENT COMMENT= HIS DOOR DOWN |
| 01/20/06 | 15:57:44 | c16 | 501001 | EVENT COMMENT= Duplicate Event:Location = 210 20TH ST NE DC, Cross Street 1 = CONSTITUTION |
| | | | | AVE |
| | | | | NE C ST NE, Cross Street 2 = C ST NE, Alarm Level = 0 |
| | | | | End of Duplicate Event data |
| 01/20/06 | 15:58:05 | c16 | 501001 | EVENT COMMENT= Cancel Request from agency MPD : POLICE NO LONGER NEEDED |
| | | | | >>>> by: ERIKA ABRAHAM at 01/20/06 15:58:05 on terminal: c16 |
| 01/20/06 | 15:58:39 | d03 | 1298 | Agency= MPD , Group= 1D , Beat= 103 , Status= C , Priority= 3 , ETA= 0 , Hold Type= 0 , |

**Date**     **Time**     **Term** **OperatAction**

Cancel Comment= 1022 , Primary Member= 0 , Current= T , Open Current= F , Type Code= ULEN

UNLAWFUL ENTRY , SubType Code= IP - IN PROGRESS
EVENT CLOSED:
Disposition Assigned= CANCELEV

# Event Chronology

**Event Number: I20060035016**

| <u>Date</u> | <u>Time</u> | <u>Term</u> | <u>Operat</u> | <u>Action</u> |
|------|------|------|------|------|
| 01/20/06 | 15:24:59 | c01 | 501031 | EVENT CREATED: Location= 210 20TH ST NE DC , 4 : alias 210 20 ST NE,4 , Cross Streets= CONSTITUTION AVE NE / C ST NE , Name= T-MOBILE USA, INC. , Address= 2500 Benning Rd , Call |

Source= ANI/ALI , Phone Number= 202-413-3300
EVENT UPDATED: Location= 210 20TH ST NE DC , 4 : alias 210 20 ST NE,4 , Cross Streets= CONSTITUTION AVE NE / C ST NE , Name= T-MOBILE USA, INC. , Address= 2500 Benning Rd , Call
Source= ANI/ALI , Phone Number= 202-413-3300
Agency= MPD , Group= 1D , Beat= 103 , Status= P , Priority= 1 , ETA= 0 , Hold Type= 0 , Primary Member= 0 , Current= F , Open Current= F , Type Code= BUA1 - BURGLARY ONE , SubType
Code= JO - JUST OCCURRED
Agency= MPD , Group= 1D , Beat= 103 , Status= P , Priority= 1 , ETA= 0 , Hold Type= 0 , Primary Member= 0 , Current= F , Open Current= F , Type Code= BUA1 - BURGLARY ONE , SubType
Code= JO - JUST OCCURRED
EVENT COMMENT= MIC

| 01/20/06 | 15:25:00 | cadcom | 501031 | EVENT COMMENT= ** LOI search completed at 01/20/06 15:25:00 |
| 01/20/06 | 15:26:30 | d03 | 1298 | Agency= MPD , Group= 1D , Beat= 103 , Status= C , Priority= 1 , ETA= 0 , Hold Type= 0 , Cancel Comment= Duplicate and Cancel , Primary Member= 0 , Current= T , Open Current= F , Type Code= BUA1 - BURGLARY ONE , SubType Code= JO - JUST OCCURRED |

EVENT CLOSED:
CROSS REFERENCED TO EVENT= I20060035015
Disposition Assigned= DUPNCAN
EVENT COMMENT= ** Cross Referenced to Event # I20060035015 at: 01/20/06 15:26:30
** >>>> by: VERONICA A. STEWART on terminal: d03

| 01/20/06 | 15:28:08 | c01 | 501031 | EVENT COMMENT= LOF B/F WEARING BROWN SHIRT WITH GOLD WRITING AND BLUE JEANS |
| 01/20/06 | 15:28:20 | c01 | 501031 | EVENT COMMENT= AND B/M WEARING DARK SHIRT AND BLUE JEANS |
| 01/20/06 | 15:28:37 | c01 | 501031 | EVENT COMMENT= COMPL STATES THEY KICKED HIS DOOR IN |
| 01/20/06 | 15:29:05 | c01 | 501031 | EVENT COMMENT= COMPL IS NOW OUT SIDE IN A BLACK NISSIAN MAXIMAM WITH DC TAGS |
| 01/20/06 | 15:29:33 | c01 | 501031 | EVENT COMMENT= COMPL NOW STATES HE IS GOING BACK INTO HIS HOME AND WAIT FOR THE POLICE |
| 01/20/06 | 15:29:53 | c01 | 501031 | EVENT COMMENT= BECAUSE THE PEOPLE ARE COMING TOWARDS HIS VEHICLE, |
| 01/20/06 | 15:30:01 | c01 | 501031 | EVENT COMMENT= COMPL IS POSSIBLY A SICKMO |

# Event Chronology

**Event Number:  I20060035288**

| <u>Date</u> | <u>Time</u> | <u>Term</u> | <u>Operat</u> | <u>Action</u> |
|------|------|------|------|------|
| 01/20/06 | 17:36:11 | c02 | 1242 | EVENT CREATED: Location= 210 20TH ST NE DC , 4 : alias 210 20 ST NE,4 , Cross Streets= CONSTITUTION AVE NE / C ST NE , Name= MR ANTHONY BRIDGEPORT , Address= TRANSFERRED OR OPERATOR ASSIST CALL , Call Source= ANI/ALI , Phone Number= 413-3300 Agency= MPD , Group= 1D , Beat= 103 , Status= P , Priority= 1 , ETA= 0 , Hold Type= 0 , Primary Member= 0 , Current= F , Open Current= F , Type Code= BUA2 - BURGLARY TWO , SubType Code= IP - IN PROGRESS EVENT COMMENT= :VERIZ 2ND PARTY CALL...... BLACK FEAMEL BROWN SHIRT BLUE BREAKING INTO FRONT DOOR OF APT....... COMPL STATES HIS WIFE MS GETTER IN ROUT TO LOCATION |
| 01/20/06 | 17:36:13 | c02 | 1242 | EVENT UPDATED: Location= 210 20TH ST NE DC , 4 : alias 210 20 ST NE,4 , Cross Streets= CONSTITUTION AVE NE / C ST NE , Name= MR ANTHONY BRIDGEPORT , Address= TRANSFERRED OR OPERATOR ASSIST CALL , Call Source= ANI/ALI , Phone Number= 413-3300 Agency= MPD , Group= 1D , Beat= 103 , Status= A , Priority= 1 , ETA= 0 , Hold Type= 0 , Primary Member= 0 , Current= F , Open Current= F , Type Code= BUA2 - BURGLARY TWO , SubType Code= IP - IN PROGRESS |
| 01/20/06 | 17:36:13 | cadcom1242 | | EVENT COMMENT= ** LOI search completed at 01/20/06 17:36:13 |
| 01/20/06 | 17:40:29 | c01 | 501031 | EVENT COMMENT= Duplicate Event:Location = 210 20TH ST NE DC: ALIAS 210 20 ST NE DC, Cross Street 1 = CONSTITUTION AVE NE C ST NE, Cross Street 2 = C ST NE, Caller Name = WASHINGTON, Caller Ph Number = 202-911-0000, Caller Address = TRANSFERRED OR OPERATOR ASSIST CALL, Call Source = ANI/ALI, Alarm Level = 0 End of Duplicate Event data |
| 01/20/06 | 17:42:20 | c01 | 501031 | EVENT COMMENT= 2ND CALL FROM COMPL STATES HIS WIFE IS ON THE SCENE |
| 01/20/06 | 17:43:46 | c01 | 501031 | EVENT COMMENT= THIS IS IN REF TO CCN# 008-952 |
| 01/20/06 | 17:43:57 | d03 | 1298 | Agency= MPD , Group= 1D , Beat= 103 , Status= P , Priority= 1 , ETA= 0 , Hold Type= 0 , Primary Member= 0 , Current= F , Open Current= F , Type Code= BUA2 - BURGLARY TWO , SubType Code= IP - IN PROGRESS Agency= MPD , Group= 1D , Beat= 103 , Status= A , Priority= 1 , ETA= 0 , Hold Type= 0 , Primary Unit= 1031 , Primary Member= 7185 , Current= F , Open Current= F , Type Code= BUA2 - BURGLARY TWO , SubType Code= IP - IN PROGRESS |
| 01/20/06 | 17:44:12 | d03 | 1298 | Agency= MPD , Group= 1D , Beat= 103 , Status= A , Priority= 1 , ETA= 0 , Hold Type= 0 , Primary Unit= 1031 , Primary Member= 7185 , Current= T , Open Current= F , Type Code= BUA2 - BURGLARY TWO , SubType Code= IP - IN PROGRESS EVENT CLOSED: Disposition Assigned= NOF |
| 01/20/06 | 17:45:34 | c01 | 501031 | EVENT COMMENT= COMPL STATES HE TALKED TO SGT ROBINSON FROM 1D EARLIER AND WAS TOLD HE DOES NOT |
| 01/20/06 | 17:46:16 | c01 | 501031 | EVENT COMMENT= HAVE TO BE AT THE SCENE |
| 01/20/06 | 17:47:07 | c01 | 501031 | EVENT COMMENT= COMPL STATES THE NEIGHBOR CALLED AND TOLD HIM THE POLICE AND UNKNOWN MALE AND 2 FEMALES |
| 01/20/06 | 17:47:17 | c01 | 501031 | EVENT COMMENT= ON OF THE FEMALES IS THE LANDLORD |

# Event Chronology

**Event Number: I20060035322**

| Date | Time | Term | Operat | Action |
|------|------|------|--------|--------|
| 01/20/06 | 17:56:02 | c01 | 501031 | EVENT CREATED: Location= 210 20TH ST NE DC :F/O , Cross Streets= CONSTITUTION AVE NE / C ST NE<br>, Name= MR. ANTHONY BRIDGEFORTH , Phone Number= 240-694-7153<br>EVENT COMMENT= NEED OFFICIAL TO RESPOND TO LOC IN REF TO DISPUTE WITH OFFICERS<br>ON THE SCENE<br>THE OFFICIAL CAN SEE COMPL'S WIFE (YOLANDA GETER) ON THE SCENE<br>COMPL IS IN ROUTE |
| 01/20/06 | 17:56:03 | c01 | 501031 | EVENT UPDATED: Location= 210 20TH ST NE DC :F/O , Cross Streets= CONSTITUTION AVE NE / C ST NE<br>, Name= MR. ANTHONY BRIDGEFORTH , Phone Number= 240-694-7153<br>Agency= MPD , Group= 1D , Beat= 103 , Status= P , Priority= 3 , ETA= 0 , Hold Type= 0 ,<br>Primary Member= 0 , Current= F , Open Current= F , Type Code= OTHR - OTHER<br>Agency= MPD , Group= 1D , Beat= 103 , Status= A , Priority= 3 , ETA= 0 , Hold Type= 0 ,<br>Primary Member= 0 , Current= F , Open Current= F , Type Code= OTHR - OTHER |
| 01/20/06 | 17:56:05 | cadcom | 501031 | EVENT COMMENT= ** LOI search completed at 01/20/06 17:56:05 |
| 01/20/06 | 18:01:37 | d18 | 1633 | EVENT COMMENT= Duplicate Event:Location = 210 20TH ST NE DC, Cross Street 1 = CONSTITUTION<br>AVE<br>NE C ST NE, Cross Street 2 = C ST NE, Alarm Level = 0<br>End of Duplicate Event data |
| 01/20/06 | 18:56:20 | d02 | 1665 | Agency= MPD , Group= 1D , Beat= 103 , Status= P , Priority= 3 , ETA= 0 , Hold Type= 0 ,<br>Primary Member= 0 , Current= F , Open Current= F , Type Code= OTHR - OTHER |
| 01/20/06 | 18:56:21 | d02 | 1665 | Agency= MPD , Group= 1D , Beat= 103 , Status= A , Priority= 3 , ETA= 0 , Hold Type= 0 ,<br>Primary Unit= CR130 , Primary Member= 0 , Current= F , Open Current= F , Type Code= OTHR - OTHER |
| 01/20/06 | 18:57:10 | d02 | 1665 | Agency= MPD , Group= 1D , Beat= 103 , Status= A , Priority= 3 , ETA= 0 , Hold Type= 0 ,<br>Primary Unit= CR130 , Primary Member= 0 , Current= T , Open Current= F , Type Code= OTHR - OTHER<br>EVENT CLOSED:<br>Disposition Assigned= NRT |

