## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Anthony Bridgeforth, | |
| Plaintiff, | |
| v. | C.A. No.: 06-2128 (RCL) |
| Khadijah Bronson, *et al.*, | |
| Defendants. | |

### DEFENDANTS OFFICER JOSEPH A. POWELL, OFFICER JAMES L. CARTER, OFFICER JOSE ACOSTA, OFFICER DARRELL D. JOHNSON, OFFICER DAVID SMITH, CAPTAIN RALPH W. MCLEAN AND THE DISTRICT OF COLUMBIA'S MEMORANDUM OF POINTS AND AUTHORITIES IN RESPONSE AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Defendants Officer Joseph A. Powell (hereinafter "Powell"), Officer James L. Carter (hereinafter "Carter"), Officer Jose Acosta (hereinafter "Acosta"), Officer Darrell D. Johnson (hereinafter "Johnson"), Officer David Smith (hereinafter "Smith"), Captain Ralph W. McLean (hereinafter "McLean"), and the District of Columbia (hereinafter "District"), by and through counsel, herein submit their response and opposition to plaintiff's Motion for Summary Judgment, and state as follows:

1.    **Plaintiff Anthony Bridgeforth Was Not a Legal Tenant of 210 20th Street, N.E. and Was Removed from that Location For Unlawful Entry.**

Plaintiff avers that "District of Columbia law is clear that a landlord may not evict a tenant…" According to Plaintiff, he was a tenant of Defendant Khadijah Bronson and that the District defendants unlawfully evicted him from his apartment in violation of his constitutional rights.  *See* Plaintiff's Motion, generally.  The existence of the landlord and tenant relationship is a question of law for the court, unless there are disputed factual issues.  *See Young v. District of Columbia,* 752 A.2d 138, 145 (D.C. 2000).  In this case,

plaintiff Anthony Bridgeforth testified during his deposition that at the time of the incident, he was the recipient of D.C. Housing Authority Section Eight benefits since either the year 2000 or 2001. *See* Plaintiff Anthony Bridgeforth's deposition at 82:12-16 and 86:9-22, hereto attached as Exhibit 1. Plaintiff testified that D.C. Housing Authority Section Eight recipients **must sign** a rental lease **before** they can move into an apartment for which the D.C. Housing Authority program will be paying benefits.  Bridgeforth dep. at 126:6-12.  Plaintiff testified that he did not sign a lease for the unit owned by Defendant Bronson.  Bridgeforth dep. at 115:9-22 and 116:1-3.  In fact, Plaintiff testified that on January  11, 2006, he returned to the D.C. Housing authority and signed a document indicating that "he didn't sign a lease" to reside in the unit and wished not to stay in the unit because of the living conditions.  *See* Bridgeforth's dep. at 211:6-22 and 212:1, and *See* also January 11, 2006, letter from Anthony Bridgeforth hereto attached as Exhibit 2.

Co-defendant Bronson testified that she did not consider Plaintiff her tenant because he refused to sign a lease and he signed a document indicating that he didn't want to reside in the unit. *See* Khadijah Bronson's deposition at 203:4-19, hereto attached as Exhibit 3, and Bridgeforth's dep. at 211:6-22 and 212:1, hereto attached as Exhibit 1.

The facts regarding the non-existence of a rental lease or contract between Plaintiff and co-defendant Bronson for the rental of 210 20th Street, N.E. / the 107 Wayne Place, S.E., Washington, D.C. are not in dispute.  Bridgeforth dep. at 115:9-22 and 116:1-3.  It is also not disputed that co-defendant Bronson told the police that Plaintiff had broken into the apartment while she was away.  *See* Bronson dep. at 151:1-12, hereto attached as Exhibit 3.  D.C. Official Code § 22-3302, the District of Columbia unlawful

entry statute, provides for the punishment of anyone who remains on either private or public property without lawful authority and who refuses to leave on the demand of the person lawfully in charge.  *See also O'Brien v. United States*, 444 A.2d 946, 948 (D.C. 1982) ("the mere demand of the person lawfully in charge to leave necessarily deprives the other party of any lawful authority to remain"); *Mary Carson, et al. v. U.S.,* 419 A.2d 996 (D.C. 1980), holding under the statute, individual citizens may not be ejected from public property on the order of the person lawfully in charge absent some additional, specific factor establishing their lack of a legal right to be there.  The Defendants' decision to ask Plaintiff to leave the apartment was based on § 22-3302, not because of any landlord/tenant dispute.  Probable cause existed for Plaintiff's removal from the subject property under § 22-3302.  An officer has probable cause to arrest or take lawful action if he … has reason to believe that a crime has been or is about to be committed."[1] *See* Standardized Jury Instructions for the District of Columbia, Instruction 18-3. "Another way the officer…may prove the arrest was legally justified is to show that the officer reasonably believed, in good faith, that his conduct toward the plaintiff was lawful." *Id.* Defendant Bronson represented to the Defendants that Plaintiff was on the property unlawfully and refused to leave at her request.  Defendant Bronson told the Defendants that she did not give Plaintiff a key, that Plaintiff was a locksmith and had broken the door to gain entry while she was away. Bronson dep. at 151:1-12.  Because Plaintiff was not evicted from his apartment but was told to leave under § 22-3302, his claims against these Defendants for unlawfully violating his constitutional rights fail as a matter of law.

---

[1] While Plaintiff was not arrested, the Defendants were within their right to arrest him for unlawful entry based on the facts as presented to the Defendants on the day of the subject incident.

3

2.    **Even if Plaintiff were Lawfully on the Subject Property, Plaintiff Cannot Establish Liability Against These Defendants For Requesting That He Leave the Subject Property.**

   A.    **Plaintiff cannot Maintain His Claim Against the District Because He Has Failed to Establish a District Custom, Policy or Practice Was The Moving Force Behind His Constitutional Injury.**

Plaintiff alleges he was wrongfully evicted by Defendants Powell, Carter, Acosta, Johnson, Smith, and McLean, members of the D.C. Metropolitan Police Department. Plaintiff has filed suit against the District under 42 U.S.C. Sec. 1983 for the alleged wrongful eviction.  *See* Pl.'s Complaint.  *See also*, Pl.'s Motion, generally.  It is clearly established that there is no *respondeat superior* liability on the part of a municipality for the alleged constitutional misconduct of its employees.  *See Monell v. Dept. of Soc. Serv. of City of New York*, 436 U.S. 658, 690 (1978), holding municipal liability is restricted to cases in which "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers."  The Supreme Court determined that:

> a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom … inflicts the injury that the government as an entity is responsible under § 1983."

*Monell,* 436 U.S. at 694.  The Supreme Court further held in *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 (1985), that, "at the very least there must be an affirmative link between the policy and the particular constitutional violation alleged."  The *Oklahoma City* decision interpreted *Monell* as holding that "municipal liability should not be imposed *when the municipality was not itself at fault*."  *Id.* at 818 (emphasis added). Therefore, in order for Plaintiff to prevail on a claim of municipal liability against the

District under 42 USC § 1983, Plaintiff must show that the District's customs, practices, and/or policies were the moving force behind the alleged constitutional violation.

In the instant case, Plaintiff cannot establish that his alleged injuries resulted from any unconstitutional policy of the District, or that a widespread and deliberate custom or practice of evicting individuals from their home in the District of Columbia was the moving force behind his stated constitutional violations. In fact, the evidence adduced in discovery and presented by Plaintiff in his motion for summary judgment, establishes that there is no District policy to evict tenants. *See* Pl.'s Opp., generally.

In an effort to show that the District's police officers have a custom of wrongfully evicting tenants which would support their constitutional claim against the District, Plaintiff cites to and relies on the *McMillian* case that occurred in 1998, approximately ten (10) years before the subject incident. *See McMillian v. Davis,* Civil Action No.: 98-7746 (D.C. Super). This case, by itself, is insufficient to establish that the District has a practice of wrongful evictions that led to Plaintiff's injuries. The simple fact that the alleged wrongful eviction in *McMillian* occurred so many years before this case negates any finding that MPD has a practice of wrongfully evicting tenants. More importantly, the District was not found liable in the *McMillian* case. Instead, for whatever reasons, the parties agreed to settle all claims against the District. Plaintiff cannot benefit from the settlement between the District and the *McMillian* family, and can not use that case to establish the District's liability in this case. See Pl.'s motion, generally.

