## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

ANTHONY BRIDGEFORTH,

        Plaintiff,

        v.

KHADIJAH BRONSON, et al.,

        Defendants.

_____

)
)
)
)
)
)
)
)
)
)
)

    **Civil Action No. 06-2128 (RCL)**

## MEMORANDUM OPINION

      This matter comes before the Court on the parties' cross-motions for summary judgment. The Court has considered the motion filed by defendants David Smith, Joseph Powell, Darrell Johnson, Ralph W. McLean, the District of Columbia, James Carter, and Jose Acosta [23], plaintiff's motion [24, 25], the above mentioned defendants' reply and opposition [28, 32], co-defendant Khadijah Bronson's reply and opposition [30], plaintiff's reply and opposition [29, 31], the entire record herein, and the applicable law. For the reasons set forth below, defendants' motion [23] will be GRANTED in part and DENIED in part; plaintiff's motion [24] will be GRANTED in part and DENIED in part.

## BACKGROUND

      This case arises out of the alleged eviction of Anthony Bridgeforth ("plaintiff") from an apartment at 210 20th St, N.E. by a landlord and several on-duty police officers in which there was a dispute as to the nature of plaintiff's occupancy. Plaintiff was enrolled in Section 8

Tenant-Based assistance and had completed paperwork required by the D.C. Housing Choice

Voucher Program (Pl. Statement of Undisputed Mat. Facts ¶ 1; Defs. Statement of Undisputed

Mat. Facts ¶ 1.) but an official lease between the plaintiff and landlord was never executed (Defs.

Statement of Undisputed Mat. Facts ¶ 8).[1]   Prior to completing the necessary paperwork,

plaintiff moved into an apartment owned by the landlord.  (Pl. Statement of Undisputed Mat.

Facts ¶ 8.)  Whether the landlord instructed plaintiff to do so or consented to his moving is in

dispute.

On January 20, 2006 the landlord, believing that plaintiff should not be in the apartment,

attempted to force plaintiff to leave the apartment, soliciting the help of a friend and eventually

the D.C. Metropolitan Police Department.  (*Id.* ¶ 8.)  Responding to repeated calls from the

landlord, the D.C. Metropolitan Police Department eventually determined that there was no

landlord-tenant relationship and asked plaintiff to leave or else be arrested for unlawful entry.

(*Id.* ¶¶ 13,15.)

Except where expressly indicated, the following facts are not in dispute.

1.      **Occupancy Dispute**

Plaintiff is a resident of the District of Columbia enrolled in Section 8 Tenant-Based

Assistance as part of the Housing Choice Voucher Program.  (*Id.* ¶ 1; Defs. Statement of

Undisputed Mat. Facts ¶ 1.)  Defendant Khadijah Bronson ("Bronson") is the landlord and lessor

of 210 20th St, N.E.  (Pl. Statement of Undisputed Mat. Facts ¶ 2.)  In early November 2005,

---

[1] Because only the counsel representing Joseph Powell, James Carter, Jose Acosta, Darrell Johnson, David Smith, Ralph McLean, and the District of Columbia prepared a statement of undisputed material facts, this will be collectively referred to as the defendants' statement of undisputed material facts.

plaintiff and Bronson met to initiate the District of Columbia Housing Authority ("DCHA")

lease-up package.  (*Id.* ¶ 5.)   At this time, Bronson also signed a contract to receive payments

from the DCHA, for which she began receiving rent payment at the beginning of January 2006.

(*Id.* ¶¶ 7,10; Pl. Ex. 31.)

       Upon visiting the property, plaintiff was shown a unit in the same complex that was next

to the apartment to be leased.  (Defs. Statement of Undisputed Mat. Facts ¶¶ 5,6.)  Subsequently,

Bronson learned that her mother was ill and decided to leave D.C. to attend to her.  (*Id.* ¶ 7.)