# Event Chronology

**Event Number:  I20060035691**

| Date | Time | Term | Operat | Action |
|------|------|------|--------|--------|
| 01/20/06 | 20:44:53 | d01 | 1628 | EVENT CREATED: Location= 210 20TH ST NE DC , Cross Streets= CONSTITUTION AVE NE / C ST NE , |
| | | | | Call Source= OFFICER |
| | | | | Agency= MPD , Group= 1D , Beat= 103 , Status= A , Priority= 3 , ETA= 0 , Hold Type= 0 , |
| | | | | Primary Member= 0 , Current= F , Open Current= F , Type Code= OTHR - OTHER |
| | | | | EVENT COMMENT= Field Event |
| 01/20/06 | 20:44:54 | cadcoml | 628 | EVENT COMMENT= ** LOI search completed at 01/20/06 20:44:54 |
| 01/20/06 | 20:48:04 | d01 | 1628 | Agency= MPD , Group= 1D , Beat= 103 , Status= P , Priority= 3 , ETA= 0 , Hold Type= 0 , |
| | | | | Primary Member= 0 , Current= F , Open Current= F , Type Code= OTHR - OTHER |
| | | | | EVENT COMMENT= ** Event held for 1 minutes and unit CR1039 |
| 01/20/06 | 20:48:05 | d01 | 1628 | Agency= MPD , Group= 1D , Beat= 103 , Status= H , Priority= 3 , ETA= 0 , Hold Type= 1 , Hold |
| | | | | Unit= CR1039 , Primary Member= 0 , Current= F , Open Current= F , Type Code= OTHR - OTHER |
| | | | | Agency= MPD , Group= 1D , Beat= 103 , Status= C , Priority= 3 , ETA= 0 , Hold Type= 1 , Hold |
| | | | | Unit= CR1039 , Cancel Comment= Duplicate and Cancel , Primary Member= 0 , Current= T , Open |
| | | | | Current= F , Type Code= OTHR - OTHER |
| | | | | EVENT CLOSED: |
| | | | | CROSS REFERENCED TO EVENT= I20060035696 |
| | | | | Disposition Assigned= DUPNCAN |
| | | | | EVENT COMMENT= ** Cross Referenced to Event # I20060035696 at: 01/20/06 20:48:05 |
| | | | | ** >>>> by: TRACEY P. WILLIAMS on terminal: d01 |

# Event Chronology

**Event Number:  I20060035696**

| **Date** | **Time** | **Term** | **Operat** | **Action** |
|---|---|---|---|---|
| 01/20/06 | 20:47:12 | c10 | 501015 | EVENT CREATED: Location= 210 20TH ST NE DC , Cross Streets= CONSTITUTION AVE NE / C ST NE , |
|  |  |  |  | Name= NEXTEL , Address= 1657 BENNING RD , Call Source= ANI/ALI , Phone Number= 301-674-7370 |
|  |  |  |  | EVENT UPDATED: Location= 210 20TH ST NE DC , Cross Streets= CONSTITUTION AVE NE / C ST NE , |
|  |  |  |  | Name= NEXTEL , Address= 1657 BENNING RD , Call Source= ANI/ALI , Phone Number= 301-674-7370 |
|  |  |  |  | Agency= MPD , Group= 1D , Beat= 103 , Status= P , Priority= 1 , ETA= 0 , Hold Type= 0 , |
|  |  |  |  | Primary Member= 0 , Current= F , Open Current= F , Type Code= BUA1 - BURGLARY ONE , SubType |
|  |  |  |  | Code= IP - IN PROGRESS |
|  |  |  |  | Agency= MPD , Group= 1D , Beat= 103 , Status= A , Priority= 1 , ETA= 0 , Hold Type= 0 , |
|  |  |  |  | Primary Unit= CR1039 , Primary Member= 2013 , Current= F , Open Current= F , Type Code= BUA1 |
|  |  |  |  | - BURGLARY ONE , SubType Code= IP - IN PROGRESS |
| 01/20/06 | 20:47:12 | cadcom | 501015 | ** LOI search completed at 01/20/06 20:47:12 |
| 01/20/06 | 20:47:12 | c10 | 501015 | EVENT COMMENT= MIC |
| 01/20/06 | 20:47:34 | c10 | 501015 | EVENT COMMENT= APARTMENT 4 |
| 01/20/06 | 20:47:51 | c10 | 501015 | EVENT COMMENT= CALLER STATES THAT SOMEONE IS TRYING TOP BREAK INTO HIS APARTMENT |
| 01/20/06 | 20:48:02 | c10 | 501015 | EVENT COMMENT= BY BREAKING HIS DOOR IN |
| 01/20/06 | 20:48:04 | d01 | 1628 | EVENT COMMENT= Duplicate Event:Location = 210 20TH ST NE DC, Cross Street 1 = CONSTITUTION |
|  |  |  |  | AVE |
|  |  |  |  | NE, Cross Street 2 = C ST NE, Type = OTHR OTHER, Call Source = OFFICER, Alarm Level = 0 |
|  |  |  |  | Field Event |
|  |  |  |  | ** LOI search completed at 01/20/06 20:44:54 |
|  |  |  |  | ** Event held for 1 minutes and unit CR1039 |
| 01/20/06 | 20:48:05 | d01 | 1628 | CROSS REFERENCED TO EVENT= I20060035691 |
|  |  |  |  | EVENT COMMENT= End of Duplicate Event data |
|  |  |  |  | ** Cross Referenced to Event # I20060035691 at: 01/20/06 20:48:05 |
|  |  |  |  | ** >>>> by: TRACEY P. WILLIAMS on terminal: d01 |
| 01/20/06 | 20:48:23 | c10 | 501015 | EVENT COMMENT= CALLER'S NAME.....ANTHONY BRIDGEFORTH |
| 01/20/06 | 20:48:35 | c10 | 501015 | EVENT COMMENT= CALLER IS IN A BEDROOM CLOSET |
| 01/20/06 | 20:49:02 | c10 | 501015 | EVENT COMMENT= CALLER WILL THROW THE KEYS OUT THE WINDOW |
| 01/20/06 | 20:49:17 | c10 | 501015 | EVENT COMMENT= TRC IS STILKL ON PHONE WITH CALLER |
| 01/20/06 | 20:50:12 | c10 | 501015 | EVENT COMMENT= PLEASE SEND AN OFFICIAL TO RESPOND |
| 01/20/06 | 20:50:18 | c10 | 501015 | EVENT COMMENT= TO THE ABOVE LOC |
| 01/20/06 | 20:50:21 | c10 | 501015 | EVENT COMMENT= POLICE ON SCENE |
| 01/20/06 | 21:08:24 | c16 | 6839 | EVENT COMMENT= Duplicate Event:Location = 210 20TH ST NE DC, Cross Street 1 = CONSTITUTION |
|  |  |  |  | AVE |
|  |  |  |  | NE C ST NE, Cross Street 2 = C ST NE, Alarm Level = 0 |
|  |  |  |  | End of Duplicate Event data |
| 01/20/06 | 21:08:55 | c06 | 501019 | EVENT COMMENT= Duplicate Event:Location = 210 20TH ST NE DC: ALIAS 210 20 ST NE DC, Cross |
|  |  |  |  | Street 1 = CONSTITUTION AVE NE C ST NE, Cross Street 2 = C ST NE, Alarm Level = 0 |
|  |  |  |  | End of Duplicate Event data |
| 01/20/06 | 22:11:41 | d02 | 1790 | Disposition Assigned= NRT |
| 01/20/06 | 23:32:53 | d02 | 1458 | Agency= MPD , Group= 1D , Beat= 103 , Status= A , Priority= 1 , ETA= 0 , Hold Type= 0 , |

| <u>Date</u> | <u>Time</u> | <u>Term</u> | <u>Operat</u> | <u>Action</u> |
|---|---|---|---|---|

Primary Unit= CR1039 , Primary Member= 2013 , Current= T , Open Current= F , Type Code=
BUA1
  - BURGLARY ONE , SubType Code= IP - IN PROGRESS
EVENT CLOSED:

# Event Chronology

**Event Number: I20060036073**

| **Date** | **Time** | **Term** | **Operat** | **Action** |
|---|---|---|---|---|
| 01/20/06 | 23:28:06 | d02 | 1458 | EVENT CREATED: Location= 210 20TH ST NE DC , 4 , Cross Streets= CONSTITUTION AVE NE / C ST NE , |
| | | | | , Call Source= OFFICER |
| | | | | Agency= MPD , Group= 1D , Beat= 103 , Status= A , Priority= 3 , ETA= 0 , Hold Type= 0 , |
| | | | | Primary Member= 0 , Current= F , Open Current= F , Type Code= SEEC - SEE COMPLAINANT , |
| | | | | SubType Code= RPT - REPORT |
| | | | | EVENT COMMENT= Field Event |
| | | | | REF A SQUATTER IN THE APT UNIT—PER CR125 |
| 01/20/06 | 23:28:07 | cadcomt | 1458 | EVENT COMMENT= ** LOI search completed at 01/20/06 23:28:07 |
| 01/20/06 | 23:30:12 | d02 | 1458 | EVENT UPDATED: Location= 210 20TH ST NE DC , 4 , Cross Streets= CONSTITUTION AVE NE / C ST NE |
| | | | | , Name= CR125 , Call Source= OFFICER |
| | | | | Agency= MPD , Group= 1D , Beat= 103 , Status= A , Priority= 3 , ETA= 0 , Hold Type= 0 , |
| | | | | Primary Unit= 1032 , Primary Member= 2077 , Current= F , Open Current= F , Type Code= SEEC - |
| | | | | SEE COMPLAINANT , SubType Code= RPT - REPORT |
| 01/20/06 | 23:59:32 | d02 | 1458 | EVENT COMMENT= SUB |
| 01/20/06 | 23:59:57 | d02 | 1458 | EVENT COMMENT= SUBJ IS KNOWN TO SMOKE PCP |
| 01/21/06 | 00:09:11 | c09 | 501008 | EVENT COMMENT= Duplicate Event:Location = 210 20TH ST NE DC, Cross Street 1 = CONSTITUTION |
| | | | | AVE |
| | | | | NE C ST NE, Cross Street 2 = C ST NE, Alarm Level = 0 |
| | | | | End of Duplicate Event data |
| 01/21/06 | 00:11:40 | c09 | 501008 | EVENT COMMENT= Duplicate Event:Location = 210 20TH ST NE DC, Cross Street 1 = CONSTITUTION |
| | | | | AVE |
| | | | | NE C ST NE, Cross Street 2 = C ST NE, Alarm Level = 0 |
| | | | | End of Duplicate Event data |
| 01/21/06 | 00:19:46 | c09 | 501008 | EVENT COMMENT= UCT HOWELL K. |
| 01/21/06 | 01:44:00 | d15 | 1459 | Disposition Assigned= NRT |
| 01/21/06 | 01:44:01 | d15 | 1459 | Agency= MPD , Group= 1D , Beat= 103 , Status= A , Priority= 3 , ETA= 0 , Hold Type= 0 , |
| | | | | Primary Unit= 1032 , Primary Member= 2077 , Current= T , Open Current= F , Type Code= SEEC - |
| | | | | SEE COMPLAINANT , SubType Code= RPT - REPORT |
| | | | | EVENT CLOSED: |

# EXHIBIT 23

Williams, J. B. #02\

**Metropolitan Police Department**

## Incident-Based Event Report

Washington, D.C.