Not only does Plaintiff's reliance on *McMillian* to establish the District's policy and/or practice fail because it does not establish that the District had a widespread policy of unlawful evictions, it negates any finding of deliberate indifference to citizen

complaints about evictions.  According to Plaintiff, as a result of the *McMillian*
settlement, the District adopted training in five respects:  (a) "Roll Call Training" on
"Residential and Self-help Evictions" issued to each patrol district and division "at least
every three months"; (b) a component in the "Field Training Officer Course" on eviction
policy beginning in March 2001; (c) training on MPD eviction policy in "all future
courses" offered to "First Line Supervisor[s] & Reserve Officer[s]; (d) training on MPD
eviction policy included in the 32-hours of in-service training required for "lieutenants
and above"; and (e) inclusion of MPD eviction policy in the standard curriculum offered
to all recruits/later officers.  See Pl.'s Opp. at pg. 8.  Moreover, MPD's material used to
implement the training and tracking plan "plainly advise that MPD does not facilitate
with evictions."  See Pl.'s Opp. at pg. 8.  As shown clearly by Plaintiff, the District's
policies were not the moving force behind his alleged wrongful eviction.

　　　　Having failed to establish that any District custom, policy or practice resulted in
his alleged wrongful eviction, Plaintiff argues that the District's failure to train and/or
supervise its employees on wrongful evictions resulted in Plaintiff's damages.  However,
in order to prevail on a failure to train and/or supervise claim, Plaintiff must establish
through expert testimony, the appropriate training which the District should have
provided but failed to do so, as well as the level of supervision which was required but
not given.  *See Toy v. District of Columbia,* 549 A.2d 1, 7 (D.C. 1988); *see also District
of Columbia v. Peters*, 527 A.2d 1269, 1273 (D.C. 1987) (expert testimony required in
criminology/law enforcement); *District of Columbia v. White,* 442 A.2d 159, 164-65 (D.C.
1982) (expert testimony required to determine if police breached standard of care); *Dist.
of Columbia v. White,* 442 A.2d 159, 164 (D.C.1982) (requiring expert testimony

concerning adequacy of the MPD's weapons safety training);  *Etheridge v. Dist. of Columbia,* 635 A.2d 908, 917-18 (D.C.1993) (expert testimony regarding the recognized standards of care for police training, supervision, and use of force).  Plaintiff's failure to support his motion for summary judgment with expert testimony, precludes his ability to prevail on this claim.

Lastly, Plaintiff seeks to hold the District liable for Defendant McLean's decision to have Plaintiff removed from the subject apartment for unlawful entry.  As clearly established under *Monell*, the District cannot be held liable for the alleged constitutional torts of its employees.  Defendant McLean is not a final policymaker for the D.C. Metropolitan Police Department.  See Pl.'s Motion, at pg. 31.  The final policymaker for the police department is Chief Cathy Lanier, not Defendant McLean.[2]  Absent evidence that a final policymaker was responsible for the claimed violation of Plaintiff's constitutional  rights, Plaintiff's municipal liability claim against the District fails as a matter of law.

    **B.**    **Defendants Officer Powell, Officer Carter, Officer Acosta, Officer  Johnson, Officer Smith and Captain McLean are Entitled to Qualified Immunity.**

Plaintiff has sued these Defendants for allegedly violating his constitutional rights when they determined that he had unlawfully entered the subject property, and had to leave it at the request of Defendant Bronson.  *See* Complaint, generally.  However, police officers enjoy a qualified immunity from suits alleging violations of constitutional rights.  *See Saucier v. Katz,* 533 U.S. 194, 200 (2001).  A police officer making an arrest is generally shielded from personal liability for civil damages with respect to constitutional claims

---

[2] The Court can take judicial notice that Chief Cathy Lanier is the final policymaker for the D.C. Metropolitan Police Department.

brought under 42 U.S.C. § l983, by the doctrine of qualified immunity insofar as his or her conduct does not violate clearly established rights of which a reasonable person would have known. *See Hunter v. District of Columbia*, 943 F.2d 69, 75 (D.C. Cir. l99l). In making this determination, the "relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *See Saucier*, 533 U.S. at 200.

Plaintiff admits in his Motion for Summary Judgment that the situation encountered by the defendant Officers on the night of the incident was less than ideal. "The scene at 210 20th Street, N.E. was "difficult," "hectic," and "pretty out of control," over what amounted to "an awful long time," from approximately 11:30 p.m. on January 20, 2007, to 1:44 a.m. on January 21, 2007." The defendant Officers at the scene heard Defendant Bronson's side of the story and reviewed Plaintiff's paperwork. See Plaintiff's Opposition at pg. 10.

Defendant Bronson testified during deposition that she called the police because Plaintiff was in the unit and "he wasn't supposed to be there" and "he broke into the unit" while she was out of town. Bronson dep. at 151:1-12, hereto attached as Exhibit 2. Defendant Bronson also testified that she called the Captain and told him that she had somebody in the unit that did not want to live there, that she was away and when she came back he was in the unit illegally. Bronson dep. at 173:15-22 and 174:1-20. Defendant Bronson also reported to Defendant McLean that Plaintiff was a "locksmith or had access to a locksmith" and "she swore she hadn't given him a key." McLean dep. at 39:18-41:18, hereto attached as Exhibit 4. Defendant Bronson also told Defendant McLean that she had a document indicating that Plaintiff was not supposed to be in the

unit. Bronson dep. at 173:15-22 and 174:1-20. Defendant Bronson showed the officers at the scene a document reflecting that Plaintiff had not signed a lease, and that he indicated that he didn't want the apartment.  Bronson dep. at 173:15-22 and 174:120.

Plaintiff testified that Defendant Carter asked him if he had a lease for residing at the unit and he told the officer he "didn't have a lease," and didn't sign a lease. Bridgeforth dep. at 329:22-330:4.  Plaintiff testified that when he was unable to produce a lease, he was told by the officers that he had five minutes to go or he was going to be locked up for unlawful entry.  Bridgeforth dep. at 342:18-343:2.  Defendant Officer Carter testified that he accompanied Plaintiff to the unit and "there wasn't much in there," "a bag of clothes or two," which supported his belief that Plaintiff was a squatter and on the property illegally. *See* James Carter's dep. at 32:2-21, hereto attached as exhibit 5.

Plaintiff argues that the individually named defendants are not entitled to qualified immunity because they knew that the dispute between Plaintiff and Defendant Bronson was a landlord-tenant matter and they should not have involved themselves.  To support this argument, Plaintiff refers in his Motion to the testimony of the Defendants. *See* McLean Dep. at 61:13-16 ("We don't get involved in eviction."); Acosta Dep. at 45:10-16, hereto attached as Exhibit 7,  Johnson Dep. at 42:9-19, hereto attached as Exhibit 8; Smith dep. at 82:20-83:1, hereto attached as Exhibit 9 ("The Metropolitan Police Department does not participate in evictions.").[3]  According to Plaintiff, notwithstanding this understanding, the Defendants involved themselves in the alleged landlord/tenant dispute.  Contrary to Plaintiff's claims, the testimony of the Defendants

---

[3] This same testimony negates any finding that the District of Columbia's customs, practices or policies were the moving force behind Plaintiff's claimed wrongful eviction.

do not defeat their entitlement to qualified immunity for their complained of actions.
Defendant  Carter testified that the MPD order was that if Plaintiff did not have a lease or
did not sign a lease, he would be asked to leave.  Carter dep. at 29:5-7.   Defendant
Powell testified that Plaintiff was asked to leave the premises.  Powell dep. at 18:5, hereto
attached as Exhibit 6. Defendants Acosta, Johnson, and Smith testified that police officer
told Plaintiff he had to leave.  Acosta dep. at 29:6-9; Johnson dep. at 21:6-8 & 25:18-
26:1; Smith dep. at 26:19-27: 4  & 43:11-14.  *See* Pl.'s Opp., pg. 21, FN 47.