According to plaintiff's deposition, Bronson then called him and told him that she wanted to

meet with him to give him the keys to the apartment. (Defs. Statement of Undisputed Mat. Facts

¶ 7; Bridgeforth Dep. 115:9-13.)  The parties dispute whether Bronson arranged for plaintiff to

receive a key, but it is known that plaintiff moved his belongings into the apartment he was

shown on or about December 23, 2005.  (Pl. Statement of Undisputed Mat. Facts ¶ 8.)  As a

result of the problems with the apartment, plaintiff went to the DCHA on January 11, 2006 and

signed a note stating "I Anthony Bridgeforth didn't sign a lease to be in this unit and I wish not to

stay in Unit #4 because of the living conditions."  (Bronson Opp'n. Mo. Ex 1.)  The uncertainty

surrounding plaintiff's occupation of the apartment led to the alleged constitutional violations in

which Bronson and several uniformed police officers removed plaintiff from the apartment.

**2.**      **Removal of Plaintiff from the Apartment on January 20, 2006**

       On January 20, 2006, Bronson solicited the help of a male friend to bang on the door to

the apartment that plaintiff was located in and demand that he leave.  (Pl. Statement of

Undisputed Mat. Facts ¶ 12.)  Bronson and her friend also attempted to gain entry by prying the

door open.  (*Id.*)  Startled by this, plaintiff contacted the police.  (Defs. Statement of Undisputed

Mat. Facts ¶ 10.)   Responding to plaintiff's call, the police officers eventually informed Bronson that they could not intervene because the dispute appeared to be between a landlord and a tenant. (*Id*. ¶ 12.)  Subsequently, Bronson contacted the D.C. Metropolitan Police Department several times in attempt to get the police to assist in the removal of plaintiff from the apartment.  (*Id*. ¶ 13.)

Uniformed police officers were dispatched to the premises five times on January 20, 2006.  (Pl. Statement of Undisputed Mat. Facts ¶ 13.)  During the first response, the officers declined to get involved.  (*Id.* ¶ 13a.)  Officer Williams assigned a six-digit CCN incident number to the call and issued a business card to Bronson with the words "LANDLORD TENANT" written on the bottom.  (*Id.*)  The D.C. Metropolitan Police Department officers also declined to get involved during the second, third, and fourth responses.  (*Id.* ¶ 13b-d.)

The fifth response was dispatched around 11:30 p.m., and at least Officers Carter, Smith, Acosta, Powell, and Johnson were present.  (*Id.* ¶ 13e.)  The response was initially dispatched as a landlord-tenant dispute and Officer Carter was in charge of the scene.  (*Id.* ¶ 17.)  During this time, Captain Ralph W. McLean was serving as the "watch commander" responsible for police activity in the Metropolitan Police Department First District.  (*Id.* ¶ 4.)  The officers were at the scene for over two hours as they attempted to determine plaintiff's status as a tenant and Captain McLean spoke with Bronson on the phone several times to determine the nature of the dispute. (*Id.* ¶ 18.)  Once at the scene, Officer Carter noted that there were only a bag of clothes or two in the apartment, which led to his belief that plaintiff was a squatter.  (Defs. Statement of Undisputed Mat. Facts ¶ 22.)

Bronson told Captain McLean that somebody was in the unit that did not live there, that

she had been away and she found him in the unit when she returned, that plaintiff was a

locksmith, and she swore she had not given him the key.  (*Id.* ¶¶ 18, 21.)   Bronson also indicated

to Captain McLean that she had a document that indicated that he should not be in the unit.  (*Id.* ¶

19.)  Officers at the scene were shown plaintiff's written statement that he did not want to remain

in the apartment, which also stated that plaintiff had not officially executed a lease.  (*Id.* ¶ 20.)

After speaking to Bronson and Officer Carter, Captain McLean directed the officers at the scene

to tell plaintiff that if he did not leave the premises, he would be arrested for unlawful entry.  (Pl.