**PART I - CLASSIFICATION OF EVENT**

| 1 TYPE OF REPORT | 2 DATE AND TIME OF EVENT | 3 DATE OF REPORT | 4 TIME OF REPORT | 5 6 7 DISTRICT | SECTOR | BEAT | 8 COMPLAINT NUMBER |
|---|---|---|---|---|---|---|---|

Start Date / Start Time / End Date / End Time — 2006 12 20

- Offense
- ● Incident

DATE OF REPORT: 2006 13 00

**FILL IN THE OVALS COMPLETELY**

Right Mark ●
Wrong Marks ⊘ ⊗ ●

DISTRICT 1 — SECTOR 03 — BEAT 00 — COMPLAINT NUMBER 8952

| 9 EVENT LOCATION ADDRESS | 10 REPORT RECEIVED BY | 11 IS RADIO RUN LOCATION AND EVENT LOCATION THE SAME? | 12 PROPERTY TYPE |
|---|---|---|---|
| 210 20th St. NE #4 | TRU / On-scene / Walk-in / Radio run | ● Yes  No | ● Public  Private |

Rear of / In front of / Along side of / Inside of — NW Corner / NE Corner / SW Corner / SE Corner

| 13 EVENT NO. 1 | 14 EVENT NO. 2 | 15 EVENT NO. 3 |
|---|---|---|
| Miscellaneous Report | | |

| 16 FORCED ENTRY | 17 POINT OF ENTRY | 18 a. Method Used | b. Tools Used | 19 WEATHER CONDITIONS |
|---|---|---|---|---|
| Yes ● No | | | | Clear / Cloudy — Rain / Snow — Other / ● Not applicable — Unknown |

**20 SUSPECTED HATE CRIME?**
● None  Ethnic  Sexual Orientation  Racial  Religious  Other

**21 SECURITY SYSTEM (Mark all that apply)**
Alarm/Audio  Camera  Dead bolt  Exterior lights  Fence  Neighborhood watch  Not applicable
Alarm/Silent  Dog  Unlocked  Interior lights  Guard  Unknown

**22 LOCATION TYPE (Mark only one)**
Air/Bus/Train terminal
Alley
Bank/Savings & loan
Bus stop
Church/Synagogue/Temple
College/University
Commercial office building
Construction site
Convenience store
Department/Discount store
D.C. government building

Doctor's office/Hospital
Drug store
Federal/Government bldg.
Field/Woods
Grocery/Supermarket
Hotel/Motel/Etc.
Jail/Prison
Lake/Waterway
Liquor store
Park area
Parking lot/Parking garage
Public housing project

Public/Private school
Rental storage facility
Residence/Home
Restaurant
Service station
Sidewalk
Specialty store
Street/Highway/Road
Tavern/Night club
Other
Not applicable
Unknown

**23 DESIGNATED AREAS (Mark all that apply)**
Victim's vehicle
Suspect's vehicle
Taxi-cab
Bus
Train/Metro/Amtrak/Etc.
Hallway
Elevator
Stairwell
Basement/Laundry room

Apartment/Condo unit
Single family dwelling
Hotel/Motel room
College/University dorm
Classroom
Office room
Vacant building/room
Customer area
Storage area

In public
W/in 1 block of public housing
W/in 1,000 ft. of school
Other
Not applicable
Unknown

**PART II - VICTIM INFORMATION**

| 24 NAME OF COMPLAINANT/VICTIM/MISSING PERSON NO. 1 | 25 RELATED TO EVENT NO(S). |
|---|---|
| Bridgeforth, Anthony | ● 2  3  4  5 / 6  7  8  9  10 |

**26 VICTIM TYPE**
● Individual  Financial inst.  Religious org.  Police officer
Business  Government  Society/Public  Other

| 27 DATE OF BIRTH | 28 AGE RANGE | 29 SEX | 30 HOME PHONE |
|---|---|---|---|
| 16 69 — Unknown / NA | 0-1 yr. / 2-12 yrs. / 13-17 yrs. / 18-65 yrs. / Over 65 | ● Male  Female  Unknown | ( ) No Phone |

| 31 BUSINESS PHONE |
|---|
| ( ) N/A |

**32 RACE/ETHNICITY (Mark all that apply)**
American Indian/Alaskan Native  Japanese
Asian/Pacific Islander  Korean
● Black  Vietnamese
Chinese  White
Latino/Hispanic  Other
Jamaican  Unknown/Refused

| 33 HOME ADDRESS | ● DC Resident  Non-DC Resident  Unknown |
|---|---|
| 210 20th St. NE #4 | |

| 34 BUSINESS ADDRESS/SCHOOL |
|---|
| N/A |

| 35 OCCUPATION | 36 IS EVENT RELATED TO OCCUPATION? |
|---|---|
| | Yes  No |

| 37 ADDITIONAL MEANS TO CONTACT COMPLAINANT/VICTIM NO. 1 |
|---|

| 38 NAME OF COMPLAINANT/VICTIM/MISSING PERSON NO. 1 | 39 RELATED TO EVENT NO(S). |
|---|---|
| Bronson, Khadijah | ● 2  3  4  5 / 6  7  8  9  10 |

**40 VICTIM TYPE**
● Individual  Financial inst.  Religious org.  Police officer
Business  Government  Society/Public  Other

| 41 DATE OF BIRTH | 42 AGE RANGE | 43 SEX | 44 HOME PHONE |
|---|---|---|---|
| Unknown / NA | 0-1 yr. / 2-12 yrs. / 13-17 yrs. / 18-65 yrs. / Over 65 | Male  ● Female  Unknown | (202) 277-1772 Cell |

| 45 BUSINESS PHONE |
|---|
| ( ) |

**46 RACE/ETHNICITY (Mark all that apply)**
American Indian/Alaskan Native  Japanese
Asian/Pacific Islander  Korean
● Black  Vietnamese
Chinese  White
Latino/Hispanic  Other
Jamaican  Unknown/Refused

| 47 HOME ADDRESS | ● DC Resident  Non-DC Resident  Unknown |
|---|---|
| 1050 4th St. NE    20019 | |

| 48 BUSINESS ADDRESS/SCHOOL |
|---|

| 49 OCCUPATION | 50 IS EVENT RELATED TO OCCUPATION? |
|---|---|
| | Yes  No |

| 51 ADDITIONAL MEANS TO CONTACT COMPLAINANT/VICTIM NO. 1 |
|---|

| 52 STATUS (Mark one) | 53 REVIEWER |
|---|---|
| Open / ● Closed / Unfounded / Suspended / Closed by arrest, attach PD-252 | R. Tay — Attachment 1 |

**55** IS VICTIM #1 THE REPORTING PERSON? IF NO, ENTER THE NAME, ADDRESS AND PHONE NUMBER OF THE REPORTING PERSON.
○ Yes  ○ No

Name: _____
Address: _____

Phone-Area Code: _____

**56** DID THE REPORTED EVENT OCCUR AS A RESULT OF AN INTRA-FAMILY MATTER?
○ Yes  ● No

**56A** WAS PD FORM 378A ISSUED?
○ Yes  ○ No

**57** IS CPO/TPO OUTSTANDING?
○ Yes  ○ No  ○ Unknown

IF YES, ENTER CPO/TPO #:

**58** INJURIES  Use the following codes to describe injuries. (Mark all that apply)

N = None Visible
M = Apparent Minor Injury
B = Apparent Broken Bones

O = Other Major Injury
I = Possible Internal Injury
G = Gunshot

L = Severe Laceration
T = Loss of Teeth
U = Unconscious

| INJURED | NUMBER | INJURY CODE | DESCRIBE INJURY | WHERE TAKEN | BY WHOM | DCFD AMB. | DCFD AMB.# | STATUS |
|---|---|---|---|---|---|---|---|---|
| ○ Victim | ① ② ③ ④ ⑤ | N M L B I O T U | | | | ○ Yes | | ○ Admitted |
| ○ Suspect | ① ② ③ ④ ⑤ | N M L B I O T U | | | | ○ No | | ○ Released |
| ○ Victim | ① ② ③ ④ ⑤ | N M L B I O T U | | | | ○ Yes | | ○ Admitted |
| ○ Suspect | ① ② ③ ④ ⑤ | N M L B I O T U | | | | ○ No | | ○ Released |
| ○ Victim | ① ② ③ ④ ⑤ | N M L B I O T U | | | | ○ Yes | | ○ Admitted |
| ○ Suspect | ① ② ③ ④ ⑤ | N M L B I O T U | | | | ○ No | | ○ Released |
| ○ Victim | ① ② ③ ④ ⑤ | N M L B I O T U | | | | ○ Yes | | ○ Admitted |
| ○ Suspect | ① ② ③ ④ ⑤ | N M L B I O T U | | | | ○ No | | ○ Released |

**PART III - PROPERTY**

**59** Codes
S = Stolen
E = Evidence
R = Recovered
F = Found

I = Impounded
V = Vehicle from which theft occurred
D = Alleged drug type

L = Lost
P = Suspected proceeds of crime
O = Other

a. Property Book & Page No.

b. Location of Property Book

| Code | Description of Item(s) | Serial Number/ Operation ID No. | Model No. | Color | Size | Quantity | Comp. Value | Age | MPDC Value |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**60** VEHICLE INFORMATION  Vehicle operated/used by:  ○ Victim  ○ Suspect  ○ Victim's vehicle taken by suspect

| Code | Year | Make | Model | Color | Body | Tag No./State/Year | VIN |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

**PART IV - SUSPECT/MISSING PERSON INFORMATION (Use narrative if additional space is needed.)**

**61**  #1  ○ Suspect  ○ Missing

| a. Race | b. Sex | c. Exact Age or Range | d. Height | e. Weight | f. Eyes | g. Hair |
|---|---|---|---|---|---|---|
| ○ Asian ○ White ○ Black ○ Latino/Hispanic ○ Unknown ○ Other | ○ Male ○ Unknown ○ Female | | | | | |

| h. Complexion | i. Scars | j. Mustache | k. Facial Hair | l. Hat | m. Coat/Jacket | n. Pants | o. Blouse/Shirt | p. Perpetrator Suspected of Using |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | ○ Alcohol ○ Drugs ○ Computer ○ N/A |

q. Weapons Used in Offense (Mark all that apply)

| Firearm | Other | | Color | Make | Model | Caliber |
|---|---|---|---|---|---|---|
| ○ Handgun ○ Shotgun ○ Other ○ Revolver ○ Semi-automatic firearm ○ Rifle ○ Automatic | ○ Cutting instrument ○ Hands/Feet/Teeth ○ Other (specify) ○ Blunt object ○ None ○ Motor vehicle ○ Unknown | | | | | |

**62**  #2  ○ Suspect  ○ Missing

| a. Race | b. Sex | c. Exact Age or Range | d. Height | e. Weight | f. Eyes | g. Hair |
|---|---|---|---|---|---|---|
| ○ Asian ○ White ○ Black ○ Latino/Hispanic ○ Unknown ○ Other | ○ Male ○ Unknown ○ Female | | | | | |

| h. Complexion | i. Scars | j. Mustache | k. Facial Hair | l. Hat | m. Coat/Jacket | n. Pants | o. Blouse/Shirt | p. Perpetrator Suspected of Using |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | ○ Alcohol ○ Drugs ○ Computer ○ N/A |

q. Weapons Used in Offense (Mark all that apply)

| Firearm | Other | | Color | Make | Model | Caliber |
|---|---|---|---|---|---|---|
| ○ Handgun ○ Shotgun ○ Other ○ Revolver ○ Semi-automatic firearm ○ Rifle ○ Automatic | ○ Cutting instrument ○ Hands/Feet/Teeth ○ Other (specify) ○ Blunt object ○ None ○ Motor vehicle ○ Unknown | | | | | |

**63**  #3  ○ Suspect  ○ Missing

| a. Race | b. Sex | c. Exact Age or Range | d. Height | e. Weight | f. Eyes | g. Hair |
|---|---|---|---|---|---|---|
| ○ Asian ○ White ○ Black ○ Latino/Hispanic ○ Unknown ○ Other | ○ Male ○ Unknown ○ Female | | | | | |

| h. Complexion | i. Scars | j. Mustache | k. Facial Hair | l. Hat | m. Coat/Jacket | n. Pants | o. Blouse/Shirt | p. Perpetrator Suspected of Using |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | ○ Alcohol ○ Drugs ○ Computer ○ N/A |

q. Weapons Used in Offense (Mark all that apply)

| Firearm | Other | | Color | Make | Model | Caliber |
|---|---|---|---|---|---|---|
| ○ Handgun ○ Shotgun ○ Other ○ Revolver ○ Semi-automatic firearm ○ Rifle ○ Automatic | ○ Cutting instrument ○ Hands/Feet/Teeth ○ Other (specify) ○ Blunt object ○ None ○ Motor vehicle ○ Unknown | | | | | |

*Value of vehicles to be entered by Information Processing section

CCN 008-952

**PART V - MISSING PERSONS**

**64** PROBABLE CAUSE OF ABSENCE AND DESTINATION

**65** COMPLAINT NUMBER

0 0 8 9 5 2

**66** IF MISSING PERSON HAS RUN AWAY BEFORE, GIVE DATE AND WHERE LOCATED:

**67** CLASSIFICATION

Critical
Non-critical

**68** CLASSIFIED BY:

**69** PHYSICAL/MENTAL CONDITION (i.e., diabetic)

**70** DESCRIBE ARTICLES OF JEWELRY WORN AND IDENTIFICATION CARRIED

**71** NAME OF PARENT/GUARDIAN

**72** ADDRESS OF PARENT/GUARDIAN

**73** IF JUVENILE, ENTER MOTHER'S MAIDEN NAME

**74** MISSING PERSON SECTION NOTIFIED (Name)

**75** NARRATIVE    Describe event and action taken. If additional narrative space is needed, use PD Form 251-A.

Item Number Continued

ON 01-20-06 at approximately 1200 hrs., C1 (tenant) and C2 (Landlord) were having a dispute.