        As an initial matter, Plaintiff is required to establish each Defendant's individual
liability in this matter.  *See Monell, supra.*  Just as the District cannot be held liable for
the constitutional torts of its employees, one employee cannot be held liable for the
constitutional torts of a co-worker.  Given Plaintiff's failure to show that each named
Defendant acted in contravention of the law, his claims fail as a matter of law.

        Secondly, in making the determination as to whether the Defendants are entitled to
qualified immunity, and to assess whether their actions were objectively reasonable, the
Court must consider the facts as they would have been perceived by a reasonable officer on
the scene, and not with the 20/20 vision that comes with knowledge of the full landscape of
the facts.  *See Graham v. Connor*, 490 U.S. 386, 396 (1989); *see also Richardson v. U.S.
Department of Interior*, 740 F. Supp. 15 (D.D.C. 1990) (holding that an officer did not
violate a clearly established right when that officer had an honest and reasonable belief that
the plaintiff had violated the law in light of the facts available to him at the scene of the
arrest).  When the Defendants arrived at the subject location, they were told by Defendant
Bronson that Plaintiff "wasn't supposed to be there," that he "broke into the unit while
she was out of town." Defendant Bronson also presented a signed document by Plaintiff

which indicated that he had not signed a lease and didn't want the apartment. Additionally, because of the chaotic situation they found themselves in, and Defendant Bronson's demand to speak with a Captain at the Department, Defendant McLean was contacted. Defendant McLean spoke with the complaining witness Defendant Bronson and asked informational questions. Once Defendant McLean was told by the Defendant Officers that Defendant Bronson had presented documents showing that Plaintiff was on the property unlawfully, Defendant McLean instructed the officers to ask Plaintiff to leave the subject property pursuant to the unlawful entry statute. *See* McLean Dep. at 42:4–8. The Defendants' decision was not based on incompetence and was not plainly wrong. Plaintiff's argument essentially invites this court to hold, as a matter of constitutional law, that a police officer, summoned to mediate a volatile dispute involving an alleged trespasser, is obliged to leave the situation unresolved simply because the trespasser represents himself to be entitled to be there. That is simply absurd. More importantly, Defendants Powell, Carter, Acosta, Johnson, and Smith had no reason to believe that following the guidance of Defendant McLean was wrong or was in violation of Plaintiff's constitutional rights. Accordingly, they are entitled to qualified immunity for their actions because any reasonable officer in their position would have taken the same action.

Even if Defendant McLean was wrong in ordering Plaintiff's removal, he too is entitled to qualified immunity. *See Anderson v. Creighton*, 483 U.S. 635, 638 (1987), holding a police officer should prevail on the qualified immunity defense even if he is mistaken, if a reasonable officer could have believed that the action taken was not in violation of clearly established constitutional law. *Anderson*, 483 U.S. at 641. *See also*,

*District of Columbia v. Evans*, 644 A.2d l008, l0l5 (D.C. 1994).   A reasonable officer in Defendant McLean's position would have reasonably believed that Plaintiff was in violation of the unlawful entry statute, and his decision to proceed under that statute was not in violation of clearly established constitutional law.

Respectfully submitted,

PETER J. NICKLES
Interim Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division

_____/s/ Patricia A. Jones_____
PATRICIA A. JONES [428132]
Chief, General Litigation, Section IV

_____/s/ Leticia L. Valdes_____
LETICIA L. VALDES [0461327]
Assistant Attorney General
441 4th Street, N.W.
Sixth Floor South
Washington, D.C. 20001
(202) 442-9845; (202) 730-1881
Leticia.Valdes@dc.gov

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Anthony Bridgeforth,

      Plaintiff,

    v.

Khadijah Bronson, *et al.*,

      Defendants.

C.A. No.: 06-2128 (RCL)

## **ORDER**

Upon consideration of Plaintiff's Motion for Summary Judgment, defendants District of Columbia, Officer Powell, Officer Carter, Officer Acosta, Officer Johnson, Officer Smith and Captain McLean's response and opposition thereto, and the record herein, it is this _____ day of _____, 2008,

ORDERED:    that Plaintiff's Motion for Summary judgment is hereby DENIED for the reasons set forth in the defendants' opposition.

SO ORDERED.

_____
Judge Royce C. Lamberth

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Anthony Bridgeforth,

      Plaintiff,

      v.

Khadijah Bronson, *et al.*,

      Defendants.

C.A. No.: 06-2128 (RCL)

## DEFENDANTS OFFICER JOSEPH A. POWELL, OFFICER JAMES L. CARTER, OFFICER JOSE ACOSTA, OFFICER DARRELL D. JOHNSON, OFFICER DAVID SMITH, CAPTAIN RALPH W. MCLEAN AND THE DISTRICT OF COLUMBIA'S RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS

      Defendants Officer Joseph A. Powell (hereinafter "Powell"), Officer James L. Carter (hereinafter "Carter"), Officer Jose Acosta (hereinafter "Acosta"), Officer Darell D. Johnson (hereinafter "Johnson"), Officer David Smith (hereinafter "Smith"), Captain Ralph W. McLean's (hereinafter "McLean"), and the District of Columbia (hereinafter "District"), by and through counsel, herein respond to Plaintiff's Statement of Material Facts in like-numbered paragraphs, and state as follows:

1.      The statement is admitted, but it is not material since the Defendants deny and dispute that they had this information on the date of the subject incident when Defendant Bronson told these Defendants that she did not give Plaintiff a key to the apartment, but that Plaintiff was a locksmith and he broke into the unit. *See* Bronson dep. at 151:1-12, 173:15-22 and 174:1-20, *See* McLean dep. at 39:18-41:18.

2.      These Defendants admit that this was Defendant Bronson's testimony at deposition.  However, these statements are not material since these Defendants dispute

and deny that they had this information prior to making any decisions or taking any action on the day of the subject incident.

3.      Admitted.

4.      These Defendants admit that Defendant Ralph McLean was an MPD Captain serving as the watch commander and that he supervised the police officers with respect to police activity in MPD's First District, and supervised the actions of the police officers on the scene of the incident.

5.      The Defendants admit that this was the testimony of the parties at deposition. The statements are not material or relevant since these Defendants did not have this information at the time they acted pursuant to the unlawful entry statute.

6.      The Defendants deny that there was a one year lease between Ms. Bronson and Mr. Bridgeforth, as Mr. Bridgeforth testified that he did not sign a lease for the property. The defendants admit that the remaining facts were the testimony of the parties at deposition. The statements are not material or relevant since these Defendants did not have this information at the time they acted pursuant to the unlawful entry statute. Bridgeforth dep. at 115:9-22 and 116:1-3.

7.      The Defendants admit that this was the testimony of the parties at deposition. The statements are not material or relevant since these Defendants did not have this information at the time they acted pursuant to the unlawful entry statute. *See* Bronson dep. at 151:1-12, 173:15-22 and 174:1-20, *See* McLean dep. at 39:18-41:18.

8.      The Defendants admit that this was the testimony of the parties at deposition. The statements are not material or relevant since these Defendants did not have this information at the time they acted pursuant to the unlawful entry statute.

9.      The Defendants admit that this was the testimony of the parties at deposition.  The statements are not material or relevant since these Defendants did not have this information at the time they acted pursuant to the unlawful entry statute.  *See* Bronson dep. at 151:1-12, 173:15-22 and 174:1-20, *See* McLean dep. at 39:18-41:18.

10.     The Defendants admit that this was the testimony of the parties at deposition.  The statements are not material or relevant since these Defendants did not have this information at the time they acted pursuant to the unlawful entry statute.  *See* Bronson dep. at 151:1-12, 173:15-22 and 174:1-20, *See* McLean dep. at 39:18-41:18.

11.     The Defendants admit that this was the testimony of the parties at deposition.  The statements are not material or relevant since these Defendants did not have this information at the time they acted pursuant to the unlawful entry statute.  *See* Bronson dep. at 151:1-12, 173:15-22 and 174:1-20, *See* McLean dep. at 39:18-41:18.

12.     The Defendants admit that this was the testimony of the parties at deposition.  The statements are not material or relevant since these Defendants did not have this information at the time they acted pursuant to the unlawful entry statute.  *See* Bronson dep. at 151:1-12, 173:15-22 and 174:1-20, *See* McLean dep. at 39:18-41:18.