Statement of Undisputed Mat. Facts ¶ 15.)  Officer Smith noted that plaintiff was "very agitated"

by the events.  (Pl. Mo. at 18)  Captain McLean never arrived at the scene or spoke to plaintiff

and admits that he did not know how Section 8 housing assistance works.  (Pl. Statement of

Undisputed Mat. Facts ¶ 16.)  In addition, Captain McLean was not aware that plaintiff claimed

to be a tenant.  (*Id.*)  After plaintiff was removed from the apartment, the police officers

remained at the scene while Bronson had the locks changed on the apartment to prevent plaintiff

from returning.  (*Id.* ¶ 20.)

**3.      Police Department Policy on Landlord-Tenant Disputes**

        D.C. Metropolitan Police Department policy mandates that officers should not get in

apparent landlord-tenant disputes.  (*Id.* ¶ 22.)  Officers are also instructed not to facilitate

evictions.  (*Id.* ¶ 22; Pl. Ex. 22.)  In fact, nearly every individual officer on the scene, including

Officer Carter, was aware of the basic parameters of this policy.  (Pl. Mo. 23.)  Training

programs regarding landlord-tenant disputes were implemented as a result of the litigation in

*McMillian v. Davis*, which required the District of Columbia to provide several different types of

training for both patrol officers and field officers.  (Pl. Statement of Undisputed Mat. Facts ¶ 25.)

According to officers at the department, D.C. Metropolitan Police Department officers respond to and make determinations regarding apparent landlord-tenant disputes every day.  (Pl. Statement of Undisputed Mat. Facts ¶ 23.)  Plaintiff's expert, however, has testified that for a period of ten years, between 1998 and 2008, there were only three instances of alleged unlawful evictions in the District of Columbia.  (Defs. Statement of Undisputed Mat. Facts ¶ 25.) Plaintiff avers that the Metropolitan Police Department has failed to train its officers in any of the required programs after February 2001.  (Pl. Statement of Undisputed Mat. Facts ¶ 25.)  The parties dispute whether the D.C. Metropolitan Police Department's policies fall below the standards for accepted police practices.

## DISCUSSION

### I.    Legal Standard for Summary Judgment

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact" suitable for trial.  Fed.R.Civ.P. 56(c).  A court must look to the substantive law on which a claim or defense rests to determine whether an issue involves "material" facts.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is "genuine" if its resolution could establish an essential element of the nonmoving party's challenged claim or defense.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Where "the nonmoving party [] fails[] to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to judgment as a matter of law.  *Id.* at 323.  Further, the court must accept the nonmoving party's evidence as true and must draw "all justifiable inferences" in his favor.  *Anderson*, 477 U.S. at 255.  This standard

is "'very close' to the 'reasonable jury' directed verdict standard," and despite their distinct procedural postures, "the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or . . . is [instead] so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

The judge's role at the summary judgment stage is limited.  *See id.* at 249.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences are jury functions, not those of a judge . . . ." *Id.* at 255.  Accordingly, the judge may not "assess the credibility of witnesses" at the summary judgment stage.  *United States v. Project on Gov't Oversight*, 454 F.3d 306, 313 (D.C. Cir. 2006).  Indeed, "[e]valuation of the credibility of witnesses must be left to the factfinder . . . ." *Id.*

## II.     Analysis

### A.     Intentional Infliction of Emotional Distress

Plaintiff contends that the individual officers responsible for his removal should be liable for the tort of intentional infliction of emotional distress.  Construing the facts in a light most favorable to plaintiff, the Court finds that a claim for intentional infliction of emotional distress cannot be established because no showing of extreme and outrageous conduct or severe emotional distress has been made.

 Under District of Columbia law, to succeed in a claim of intentional infliction of emotional distress (IIED), a plaintiff must show: "(1) 'extreme and outrageous' conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff 'severe emotional distress.'" *Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984); *see also Larijani v. Georgetown Univ.*, 791 A.2d 41, 44 (D.C. 2002) (finding extreme and outrageous conduct

because an employee was knowingly and continuously subjected to noise-making machines).

Extreme and outrageous conduct is determined by considering the applicable contemporary

standards of offensiveness and decency, and the specific context in which the conduct took place.