C2 states that C1 should not be at the above location because C1 did not signed a lease, and C1 stated that he has permission from Section 8 to be there and the rent has been paid through January 31st. C1 states that he opt-out of his lease and will be out by the end of January.

**76** EVIDENCE TECHNICIAN/CSES #

**77** NAME OF INVESTIGATOR NOTIFIED

**78** TELETYPE NOTIFIED (Name)

NOTIFICATION ALSO REQUIRED WHENEVER MISSING PERSON LOCATED

**79** TELETYPE #

**80** REPORTING OFFICER'S SIGNATURE

Jeannette E. Williams

**ELEMENT** ID

BADGE NUMBER

**81** OTHER POLICE AGENCY (indicate if report prepared by officer other than MPD)

USCP
USSS
METRO TRANSIT
OTHER

**82** SECOND OFFICER'S NAME

BADGE NUMBER

**ELEMENT**

**83** SIGNATURE OF SUPERVISOR

Sgt. MALDON

BADGE NUMBER

**ELEMENT** 101

PAGE 3

**PART VI - ADDITIONAL INFORMATION** (Use PD Form 251-C for additional victims or suspects.)

| NAME OF COMPLAINANT/VICTIM/MISSING PERSON NO. 1 | 85 RELATED TO EVENT NO(S). |
| --- | --- |
| | 1  2  3  4  5 |
| | 6  7  8  9  10 |

| 98 NAME OF COMPLAINANT/VICTIM/MISSING PERSON NO. 1 | 99 RELATED TO EVENT NO(S). |
| --- | --- |
| | 1  2  3  4  5 |
| | 6  7  8  9  10 |

**VICTIM TYPE**

| Individual | Financial inst. | Religious org. | Police officer |
| --- | --- | --- | --- |
| Business | Government | Society/Public | Other |

100 **VICTIM TYPE**

| Individual | Financial inst. | Religious org. | Police officer |
| --- | --- | --- | --- |
| Business | Government | Society/Public | Other |

**DATE OF BIRTH** 88 | **AGE RANGE** 89 | **SEX** 90 | **HOME PHONE**

Unknown        NA

| Month | Day | Year |
| --- | --- | --- |
| Jan | | |
| Feb | | |
| Mar | 0  0 | 0  0 |
| Apr | 1  1 | 1  1 |
| May | 2  2 | 2  2 |
| Jun | 3  3 | 3  3 |
| Jul | 4 | 4  4 |
| Aug | 5  5 | 5  5 |
| Sep | 6  6 | 6  6 |
| Oct | 7  7 | 7  7 |
| Nov | 8  8 | 8  8 |
| Dec | 9 | 9  9 |

AGE RANGE: 0-1 yr. / 2-12 yrs. / 13-17 yrs. / 18-65 yrs. / Over 65

SEX: Male / Female / Un-known

91 **BUSINESS PHONE** (    )

92 **RACE/ETHNICITY (Mark all that apply)**

| American Indian/Alaskan Native | Japanese |
| --- | --- |
| Asian/Pacific Islander | Korean |
| Black | Vietnamese |
| Chinese | White |
| Latino/Hispanic | Other |
| Jamaican | Unknown/Refused |

101 **DATE OF BIRTH** | 102 **AGE RANGE** | 103 **SEX** 104 | **HOME PHONE**

Unknown        NA

| Month | Day | Year |
| --- | --- | --- |
| Jan | | |
| Feb | | |
| Mar | 0  0 | 0  0 |
| Apr | 1  1 | 1  1 |
| May | 2  2 | 2  2 |
| Jun | 3  3 | 3  3 |
| Jul | 4  4 | 4 |
| Aug | 5  5 | 5 |
| Sep | 6  6 | 6 |
| Oct | 7  7 | 7 |
| Nov | 8  8 | 8 |
| Dec | | 9  9 |

AGE RANGE: 0-1 yr. / 2-12 yrs. / 13-17 yrs. / 18-65 yrs. / Over 65

SEX: Male / Female / Un-known

105 **BUSINESS PHONE** (    )

106 **RACE/ETHNICITY (Mark all that apply)**

| American Indian/Alaskan Native | Japanese |
| --- | --- |
| Asian/Pacific Islander | Korean |
| Black | Vietnamese |
| Chinese | White |
| Latino/Hispanic | Other |
| Jamaican | Unknown/Refused |

83 **HOME ADDRESS**        DC Resident        Non-DC Resident        Unknown

107 **HOME ADDRESS**        DC Resident        Non-DC Resident        Unknown

84 **BUSINESS ADDRESS/SCHOOL**

108 **BUSINESS ADDRESS/SCHOOL**

85 **OCCUPATION** | 96 **IS EVENT RELATED TO OCCUPATION?** Yes  No  Unknown

109 **OCCUPATION** | 110 **IS EVENT RELATED TO OCCUPATION?** Yes  No  Unknown

97 **ADDITIONAL MEANS TO CONTACT COMPLAINANT/VICTIM NO. 1**

111 **ADDITIONAL MEANS TO CONTACT COMPLAINANT/VICTIM NO. 1**

---

112 **#1** | a. Race | b. Sex | c. Exact Age or Range | d. Height | e. Weight | f. Eyes | g. Hair

Suspect / Missing | Asian  White  Unknown / Black  Latino/Hispanic  Other | Male  Unknown / Female |

| h. Complexion | i. Scars | j. Mustache | k. Facial Hair | l. Hat | m. Coat/Jacket | n. Pants | o. Blouse/Shirt | p. Perpetrator Suspected of Using |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | | Alcohol  Drugs |
| | | | | | | | | Computer  N/A |

q. Weapons Used in Offense (Mark all that apply) | Color | Make | Model | Caliber

| Firearm | | | Color | Make | Model | Caliber |
| --- | --- | --- | --- | --- | --- | --- |
| Handgun  Shotgun  Other | Cutting instrument  Other Hands/Feet/Teeth  Other (specify) | | | | | |
| Revolver  Semi-automatic  firearm | Blunt object  None | | | | | |
| Rifle  Automatic | Motor vehicle  Unknown | | | | | |

113 **#2** | a. Race | b. Sex | c. Exact Age or Range | d. Height | e. Weight | f. Eyes | g. Hair

Suspect / Missing | Asian  White  Unknown / Black  Latino/Hispanic  Other | Male  Unknown / Female |

| h. Complexion | i. Scars | j. Mustache | k. Facial Hair | l. Hat | m. Coat/Jacket | n. Pants | o. Blouse/Shirt | p. Perpetrator Suspected of Using |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | | Alcohol  Drugs |
| | | | | | | | | Computer  N/A |

q. Weapons Used in Offense (Mark all that apply) | Color | Make | Model | Caliber

| Firearm | | | Color | Make | Model | Caliber |
| --- | --- | --- | --- | --- | --- | --- |
| Handgun  Shotgun  Other | Cutting instrument  Other Hands/Feet/Teeth  Other (specify) | | | | | |
| Revolver  Semi-automatic  firearm | Blunt object  None | | | | | |
| Rifle  Automatic | Motor vehicle  Unknown | | | | | |

114 **#3** | a. Race | b. Sex | c. Exact Age or Range | d. Height | e. Weight | f. Eyes | g. Hair

Suspect / Missing | Asian  White  Unknown / Black  Latino/Hispanic  Other | Male  Unknown / Female |

| h. Complexion | i. Scars | j. Mustache | k. Facial Hair | l. Hat | m. Coat/Jacket | n. Pants | o. Blouse/Shirt | p. Perpetrator Suspected of Using |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | | Alcohol  Drugs |
| | | | | | | | | Computer  N/A |

q. Weapons Used in Offense (Mark all that apply) | Color | Make | Model | Caliber

| Firearm | | | Color | Make | Model | Caliber |
| --- | --- | --- | --- | --- | --- | --- |
| Handgun  Shotgun  Other | Cutting instrument  Other Hands/Feet/Teeth  Other (specify) | | | | | |
| Revolver  Semi-automatic  firearm | Blunt object  None | | | | | |
| Rifle  Automatic | Motor vehicle  Unknown | | | | | |

# EXHIBIT 24

METROPOLITAN POLICE DEPARTMENT
WASHINGTON, D.C.

OFFICER

JEANNETTE E. WILLIAMS
BADGE #527

FIRST DISTRICT
SUBSTATION
500 E ST., SE
WASHINGTON, DC 20002
(202) 698-0068
CCN 203-752
DATE 1-20-06
Landlord/Tenant

AB00011

# EXHIBIT 25

# DISTRICT OF COLUMBIA
# HOUSING AUTHORITY
# LEASE-UP PACKAGE



## *CHECKLIST*

### PLEASE INITIAL AS VERIFICATION THAT THE FOLLOWING ITEMS ARE INCLUDED

| FRONT DESK INITIALS | LANDLORD INITIALS | REQUIRED DOCUMENTS |
|---|---|---|
| _____ | _____ | **Request for Tenancy Approval** (Make sure Utility Responsibility Data is correct and all boxes are completed) |
| _____ | _____ | Payment Information Form |
| _____ | _____ | W-9 Forms (one for the owner and one for the management company, if applicable) |
| _____ | _____ | Copy of Recorded Deed in the Housing Choice Voucher Program |
| _____ | _____ | Copy of Standard Lease **that has NOT been dated or signed**. |
| _____ | _____ | Management Agreement (required if owner is different from the landlord) |
| _____ | _____ | Basic Section 8 Program Inspection Division Housing Standards |

---

**AGENT/OWNER use only**

### THIS COMPLETED PACKET MUST BE RETURNED TO BEGIN THE LEASING PROCESS.

Please be sure your unit complies with the District of Columbia Housing Code(s) and the U.S. Department of Housing and Urban Development (HUD) Housing Quality Standards (see attached "Notice to all Landlords and Tenants").

### OWNER'S CERTIFICATION STATEMENT

This is to certify that with submission of this "Lease-Up" package I am stating that this unit is ready to be inspected by a Housing Choice Voucher Inspector.

Agent/Owner Signature _____ Date _____

Agent/Owner daytime Phone # _____

**Agent/Owner will be contacted upon selection of inspection date.**

**DISTRICT OF COLUMBIA HOUSING AUTHORITY**
**HOUSING CHOICE VOUCHER PROGRAM**
**LEASING DIVISION**

**LEASE-UP CHECKLIST**

EXHIBIT
*11-6-07*
*KB #4*

Tenant Name: *Anthony Bridgeforth*

Unit Address: *210 20th St NE #4*

Telephone #: Residence _____ Business: _____

Program: Voucher/MOD #*V0079-0128* Unit Size *1*

Lease-up Effective *12-1-05* Recertification Month *Apr.*

| | |
|---|---|
| ✓ | CONTRACT RENT *$1052* |
| ✓ | TENANT RENT *— 0 —* |
| ✓ | HAP PAYMENT *1052* |
| | UTILITY REIMBURSEMENT |
| ✓ | COLLATERAL SHEET |
| ✓ | LEASEUP (CHECK ONE) NEW        TRANSFER ✓ |
| ✓ | CONTRACT |
| ✓ | RENT DETERMINATION LETTER(PARTICIPANT) |
| ✓ | RENT DETERMINATION LETTER (HOUSING PROVIDER) |
| ✓ | HUD 50058 |
| ✓ | LEASE (EXECUTED BY PARTICIPANT& HOUSING PROVIDER) |
| | LEASE ADDENDUM |
| ✓ | LEAD BASED PAINT ADDENDUM |
| ✓ | UTILITY ALLOWANCE CHART |
| ✓ | RENT REASONABLENESS CERTIFICATION |
| ✓ | PASSED INSPECTION BOOKLET |
| ✓ | REQUEST FOR TENANCY APPROVAL PACKAGE |
| ✓ | NOTICE OF INTENT TO VACATE(IF APPLICABLE) |
| | CLIENT PLACEMENT DOCUMENTS |
| | MISCELLANEOUS DOCUMENTS |
| | OTHER |

My signature of this lease-up checklist certifies that I personally reviewed this file and ensure that it contains all required documents and signatures related to this clients lease-up.