13.(a)-(e)      The Defendants admit that this was the testimony of the parties at deposition.  The statements are not material or relevant since these Defendants did not have this information at the time they acted pursuant to the unlawful entry statute.  *See* Bronson dep. at 151:1-12, 173:15-22 and 174:1-20, *See* McLean dep. at 39:18-41:18.

14.     These defendants admit that Defendant Bronson spoke to Captain Mclean and told him that she had somebody in the unit that did not want to live there, that she was away and when she came back he was in the unit illegally. Bronson dep. at 173:15-22 and

3

174:1-20. Defendant Bronson also reported to Captain McLean that plaintiff was a "locksmith or had access to a locksmith" and "she swore she hadn't given him a key." McLean dep. at 39:18-41:18, hereto attached as Exhibit 3. Defendant Bronson also told the captain that she had a document indicating that plaintiff was not supposed to be in the unit. Bronson dep. at 173:15-22 and 174:1-20.

15.     Admitted.

16.     These Defendants admit that Defendant McLean did not visit the incident scene and did not speak to Plaintiff.  Further answering, Defendant McLean admits that he did not know how the Section 8 housing program worked, that Plaintiff claimed to be a tenant, and had not reviewed any of the paperwork related to the parties' relationship but that is not material or relevant.   Although Defendant McLean did not personally observe the other Defendant Officers review the paperwork, Defendant McLean was told by Plaintiff and one or more of the Defendant officers at the scene that Plaintiff admitted that he did not have a lease and had written a letter indicating that he did not wish to rent the subject apartment.  There is no evidence in this record that Plaintiff presented paperwork to any of the Defendants relating to his relationship with Defendant Bronson. *See* Bronson dep. at 151:1-12, 173:15-22 and 174:1-20, *See* McLean dep. at 39:18-41:18.

17.     Defendants admit that Defendant Carter was in charge at the incident scene. Further answering, Defendants admit that when Defendant Carter first received the call it was initially dispatched as a landlord/tenant dispute.  After arriving on the incident scene, the Defendants were presented with information that Plaintiff had unlawfully entered Defendant Bronson's property and would not leave when asked to do so. *See* Bronson dep. at 151:1-12, 173:15-22 and 174:1-20, *See* McLean dep. at 39:18-41:18.

18.     Officer McGunigal was not designated as a District 30(b)(6) witness.  Further

answering, the Defendants listened to the parties and received information from

Defendant Bronson that Plaintiff had broken into the apartment and was unlawfully on

the premises.  *See* Bronson dep. at 151:1-12, 173:15-22 and 174:1-20, *See* McLean dep.

at 39:18-41:18.

19.     Defendants admit that Carter, Smith, Acosta and Johnson entered the apartment

building at 210 20th Street, N.E.  The Defendants deny that the apartment was Plaintiff's

apartment. *See* January 11, 2006, letter from Anthony Bridgeforth hereto attached as

Exhibit 2.

 20.     Admitted that Defendant Bronson told the Officers that Plaintiff had broken into

the apartment and she changed the locks while the Defendants were there.

21.     Admitted but not material.

22.     Admitted

23.     Admitted, but not relevant.  There is no testimony or evidence in this record that

MPD police officers evict tenants even if they make landlord-tenant dispute

determinations.

24.     Admitted, but not relevant.  An officer on the scene has to be able to use judgment

when on an incident scene.  He is not required to contact a supervisor each and every

time he fronts a situation.  This does not mean that the officer is a final policymaker,

and/or that the officer has engaged in wrongful evictions.

25.     Admitted.

26.     Admitted but not material.

27.     Admitted but not material.

Respectfully submitted,

PETER J. NICKLES
Interim Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General, Civil Litigation Division


_____/s/ Patricia A. Jones_____
PATRICIA A. JONES [428132]
Chief, General Litigation, Section IV


_____/s/ Leticia L. Valdes_____
LETICIA L. VALDES [0461327]
Assistant Attorney General
441 4th Street, N.W.
Sixth Floor South
Washington, D.C. 20001
(202) 442-9845; (202) 730-1881 (fax)
Leticia.Valdes@dc.gov

# Exhibit 1

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

+ + + + +

| | |
|---|---|
| IN THE MATTER OF:<br><br>ANTHONY BRIDGEFORTH,<br>        Plaintiff,<br><br>        v.<br><br>KHADIJAH BRONSON, ET AL,<br>        Defendants. | C.A. No.<br>06-2128<br>(RCL) |

Thursday,
December 6, 2007

Washington, D.C.

DEPOSITION OF:

ANTHONY BRIDGEFORTH

called for examination by Counsel for the

Defendant, pursuant to Notice of Deposition,

in the Office of the Attorney General for the

District of Columbia, 441 4th Street, N.W., 6th

Floor South Conference Room, when were present

on behalf of the respective parties:

2

APPEARANCES:

On Behalf of the Plaintiff:

        JEREMY T. MONTHY, ESQ.
of:  Hogan & Hartson, LLP
        555 13th Street, N.W.
        Washington, D.C. 20004
        (202) 637-5600

On Behalf of the Defendants:

        LETICIA L. VALDES, ESQ.
        Assistant Attorney General
        441 4th Street, N.W.
        Sixth Floor South
        Washington, D.C. 20001
        (202) 442-9845

        DARRYL F. WHITE, ESQ.
        4308 Georgia Avenue, N.W.
        Washington, D.C. 20011
        (202) 882-4880

82

1          A      Apartment No. 3 or 4.

2          Q      And why did you leave that unit?

3          A      That unit didn't have air and it

4     was crazy.

5          Q      Okay.   Mr. Bridgeforth, do you

6     recall the first time you applied for benefits

7     from the D.C. Housing Authority?

8          A      Yes.

9          Q      Okay.   When was that?   What year

10    was it?

11         A      Either 2000 or 2001.

12         Q      Okay.   And have you -- did you

13    receive D.C. Housing benefits continuously,

14    that means without stopping from 2000/2001

15    until this year?

16         A      Yes.

17         Q      Okay.   What is your understanding

18    of the benefits that you received from the

19    D.C. Housing Authority?

20         A      I'm not sure what you mean.

21         Q      Why were you receiving the

22    benefits?

1    explained to you about the program?

2         A    They basically tell you, you know,

3    your name came up, you're entitled to either

4    public housing or Section 8 Program.   They

5    tell you how it work, what communities you can

6    move in and sign the list and then they ended

7    the meeting, you get a copy of your voucher.

8    You can go out and start looking.

9         Q    Okay.   Were you -- did they tell

10   you you were going to receive public housing

11   assistance or Section 8 or both?

12        A    For me personally?

13        Q    Yes, you personally.

14        A    They told me both.

15        Q    Okay.   What's the difference

16   between public housing and Section 8?

17        A    Public --

18        Q    If you know.

19        A    -- housing, from my understanding,

20   says like communities that the city own the

21   property.  In Section 8, independent landlords

22   for the city and you can lodge as well.

115

1      A      After we completed the paperwork,

2    I took the paperwork back to Housing.

3      Q      Okay.  And then what happened?

4      A      I  informed  Ms.  Bronson  that  I

5    completed what I needed and that was the end

6    of it for me.

7      Q      Okay.

8      A      And  then  she  made  a  couple  of

9    phone calls or whatever she did.   The next

10   thing I know she was calling me telling me I

11   need  to  meet  up  with  her,  because  she  had  a

12   family emergency and she needed to leave town

13   to pick up the keys.

14     Q      Okay.

15     A      So --

16     Q      Yet, you still had not visited 210

17   20th Street, N.E.?

18     A      That's correct.

19     Q      Okay.   You  had  no  idea  what  the

20   apartment looked like?

21     A      No, I didn't.

22     Q      Okay.   During  the  meeting  at  the

116

1    ice   cream   parlor,   did   you   complete   a

2    residential lease with Ms. Bronson for renting

3    her property?

4          A    No.

5               MR. MONTHY:  Objection.

6               BY MS. VALDES:

7          Q    You did not.   As part of the

8    requirement, since you've been in the program,

9    by then you have been in the D.C.  Housing

10   Program for at least four years, was part of

11   the requirement that you sign a lease to

12   reside in the unit?