*Larijani*, 791 A.2d at 44; *see also Oliver v. Mustafa*, 929 A.2d 873, 876 (D.C. 2007) (affirming

default judgment of wrongful eviction and intentional infliction of emotional distress claims

where plaintiff was forced to live in, and eventually locked out of, a drug and prostitution ridden

rooming house).  Generally, only if a reasonable person would consider a set of facts outrageous

can a claim of intentional infliction of emotional distress succeed.  *Larijani*, 791 A.2d at 44.  In

order to satisfy the third element of the claim, the emotional harm must be severe.  *See id.* at 43

(finding severe emotional distress because the plaintiff suffered severe and permanent injuries to

mind and body including, involuntary body tremors, cold sweats, hysteria, muscular pain,

hyperventilation, depression, and a traumatized psyche); *see also Oliver*, 929 A.2d at 876

(explaining that plaintiff was forced to be homeless for three months as a result of the

defendant's conduct).

   A reasonable person would not likely view the conduct of the individual officers as

extreme and outrageous.  The individual officers, in various capacities, determined that plaintiff

was a squatter after speaking with Bronson and thus asked plaintiff to leave.  Even when viewing

the facts in a light most favorable to the plaintiff, these measures can hardly be seen as extreme

and outrageous and are unlike the outrageous conduct evidenced in *Larijani* and *Oliver*.  In

*Larijani*, the defendant activated a noise making machine that cause severe harm to the plaintiff

for every minute of every work day for almost year.  791 A. 2d. at 42.  In addition, the landlord in

*Oliver* permitted drug use and prostitution in the rooming house that she rented out, and

endangered the physical safety of the resident during his time there.  929 A.2d at 875.  These

examples of extreme and outrageous conduct are in no way analogous to the conduct of the

police officer defendants.  Unlike the conduct in *Larijani* or *Oliver*, a reasonable person would

not deem the individual officers' conduct as outrageous, thus defeating any claim for intentional

infliction of emotional distress.

Even if the conduct were deemed extreme and outrageous, plaintiff has failed to make a

sufficient showing of severe emotional distress.  To demonstrate severe emotional distress,

plaintiff points to the deposition of Officer Smith who indicated that plaintiff was "very agitated"

by the events.  This is the extent of plaintiff's claim of severe emotional distress.  Although

plaintiff alleges that severe emotional distress was found for much less in *Oliver*, this assertion is

incorrect.  In *Oliver*, the plaintiff was locked out of his room without his security deposit because

of a dispute with the landlord, causing him to be homeless for three months.  929 A.2d at 875.

Similarly, in *Larijani* the plaintiff suffered from a variety of symptoms including, but not limited

to, involuntary body tremors, cold sweats, hysteria, muscular pain, hyperventilation, depression,

and a traumatized psyche.  Among the list of emotional harms, agitation was not one of the

emotional harms the court mentioned.  Even if plaintiff were "very agitated" by the events on

January 20, 2006, agitation cannot conceivably raise the level of these severe emotional distress

evidenced in the District of Columbia's intentional infliction of emotional distress case law.  As

a result, summary judgment shall be granted for the District of Columbia and individual officers

as to the claim of intentional infliction of emotional distress.

### B.    Collateral Estoppel

Plaintiff further argues that Bronson is collaterally estopped from claiming that plaintiff

9

was not a tenant because the issue was litigated in D.C. Superior Court.  The Court finds that this

claim is invalid because collateral estoppel does not usually apply to preliminary injunctions.

The doctrine of collateral estoppel prevents the relitigation of issues that were actually

litigated in a previous proceeding and are essential to the prior judgment.  *See Kingman Park*

*Civic Ass'n v. Williams*, 924 A.2d 979, 987 (D.C. 2007).  A court's granting of a preliminary

injunction does not generally form a basis for collateral estoppel.  *See Univ. of Texas v.*

*Camenisch*, 451 U.S. 390, 395 (1981); *see also Kuzinich v. Santa Clara*, 689 F.2d 1345, 1350-51

(9th Cir. 1983) (holding that the granting of a preliminary injunction in a § 1983 claim does not

collaterally estopp the defendants from litigating an issue in further proceedings).  In *Kuzinich*,

the court reasoned that a preliminary injunction will not usually result in collateral estoppel

because the it "does not amount to an adjudication of the ultimate rights in controversy."  689

F.2d at 1350.  In limited circumstances, collateral estoppel may apply where the proceedings

made the findings "sufficiently firm" to remove any compelling reason to permit the issues to be

relitigated.  *See Hawksbill Sea Turtle v. FEMA*, 126 F.3d 461, 474 n.11 (3d Cir. 1997).