*Carolyn Foust*                    *1-4-06*
LEASE-UP PREPARED BY              DATE

My signature to this lease-up checklist certifies that I personally reviewed this file and ensure that it contains all required documents and signatures related to this clients lease-up.

_____     _____
SUPERVISORY SIGNATURE              DATE

# EXHIBIT 26

# Request for Tenancy Approval
## Housing Choice Voucher Program

**U.S. Department of Housing
and Urban Development**
Office of Public and Indian Housing

OMB Approval No. 2577-0169
(exp. 03/31/2004)

Public reporting burden for this collection of information is estimated to average .08 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless that collection displays a valid OMB control number.

Eligible families submit this information to the Public Housing Authority (PHA) when applying for housing assistance under Section 8 of the U.S. Housing Act of l937 (42 U.S.C. 1437f). The PHA uses the information to determine if the family is eligible, if the unit is eligible, and if the lease complies with program and statutory requirements. Responses are required to obtain a benefit from the Federal Government. The information requested does not lend itself to confidentiality.

| 1. Name of Public Housing Agency (PHA) | 2. Address of Unit (street address, apartment number, city, State & zip code) |
|---|---|
| District of Columbia Housing Authority<br>Housing Choice Voucher Program<br>New Project-Based Voucher Leasing Package | |

| 3. Requested Beginning Date of Lease | 4. Number of Bedrooms | 5. Year Constructed | 6. Proposed Rent | 7. Security Deposit Amt. | 8. Date Unit Available for Inspection |
|---|---|---|---|---|---|
| | | | | | |

**9. Type of House/Apartment**

☐ Single Family Detached  ☐ Semi-Detached / Row House  ☐ Manufactured Home  ☒ Garden / Walkup  ☐ Elevator / High-Rise

**10. If this unit is subsidized, indicate type of subsidy:**

☐ Section 202  ☐ Section 221(d)(3)(BMIR)  ☐ Section 236 (Insured or noninsured)  ☐ Section 515 Rural Development

☐ Home  ☐ Tax Credit

☐ Other (Describe Other Subsidy, Including Any State or Local Subsidy) _____

**11. Utilities and Appliances**

The owner shall provide or pay for the utilities and appliances indicated below by an "O". The tenant shall provide or pay for the utilities and appliances indicated below by a "T". Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Specify fuel type | | | | | Provided by | Paid by |
|---|---|---|---|---|---|---|---|
| Heating | ☒ Natural gas | ☐ Bottle gas | ☐ Oil | ☐ Electric | ☐ Coal or Other | | T |
| Cooking | ☒ Natural gas | ☐ Bottle gas | ☐ Oil | ☐ Electric | ☐ Coal or Other | O | |
| Water Heating | ☒ Natural gas | ☐ Bottle gas | ☐ Oil | ☐ Electric | ☐ Coal or Other | O | O |
| Other Electric | | | | | | | T |
| Water | | | | | | | T |
| Sewer | | | | | | O | O |
| Trash Collection | | | | | | O | O |
| Air Conditioning | | | | | | O | O |
| Refrigerator | | | | | | T | T |
| Range/Microwave | | | | | | O | O |
| Other (specify) | | | | | | | T |

EXHIBIT
11-6-07
KB #5

Previous editions are obsolete

Page 1 of 2

form HUD-52517 (06/2003)
ref. Handbook 7420.8

12. Owner's Certifications.

a. The program regulation requires the PHA to certify that the rent charged to the housing choice voucher tenant is not more than the rent charged for other unassisted comparable units. **Owners of projects with more than 4 units must complete the following section for most recently leased comparable unassisted units within the premises.**

| Address and unit number | Date Rented | Rental Amount |
|---|---|---|
| 1. ⟨illegible⟩ NE #4 | Dec 1 | |
| 2. | | |
| 3. | | |

b. The owner (including a principal or other interested party) is not the ~~parent, child, grandparent, grandchild, sister or brother of any member of the family,~~ unless the PHA has determined (and has notified the owner and the family of such determination) that approving leasing of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

c. Check one of the following:

_✓_ Lead-based paint disclosure requirements do not apply because this property was built on or after January 1, 1978.

_____ The unit, common areas servicing the unit, and exterior painted surfaces associated with such unit or common areas have been found to be lead-based paint free by a lead-based paint inspector certified under the Federal certification program or under a federally accredited State certification program.

_____ A completed statement is attached containing disclosure of known information on lead-based paint and/or lead-based paint hazards in the unit, common areas or exterior painted surfaces, including a statement that the owner has provided the lead hazard information pamphlet to the family.

13. **The PHA has not screened the family's behavior or suitability for tenancy. Such screening is the owner's own responsibility.**

14. The owner's lease must include word-for-word all provisions of the HUD tenancy addendum.

15. The PHA will arrange for inspection of the unit and will notify the owner and family as to whether or not the unit will be approved.

---

| Khadijah Branson | |
|---|---|
| Print or Type Name of Owner/Owner Representative | Print or Type Name of Household Head |
| _(signature)_ | |
| Signature | Signature (Household Head) |
| 1651 45th St NE Box 2011 | |
| Business Address | Present Address of Family (street address, apartment no., city, State, & zip code) |
| 202-277 1773     1/11/06 | |
| Telephone Number     Date (mm/dd/yyyy) | Telephone Number     Date (mm/dd/yyyy) |



form HUD-52517  (06/2003)
ref. Handbook 7420.8

# Request for Tenancy Approval
## Housing Choice Voucher Program

**U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing**

OMB Approval No. 2577-0169
(exp. 03/31/2004)

Public reporting burden for this collection of information is estimated to average .08 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless that collection displays a valid OMB control number.

Eligible families submit this information to the Public Housing Authority (PHA) when applying for housing assistance under Section 8 of the U.S. Housing Act of 937 (42 U.S.C. 1437f). The PHA uses the information to determine if the family is eligible, if the unit is eligible, and if the lease complies with program and statutory requirements. Responses are required to obtain a benefit from the Federal Government. The information requested does not lend itself to confidentiality.

| 1. Name of Public Housing Agency (PHA) | 2. Address of Unit (street address, apartment number, city, State & zip code) |
|---|---|
| District of Columbia Housing Authority<br>Housing Choice Voucher Program<br>Transfer Regular Voucher Leasing Package | 210 20th St NE #2 ℗m<br>W.D.C 20002 |

| 3. Requested Beginning Date of Lease | 4. Number of Bedrooms | 5. Year Constructed | 6. Proposed Rent | 7. Security Deposit Amt. | 8. Date Unit Available for Inspection |
|---|---|---|---|---|---|
| ASAP | 2 | 1950 | $1200 /m | $500 | ASAP |

**9. Type of House/Apartment**

☐ Single Family Detached ☐ Semi-Detached / Row House ☐ Manufactured Home ☐ Garden / Walkup ☐ Elevator / High-Rise

**10. If this unit is subsidized, indicate type of subsidy:**

☐ Section 202 ☐ Section 221(d)(3)(BMIR) ☐ Section 236 (Insured or noninsured) ☐ Section 515 Rural Development

☐ Home ☐ Tax Credit

☐ Other (Describe Other Subsidy, Including Any State or Local Subsidy) _____

**11. Utilities and Appliances**

The owner shall pay or pay for the utilities and appliances indicated below by an "O". The tenant shall provide or pay for the utilities and appliances indicated below by a "T". Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Specify fuel type | | | | | Provided by | Paid by |
|---|---|---|---|---|---|---|---|
| Heating | ☐ Natural gas | ☐ Bottle gas | ☐ Oil | ☐ Electric | ☐ Coal or Other | | T |
| Cooking | ☐ Natural gas | ☐ Bottle gas | ☐ Oil | ☐ Electric | ☐ Coal or Other | | T |
| Water Heating | ☐ Natural gas | ☐ Bottle gas | ☐ Oil | ☐ Electric | ☐ Coal or Other | | T |
| Other Electric | | | | | | | T |
| Water | | | | | | | T |
| Sewer | | | | | | | O |
| Trash Collection | | | | | | | O |
| Air Conditioning | | | | | | | O |
| Refrigerator | | | | | | | O |
| Range/Microwave | | | | | | | O |
| Other (specify) | | | | | | | |



EXHIBIT
11-6-07
KB #6

EXHIBIT
A



12.  Owner's Certifications.

a.      The program regulation requires the PHA to certify that the rent charged to the housing choice voucher tenant is not more than the rent charged for other unassisted comparable units. Owners of projects with more than 4 units must complete the following section for most recently leased comparable unassisted units within the premises.

| | Address and unit number | Date Rented | Rental Amount |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |

b.      The owner (including a principal or other interested party) is not the parent, child, grandparent, grandchild, sister or brother of any member of the family, unless the PHA has determined (and has notified the owner and the family of such determination) that approving leasing of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

c.  Check one of the following:

_____ Lead-based paint disclosure requirements do not apply because this property was built on or after January 1, 1978.

_____ The unit, common areas servicing the unit, and exterior painted surfaces associated with such unit or common areas have been found to be lead-based paint free by a lead-based paint inspector certified under the Federal certification program or under a federally accredited State certification program.

_____ A completed statement is attached containing disclosure of known information on lead-based paint and/or lead-based paint hazards in the unit, common areas or exterior painted surfaces, including a statement that the owner has provided the lead hazard information pamphlet to the family.

13.     The PHA has not screened the family's behavior or suitability for tenancy. Such screening is the owner's own responsibility.

14.     The owner's lease must include word-for-word all provisions of the HUD tenancy addendum.

15.     The PHA will arrange for inspection of the unit and will notify the owner and family as to whether or not the unit will be approved.

Print or Type Name of Owner/Owner Representative

Khadyah Brown

Signature

Business Address  1050 45th St NE

| Telephone Number  2/277-1772 | Date (mm/dd/yyyy)  11/4/05 |
|---|---|

Print or Type Name of Household Head

Anthony Bridgeforth

Signature (Household Head)

Present Address of Family (street address, apartment no., city, State, & zip code)  5108 Hayes St NE

| Telephone Number  (202) 413-3300 | Date (mm/dd/yyyy)  11/4/2005 |
|---|---|

form HUD-52517  (06/2003)
ref. Handbook 7420.8

# EXHIBIT 27

# District of Columbia Housing Choice Voucher Program
## Lease Information Form

Please review this form carefully. This form is not a lease. The purpose of this form is to capture required information contained in the executed lease. This is a required form to be completed at the time of participant lease-up and included in the participant file as part of their occupancy package.

### Lease Information

1.  **Contract Unit:** (enter address of unit( must include zip code) including apartment number, if any)

    _210 20th St NE #4_

2.  **Tenant:** (Enter full name and social security number of the head of household)

    _Anthony Bridgeforth - 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_

    **Unit Type / Check One:**

    Apartment Walk-Up     Apartment High Rise     Semi-Detached House     Interior Row     Detached House
    Duplex

    **Ward / Check One:**

    Ward 1     Ward 2     Ward 3     Ward 4     Ward 5     Ward 6     Ward 7     Ward 8

3.  **Owner/Landlord:** (Enter name and address of Owner/Landlord (if applicable)

    _Khadyar Brim     1050 45th St NE, 2001_

4.  **Initial Term:** The initial term of lease must be at least one year unless a shorter term is approved by HCVP.

    The initial term begins on _12-1-05_

    The initial term ends on _11-30-06_

    Following the initial term of the lease, the lease will be renewed automatically on a
    (You must check one)   **Month-to-month**          **Indefinite duration basis until:**
    a. termination of the lease by the Owner/Landlord in accordance with this lease;
    b. termination of the lease by the tenant in accordance with this lease;
    c. mutual agreement between the Owner/Landlord and tenant to terminate the lease during the term of the lease;
    d. termination of the Housing Assistance Payments Contract by HCVP;
    e. termination of the tenant family's assistance by HCVP.

    Owner/Landlord Initial _KB_          Participant Initial _AB_

5.  **Household Members:** (Enter the full names of all family members.)

    | | |
    |---|---|
    | Anthony Bridgeforth | SELF |
    | | |
    | | |
    | | |



The family must promptly inform HCVP of the birth, adoption, or court-awarded custody of a child. No other person may reside in the unit without prior written approval by the Owner/Landlord **and** HCVP.