13         A    No.

14               MR. MONTHY:  Objection.  Go ahead.

15               BY MS. VALDES:

16         Q    So as you sit here today, did you

17   ever sign a lease for any of the units that

18   you  resided  in  while  the  D.C.  Housing

19   Authority was providing you assistance?

20         A    Yes.

21         Q    You did.   Every unit that you

22   resided before 210 20th Street?

126

1    you sign and date it.  The landlord sign and

2    date it and then the -- your officer sign and

3    date it and put their initials, then that

4    start the HAP contract.

5        Q    Okay.

6        A    Then they okay the landlord to

7    give you the keys.  They going to be paying.

8    You have legal rights to that unit.

9        Q    And you have to sign those

10   documents before you can move in?

11           MR. MONTHY:  Objection.

12           THE WITNESS:  Right.

13           BY MS. VALDES:

14       Q    Okay.

15       A    No, no, no, no.  You have --

16   that's the final step of the process.

17       Q    Okay.

18       A    Yeah, you have to sign those

19   documents before you actually get --

20       Q    Move in?

21       A    Right, because -- that's right.

22       Q    Okay.  That's what I wanted to

211

1    the D.C. Housing Authority?

2         A    I did.

3         Q    Okay.    But  this  is  not  the

4    document that you signed?

5         A    No, this one -- this is not it.

6         Q    Okay.  Okay.  Mr. Bridgeforth, I

7    just gave you a document that has been marked

8    as Exhibit No. 7.

9                   (Whereupon,   the   document   was

10                  marked    as    Exhibit    7    for

11                  identification.)

12              BY MS. VALDES:

13        Q    Could   you   tell   me   what   the

14   document is?

15        A    A letter that I was advised to

16   write by Housing.

17        Q    And you were advised to write by

18   who?

19        A    Donna   Scrimes,   Ronald   McCoy,

20   Housing officials.

21        Q    Okay.  Is that your signature on

22   the bottom of the letter?

212

1        A       It sure is.

2        Q       Okay.

3        A       Yes.

4        Q       Tell me how the writing on this

5    letter came about.

6        A       Okay.  January the 10th, they did

7    an initial inspection at 210 20th Street.  The

8    inspector advised Ms. Bronson certain things

9    to do.  She didn't comply.  They told me if

10   she didn't comply, come back down to Housing

11   on the 11th and see Ms. Donna Scrimes.

12       Q       Okay.

13       A       I came to Housing on the 11th, Ms.

14   Donna Scrimes advised me that the only way I

15   could get out of the unit, because of the HAP

16   contract is now in place, is if the landlord

17   let me out of the unit or if I had a valid

18   reason why -- a valid of reason of me not

19   wanting to be in the unit.

20       Q       Okay.

21       A       I wanted to transfer.

22       Q       Okay.

329

1        A     He was a Spanish man.

2        Q     Well built, built, skinny?

3        A     I ain't look at him like that.

4        Q     Okay.   Anybody else go upstairs

5   with you?

6        A     They did, but I'm not familiar

7   with them.

8        Q     Okay.  And you are telling me that

9   they were going ahead of you and you were

10  following them or they were following you?

11       A     No, they followed me.

12       Q     Okay.  And you said Acosta was a

13  step ahead of you?

14       A     We talked on the steps.

15       Q     Okay.  And he was below you?

16       A     He was either one person behind me

17  or right behind me.

18       Q     Okay.

19       A     But I can't remember if he came

20  all the way up.  He -- I think he may have

21  been the one in the hallway.

22       Q     Okay.  So then what else happened?

1          A      We -- they asked me did I live --

2     no, Carter asked me did I have a lease.

3          Q      Okay.

4          A      I told him I didn't have a lease.

5          Q      Okay.

6          A      He said well, I had to go.    He

7     wasn't interested in nothing but a lease.

8          Q      Okay.

9          A      So, you know, I -- he was -- then

10    he start talking about Ms. Bronson.    So I

11    started dealing with the other officer.

12         Q      Wait.    Let me stop you for a

13    minute.  Did Ms. Bronson also go upstairs with

14    all of you?

15         A      Yeah, I mean, I don't know if she

16    went up, but she was right in the midst of the

17    action.

18         Q      Okay.  I want you to try to keep

19    this description as clear as possible.  You

20    are going up the stairs to look for your

21    paperwork.  Four police officers, at least,

22    follow you.  Did Ms. Bronson also follow you?

342

1       Q    That's James Carter talking to

2   you?

3       A    Yes, yes.

4       Q    Okay.

5       A    So --

6       Q    And do you know who he was

7   speaking to on the telephone when you said he

8   -- was it he that was on the telephone?

9       A    Both him and Khadijah.

10      Q    Okay.

11      A    I didn't know at the time.

12      Q    Okay.  But they were on the

13   telephone?

14      A    Yes.

15      Q    Do you know whom Officer Carter

16   was speaking to?

17      A    Not at the time.

18      Q    Okay.  That's fine.  Then what

19   happened?

20      A    I couldn't get the lease.  I

21   couldn't -- they wouldn't accept my paperwork,

22   so he said you got five minutes to go or

343

1  you're going to be locked up for unlawful

2  entry.

3       Q    Okay.

4       A    So --

5       Q    Go ahead.

6       A    -- I said unlawful entry is a --

7  he said yeah.  You're lucky I don't lock you

8  up now.  You're a squatter in these people

9  property illegally.  So I said man, what's a

10 squatter?  So he said I'll tell you what, if

11 you ain't out of here in five minutes, I'm

12 going to lock you up for unlawful entry.  You

13 do know what that is, don't you?  So I said

14 yeah.  So when he said that, I know that

15 statute, so I just said let's go.

16      Q    And that's Officer Carter who said

17 that?

18      A    Yeah.

19      Q    Did Officer Smith ever say

20 anything to you?

21      A    When I'm leaving, I'm trying to

22 get anybody to listen.  I said come on, man,

# Exhibit 2

I Anthony Bridgeforth
DIDN't SIGN A LEASE TO
BE IN THIS UNIT AND I WISH
NOT TO STAY IN UNIT #9
BECAUSE OF THE LIVING CONDITIONS

1-11-06
4:50 PM

Anthony Bridgeforth

# Exhibit 3

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

ANTHONY BRIDGEFORTH,          *

      Plaintiff,          *

                  *

    vs.          *   CASE NO.:

               *   06-2128 (RLC)

KHADIJAH BRONSON, et al.,     *

      Defendants.          *

* * * * * * * * * * * * * * * * * * * * * * *

      The deposition of KHADIJAH BRONSON was
taken on Tuesday , November 6, 2007, commencing
at 10:23 a.m. at Hogan & Hartson, LLP, 555 13th
Street, N.W., Washington, D.C. 20004, before
Deborah A. Gurley, Registered Professional
Reporter, Notary Public for the District of
Columbia, when were present on behalf of the
respective parties:

* * * * * * * * * * * * * * * * * * * * * * *

Reported by:

      Deborah A. Gurley, Court Reporter

Al Betz & Associates, Inc.
www.albetzreporting.com



Page 2

1   APPEARANCES:

2

3       For the Plaintiff:

4       JEREMY MONTHY, ESQ.

5       Hogan & Hartson, LLP

6       555 13th Street, N.W.

7       Washington, D.C. 20004

8       202.637.5600 (Voice)

9       202.637.5910 (Fax)

10

11      For Defendant Bronson:

12      DARRYL F. WHITE, ESQ.

13      Law Offices of Darryl F. White

14      4308 Georgia Avenue, N.W.

15      Washington, D.C. 20011

16      202.882.4880 (Voice)

17

18

19

20

21

Page 3

1    APPEARANCES (Continued):

2

3        For Defendant The District of Columbia

4        LETITIA VALDES, ESQ.

5        Office of the Attorney General

6        For the District of Columbia

7        441 4th Street, N.W.