In this case, there is no indication that the granting of the preliminary injunction made the

findings sufficiently firm to remove any compelling reason to permit the issues to be relitigated.

Upon hearing the arguments of both parties, the D.C. Superior Court saw fit to issue a

preliminary injunction, permitting plaintiff to return to the premises.  Such a finding does not

suggest that the issue was meant to be settled.  Rather, the finding was a temporary means by

which the court could minimize any potential harm while legal proceedings progressed.

Therefore, plaintiff's claim that Bronson is collaterally estopped from litigating the issue of

whether there was a landlord-tenant relationship is denied.

C.      **District of Columbia Liability Under § 1983**

Plaintiff claims that the District of Columbia is liable for the alleged unconstitutional

torts committed by its employees under § 1983 for failure to train, failure to supervise, and

unlawful policymaking that resulted in plaintiff's injuries.  The court, having reviewed the

record, declines to grant summary judgment because material facts relating to these claims are in

dispute.

"[A] municipality can be found liable under § 1983 only where the municipality *itself*

causes the constitutional violation at issue."  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385

(1989) (citing *Monell v. Dep't of Soc. Serv. of the City of New York*, 436 U.S. 658, 694 (1978)).

As a result, "*respondeat superior* or vicarious liability will not attach under § 1983."  *Id.*

Municipal liability only arises when the execution of the government's policy or custom inflicts

the injury complained set forth in the complain.  *See id.*  For example, when the failure to train

results in a constitutional deprivation, municipal liability is only proper "where that city's failure

to train reflects deliberate indifference to the constitutional rights of its inhabitants."  *Id.* at 392;

*see also Daskalea v. District of Columbia*, 227 F.3d 433, 441 (D.C. Cir. 2000).  In addition to

failure to train, municipalities may be liable for violations under § 1983 where the evidence

demonstrates that constitutional violations were caused by a failure to adequately supervise or

discipline those employees.  *See Parker v. District of Columbia*, 850 F.2d 708, 714 (D.C. Cir.

1988).  Further, a municipality may be liable for a single policy decision if the person setting

such policy has sufficient decision-making authority over the subject matter.  *See City of St.*

*Louis v. Praprotnik*, 485 U.S. 112, 123 (1988).

In this instance, summary judgment is not proper because the adequacy and existence of

landlord-tenant training, and Captain McLean's authority in establishing district policy in this regard, is in dispute.  Both parties assert that the ambiguous conclusions of plaintiff's expert warrant summary judgment for their side.  Additionally, although plaintiff's expert admits that training programs were established and that it appears that the defendants were trained in landlord-tenant policy because they all knew it was unlawful to get involved in such disputes, plaintiff avers that the Metropolitan Police Department failed to train any of its police officers on landlord-tenant policy under these programs since February 2001.  In addition to disputed material facts, it is unclear whether Captain McLean's decision to remove plaintiff from the apartment constituted a policy decision on behalf of the D.C. Metropolitan Police Department. Accordingly, summary judgment will not be granted as to plaintiff's § 1983 claims against the District of Columbia.

> **D.    Qualified Immunity**

The police officer defendants assert that they are entitled to qualified immunity. Applying the two-step analysis set forth in *Saucier v. Katz*, 533 U.S. 194 (2001), the Court finds that qualified immunity is not appropriate.