# District of Columbia Housing Choice Voucher Program
## Lease Information Form

HCVP **Approved Rent to Owner/Landlord** (total monthly rent):     $ *1052*

   a.   Tenant Rent to Owner/Landlord:     $ — 0 —

   b.   Housing Assistance Payment to Owner/Landlord:     $ *1052*

**Owner/Landlord and Tenant in Agreement that after the initial term of the lease the Owner/Landlord can request a rent increase?**

*Owner/Landlord Initials* _____     *Participant Initials* _____*AB*_____

The total rent to Owner/Landlord is the initial rent for this unit. The housing assistance payment to Owner/Landlord shall be payable by HCVP as housing assistance payments on behalf of the tenant. The tenant rent to Owner/Landlord shall be payable by the tenant directly to the Owner/Landlord/Management Company.

The Owner/Landlord can request a rent increase after the initial term of the lease. The Owner/Landlord must give HCVP, 90 days prior to their family annual recertification date, written notice before commencement of any change in rent. The notice shall state the proposed new rental amount and the date the new rental amount will be effective. The Owner/Landlord may not change the rent without HCVP approval. The Owner/Landlord may not make side deals to charge additional amounts to the tenant. All rent increase requests are subject to Housing Choice Voucher Program regulation and HCVP policy.

*Owner/Landlord Initial* _____     *Participant Initial* _____*AB*_____

The amount of tenant rent is subject to change during the term of the lease. Any changes in the amount of the tenant rent will be effective on the date stated in a notice by HCVP to the family and Owner/Landlord.

6. **Security Deposit:** The tenant has/will deposit(ed) $ *500* to the Owner/Landlord as a security deposit. The amount of the security deposit does not exceed the amount of security deposits charged by the Owner/Landlord to unassisted tenants or the private market practice for the area where the unit is located. The amount of security deposit must not exceed the approved contract rent.

*Owner/Landlord Initial* _____     *Participant Initial* _____*AB*_____

7. **Utilities and Appliances:** The Owner/Landlord shall provide for or pay for the utilities and appliances as indicated below by an "O" without any additional charge to the tenant. The tenant shall provide or pay for the utilities and appliances as indicated below by a "T". (Circle the Utility Type) (If Not Applicable write N/A)

| Item | (Circle One) | Provided by | Paid by | | Item | (Circle One) | Provided by | Paid by |
|---|---|---|---|---|---|---|---|---|
| Heating | Natural gas | O | T | | Water heating | Natural gas | O | T |
| | Bottle gas | | | | | Bottle gas | | |
| | Oil/Electric | | | | | Oil/Electric | | |
| | Coal/Other | | | | | Coal/Other | | |
| Cooking | Natural gas | O | T | | Water | | | |
| | Bottle gas | | | | Sewer | | | |
| | Oil/Electric | | | | Trash Collection | | | |
| | Coal/Other | | | | Range/Microwave | | | |
| Other Electric | | O | T | | Refrigerator | | | |
| Air Conditioning | | O | T | | Other (specify) | | | |

8. **Lease termination or move out by family:** The tenant may terminate the lease without cause at any time after the initial term of the lease by giving _____*30*_____ calendar days written notice to the Owner/Landlord. If this notice is hand delivered, HCVP will require a signature of acknowledgement from the Owner/Landlord to indicate that they have been notified. If a signature cannot be obtained by the Owner/Landlord, HCVP will accept a certified mail receipt along with a copy of the vacate notice from the participant as proper notification. The acceptance of this form of vacate notification by HCVP does not prevent the Owner/Landlord from exercising their rights under local law if the Owner/Landlord feels that the participant has violated the terms of their lease – including not vacating unit in accordance with the notice.

District of Columbia Housing Choice Voucher Program
Lease Information Form

Owner/Landlord Initial _____    Participant Initial _____

9.  The Owner/Landlord and Participant acknowledge that they cannot move with continued assistance from this unit without authorization from HCVP and the new unit passing an initial HQS Inspection conducted by HCVP staff.

Owner/Landlord Initial _____    Participant Initial _____

The Owner/Landlord acknowledges that the contract rent that was approved for this unit, if the unit is a single family, interior row, or semi-detached house, was based on the participant having access to the entire dwelling. The Owner/Landlord also acknowledges that if the Owner/Landlord knowingly allows another family to occupy any portion of the dwelling that has not been approved by HCVP, that upon knowledge and verification of such act that HCVP may recapture HAP Payments made to the owner from the time the unauthorized occupancy took place. HCVP may also terminate the contract for such act.

Owner/Landlord Initial _____    Participant Initial _____

REQUIRED SIGNATURES:

TENANT _____ Anthony Bridgeforth _____  12-23-05
        Signature of Tenant                    Date Signed

OWNER/LANDLORD _____ Khadijah Barr _____  12/30/05
               Signature of Owner/Landlord        Date Signed

HCVP STAFF _____ Carolyn Gray _____  12-1-05
           Signature of HCVP Staff              Date Signed

HCVP Staff acknowledge that the participant and owner have been provided a copy of this form.

Staff Initials _____

# EXHIBIT 28

# Housing Assistance Payments Contract
# (HAP Contract)
## Section 8 Tenant-Based Assistance
## Housing Choice Voucher Program

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing

## Part A of the HAP Contract:  Contract Information

(To prepare the contract, fill out all contract information in Part A.)

1. **Contents of Contract**

   This HAP contract has three parts:

   Part A:  Contract Information
   Part B:  Body of Contract
   Part C:  Tenancy Addendum

2. **Tenant**

   BRIDGEFORTH, ANTHONY

3. **Contract Unit**

   210 20TH STREET NE #4

   WASHINGTON, DC 20002

4. **Household**

   The following persons may reside in the unit.  Other persons may not be added to the household without prior written approval of the owner and the PHA.

   BRIDGEFORTH, ANTHONY

5. **Initial Lease Term**

   The initial lease term  begins on (mm/dd/yyyy): _____12/01/2005_____
   The initial lease term ends on (mm/dd/yyyy): _____11/30/2006_____

**Initial Rent to Owner**

The initial rent to owner is: $ _____1,052.00_____

During the initial lease term, the owner may not raise the rent to owner.

**Initial Housing Assistance Payment**

The HAP contract term commences on the first day of the initial lease term.  At the beginning of the HAP contract term, the amount of the housing assistance payment by the PHA to the owner is  $ _____1,052.00_____ per month.
The amount of the monthly housing assistance payment by the PHA to the owner is subject to change during the HAP contract term in accordance with HUD requirements.

The owner shall provide or pay for the utilities and appliances indicated below by an "O". The tenant shall provide or pay for the utilities and appliances indicated below by a "T". Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Specify fuel type | | | | Provided by | Paid by |
|------|------|------|------|------|------|------|
| Heating | [✓] Natural gas | [ ] Bottle gas | [ ] Oil or Electric | [ ] Coal or Other | O | T |
| Cooking | [✓] Natural gas | [ ] Bottle gas | [ ] Oil or Electric | [ ] Coal or Other | O | T |
| Water Heating | [✓] Natural gas | [ ] Bottle gas | [ ] Oil or Electric | [ ] Coal or Other | O | T |
| Other Electric | | | | | O | T |
| Water | | | | | O | O |
| Sewer | | | | | O | O |
| Trash Collection | | | | | O | O |
| Air Conditioning | | | | | O | O |
| Refrigerator | | | | | O | O |
| Range/Microwave | | | | | O | O |
| Other (specify) | | | | | | |

**Signatures:**

**Public Housing Agency**

DISTRICT OF COLUMBIA HOUSING AUTHORITY

Print or Type Name of PHA

Signature

MICHAEL KELLY   Executive Director

Print or Type Name and Title of Signatory

Date (mm/dd/yyyy)

**Owner**

BRONSON KHADIJAH S

Print or Type Name of Owner

Signature

Khadijah Bronson

Print or Type Name and Title of Signatory

12/30/05

Date (mm/dd/yyyy)

**Mail Payments to:**

KHADIJAH S. BRONSON

Name

1050 45TH STREET NE, WASHINGTON, DC 20019

Address (street, city, State, Zip)

# EXHIBIT 29



# District of Columbia Housing Authority

**1133 North Capitol Street, Northeast**
**Washington, D.C. 20002-7599**
**(202) 535-1000**

Michael Kelly, Executive Director

Dear: *Mr. Bridgeforth*

We are pleased to inform you that your lease-up for the above mentioned property has been processed!

Effective *12-1-05*, the monthly **Contract Rent** shall be $ *1052*. The **Tenant Rent** that you are required to pay to your landlord shall be $ *-0-*. The **Housing Assistance Payment (HAP) the** Housing Choice Voucher Program pays to your landlord/realtor shall be $ *1052*.

Your pro-rata (if applicable) for the period of _____ is $ _____.
The **HAP** pro-rata for the period is $ _____. If this is your initial move, your security deposit is $ *500*.

You must pay the amount(s) shown above. Failure to pay could result in termination from the Housing Choice Voucher Program.

If you have any questions or concerns regarding this process, please call the Housing Choice Program between 8:30 a.m. and 4:45 p.m. Monday through Friday on (202) 535-1433. Ask to be referred to the Housing Program Specialist/Assistant identified.

Sincerely,

*Carolyn Foust*
Carolyn Foust
Housing Program Specialist/Assistant

**\*\*\*To the Tenant\*\*\***
**If you disagree with this decision, you may request an informal hearing. If a hearing is desired, you must submit a written request within ten working days of this notice or your right to a hearing will be waived.**

Received By: _____  Date *12/30/05*
                    (Landlord Signature)

# EXHIBIT 30

# Inspection Checklist

*plus cy*
*Fri, Dec 9, 2005*
*@ 11:30*

*11-29*
*11:30*
*ar*

Housing Choice Voucher Program

**U.S. Department of Housing and Urban Development**
Office of Public and Indian Housing

OMB Approval No. 2577-0169
(Exp. 9/30/2002)

Public reporting burden for this collection of information is estimated to average 5 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless that collection displays a valid OMB control number.

This collection of information is authorized under Section 8 of the U.S. Housing Act of 1937 (42 U.S.C. 1437f). The information is used to determine if a unit meets the housing quality standards of the section 8 rental assistance program.

| | | |
|---|---|---|
| Name of Family *Mr Anthony Bridgeforth* | Tenant ID Number *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* | Date of Request (mm/dd/yyyy) *11-4-5* |
| Inspector *C. Mince* | Neighborhood/Census Tract *80.02* | Date of Inspection (mm/dd/yyyy) *11/29/05* |
| Type of Inspection [X] Initial [ ] Special [ ] Reinspection | Date of Last Inspection (mm/dd/yyyy) | PHA *DCHA* |

## A. General Information

**Inspected Unit**

Year Constructed (yyyy) *1950*

Full Address (including Street, City, County, State, Zip)
*510-20th St NE #B4 ef*
*Washington DC 20002*

Number of Children in Family Under 6

**Housing Type** (check as appropriate)
- [ ] Single Family Detached
- [ ] Duplex or Two Family
- [ ] Row House or Town House
- [X] Low Rise: 3, 4 Stories, Including Garden Apartment
- [ ] High Rise; 5 or More Stories
- [ ] Manufactured Home
- [ ] Congregate
- [ ] Cooperative
- [ ] Independent Group Residence
- [ ] Single Room Occupancy
- [ ] Shared Housing
- [ ] Other

**Owner**

Name of Owner or Agent Authorized to Lease Unit Inspected
*Khadijah Bronson*

Phone Number *2/277-1772*

Address of Owner or Agent
*1050-4th St NE*
*Washington DC 20002*

## B. Summary Decision On Unit (To be completed after form has been filled out)

- [X] Pass
- [ ] Fail
- [ ] Inconclusive

Number of Bedrooms for Purposes of the FMR or Payment Standard *2*

Number of Sleeping Rooms *1 + Den*

## Inspection Checklist

| Item No. | 1. Living Room | Yes Pass | No Fail | In-Conc. | Comment | Final Approval Date (mm/dd/yyyy) |
|---|---|---|---|---|---|---|
| 1.1 | Living Room Present | | | | | |
| 1.2 | Electricity | | | | | |
| 1.3 | Electrical Hazards | | | | | |
| 1.4 | Security | | | | | |
| 1.5 | Window Condition | | | | | |
| 1.6 | Ceiling Condition | | | | | |
| 1.7 | Wall Condition | | | | | |
| 1.8 | Floor Condition | | | | | |