8        Suite 600 South

9        Washington, D.C. 20001

10       202.442.9845 (Voice)

11       202.727.3625 (Fax)

12

13   ALSO PRESENT:   Eric Glover, Esquire

14                   Anthony Bridgeforth

15

16

17

18

19

20

21

Page 151

1  Q. Do you remember what time the police

2 arrived?

3  A. No.

4  Q. So what did they say when they arrived?

5  A. They asked me, I guess they asked me what

6 was going -- I don't remember the conversation

7 verbatim what was said, but it had to be something

8 to the degree where I told them that he was in the

9 unit and he wasn't supposed to be there.  You know,

10 he broke into the unit.  I was out of town, I came

11 back, he's there, and, you know, he's not supposed

12 to be there.

13  Q. And did Mr. Bridgeforth speak to the

14 police officers also?

15  A. I'm sure he did.  Yeah.  I'm sure he did.

16 Yeah.  He came outside.  Everything took place

17 outside so I think they like walked up the street or

18 something.

19  Q. Were you near Mr. Bridgeforth when he

20 spoke to the police officers?

21  A. No.

Page 173

1          THE WITNESS:  I don't know.

2    BY MR. MONTHY:

3        Q.   How many people did you speak to before

4    you spoke to the captain, if you remember?

5          MS. VALDES:  Objection as to form.

6          Objection as compound.

7          MR. MONTHY:  I don't believe it is

8          compound.

9          MR. WHITE:  Go ahead and answer if you

10         can.

11         THE WITNESS:  I don't remember how many

12         people I spoke to before I spoke to the

13         captain.

14   BY MR. MONTHY:

15       Q.   Why don't you tell me what you remember

16   about what steps you took to speak to the captain?

17       A.   All I know is I spoke to him.  I don't

18   know what steps, how I got to him.  I don't know who

19   told me what.  I don't know any of that.  All I know

20   is the conversation, part of the conversation we had

21   and that was just me telling him about the

Page 174

1   situation.  I don't know at what point who referred

2   or what position.  Maybe I came up with the position

3   myself, you know, somebody tired of going through

4   dealing with people who don't really know too much.

5   I want to deal with somebody who would better know

6   or better understand.  So I don't even know if

7   somebody even actually told me to deal with

8   somebody.  In life that's how I deal with things.  I

9   deal with people at a higher authority.  That way

10  you get some results.

11       Q.   And so you said that you remember telling

12  him the situation, right?

13       A.   Yeah.

14       Q.   What did you tell him?

15       A.   That I had somebody in there who was

16  supposed to be a tenant.  They don't want to live in

17  the unit.  I was away.  When I came back he was in

18  the unit illegally.  He wasn't supposed to be there.

19  I had documents showing that he wasn't supposed to

20  be there.  And basically he was there unlawfully.

21       Q.   And when refer to documents are you

Page 203

1    For some reason they don't want to know the

2    answer to this question.

3  BY MR. MONTHY:

4    Q.    Do you understand that when Mr.

5  Bridgeforth sent this letter to Housing that he had

6  30 days to move out of the unit that he had

7  identified?

8        MS. VALDES:  Objection as to form.

9        MR. WHITE:  Go ahead and answer it.

10        THE WITNESS:  No.  I wasn't informed that

11    he had no 30 days because he was never a tenant

12    and that applies to if you are a tenant, the

13    30-day notice to anything.

14  BY MR. MONTHY:

15    Q.    You understand there to be a rule that

16  when tenants ask to leave a Section 8 unit they have

17  30 days to do so?

18    A.    That's if he's a tenant.  You keep missing

19  the point that he was never a tenant.

20    Q.    I'm not trying to make that point, ma'am.

21    A.    But you said if he was a tenant --

# Exhibit 4

Page 1

IN THE UNITED STATES DISTRICT COURT FOR

DISTRICT OF COLUMBIA


ANTHONY BRIDGEFORTH,              *

          Plaintiff,              *

                                  *

      vs.                         * Case No.:

                                  * 06-2128 (RLC)

KHADIJAH BRONSON, et al.,         *

          Defendants.             *

* * * * * * * * * * * * * * * * * * * * * * * *


          The deposition of CAPTAIN RALPH McLEAN

was taken on Tuesday, November 27, 2007,

commencing at 12:15 p.m. at 555 Thirteenth Street,

N.W., Washington, D.C., 20004, before Nancy F.

Richmond, Registered Professional Reporter, Notary

Public for the District of Columbia, when were

present on behalf of the respective parties:


Al Betz & Associates, Inc.
www.albetzreporting.com



1    APPEARANCES:

2

3        For the Plaintiff:

4    M. SCOTT STEVENS, ESQUIRE

5    HOGAN & HARTSON, L.L.P.

6    555 Thirteenth Street, N.W.

7    Washington, D.C. 20004

8    (202) 637-5600

9

10       For the Defendant, BRONSON:

11   DARRYL F. WHITE, ESQUIRE

12   LAW OFFICES OF DARRYL F. WHITE

13   4308 Georgia Avenue, N.W.

14   Washington, D.C. 20011

15   (202) 882-4880

16

17

18

19

20

21

Page 3

1   APPEARANCES (Continued):

2

3       For the Defendant, The District of Columbia:

4       LETICIA VALDES, ESQUIRE

5       OFFICE OF THE ATTORNEY GENERAL

6       FOR THE DISTRICT OF COLUMBIA

7       441 4th Street, N.W.

8       Suite 600 South

9       Washington, D.C. 20001

10      (202) 442-9845

11

12

13

14

15

16

17

18

19

20

21

1   officers had been to this location through other

2   channels?

3              MS. VALDES:  Objection as to form,

4        compound.

5        A.   It's the first I recall hearing about

6   it.

7        Q.   Okay.  And how many times did you say

8   you spoke with her throughout that evening,

9   through the night?

10             MS. VALDES:  Objection, asked and

11        answered.  You can go ahead and answer.

12        A.   I think it was three or four.

13        Q.   And do you remember approximately what

14   time you left the office?

15        A.   I thought that I left the office around

16   11:00 and got the last phonecall about him at

17   11:30.

18        Q.   That was on your cell phone?

19        A.   Yeah.  That was on my personal cell

20   phone.  But looking at my time and attendance for

21   this, which I did recently, I think on the Friday

Page 40

1    night, which was the 20th, I was there until 2:30

2    or 3:30 in the morning.

3              And then on Saturday night, Saturday

4    night was the night I left early.  I left about --

5    I left about 11:15.  Because I remember getting

6    the call right after I had gotten off of

7    Kenilworth Avenue onto 50.  I live out in

8    Maryland.  I go out 50 to go home.

9              I remember getting the call while I was

10   on 50, going out, going home.  But I was thinking

11   it was 11:30.  But I might be -- you know, it was

12   so long ago, I might just be getting the dates

13   mixed up.

14             And I'm wondering if this didn't

15   actually encompass two days, because I was

16   thinking this all happened on a Saturday, but the

17   20th is a Friday.  And I'm wondering if -- I'm

18   wondering if this didn't go on for more than the

19   one day.

20             But my recollection was that I was on my

21   way home when they said, "We're here.  She's got

1  this paper that says he's turning down the

2  apartment.  He's not supposed to be in there."

3          Also, he was -- I think she'd reported

4  to me that he was a locksmith or had access to a

5  locksmith and that he had -- that's how he had

6  gotten into the apartment.

7          Because, at first, I wasn't clear on how

8  he had gotten in there.  She swore she hadn't

9  given him a key.  She's the property owner.  You

10  know, I lent some credence to her statements,

11  because she had a vested interest in the property

12  and who's in there.

13          And my point of view was that, he had

14  looked at it.  There was a disagreement, where he

15  decided he didn't want the apartment.  She had

16  gone away, and he had moved in there, anyway,

17  which in my eyes made him a squatter and

18  established no landlord and tenant relationship.

19          So I treated it as if he was a squatter.

20  Q.   Did you review any of either party's

21  paperwork before you made the decision to tell the

1   officers to remove him?

2       A.   No.  I relied on what the officer told

3   me over the telephone.

4       Q.   What specifically was your directive to

5   the officers?

6       A.   To advise him that if he failed tc leave

7   the premises, he would be locked up for unlawful

8   entry.

9       Q.   And it's your understanding that that

10  is, in fact, what actually happened?