Government officials enjoy a qualified immunity from constitutional and statutory claims against them.  *See Saucier*, 533 U.S. at 200.  Qualified immunity protects government officials from paying damages and facing suit in civil actions where the officials were performing a discretionary function that did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The qualified immunity analysis involves two steps.  The first question is "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct

violated a constitutional right?"  *Saucier*, 533 U.S. at 201.  If the answer to this question is in the affirmative, the second step is to determine whether the right was clearly established at the time of the alleged violation.  *Id.*  In this second step, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id.* at 202; *see also Johnson v. District of Columbia*, 528 F.3d 969, 976 (D.C. Cir. 2008) (noting that although reasonableness might be a factor in both steps, the second step focuses solely on whether it was reasonable for the government official to not know their conduct was unlawful).

   I.  <u>Step One</u>

   Turning to the first of question of whether, based on the facts alleged, the officers' conduct violated a constitutional right, the Court finds that both the individual officers at the scene and Captain McLean violated plaintiff's constitutional rights under the Fourth and Fifth Amendments.

   **a.  Unreasonable Search and Seizure**

   It is well established that the Fourth Amendment prevents state actors from unreasonably seizing property and effects, and that police involvement in an eviction directly implicates this principle.  *See Soldal v. Cook County*, 506 U.S. 56, 69 (1992) ("[T]he right against unreasonable seizures would be no less transgressed if the seizure of the house was undertaken to . . . effect an eviction by the police."); *see also Illinois v. McArthur*, 531 U.S. 326, 333 (2001) (noting that the temporary removal of a resident from real property was a seizure, though it was reasonable under the circumstances); *Thomas v. Cohen*, 304 F.3d 563, 572 (6th Cir. 2002) (noting that the Fourth Amendment was violated "[w]hen a governmental agent carries out an eviction without a court

order and in the absence of any colorable legal authority . . .").  The Fourth Amendment applies

when a government official's action amounts to a "meaningful interference with an individual's

possessory interest in that property."  *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

When a state actor seizes a house to effect an eviction, the right against unreasonable seizures is

expressly implicated.  *Soldal*, 506 U.S. at 69.  Indeed, the Fourth Amendment would be hollow if

it protected a citizen's right to be free from a warrantless searches in their home, but not from

eviction at the hands of law enforcement without a court order.  *See Thomas*, 304 F.3d at 573

("Forcible eviction of tenants . . . is by its very nature a meaningful interference with their

possessory interests and is therefore no less a deprivation of their constitutional rights when

carried out by law enforcement officers in the absence of a legal basis for doing so.")

Taking the facts as alleged, it is likely an implied landlord-tenant relationship existed

between the parties. Despite the lack of a written lease, a landlord-tenant relationship may have

existed between plaintiff and Bronson because a lease is only one factor in determining whether a

landlord-tenant relationship existed.  *See Young v. District of Columbia*, 752 A.2d 138, 143

(D.C. 2000) ("Factors for consideration in that determination include a lease agreement, the

payment of rent and other considerations of occupancy between the parties.").  It is undisputed

that Bronson was paid rent for the month of January.  Additionally, plaintiff asserts that on

several occasions Bronson was in contact with plaintiff to arrange for plaintiff to receive a key to

the apartment, and that eventually a key was provided.  Further, after asking plaintiff to leave the

apartment, the officers remained at the scene while Bronson changed the locks to the apartment.

Accordingly, assuming these allegations to be true, the Court finds that plaintiff was likely a

tenant on the night of January 20, 2006, making his removal by police officers without a court

order unconstitutional.

This does not end the Fourth Amendment inquiry, however, as a seizure must also be objectively unreasonable. *See Soldal*, 506 U.S. at 71 (noting that "'reasonableness is still the ultimate standard' under the Fourth Amendment"). *Soldal* recognized that a showing of unreasonableness where officers acted pursuant to a judicial court order "would be a laborious task indeed." *Id.* at 71. However, in the absence of a court order, the government official must have "objectively reasonable grounds" for evicting a tenant. *Id.* at 72; *see also Thomas*, 304 F.3d at 574-75 (holding that it was objectively unreasonable to evict tenants because the eviction was not pursuant to a court order and the tenants had paid rent).