**EXHIBIT**
*11-6-07*
*KB #8*

\* Room Codes: 1 = Bedroom or Any Other Room Used for Sleeping (regardless of type of room);  2 = Dining Room or Dining Area;
3 = Second Living Room, Family Room, Den, Playroom, TV Room;  4 = Entrance Halls, Corridors, Halls, Staircases; 5 = Additional Bathroom;  6 = Other

| Item No. | 1. Living Room (Continued) | Yes Pass | No Fail | In-Conc. | Comment | Final Approval Date (mm/dd/yyyy) |
|---|---|---|---|---|---|---|
| 1.9 | Lead-Based Paint<br><br>Are all painted surfaces free of deteriorated paint?<br><br>If not, do deteriorated surfaces exceed two square feet per room and/or is more than 10% of a component? | | | | ☐ Not Applicable | |

| | 2. Kitchen | | | | | |
|---|---|---|---|---|---|---|
| 2.1 | Kitchen Area Present | | | | | |
| 2.2 | Electricity | | | | | |
| 2.3 | Electrical Hazards | | | | | |
| 2.4 | Security | | | | | |
| 2.5 | Window Condition | | | | | |
| 2.6 | Ceiling Condition | | | | | |
| 2.7 | Wall Condition | | | | | |
| 2.8 | Floor Condition | | | | | |
| 2.9 | Lead-Based Paint<br><br>Are all painted surfaces free of deteriorated paint?<br><br>If not, do deteriorated surfaces exceed two square feet per room and/or is more than 10% of a component? | | | | ☐ Not Applicable | |
| 2.10 | Stove or Range with Oven | | | | *gas / new* | |
| 2.11 | Refrigerator | | | | | |
| 2.12 | Sink | | | | | |
| 2.13 | Space for Storage, Preparation, and Serving of Food | | | | | |

| | 3. Bathroom | | | | | |
|---|---|---|---|---|---|---|
| 3.1 | Bathroom Present | | | | | |
| 3.2 | Electricity | | | | | |
| 3.3 | Electrical Hazards | | | | | |
| 3.4 | Security | | | | | |
| 3.5 | Window Condition | | | | | |
| 3.6 | Ceiling Condition | | | | | |
| 3.7 | Wall Condition | | | | | |
| 3.8 | Floor Condition | | | | | |
| 3.9 | Lead-Based Paint<br><br>Are all painted surfaces free of deteriorated paint?<br><br>If not, do deteriorated surfaces exceed two square feet per room and/or is more than 10% of a component? | | | | ☐ Not Applicable | |
| 3.10 | Flush Toilet in Enclosed Room in Unit | | | | | |
| 3.11 | Fixed Wash Basin or Lavatory in Unit | | | | | |
| 3.12 | Tub or Shower in Unit | | | | | |
| 3.13 | Ventilation | | | | | |



| Item No. | 4. Other Rooms Used For Living and Halls | Yes Pass | No Fail | In-Conc. | Comment | | Final Approval Date (mm/dd/yyyy) |
|---|---|---|---|---|---|---|---|
| 4.1 | Room Code* and Room Location | | | | (Circle One) Right/Center/Left | (Circle One) Front/Center/Rear        Floor Level | |
| 4.2 | Electricity/Illumination | | | | | | |
| 4.3 | Electrical Hazards | | | | | | |
| 4.4 | Security | | | | | | |
| 4.5 | Window Condition | | | | | | |
| 4.6 | Ceiling Condition | | | | | | |
| 4.7 | Wall Condition | | | | | | |
| 4.8 | Floor Condition | | | | | | |
| 4.9 | Lead-Based Paint | | | | ☐ Not Applicable | | |
| | Are all painted surfaces free of deteriorated paint? | | | | | | |
| | If not, do deteriorated surfaces exceed two square feet per room and/or is more than 10% of a component? | | | | | | |
| 4.10 | Smoke Detectors | | | | | | |
| 4.1 | Room Code* and Room Location | | | | (Circle One) Right/Center/Left | (Circle One) Front/Center/Rear        Floor Level | |
| 4.2 | Electricity/Illumination | | | | | | |
| 4.3 | Electrical Hazards | | | | | | |
| 4.4 | Security | | | | | | |
| 4.5 | Window Condition | | | | | | |
| 4.6 | Ceiling Condition | | | | | | |
| 4.7 | Wall Condition | | | | | | |
| 4.8 | Floor Condition | | | | | | |
| 4.9 | Lead-Based Paint | | | | ☐ Not Applicable | | |
| | Are all painted surfaces free of deteriorated paint? | | | | | | |
| | If not, do deteriorated surfaces exceed two square feet per room and/or is more than 10% of a component? | | | | | | |
| 4.10 | Smoke Detectors | | | | | | |
| 4.1 | Room Code* and Room Location | | | | (Circle One) Right/Center/Left | (Circle One) Front/Center/Rear        Floor Level | |
| 4.2 | Electricity/Illumination | | | | | | |
| 4.3 | Electrical Hazards | | | | | | |
| 4.4 | Security | | | | | | |
| 4.5 | Window Condition | | | | | | |
| 4.6 | Ceiling Condition | | | | | | |
| 4.7 | Wall Condition | | | | | | |
| 4.8 | Floor Condition | | | | | | |
| 4.9 | Lead-Based Paint | | | | ☐ Not Applicable | | |
| | Are all painted surfaces free of deteriorated paint? | | | | | | |
| | If not, do deteriorated surfaces exceed two square feet per room and/or is more than 10% of a component? | | | | | | |
| 4.10 | Smoke Detectors | | | | | | |

| Item No. | 4. Other Rooms Used For Living and Halls | Yes Pass | No Fail | In-Conc. | Comment | Final Approval Date (mm/dd/yyyy) |
|---|---|---|---|---|---|---|
| 4.1 | Room Code* and Room Location | | | | (Circle One) Right/Center/Left    (Circle One) Front/Center/Rear _____ Floor Level | |
| 4.2 | Electricity/Illumination | | | | | |
| 4.3 | Electrical Hazards | | | | | |
| 4.4 | Security | | | | | |
| 4.5 | Window Condition | | | | | |
| 4.6 | Ceiling Condition | | | | | |
| 4.7 | Wall Condition | | | | | |
| 4.8 | Floor Condition | | | | | |
| 4.9 | Lead-Based Paint<br><br>Are all painted surfaces free of deteriorated paint?<br><br>If not, do deteriorated surfaces exceed two square feet per room and/or is more than 10% of a component? | | | | ☐ Not Applicable | |
| 4.10 | Smoke Detectors | | | | | |
| 4.1 | Room Code* and Room Location | | | | (Circle One) Right/Center/Left    (Circle One) Front/Center/Rear _____ Floor Level | |
| 4.2 | Electricity/Illumination | | | | | |
| 4.3 | Electrical Hazards | | | | | |
| 4.4 | Security | | | | | |
| 4.5 | Window Condition | | | | | |
| 4.6 | Ceiling Condition | | | | | |
| 4.7 | Wall Condition | | | | | |
| 4.8 | Floor Condition | | | | | |
| 4.9 | Lead-Based Paint<br><br>Are all painted surfaces free of deteriorated paint?<br><br>If not, do deteriorated surfaces exceed two square feet per room and/or is more than 10% of a component? | | | | ☐ Not Applicable | |
| 4.10 | Smoke Detectors | | | | | |
| | 5. All Secondary Rooms (Rooms not used for living) | | | | | |
| 5.1 | None    Go to Part 6 | | | | | |
| 5.2 | Security | | | | | |
| 5.3 | Electrical Hazards | | | | | |
| 5.4 | Other Potentially Hazardous Features in these Rooms | | | | | |



| Item No. | 6. Building Exterior | Yes Pass | No Fail | In-Conc. | Comment | Final Approval Date (mm/dd/yyyy) |
|---|---|---|---|---|---|---|
| 6.1 | Condition of Foundation | | | | | |
| 6.2 | Condition of Stairs, Rails, and Porches | | | | | |
| 6.3 | Condition of Roof/Gutters | | | | | |
| 6.4 | Condition of Exterior Surfaces | | | | | |
| 6.5 | Condition of Chimney | | | | | |
| 6.6 | Lead Paint: Exterior Surfaces  Are all painted surfaces free of deteriorated paint?  If not, do deteriorated surfaces exceed 20 square feet of total exterior surface area? | | | | ☐ Not Applicable | |
| 6.7 | Manufactured Home: Tie Downs | *None* | | | | |
| **7.** | **Heating and Plumbing** | | | | | |
| 7.1 | Adequacy of Heating Equipment | | | | *gas* | |
| 7.2 | Safety of Heating Equipment | | | | | |
| 7.3 | Ventilation/Cooling | | | | *elect/cent* | |
| 7.4 | Water Heater | | | | *gas* | |
| 7.5 | Approvable Water Supply | | | | | |
| 7.6 | Plumbing | | | | | |
| 7.7 | Sewer Connection | | | | | |
| **8.** | **General Health and Safety** | | | | | |
| 8.1 | Access to Unit | | | | | |
| 8.2 | Fire Exits | | | | | |
| 8.3 | Evidence of Infestation | | | | | |
| 8.4 | Garbage and Debris | | | | | |
| 8.5 | Refuse Disposal | | | | | |
| 8.6 | Interior Stairs and Common Halls | | | | | |
| 8.7 | Other Interior Hazards | | | | | |
| 8.8 | Elevators | *none* | | | | |
| 8.9 | Interior Air Quality | | | | | |
| 8.10 | Site and Neighborhood Conditions | | | | | |
| 8.11 | Lead-Based Paint: Owner's Certification | | | | ☑ Not Applicable | |

If the owner is required to correct any lead-based paint hazards at the property including deteriorated paint or other hazards identified by a visual assessor, a certified lead-based paint risk assessor, or certified lead-based paint inspector, the PHA must obtain certification that the work has been done in accordance with all applicable requirements of 24 CFR Part 35. The Lead-Based Paint Owner Certification must be received by the PHA before the execution of the HAP contract or within the time period stated by the PHA in the owner HQS violation notice. Receipt of the completed and signed Lead-Based Paint Owner Certification signifies that all HQS lead-based paint requirements have been met and no re-inspection by the HQS inspector is required.

**C. Special Amenities** (Optional)

This Section is for optional use of the HA. It is designed to collect additional information about other positive features of the unit that may be present. Although the features listed below are not included in the Housing Quality Standards, the tenant and HA may wish to take them into consideration in decisions about renting the unit and the reasonableness of the rent.

Check/list any positive features found in relation to the unit.

**1. Living Room**

- ☐ High quality floors or wall coverings
- ☐ Working fireplace or stove
- ☐ Balcony, patio, deck, porch
- ☐ Special windows or doors
- ☐ Exceptional size relative to needs of family
- ☐ Other: (Specify)

**2. Kitchen**

- ☐ Dishwasher
- ☐ Separate freezer
- ☐ Garbage disposal
- ☐ Eating counter/breakfast nook
- ☐ Pantry or abundant shelving or cabinets
- ☐ Double oven/self cleaning oven, microwave
- ☐ Double sink
- ☐ High quality cabinets
- ☐ Abundant counter-top space
- ☐ Modern appliance(s)
- ☐ Exceptional size relative to needs of family
- ☐ Other: (Specify)

**3. Other Rooms Used for Living**

- ☐ High quality floors or wall coverings
- ☐ Working fireplace or stove
- ☐ Balcony, patio, deck, porch
- ☐ Special windows or doors
- ☐ Exceptional size relative to needs of family
- ☐ Other: (Specify)

**4. Bath**

- ☐ Special feature shower head
- ☐ Built-in heat lamp
- ☐ Large mirrors
- ☐ Glass door on shower/tub
- ☐ Separate dressing room
- ☐ Double sink or special lavatory
- ☐ Exceptional size relative to needs of family
- ☐ Other: (Specify)

**5. Overall Characteristics**

- ☐ Storm windows and doors
- ☐ Other forms of weatherization (e.g., insulation, weather stripping)
- ☐ Screen doors or windows
- ☐ Good upkeep of grounds (i.e., site cleanliness, landscaping, condition of lawn)
- ☐ Garage or parking facilities
- ☐ Driveway
- ☐ Large yard
- ☐ Good maintenance of building exterior
- ☐ Other: (Specify)

**6. Disabled Accessibility**

Unit is accessible to a particular disability ☐ Yes  ☒ No

Disability _____

**D. Questions to ask the Tenant** (Optional)

*( vacant )*

1. Does the owner make repairs when asked?   Yes ☐   No ☐
2. How many people live there? _____
3. How much money do you pay to the owner/agent for rent? $ _____
4. Do you pay for anything else? (specify) _____
5. Who owns the range and refrigerator?(insert O = Owner or T = Tenant) Range _____  Refrigerator _____  Microwave _____
6. Is there anything else you want to tell us? (specify) Yes ☐  No ☐

**E. Inspection Summary/Comments** (Optional)

Provide a summary description of each item which resulted in a rating of "Fail" or "Pass with Comments."

| Inspector | Date of Inspection (mm/dd/yyyy) | Address of Inspected Unit |
|---|---|---|
| C. Three | 11/29/05 | 210 20th St N.E #3 W D.C 2000 |

Type of Inspection    Initial ☒    Special ☐    Reinspection ☐

Item Number                Reason for "Fail" or "Pass with Comments" Rating

11/29/05        Unit Passed HQS initial inspection.