11      A.   Yeah.  That's what I believe happened.

12      Q.   Was an incident report created for this?

13           MS. VALDES:  Objection as to form.  Go

14      ahead and answer.

15      A.   I'm not sure.

16      Q.   Would one typically be?

17      A.   Not for an unlawful entry warning, no.

18      Q.   Okay.  So if he left voluntarily, one

19  would not necessarily be created?

20      A.   That's correct.

21      Q.   But if he were arrested --

should be there

A.    I'd send them to court.

MS. VALDES:  Objection, calls for

speculation.  Go ahead.

Q.    And is that the proper protocol?

A.    I believe so.

Q.    Have you ever received any training

regarding self-help evictions?

A.    Not that I specifically recall.  I know

we've gone over it.  We've probably had -- we've

probably had in-service training on it at one

point in time, but I don't recall when or where.

Q.    What do you understand the policy to be

regarding self-help evictions?

A.    We don't do evictions.  We don't get

involved in evictions.  We only keep the peace.

Q.    Okay.  When asked to intervene in an

eviction, what is the proper protocol?

MS. VALDES:  Objection.  I think the

question's been asked and answered, but you

can go ahead and answer.

# Exhibit 5

Page 1

## IN THE UNITED STATES DISTRICT COURT FOR

## DISTRICT OF COLUMBIA

ANTHONY BRIDGEFORTH,        *

      Plaintiff,        *

                       *

    vs.                * Case No.:

                       * 06-2128 (RLC)

KHADIJAH BRONSON, et al.,     *

      Defendants.       *

* * * * * * * * * * * * * * * * * * * * * * * *

       The deposition of OFFICER JAMES CARTER
was taken on Thursday, November 29, 2007,
commencing at 2:06 p.m. at 555 Thirteenth Street,
N.W., Washington, D.C., 20004, before Nancy P.
Richmond, Registered Professional Reporter, Notary
Public for the District of Columbia, when were
present on behalf of the respective parties:



Page 2

```
 1    APPEARANCES:

 2

 3        For the Plaintiff:

 4        M. SCOTT STEVENS, ESQUIRE

 5        HOGAN & HARTSON, LLP

 6        555 Thirteenth Street, N.W.

 7        Washington, D.C. 20004

 8        (202) 637-5600

 9

10

11        For the Defendant, The District of Columbia:

12        LETICIA VALDES, ESQUIRE

13        OFFICE OF THE ATTORNEY GENERAL

14        FOR THE DISTRICT OF COLUMBIA

15        441 4th Street, N.W., Suite 600 South

16        Washington, D.C. 20001

17        (202) 442-9845

18

19

20

21
```

29

1    that evening?

2        A.    Yes.

3        Q.    Did Captain McLean give any orders about

4    what to do at the scene?

5        A.    I believe he gave a order that if

6    Mr. Bridgeforth did not have a lease or did not

7    sign a lease, he would be asked to leave.

8            See, I didn't talk to him, so I'm just

9    going by basically what I heard.

10       Q.    Your understanding was that if he didn't

11   have a lease in hand, that he was going to be

12   asked to leave?

13       A.    No, not asked to leave by me.

14       Q.    Right.

15       A.    But he would leave the premises.  I

16   don't know if he agreed to leave the premises or

17   not, but eventually he left the premises.

18       Q.    I'm just -- I'm trying to clarify what

19   the instruction was.  I understand it wasn't --

20       A.    The instructions weren't to me.

21       Q.    But it was to an officer?

Page 32

1     A.    Maybe five, ten minutes.

2     Q.    Okay.  Did you actually go inside the

3  apartment unit?

4     A.    In the -- the door opened, in the mouth

5  of the apartment.

6     Q.    Just in the threshold there?

7     A.    (Nods head.)

8     Q.    And how long were you there?

9     A.    Maybe five to ten minutes.

10    Q.    And why were you there?

11    A.    Just to keep the peace between the two

12  parties.

13    Q.    What was Mr. Bridgeforth doing at the

14  time?

15    A.    I believe he gathered a couple of bags

16  of clothes and some things, and he left.

17    Q.    And at that point in time, he was in the

18  process of gathering his belongings?

19    A.    He gathered -- it wasn't much in there.

20  He just gathered a few things and left.  I want to

21  say it was a bag of clothes or two.

# Exhibit 6

1

IN THE UNITED STATES DISTRICT COURT FOR

DISTRICT OF COLUMBIA


ANTHONY BRIDGEFORTH,              *

        Plaintiff,              *

                            *

        vs.              * Case No.:

                         * 06-2128 (RLC)

KHADIJAH BRONSON, et al.,              *

        Defendants.              *

* * * * * * * * * * * * * * * * * * * * * * * *


        The deposition of OFFICER JOSEPH POWELL

was taken on Wednesday, November 28, 2007,

commencing at 11:20 a.m. at 555 Thirteenth Street,

N.W., Washington, D.C., 20004, before Nancy P.

Richmond, Registered Professional Reporter, Notary

Public for the District of Columbia, when were

present on behalf of the respective parties:



18

1        A.   The word was for us to go ahead and

2    remove Mr. Bridgeforth from the apartment.

3        Q.   Okay.   And I'm assuming that was

4    actually done?

5        A.   He was asked to leave the premises, and

6    he just, "Okay.   I'm going to leave."

7        Q.   And do you recall which officer asked

8    him to leave the premises?

9        A.   No, I don't recall that.

10       Q.   Was it you?

11       A.   No, sir, it wasn't me.

12       Q.   Okay.   And you said that, once asked,

13   Mr. Bridgeforth did, in fact, leave the premises?

14       A.   Yes, sir.

15       Q.   Do you recall how long he was given to

16   leave?

17       A.   No, sir.   I don't recall how long he was

18   given to leave.

19       Q.   You were -- you said that you were on

20   the scene for a while.   Was he asked as soon as

21   you arrived to leave, or was it some point in time

Q.    And why was he not on the scene?

MS. VALDES:  Objection as to form and calls for speculation.

MR. STEVENS:  You can answer.

A.    He left.

Q.    Okay.  Was he asked to leave by a police officer?

A.    Yes.

Q.    And do you recall by which officer?

A.    No.

Q.    But it was not yourself?

A.    No.

Q.    And it was not your partner, Officer Powell?

A.    No.

Q.    Did you ever go inside the premises at 210 20th Street that evening?

MS. VALDES:  Objection as to form.  Can you be more specific?  Do you want him to answer the building or the apartment?

MR. STEVENS:  Sure.  I'll reask the

    A.    It was another female there.

    Q.    So it was Mr. Bridgeforth and another female?

    A.    Yes.

    Q.    And was -- were they ultimately both asked to leave?

    A.    I think -- well, that I don't recall.

    Q.    Okay.

    A.    But the female, if I -- was the girlfriend, if I recall correctly.

    Q.    Was Mr. Bridgeforth asked to leave the premises?

    MS. VALDES:  Objection, asked and answered.

    A.    Yes.

    Q.    And did he comply with that request?

    A.    Yes.

    Q.    And that request came from an officer in the Metropolitan Police Department?

    MS. VALDES:  Objection, asked and answered.  You can go ahead and answer.

Page 26

A.  Yes.

Q.  But it wasn't yourself?  It was a different --

A.  No.

MS. VALDES:  Objection, asked and answered.

Q.  Do you recall inside the apartment whether there were any personal belongings?

A.  Well, from what I recall, it was trashed in the apartment.

Q.  You mean just things strewn about?

A.  Thing strewn about.  I didn't see no furniture or anything like that.  It was just -- apartment just looked trashed.

Q.  Did you see any clothing?

A.  No.

Q.  No clothing?  And you said there was no furniture?

A.  No furniture.

Q.  Did you look around the apartment, or did you just stay in one place?

# Exhibit 7

Page 1

# IN THE UNITED STATES DISTRICT COURT FOR

## DISTRICT OF COLUMBIA

ANTHONY BRIDGEFORTH,                    *

      Plaintiff,                     *

                             *

      vs.                             * Case No.:

                             * 06-2128 (RLC)

KHADIJAH BRONSON, et al.,                *

      Defendants.                     *

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

The deposition of OFFICER JOSE ACOSTA
was taken on Wednesday, November 28, 2007,
commencing at 1:20 p.m. at 555 Thirteenth Street,
N.W., Washington, D.C., 20004, before Nancy P.
Richmond, Registered Professional Reporter, Notary
Public for the District of Columbia, when were
present on behalf of the respective parties:

Page 29

1       Q.    Do you know why he left?

2       A.    I don't know why he left.    I know that

3  he left.