For reasons discussed in greater detail below, both the actions of the individual officers at the scene and Captain McLean were objectively unreasonable. The individual officers at the scene were aware that the dispute appeared to be between a landlord and a tenant, and after over two hours at the scene removed plaintiff from the apartment without a court order even though they were aware that it was against District of Columbia policy to get involved in landlord-tenant disputes. Further, Captain McLean made the decision to remove plaintiff without visiting the scene and without knowing that plaintiff claimed to be a tenant. It was therefore objectively unreasonable for Captain McLean to order plaintiff to be removed from the premises without a court order absent the requisite assurances that he was not a tenant. Accordingly, taking the facts as alleged, defendants violated plaintiff's Fourth Amendment rights.

### b. Due Process

Possessory interests in property invoke procedural due process protections. *See Fuentes v. Shevin*, 407 U.S. 67, 87 (1972). Further, due process generally requires notice and a hearing

prior to eviction. *Id.* at 82; *see also United States v. James Daniel Good Real Prop.*, 510 U.S.

43, 53 (1993) ("The right to prior notice and a hearing is central to the Constitution's command

of due process."). In "extraordinary situations", however, governmental interests may exist that

justify eviction prior to a hearing. *Fuentes*, 407 U.S. at 80-81; *see also Thomas*, 304 F.3d at 576

(noting that the eviction of the tenants without a court order violated their due process rights

because the state government offered no justifications).

Taking the facts as alleged, Captain McLean and the individual officers at the scene

violated plaintiff's due process rights because they removed plaintiff from the apartment without

a hearing, and have offered no legally acceptable justification for doing so. As a result, step one

of the *Saucier* analysis is satisfied with respect to both the unreasonable search and seizure and

due process claims.

II.    Step Two

Having answered step one of the *Saucier* analysis in the affirmative, it is necessary to

proceed to the second step. To determine whether a law is clearly established, this courts looks

to cases from the Supreme Court and the D.C. Circuit, as well as cases from other courts

exhibiting a consensus view. *Johnson*, 528 F.3d at 976. Notably, both *Soldal* and *Good Real*

*Property* had been decided long before plaintiff was removed from the apartment.  In conducting

step two, the Court will treat Captain McLean and the individual officers at the scene separately

in order to properly consider the specific context of each situation to determine whether it was

reasonable for the officers to not know plaintiff's rights would be violated.

**a.    Reasonableness of Captain McLean**

The Court will start by examining the conduct of Captain McLean. As applied to Captain

16

McLean, step two of the *Saucier* analysis requires this Court to answer the question: Taking into consideration the specific facts of in the incident, was it objectively reasonable for Captain McLean to believe that his decision to remove plaintiff from the premises was statutorily and constitutionally valid?  The Court concludes that it was not.

    The actions of Captain McLean were not objectively reasonable because Captain McLean, who reasonably should have known that it is unlawful for police officers to evict a tenant without a court order during a landlord-tenant dispute, nevertheless instructed the officers at the scene to remove plaintiff because Captain McLean believed plaintiff was a squatter. Captain McLean's decision was made (1) without visiting the scene himself, (2) without ever speaking to plaintiff, (3) without investigating whether plaintiff claimed to be a tenant, (4) without reviewing any of the paperwork related to the parties' relationship, (5) without knowing whether any of the officers reviewed plaintiff's documents, (6) without knowing that there had been a prior incident earlier in the day that described the dispute as between a landlord and a tenant, and (7) without any knowledge of how the Section 8 Housing voucher program worked.