C- Three

Continued on additional page ☐ Yes    ☐ No

Previous editions are obsolete                    Page 7 of 7                    form HUD-52580 (3/2001)
ref Handbook 7420.8

# EXHIBIT 31

## Housing Assistance Payments Register
### For Date Range: 01/01/1990 To 07/05/2006

Family Name: BRIDGEFORTH, ANTHONY                    Tenant ID:
       Address: 210 20TH STREET NE 4 WASHINGTON DC 20002


Owner Name: BRONSON, KHADIJAH S                    Owner ID:
       Address: 1050 45TH STREET NE WASHINGTON DC 20019


Landlord Name: KHADIJAH S. BRONSON                    Landlord ID:
       Address: 1050 45TH STREET NE WASHINGTON DC 20019


| | |
|---|---|
| Unit Bedroom Size:      2 | Lease Effective Date: 12/01/2005 |
| Contract Rent:   1052 | Lease Expiration Date: 04/01/2006 |
| Family Contribution:     0 | Family Vacancy Date: |
| HAP Payment Amount:   1052 | Number of Days Vacant: |
| Utility Allowance:    145 | Certificate\Voucher #: V V0079-0128 |

=S8 7420=

### Hap/*Uap Payment Record

| Landlord ID | Landlord Name | Date | Check # | Amount | Description |
|---|---|---|---|---|---|
| | KHADIJAH S. BRON | 01/01/2006 | 10069073 | 1052.00 | Hap Payment |
| | KHADIJAH S. BRON | 01/18/2006 | 10071345 | 1052.00 | A.BRIDGEFORTH- |
| | KHADIJAH S. BRON | 02/15/2006 | 10074032 | 1052.00 | A.BRIDGEFORTH- |
| | KHADIJAH S. BRON | 03/01/2006 | 10074435 | 1052.00 | Hap Payment |
| | KHADIJAH S. BRON | 04/01/2006 | 10077277 | 1052.00 | Hap Payment |
| | KHADIJAH S. BRON | 05/01/2006 | 10080118 | 1052.00 | Hap Payment |
| | KHADIJAH S. BRON | 06/01/2006 | 10082986 | 1052.00 | Hap Payment |
| | KHADIJAH S. BRON | 07/01/2006 | 10086005 | 1052.00 | Hap Payment |
| * | | 05/01/2002 | 151545 | 70.00 | Uap Payment |
| * | | 06/01/2002 | 154501 | 70.00 | Uap Payment |
| * | | 07/01/2002 | 157557 | 70.00 | Uap Payment |
| * | | 08/01/2002 | 160676 | 70.00 | Uap Payment |
| * | | 09/01/2002 | 163805 | 70.00 | Uap Payment |
| * | | 10/01/2002 | 173446 | 70.00 | Uap Payment |
| * | | 11/01/2002 | 176578 | 70.00 | Uap Payment |
| * | | 12/01/2002 | 179742 | 70.00 | Uap Payment |
| * | | 01/01/2003 | 184952 | 70.00 | Uap Payment |
| * | | 02/01/2003 | 188441 | 70.00 | Uap Payment |
| * | | 03/01/2003 | 191682 | 70.00 | Uap Payment |
| * | | 04/01/2003 | 194927 | 86.00 | Uap Payment |
| * | | 05/01/2003 | 198295 | 86.00 | Uap Payment |
| * | | 06/01/2003 | 201728 | 94.00 | Uap Payment |
| * | | 07/01/2003 | 205317 | 94.00 | Uap Payment |
| * | | 08/01/2003 | 208770 | 153.00 | Uap Payment |
| * | | 08/01/2003 | 208770 | -153.00 | Uap Payment |
| * | | 09/01/2003 | 212581 | 188.00 | PAY UAP FOR AU |
| * | | 10/01/2003 | 216229 | 94.00 | UAP FOR OCT - |
| * | | 11/01/2003 | 219978 | 94.00 | UAP RENT FOR N |

EXHIBIT
11-6-07
KB#15A

AB00037

Housing Assistance Payments Register
For Date Range: 01/01/1990 To 07/05/2006

Family Name: BRIDGEFORTH, ANTHONY                    Tenant ID:

==========S8 7420==========

Hap/*Uap Payment Record

| Landlord ID | Landlord Name | Date | Check # | Amount | Description |
|---|---|---|---|---|---|
| * | | 12/15/2003 | 226018 | 94.00 | UAPF OR 12/1/0 |
| * | | 01/01/2004 | 227595 | 94.00 | UAP FOR 1/1/04 |
| * | | 02/15/2004 | 233974 | 94.00 | UAP FOR 2/1/04 |
| * | | 03/15/2004 | 238044 | 94.00 | UAP FOR 03/04 |
| * | | 04/01/2004 | 239616 | 94.00 | UAP FOR 4/1/04 |
| * | | 05/01/2004 | 243556 | 94.00 | UAP FOR MQY 20 |
| * | | 06/15/2004 | 249860 | 86.00 | TENANT DUE JUN |
| * | | 07/01/2004 | 251083 | 86.00 | Uap Payment |
| * | | 08/01/2004 | 254505 | 86.00 | Uap Payment |
| * | | 09/01/2004 | 258039 | 86.00 | Uap Payment |
| * | | 10/01/2004 | 261645 | 86.00 | Uap Payment |
| * | | 11/01/2004 | 264944 | 86.00 | Uap Payment |
| * | | 12/01/2004 | 268172 | 86.00 | Uap Payment |
| * | | 01/01/2005 | 271216 | 86.00 | Uap Payment |
| * | | 02/01/2005 | 274171 | 86.00 | Uap Payment |
| * | | 03/01/2005 | 277136 | 86.00 | Uap Payment |
| * | | 04/01/2005 | 279865 | 78.00 | Uap Payment |
| * | | 05/01/2005 | 282504 | 78.00 | Uap Payment |
| * | | 06/01/2005 | 284936 | 78.00 | Uap Payment |
| * | | 07/01/2005 | 287451 | 78.00 | Uap Payment |
| * | | 08/01/2005 | 290152 | 78.00 | Uap Payment |
| * | | 01/01/2006 | 303387 | 136.00 | Uap Payment |
| * | | 03/01/2006 | 308802 | 136.00 | Uap Payment |
| * | | 04/01/2006 | 311459 | 136.00 | Uap Payment |
| * | | 05/01/2006 | 314014 | 136.00 | Uap Payment |
| * | | 05/15/2006 | 316246 | 136.00 | REISSUE CHK#31 |
| * | | 05/17/2006 | 314014 | -136.00 | Uap Payment |
| * | | 05/22/2006 | 308802 | -136.00 | Uap Payment |
| * | | 06/01/2006 | 316726 | 136.00 | Uap Payment |
| * | | 06/01/2006 | 316726 | 136.00 | REISSUE UAP EF |
| * | | 07/01/2006 | 319661 | 136.00 | Uap Payment |

Number of Payments    59              Total Amount: 12552.00

AB00038

HAP Payments To Previous Landlords
ON BEHALF OF BRIDGEFORTH, ANTHONY

| Landlord ID | Landlord Name | Date | Check # | Amount | Description |
|---|---|---|---|---|---|
| | CROTON MANAGEMENT S | 08/01/2002 | 159555 | 600.00 | Hap Payment |
| | CROTON MANAGEMENT S | 09/01/2002 | 162724 | 600.00 | Hap Payment |
| | CROTON MANAGEMENT S | 10/01/2002 | 172271 | 600.00 | Hap Payment |
| | CROTON MANAGEMENT S | 10/15/2002 | 175202 | 2120.00 | PRORATED HAP |
| | CROTON MANAGEMENT S | 11/01/2002 | 175478 | 600.00 | Hap Payment |
| | CROTON MANAGEMENT S | 12/01/2002 | 178629 | 600.00 | Hap Payment |
| | PM ASSOCIATES | 01/01/2003 | 184401 | 600.00 | Hap Payment |
| | PM ASSOCIATES | 02/01/2003 | 187891 | 600.00 | Hap Payment |
| | PM ASSOCIATES | 03/01/2003 | 191142 | 600.00 | Hap Payment |
| | PM ASSOCIATES | 04/01/2003 | 194373 | 600.00 | Hap Payment |
| | PM ASSOCIATES | 05/01/2003 | 197741 | 600.00 | Hap Payment |
| | GENESIS INVESTMENT | 06/01/2003 | 10004981 | 850.00 | Hap Payment |
| | PM ASSOCIATES | 07/01/2003 | 204736 | 600.00 | Hap Payment |
| | PM ASSOCIATES | 07/01/2003 | 204736 | 600.00 | REINSTATE JUN |
| | GENESIS INVESTMENT | 07/01/2003 | 10006101 | -850.00 | LEASE CANCELL |
| | PM ASSOCIATES | 08/01/2003 | 10007750 | 600.00 | Hap Payment |
| | PM ASSOCIATES | 09/01/2003 | 10009126 | 600.00 | Hap Payment |
| | CHARLES SMITH | 10/01/2003 | 215046 | 950.00 | Hap Payment |
| | CHARLES SMITH | 11/01/2003 | 218723 | 950.00 | Hap Payment |
| | PM ASSOCIATES | 11/01/2003 | 10011825 | 600.00 | LL NOT GIVEN |
| | CHARLES SMITH | 12/01/2003 | 222489 | 950.00 | Hap Payment |
| | CHARLES SMITH | 01/01/2004 | 226350 | 950.00 | Hap Payment |
| | CHARLES SMITH | 02/01/2004 | 230337 | 950.00 | Hap Payment |
| | CHARLES SMITH | 03/01/2004 | 234337 | 950.00 | Hap Payment |
| | CHARLES SMITH | 04/01/2004 | 238362 | 950.00 | Hap Payment |
| | CHARLES SMITH | 05/01/2004 | 242267 | 950.00 | Hap Payment |
| | CHARLES SMITH | 06/01/2004 | 247045 | 950.00 | Hap Payment |
| | CHARLES SMITH | 07/01/2004 | 10023425 | 950.00 | Hap Payment |
| | CHARLES SMITH | 08/01/2004 | 10025412 | 950.00 | Hap Payment |
| | CHARLES SMITH | 09/01/2004 | 10027454 | 950.00 | Hap Payment |
| | CHARLES SMITH | 10/01/2004 | 10029471 | 950.00 | Hap Payment |
| | CHARLES SMITH | 11/01/2004 | 10031674 | 950.00 | Hap Payment |
| | CHARLES SMITH | 12/01/2004 | 10034199 | 950.00 | Hap Payment |
| | CHARLES SMITH | 01/01/2005 | 10036874 | 950.00 | Hap Payment |
| | CHARLES SMITH | 02/01/2005 | 10039496 | 950.00 | Hap Payment |
| | CHARLES SMITH | 03/01/2005 | 10042287 | 950.00 | Hap Payment |
| | CHARLES SMITH | 04/01/2005 | 10045205 | 950.00 | Hap Payment |
| | CHARLES SMITH | 05/01/2005 | 10047978 | 950.00 | Hap Payment |
| | CHARLES SMITH | 06/01/2005 | 10050758 | 950.00 | Hap Payment |
| | CHARLES SMITH | 07/01/2005 | 10053572 | 950.00 | Hap Payment |
| | CHARLES SMITH | 08/01/2005 | 10056507 | 950.00 | Hap Payment |

Total Payments To Previous LandLords    41   for   32970.00

AB00039