4       Q.    So you're unaware of whether anyone told

5  him that he had to leave?

6       A.    He was told -- he was told he had to

7  leave, but I don't know who said it.

8       Q.    Was it one of the officers?

9       A.    It was an officer.

10      Q.    You don't know which one, though?

11      A.    No, I do not.

12      Q.    At what point was he told to leave?

13      A.    Sometime in the investigation.

14      Q.    Was it before you arrived?

15      A.    No.

16      Q.    Was it before or after you viewed the

17  apartment?

18      A.    It was after.

19      Q.    Did you have -- after seeing the

20  document that he presented to you and after

21  looking in the apartment, did you have any

1    first.  And number two, objection to the

2    extent that it's irrelevant and calls for

3    speculation.

4         A.   There's any number of different

5    scenarios that could play out.  I can't speak to

6    say that this would be the only thing that would

7    lead me to believe that he lived there or that

8    this was even a legitimate landlord/tenant

9    dispute.

10        Q.   Now, are you aware of a general policy

11   in the M.P.D. regarding landlord/tenant disputes?

12        A.   I'm aware.

13        Q.   And what is that policy?

14        A.   Refer them to civil court.

15        Q.   And when would you do that?

16        A.   Any landlord/tenant dispute.

17        Q.   Would it be any time it appears to be a

18   landlord/tenant issue, you would refer them to

19   landlord/tenant court?

20             MS. VALDES:  Objection as to form.

21        A.   There are other factors that could

# Exhibit 8

1

IN THE UNITED STATES DISTRICT COURT FOR

DISTRICT OF COLUMBIA


ANTHONY BRIDGEFORTH,              *

            Plaintiff,            *

                                  *

      vs.                         * Case No.:

                                  * 06-2128 (RLC)

KHADIJAH BRONSON, et al.,         *

            Defendants.           *

* * * * * * * * * * * * * * * * * * * * * * * * *


The deposition of OFFICER DARRELLE

JOHNSON was taken on Wednesday, November 28, 2007,

commencing at 9:40 a.m. at 555 Thirteenth Street,

N.W., Washington, D.C., 20004, before Nancy P.

Richmond, Registered Professional Reporter, Notary

Public for the District of Columbia, when were

present on behalf of the respective parties:

 COPY

42

1    fact?

2            MS. VALDES:   Objection as to form.

3        A.    When you say training, what do you...

4        Q.    Have you ever had any formal training or

5    any roll call training that officers are not

6    supposed to intervene in what appear to be

7    landlord/tenant disputes?

8        A.    Yes.

9        Q.    And you understand that the protocol is

10   not to interfere in what appear to be

11   landlord/tenant disputes?

12           MS. VALDES:   Objection as to form.

13       A.    That's correct.                  .

14       Q.    And you understand that even after a

15   court order is issued, it's the U.S. Marshals that

16   are supposed to actually effect the eviction?

17           MS. VALDES:   Objection as to form.  You

18       can go ahead.

19       A.    Yes.

20           (Whereupon, Johnson Exhibit Number 1 was

21   marked.)

# Exhibit 9

1

IN THE UNITED STATES DISTRICT COURT FOR

DISTRICT OF COLUMBIA


ANTHONY BRIDGEFORTH,              *

      Plaintiff,                 *

                             *

      vs.                        * Case No.:

                             * 06-2128 (RLC)

KHADIJAH BRONSON, et al.,          *

      Defendants.                *

* * * * * * * * * * * * * * * * * * * * * * * *


The deposition of OFFICER DAVID SMITH

was taken on Thursday, November 29, 2007,

commencing at 10:15 a.m. at 555 Thirteenth Street,

N.W., Washington, D.C., 20004, before Nancy P.

Richmond, Registered Professional Reporter, Notary

Public for the District of Columbia, when were

present on behalf of the respective parties:

 COPY

26

1    primarily as backup?

2        A.    That's correct.

3        Q.    Okay.  Was Mr. Bridgeforth asked to

4    leave the premises at any point in time that

5    evening?

6        A.    I don't recall, sir.  My role was

7    backup.

8        Q.    Okay.  Do you recall whether

9    Mr. Bridgeforth ever left the scene?

10       A.    Yes.

11       Q.    He left before you did?

12       A.    Yes.

13       Q.    Do you recall whether he was escorted by

14    a police officer?

15       A.    I don't understand how you mean

16    escorted.

17       Q.    Did he just walk away voluntarily?

18       A.    He did walk away voluntarily.

19       Q.    Okay.  Were you present when he was

20    asked to leave?

21       A.    Yes.

27

1        Q.    And who asked him to leave?

2        A.    I don't recall, sir.

3        Q.    But was it a police officer?

4        A.    As far as I know, yes, sir.

5        Q.    Okay.  And did that occur inside the

6    premises?

7        A.    I don't recall.

8        Q.    All right.  You said that you were

9    inside just for a short, few minutes?

10       A.    That's correct.

11       Q.    What was going on during those short,

12   few minutes?

13       A.    To the best of my recollection, several

14   officers were inside, and his girlfriend was

15   causing a commotion inside.  So my presence in the

16   threshold was simply to provide backup.

17       Q.    Do you recall whether this was after he

18   was asked to leave?

19       A.    I don't recall, sir.

20       Q.    Was he collecting his belongings?

21       A.    I don't -- I was standing at the

43

1       you define "removed" to mean "asked to

2       leave."

3              MR. STEVENS:  I'm just using the term.

4       If you don't agree with me, feel free to --

5              A.    I'm misunderstanding what you're saying.

6       She's exactly right.  You're going to have to

7       clarify "removed."

8              Q.    Absolutely.  Was he asked to -- you

9       understand that he was asked to leave the scene by

10      a police -- strike the question.

11              You understand that he was asked to

12      leave the premises by a police officer that

13      evening?

14              A.    Yes.

15              Q.    Okay.  Do you believe that to have been

16      the correct protocol?

17              A.    Yes.

18              Q.    And why do you believe that to be?

19              MS. VALDES:  Objection, calls for

20      speculation, and as to relevance, but go

21      ahead.

82

1      MS. VALDES:  And I'm going to object

2      because that may be your interpretation and

3      your legal interpretation, but that's not

4      what it says in the document, and the witness

5      is not bound by your legal interpretation.

6          MR. STEVENS:  And that's why I prefaced

7      my question by, "I read it as, and feel free

8      to disagree with me."

9          MS. VALDES:  I think he already answered

10     the question then.

11         THE WITNESS:  Answer the question?

12         MS. VALDES:  Yes.

13     A.   Okay.  Well, you said you were trying to

14     establish a practical definition for eviction.

15     That does not establish a definition for eviction;

16     that provides a guideline.

17     Q.   Okay.

18     A.   Okay.  I am bound by, "does not

19     participate in self-help evictions."  I just take

20     the "self-help" off, and I interpret it to say,

21     "The Metropolitan Police Departments does not

83

1    participate in evictions."

2         Q.    Okay.

3         A.    I'm not a lawyer.  I have no training in

4    legal precedent.  Therefore, I don't even look at

5    that quote when I read this.  I read it because

6    I'm supposed to and then I am bound by what I told

7    you I am bound by.

8         Q.    Okay.

9         A.    I hope that answers your question.

10        Q.    It does.  It does.  Do you know -- are

11   you aware of any circular or any other guideline

12   within the Metropolitan Police Department relating

13   to purported self-help evictions that discusses

14   whether or not rent has been paid as a factor to

15   review?

16             MS. VALDES:  Objection as to form.

17        A.    Sir, there's over something like 1500 to

18   1700 general orders.  And while I am familiar with

19   the orders that pertain to me, if you put them in

20   front of me and I had a chance to review them, I

21   would be able to perfectly help you with them.