    When determining whether it was objectively reasonable for Captain McLean to believe that plaintiff's statutory or constitutional rights would not be violated by effectively evicting plaintiff, Captain McLean should not benefit from his failure to speak with plaintiff or otherwise investigate the situation.  In other words, Captain McLean's failure to take the above measures should factor into the reasonableness of his decision.  As the *Saucier* court noted, "whether a right is clearly established [depends on] whether it would be clear to a reasonable officer that his conduct was unlawful in *the situation confronted*."  533 U.S. at 202 (emphasis added).  Any reasonable officer in the District of Columbia should know that is unlawful for police officers to

17

assist in evictions without a court order because of D.C. Metropolitan Police Department policy and existing Supreme Court precedent.  Knowing this, it is thus unreasonable for a police captain to order the removal of plaintiff without having the requisite assurances that plaintiff was, in fact, a squatter.  Accordingly, taking the facts as alleged, a constitutional violation occurred and Captain McLean could not reasonably have thought his conduct was lawful, thereby precluding the qualified immunity defense.

###### b.      Reasonableness of the Officers at the Scene

Next, the Court turns to the reasonableness of the individual officers' decision to participate in the removal of plaintiff.  As applied to the individual officers, step two of the *Saucier* analysis requires this Court to answer the question: Taking into consideration the specific facts of in the incident, was it objectively reasonable for the individual officers to believe that their participation in the removal of plaintiff from the apartment was statutorily and constitutionally valid?  Again, the Court concludes that it was not.

Unlike Captain McLean, the rest of the officers were present at the scene to witness the dispute between Bronson and plaintiff.  They thus became aware that plaintiff claimed he was a resident when he attempted to provide documentation to the officers that indicated he was permitted to be in the apartment.  Nearly every officer on the scene was aware of the basic policy prohibiting police involvement in landlord-tenant disputes, and yet the officers remained involved in the dispute.  In fact, the officers were at the scene for over two hours, which suggests that this was not a routine squatter incident and that the individual officers were attempting to determine themselves whether a landlord-tenant relationship existed.   The officers at the scene likely knew that this was a landlord-tenant issue because it was dispatched as a landlord-tenant

dispute.

Despite all of this, the officers came to the conclusion that plaintiff was a squatter because he had only a few belongings in the apartment and they were shown the letter in which plaintiff indicated the he had not signed a lease.  From these observations, and pursuant to Captain McLean's order, the individual officers removed plaintiff from the apartment.  Notably, as stated above, the officers did not inform Captain McLean that plaintiff claimed to be a tenant making their execution of Captain McLean's order even more unreasonable.  Having established that any reasonable officer would know that it is unlawful for police officers to assist in an eviction without a court order, and in view of the Supreme Court's precedent on point, the Court concludes that it was unreasonable for the individual officers to believe that their actions were lawful.  Even though the officers may have thought plaintiff was a squatter, it was not objectively reasonable to remove plaintiff when the officers had reason to believe that the dispute was between a landlord and a tenant.  By reaching conclusions themselves, the police officers were assuming the role of the court and thereby defeating the purpose of the eviction laws established in the District of Columbia and Supreme Court precedent.  Although, similar to Captain McLean, the officers may have mistakenly believed that plaintiff was a squatter, that mistake was unreasonable.

Accordingly, the Court finds that qualified immunity is not appropriate for Captain McLean or the individual officers at the scene, and that summary judgment shall be granted for the plaintiff as to the issue of qualified immunity.

## **CONCLUSION**

For the foregoing reasons, summary judgment will be granted for the District of

Columbia and individual officer defendants as to the claim of intentional infliction of emotional distress.  Further, qualified immunity will be denied for the individual officers.  Under the two step *Saucier* analysis, the officers violated the rights of plaintiff and were objectively unreasonable in believing that they were not.  Accordingly, summary judgment will be granted in favor of the plaintiff as to the issue of qualified immunity.

Because there is a material dispute as to whether plaintiff and Bronson formed an implied landlord-tenant relationship, the following claims remain to be tried: (1) wrongful eviction claim against Bronson (Count I); (2) wrongful eviction claim against the District of Columbia and individual officers (Count II); (3) Section 1983 due process violations against both the District of Columbia and the individual officers (Counts III and V); (4) Section 1983 unreasonable search and seizure claims against the District of Columbia and Officers Carter and Smith (Counts IV and VI); and (5) intentional infliction of emotional distress against Bronson (Count VII). A separate order shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on November 3, 2008.